**<u>ADDENDUM</u>**

1    **UNITED STATES DISTRICT COURT**
2    **FOR THE DISTRICT OF NEW JERSEY**

3    _____

4    MAHMOUD KHALIL,

5         Plaintiff,                    CIVIL ACTION NUMBER:

6              vs.                      2:25-cv-1963-MEF

7    Deputy Director William P.         Oral Argument
     Joyce, in his official
8    capacity as Acting Field
     Office Director of New York,
9    Immigration and Customs
     Enforcement, et al.,

10        Defendants.

11   _____

12        **Frank R. Lautenberg Post Office and Courthouse**
          **Two Federal Square**
          **Newark, New Jersey  07102**
13        **June 20, 2025**

14   **B E F O R E:**              **THE HONORABLE MICHAEL E. FARBIARZ,**
                                   **UNITED STATES DISTRICT COURT JUDGE**
15
     **A P P E A R A N C E S:**
16
          IMMIGRATION RIGHTS CLINIC, BY:
17        ALINA DAS, ESQ.
          NYU School of Law
18        245 Sullivan Street
          5th Floor
19        New York, New York  10012

20             appeared on behalf of Petitioner;

21             Lisa Larsen, RPR, RMR, CRR, FCRR
                    Official Court Reporter
22             Lisa_Larsen@njd.uscourts.gov
                    (973)776-7741
23

24
          **Proceedings recorded by mechanical stenography.**
25        **Transcript produced by computer-aided transcription.**

```
 1   A P P E A R A N C E S:  (Cont'd.)

 2        UNITED STATES DEPARTMENT OF JUSTICE, BY:
          BY:  DHRUMAN Y. SAMPAT, SENIOR LITIGATION COUNSEL
 3             SARAH S. WILSON, ASST. DIRECTOR
               P.O. Box 878
 4             Ben Franklin Station
               Washington, D.C.  20044
 5
               appeared on behalf of Respondents; and
 6
     A L S O   P R E S E N T:
 7
          Amy Greer
 8        Amy Belsher
          Veronica Salama
 9        Robert Hodgson
          Omar Jadwat
10        Esha Bhandari
          Noor Zafar
11        Brian Hauss
          Brett Kaufman
12        Baher Azmy
          Samah Sisay
13        Naz Ahmad
          Ramzi Kassem
14        Mudassar Toppa
          Diala Shamas
15        Marc Van Der Hout
          Johhny Sinodis
16        Oona Cahill
          Jeanne LoCicero
17        Liza Weisberg

18

19

20

21

22

23

24

25
```

```
 1                  (PROCEEDINGS held via Teams before the
 2                  HONORABLE MICHAEL E. FARBIARZ, United States
 3                  District Court Judge, on June 20, 2025.)
 4          THE COURT:  Good afternoon.  This is Judge Farbiarz.
 5          I'll ask will the courtroom deputy please confirm that
 6   the court reporter is on the line.
 7          THE DEPUTY CLERK:  Good afternoon, Judge.  Yes, Lisa
 8   Larsen is on the Teams conference.
 9          THE COURT:  Thanks very much.
10          We are here for Khalil v. Trump, et al.
11          I want to go around the horn and get appearances but,
12   given the number of lawyers I know who have appeared on this
13   case, I'm gonna do what I did last time, which is I'm simply
14   going to ask the lawyer or lawyers who expect to speak to the
15   pending motion to introduce just themselves and we'll take it
16   from there.
17          First, the lawyer or lawyers who will be appearing --
18   rather, speaking today, for the petitioner.
19          MS. DAS:  Good afternoon, Your Honor.  This is Alina
20   Das from the NYU Immigrant Rights Clinic, Washington Square
21   Legal Services.  I'll be arguing on behalf of the petitioner
22   today.
23          THE COURT:  Ms. Das, good afternoon to you.
24          And for the respondents.
25          MR. SAMPAT:  Good afternoon, Your Honor.  Dhruman
```

1   Sampat and I'll be arguing on behalf of the respondents today.

2        THE COURT:  Good afternoon to you.

3        What I'll ask you to do, the lawyer for the petitioner

4   and also the lawyer for the respondent, just so the record is

5   complete, could I ask you to please at the end of today's

6   proceeding file a very simple one-sentence letter that

7   indicates all of your colleagues who are on the phone so we

8   have a full and complete record of everybody who has appeared.

9        Can I ask you to do that, please.

10        MS. DAS:  Yes, Your Honor.

11        MR. SAMPAT:  Of course, Your Honor.

12        THE COURT:  Thanks a lot.  I appreciate it.

13        I want to start out -- let's just start out for half a

14   moment as to where we are.  Motion for -- a letter with

15   respect to bail and release was filed on Monday from

16   petitioner, including a short letter brief, the respondents

17   responded on Tuesday, the petitioner filed his response on

18   Wednesday, yesterday was of course a court holiday, and today,

19   Friday noon, we are here for oral argument with respect to the

20   motion for bail or for release.  That's where we are.

21        In the interest of saving us some time, I want to

22   address at the outset an argument that was made by the

23   respondents that I don't find persuasive.  I want to just

24   explain my reasons so that we not invest our time on it.

25        The respondents essentially argue, among other things,

1  that the petitioners have simply made what functions as a

2  motion for reconsideration of my Friday decision, which is to

3  say my decision of seven days ago.

4       I think that's simply not right.  What happened a week

5  ago, a week ago today, is that as of 9:30 in the morning I

6  preliminarily enjoined certain things, detention as to and

7  efforts to remove as to the Secretary of State's determination

8  as to the petitioner here.

9       An hour or so later the petitioner filed a letter

10 saying, given the Court's decision as to the Secretary of

11 State's determination, the petitioner needed to be released on

12 the other ground he was held.

13      That is simply not persuasive, and it's not persuasive

14 because the fact that a person cannot be held or removed on

15 one charge simply does not logically imply that he or she

16 cannot be held or removed on another charge.

17      If this were a criminal case, which it's of course not,

18 the court held that a person -- a charge of theft could not go

19 forward.  That would not imply that the other charge in the

20 case, pretend it's robbery, could not go forward.  That

21 doesn't follow logically.

22      As of Friday, that was the only argument that the

23 petitioner had made, as I understood it, and as I do

24 understand it now.

25      Over the weekend the petitioner apparently developed

1  and on Monday filed a different argument.  That argument is

2  not that the preliminarily enjoining of the Secretary of

3  State's determination charge, that that preliminary enjoining

4  implied logically that another charge could not go forward;

5  rather, it's a different argument.

6      The Monday argument is that the remaining charge is one

7  as to which the petitioner is entitled to either release or

8  removal -- excuse me, release or -- not "removal," forgive me,

9  release or transfer to this district.

10      So they're just simply different things.  The Friday

11  argument was that there is a logical reason why enjoining

12  Charge A requires not going forward on Charge B.  That's not

13  logical.

14      The argument made Monday and the one we are here

15  principally to discuss, the argument as to bail, is an

16  argument simply that as to Charge B there is a request for

17  bail the petitioner.

18      I do not understand the petitioner to be making a

19  motion for reconsideration.  I think that's a misunderstanding

20  of the argument that was pressed by the petitioner last week

21  and a misunderstanding of the decision I made on Friday.

22      So I wanted to say all that at the outset, Mr. Sampat,

23  so we don't spend any time on it because I don't view it as a

24  meaningful -- not that it's not meaningful but it's just an

25  argument that I don't think is persuasive.  So I wanted to say

1    that from the outset.

2         I'll ask Ms. Das if I could just get an update from you

3    as to where things stand in terms of the process of seeking

4    bail in front of the immigration judge.

5         MS. DAS:  Yes, Your Honor, and thank you.

6         So on Friday, as you know, immigration counsel sought

7    release directly from the DHS.  That was denied on Monday.  On

8    Tuesday immigration counsel filed a motion for a bond hearing

9    with the immigration judge.

10        As of this morning or just before this hearing, we have

11   not heard back as to whether that bond hearing has been

12   scheduled.  In addition, Mr. Van Der Hout had also asked DHS

13   on Friday if it would direct the immigration judge to this

14   Court's opinion and indicate that it would be withdrawing or

15   dismissing that charge so that the case could move forward.

16        As far as we know, there has not been a filing from DHS

17   to the immigration judge about that matter, either.

18        THE COURT:  Can you explain a little bit -- I

19   understood from Exhibit C to your Wednesday filing, Ms. Das,

20   that Mr. Van Der Hout, who I believe is the immigration

21   counsel you alluded to, that Mr. Van Der Hout was seeking an

22   immigration judge proceeding as soon as this coming Monday.

23        So, first, I hear you to be saying that that has not

24   yet been scheduled.

25        Do I have that right?

1    MS. DAS:  That's right, Your Honor.

2    THE COURT:  What was the second point, if you could

3 just slow it down a bit and explain that a little more fully.

4    MS. DAS:  Absolutely, Your Honor.

5    In the same letter to -- the e-mail to the Department

6 of Homeland Security where Mr. Van Der Hout attached the

7 request for release directly to DHS, there was also a request

8 to DHS that they indicate to the immigration court that they

9 will be dismissing or withdrawing the foreign policy ground or

10 otherwise not relying on it, given this Court's order.

11    In our view, that would facilitate the bond hearing for

12 the Government to actually be conveying to the immigration

13 judge that it can go forward on the bond hearing.  Of course

14 Mr. Van Der Hout has also given the court ruling to the

15 immigration court and has sought reconsideration of her prior

16 determination directly, just to cover all bases; but I just

17 wanted to indicate that as far as we know we're not aware of

18 DHS submitting any filings with respect to our request for

19 bond to the immigration judge or any filings related to the

20 foreign policy ground.

21    THE COURT:  Right.  But what I'm just not fully

22 understanding is why it matters.  It sounds like the

23 petitioner has himself conveyed to the immigration judge that

24 the charge that rests on the Secretary of State's

25 determination has been preliminarily enjoined.

1       What difference does it make if DHS also says something

2  about that to the immigration judge?

3       MS. DAS:  Your Honor, it may not make a difference.

4  It's certainly our position that the immigration judge should

5  grant a motion for a bond hearing and hold that bond hearing

6  as quickly as possible; but in our experience in litigating

7  these issues, the immigration judge generally

8  does like to hear from both sides, and so that's why we

9  suggested it.

10      THE COURT:  That makes sense.  I wondered if there was

11  something else I was missing, but I do appreciate how that

12  makes sense.

13      One other -- Mr. Sampat, is there anything about what

14  Ms. Das just said that is inaccurate, from your perspective?

15      Mr. Sampat, we don't hear you, if you're speaking.

16      MR. SAMPAT:  Sorry, Your Honor.  I was muted and I lost

17  Your Honor's questions when I was trying to un-mute.  I

18  apologize.

19      THE COURT:  Not at all.  No worries.

20      Is there anything in what Ms. Das said that is

21  inaccurate, from your perspective?

22      MR. SAMPAT:  Not that I know of.  I will say that from

23  my understanding the bond hearing -- I agree with Ms. Das that

24  the bond hearing has not yet been scheduled in front of the

25  immigration judge, but I can represent that they are usually

1  scheduled pretty quickly.  So if it's not scheduled for this

2  upcoming Monday, as per Mr. Khalil's request, we anticipate it

3  should be scheduled pretty soon.

4        THE COURT:  Okay.  All right.  I appreciate that.

5        Ms. Das, I'm going to come back to you for half a

6  moment.

7        Do you have an understanding as to what your

8  expectation is as to how an immigration judge detention

9  hearing would go, which is to say, live witnesses, a decision

10  in one day?

11        What is your expectation based on experience with this

12  particular judge in general, et cetera?

13        MS. DAS:  Yes, Your Honor.

14        So it can go in different ways, so it's not precisely

15  clear.  But as a general matter, when an immigration judge

16  receives a request to schedule a bond hearing, the immigration

17  judge will typically set a date for that hearing.

18        The parties are generally given the opportunity to

19  submit bond submissions.  In a bond hearing the immigration

20  judge would put the burden on the non-citizen respondent to

21  demonstrate lack of flight risk and danger, and in addition to

22  written submissions to that effect the immigration judge would

23  typically take testimony at a bond hearing, although there are

24  occasions where they will simply rely on argumentation from

25  both sides.

1     In the typical case, an immigration judge would rule on

2 bond on that day, but there are instances where a judge will

3 reserve decision and take some time to issue a decision on

4 bond.

5     As we noted in our papers, what we have seen most

6 recently with respect to students in particular engaged in

7 political speech is that the Government has been filing an

8 automatic stay.  If they file an appeal of the bond decision

9 within one day of the decision, they receive an automatic stay

10 where the bond decision would not be implemented while the

11 Department of Homeland Security pursued an appeal to the Board

12 of Immigration appeals which is a process that typically takes

13 months to resolve.

14     THE COURT:  Mr. Sampat, do the respondents have a

15 position as to what they would do with respect to the

16 referenced automatic stay if an immigration judge granted

17 release here?

18     MR. SAMPAT:  No, Your Honor, we don't have a position

19 because we think it's speculative at this moment.  We still

20 don't know what the immigration judge is gonna do.

21     THE COURT:  All right.  I got it.

22     Mr. Sampat, just to round it out, anything that

23 Ms. Das said that strikes you as inaccurate in terms of

24 characterization of the process?

25     MR. SAMPAT:  No.  The only note that I had was noting

1  that sometimes bond decisions can be reserved, but Ms. Das

2  said that so I think we're good on our end.

3  　　　THE COURT:  Thanks very much.

4  　　　This is the petitioner's motion, so ordinarily I'd have

5  the petitioner go first in terms of argument, but the

6  respondents here have a number of threshold issues that they

7  press.

8  　　　The first and most important is, as always,

9  jurisdiction, not most important but necessarily first, which

10 is to say an argument under 1226(e).  There's also an argument

11 about exhaustion.

12 　　　Mr. Sampat, I wanted to hear you out on one or both of

13 those arguments at the outset.  Why don't you just give me a

14 few moments on your position now.

15 　　　MR. SAMPAT:  Of course, Your Honor.

16 　　　Understanding that we're not gonna talk about the

17 motion for reconsideration, so on the 1226(e), Your Honor --

18 　　　THE COURT:  Mr. Sampat, let me stop you for a second.

19 There is no motion for reconsideration.  My point was that

20 I do not view what was filed by the petitioner on Monday as a

21 motion to reconsider my Friday decision.  I view it as just

22 simply a separate motion that progresses a different theory.

23 　　　The Friday theory was, in my judgment, not persuasive

24 because, as I said, analogically, not being able to go forward

25 on theft does not mean that somebody cannot go forward on

1  robbery.  Those are simply separate.

2       This is a different argument, so I just want to be

3  crystal clear, Mr. Sampat, my point is that I do not view the

4  Monday motion by the petitioner as a motion for

5  reconsideration.

6       With that, back to you.

7       MR. SAMPAT:  I appreciate that, Your Honor.  I was only

8  characterizing what our position was in our papers.

9  Understood.

10      On 1226(e), Your Honor, we think the text is pretty

11 clear.  It sets forth that the Attorney General's

12 discretionary judgment regarding the application of this

13 section shall not be subject to review and that no court may

14 set aside an action or decision under this section regarding

15 the detention of any alien.

16      Mr. Khalil is currently detained pursuant to 1226(a) in

17 light of the fraud and willful misrepresentation charge.

18 Congress has authorized the executive to detain aliens if

19 they're deemed removable or inadmissible.  That decision is

20 not subject for review and a court order requiring release

21 would offend 1226(e).

22      We think that the Third Circuit's decision in *Borbot v.*

23 *The Warden* at 906 F.3d 274 says exactly that.  So we think the

24 release request is actually foreclosed by Third Circuit law,

25 as well.

1      THE COURT:  Here is the thing I don't get about that:

2      You briefed that argument without saying anything about

3 the Supreme Court's decision in *St. Cyr* in 2001 or the Supreme

4 Court's decision in *Demore* in 2003.

5      As you know, those decisions stand for the

6 proposition -- well, step back.  As we know from *Colorado*

7 *River* and many other cases, federal courts have a, quote,

8 unquote, virtually unflagging obligation to exercise their

9 jurisdiction.

10      United States Congress has given the court habeas

11 jurisdiction.  The Supreme Court in *St. Cyr* said that

12 jurisdiction stripping or habeas jurisdiction stripping in the

13 immigration context has to be extraordinarily clear.

14      The Supreme Court said in *St. Cyr* that jurisdiction was

15 not stripped as to a passage that was headed "elimination of

16 custody review by habeas corpus."  That's what Congress had

17 written, and the Supreme Court said it wasn't clear enough.

18      Then in 2003 in *Demore,* Chief Justice Rehnquist says

19 that as to 1226(e), which is the portion of the statute that

20 you're invoking, that it, quote, contains no explicit

21 provision barring habeas review.

22      So what I don't fundamentally understand is how it can

23 be that the Supreme Court has said in general as to the

24 immigration statute and in particular as to this portion of

25 the immigration statute that it's not clear enough to vitiate

1  habeas and -- to eliminate habeas jurisdiction and yet you're

2  arguing here today that 1226(e) does strip away habeas

3  jurisdiction.

4       How do those live together?

5       MR. SAMPAT:  So, Your Honor, to take Your Honor's

6  points in turn, *St. Cyr* pre-dated the REAL ID Act which

7  obviously curtails federal court's habeas jurisdiction moving

8  forward where removal orders were now channeled through the

9  petition for review process.

10      *Demore* talks about 1226(e), but I think it's important

11 to note that *Borbot* post-dates all of those decisions.  And

12 the Third Circuit was clear on -- that a challenge to a

13 particular action or decision to detain would be barred under

14 1226(a).

15      THE COURT:  I don't think any of that is right.  I

16 think the problem you have is that there is a longstanding

17 idea -- well, let's step back for half a moment.

18      The fact that *St. Cyr* pre-dates the REAL ID I think

19 cuts strongly against your position because what it suggests

20 is that Congress was well aware of the requisite level of

21 specificity that it required if it was gonna strip habeas

22 jurisdiction and 1226(e) is not particularly specific.

23      There are circuit courts all over the country --

24 Second, Ninth, the Fifth, the Seventh -- all of whom have held

25 that 1226(e) does not bar the exercise of habeas jurisdiction.

1       I'll just say the names of those cases so we have them.

2  The Second Circuit is *Ozturk*, O-Z-T-U-R-K.  The Ninth Circuit

3  is *Martinez*, citing the *Singh* case, S-I-N-G-H.  The Fifth

4  Circuit is *Najera*, N-A-J-E-R-A, and the Seventh Circuit is

5  *Al-Siddiqui*, which I think is an especially helpful case,

6  A-L, dash, S-I-D-D-I-Q-U-I, all of which emphasizes that

7  *Demore* has a clear -- that *St. Cyr* requires a clear statement.

8  *Demore* makes it clear that there's no clear statement in

9  1226(e) so there's no stripping of habeas jurisdiction.

10      And to close it out, federal courts have held for --

11  since the 19th century that one of the incidents of habeas

12  jurisdiction is the ability to grant or not grant bail pending

13  resolution of a habeas case.

14      You cited in your March filing the Third Circuit's

15  *Johnston* decision on that from the '50s.  The Second Circuit's

16  *Mapp v. Reno* case collects decisions way back to the

17  19th century.

18      I have Judge Posner -- I scribbled a note to myself --

19  from 2007 for the Second Circuit talking about the possibility

20  of bail in the habeas context being a, quote, natural

21  incident, end quote, of habeas jurisdiction.

22      So I think the problem you have fundamentally,

23  Mr. Sampat, is that over and over again the circuit courts of

24  the United States have held that there's insufficient clarity

25  in 1226(e) under *St. Cyr* to strip habeas jurisdiction, and a

1   core aspect of habeas jurisdiction -- in the Third Circuit,

2   *Lucas*, *Landano*, *Johnston* -- throughout the United States a

3   core incident of habeas jurisdiction is the possibility of

4   admitting somebody into bail.

5         So I don't see 1226(e) as being clear enough under

6   *Demore* to strip habeas jurisdiction; and if it does not strip

7   habeas jurisdiction, 1226(e) does not strip one of the basic

8   incidents of habeas jurisdiction, which is the ability of a

9   federal court to grant someone bail in advance of a final

10  decision as to the habeas claim.

11        Anything else you want to add on this, Mr. Sampat?

12        MR. SAMPAT:  Yeah, Your Honor.  Yes, Your Honor.  Just

13  on the *Demore* point.

14        THE COURT:  Sure.

15        MR. SAMPAT:  I very quickly pulled it up, and it seems

16  like the Court's reasoning on 1226(e) was that because Mr. Kim

17  there was not challenging the individual judgment or decision

18  to detain, that it was rather challenging the statutory

19  framework --

20        THE COURT:  Mr. Sampat, Mr. Sampat, this is what

21  happens when you pull things up during oral argument.

22        There's a reason I cited you to *Al-Siddiqui* out of the

23  Seventh Circuit in particular.  It makes it crystal clear that

24  there are -- it is true that in *Demore* itself that was the

25  issue, but, number one, Chief Justice Rehnquist said -- this

1    is why I quoted this particular line that, quote,

2    Section 1226(e) contains no explicit provision barring habeas

3    review.

4         Under *St. Cyr* that is dispositive, whether the case is

5    one that challenges a regulation or challenges something as

6    applied.

7         That's number one.

8         Number two, that's why the *Al-Siddiqui* case out of the

9    Seventh Circuit matters.  It collects a number of cases that

10   emphasize that *Demore's* holding is controlling regardless of

11   the nature of the challenge.

12        Now, there are gonna be some outer limits aspects to

13   that, but the problem is Congress needs to speak clearly.  And

14   having not spoken clearly, that is, under the cases I have

15   cited, even under Chief Justice Rehnquist's quote that I read

16   to you from the Supreme Court, that's in my judgment the end

17   of the matter.

18        Anything else, Mr. Sampat?

19        MR. SAMPAT:  Not on that, Your Honor.  I think we have

20   exhausted our arguments on 1226.

21        THE COURT:  Fair enough.

22        I do not view 1226(e) as a jurisdictional bar here to

23   admitting or not admitting the petition to bail.

24        What's the exhaustion argument?  Is that an argument

25   you're making, Mr. Sampat, that there's administrative

1  exhaustion?  What's your position on that?

2      MR. SAMPAT:  So, Your Honor, our position is that as a

3  prudential matter it makes for sense for Mr. Khalil to avail

4  himself at the administrative process and to avoid conflicting

5  decisions between this Court and the immigration judge.

6      He's currently -- as we know, he has filed for a motion

7  of custody re-determination before the immigration Judge.

8  He's availing himself to those processes.  It makes more sense

9  for him to go through that process right now than it is for

10  Your Honor to weigh in.

11      THE COURT:  Okay.  What is the -- that argument proves

12  very little in the sense that it says nothing about why I

13  should wait for the immigration judge versus why the

14  immigration judge should wait for me.

15      What is the argument for why I should wait for the

16  immigration judge?

17      MR. SAMPAT:  Well, Your Honor, it goes back to some of

18  the cases that we have cited in our briefs where judges within

19  the district have said that they won't exercise habeas

20  jurisdiction or won't review claims absent a petitioner

21  exhausting administrative remedy.

22      I'll also point Your Honor to a decision that just came

23  out a few days ago out of the Southern District of New York.

24  The name of the case is *Guzman vs. Joyce*, which can be found

25  at 2025 Westlaw 1696891.

1       That case, Your Honor, discusses and supports the fact

2   that exhaustion is an important part of this process before a

3   party was to run into federal court because if the issue can

4   be resolved administratively it is better for -- it's a better

5   course of action than expending judicial resources here.

6       THE COURT:  I hear that, but I think it's a -- look,

7   you invoke in your papers and you invoked at the outset of

8   what you just said two District of New Jersey cases.  There's

9   the opinion from Judge McNulty and there's the opinion from

10  Judge Wigenton.

11      I think the problem you have is that both of those

12  cases rely on *DeValle* and *Yi*, which are Third Circuit cases

13  that say that administrative exhaustion is jurisdiction.  But

14  of course -- and I'm honestly surprised that nobody brings

15  these cases to my attention in these papers, but such is life.

16  It's the same issue I have with *Demore.*  Again, nobody brings

17  this up.

18      In 2023 the Supreme Court held, as we all know, that

19  the exhaustion provisions such as they are of 8 U.S.C.

20  1252(d)(1), that those exhaustion provisions are not

21  jurisdiction.

22      And so the cases, Mr. Sampat, you're citing are -- they

23  just look a whole lot different.  They are based on a

24  Third Circuit conception that administrative exhaustion is

25  jurisdiction; but after those district court decisions came

1  down, the United States Supreme Court explicitly held in 2023

2  that 1252(d)(1) is not jurisdiction.

3       Instead, the conclusion from the Supreme Court is that

4  there is, if anything, some kind of common law exhaustion

5  required.  I don't know if that common law exhaustion is in

6  play here or not.

7       The Third Circuit in *DeValle* suggested that 1252(d)(1)

8  requires exhaustion, even in the context of something that

9  long pre-dates review of a final order.  One can look at that

10 in many different ways, and one can look at that as surviving

11 or not surviving the Supreme Court's decision in

12 *Santos-Zacaria* of 2023.

13      But assuming arguendo Santos-Zacaria applies here, then

14 exhaustion is only a prudential issue, which is how you

15 started off, Mr. Sampat.

16      First, let me just say I'm not sure under *DeValle* that

17 there is a need for prudential exhaustion before the entry --

18 before the entry of an order of final removal.  I don't know

19 the answer to that.

20      But even assuming arguendo that there is some need

21 for that kind of exhaustion, all of the factors that

22 Justice Jackson for the Supreme Court in *Santos-Zacaria*

23 pointed out, all of those factors weigh heavily in the

24 direction of me taking this issue on.

25      Supreme Court Justice Jackson speaks about the, quote,

1    unquote, orderly progression of the litigation.  Here there

2    are bail arguments that have been made in front of me.  There

3    has not even been a scheduled bail hearing in front of the

4    immigration judge so it's hard to know why orderly progression

5    does not cut in favor of me simply resolving the issue.

6         The Supreme Court in *Santos-Zacaria* invokes efficiency,

7    it invokes, quote, unquote, waste of work.  That would seem to

8    cut in favor of me resolving the issue here as well.

9         There's been many, many, many pieces of evidence filed.

10   There has been a great deal of litigation on this particular

11   issue.

12        Hard to know why at this stage it's more efficient in

13   terms of the judicial resources you alluded to, Mr. Sampat,

14   for me not to just take the case and resolve it myself.

15        Finally, there is something of a futility reason to

16   avoid exhaustion.  I have to say that with respect to that

17   there is a very strong and uncontested record here as to lack

18   of flight risk and lack of dangerousness.

19        Given that strong and uncontested record, it becomes

20   hard to know what the reason, other than waste of time, is to

21   send this to an immigration judge who will look at those same

22   two factors under C.F.R. 1003.19(h)(3) and will come to what I

23   imagine is a pretty obvious solution.

24        I think the New Jersey cases you cite rest on Third

25   Circuit decisions that themselves treat exhaustion as

1   jurisdiction.  The Supreme Court in 2023 made crystal clear

2   that exhaustion is not jurisdictional.

3        To the extent that exhaustion is required, in contexts

4   like this one it is required as a prudential matter; and if

5   it is required, if it is required as a prudential matter, for

6   all the reasons I have just mentioned, I don't understand why

7   it would be required here under the factors set out in

8   *Santos-Zacaria* in 2023.

9        So it's a prudential matter, it's a discretionary

10  matter, and I will not exercise my discretion to avoid this

11  decision, given where things are postured.

12       Mr. Sampat, anything else you want to add on

13  exhaustion?

14       MR. SAMPAT:  Nothing else, Your Honor.

15       THE COURT:  Mr. Sampat, I'm going to keep sticking with

16  you because a lot of the preliminary things run through

17  arguments the respondents have made.

18       The standard here with respect to bail, I want to

19  understand where you're coming from on this.

20       MR. SAMPAT:  On the extraordinary circumstances

21  standard, Your Honor?

22       THE COURT:  Yeah, what the key case is and what the

23  substantive standard that that case or cases stands for.

24       MR. SAMPAT:  Yes, Your Honor.

25       So *Landano* sets forth the extraordinary circumstances

1  standard, and we think that means, you know, it is something

2  in the form of severe health complication or something that

3  would be irreparable in a case where an individual would

4  not -- further delay would severely prejudice a petitioner.

5       We don't have that here.  Mr. Khalil, again, is before

6  an immigration judge, is receiving his due process.  If he's

7  released, his case would be transferred to the non-detained

8  docket, so those proceedings would remain ongoing.

9       It's a pretty high burden, and we don't think

10  Mr. Khalil has made it.  We think a lot of that is rooted in

11  our March 23rd filing on the opposition for his motion for

12  release.

13       THE COURT:  Why do you think *Landano* provides the

14  standard?  Let me step back even further.

15       What is the standard that you view as the one that

16  you've made?

17       MR. SAMPAT:  I'm sorry, Your Honor.  Give me one

18  moment.

19       THE COURT:  Let me explain to you why I'm asking the

20  question.

21       In your March 23rd filing you just alluded to, at

22  page 17 you indicate that the standard that needs meeting here

23  is what you described as the *Landano* standard, and you say

24  that it is, quote, unquote, conjunctive, that there needs to

25  be a showing of both high probability of success on

1   substantial claims and extraordinary circumstances.

2        I'm not sure -- is that your position today, or do you

3   have a different position?

4        MR. SAMPAT:  No, that is our position today.  That is

5   a -- it is a conjunctive standard, Your Honor.

6        THE COURT:  So in other words, your judgment is that

7   there needs to be a showing of extraordinary circumstances,

8   whatever that means, plus there needs to be a high

9   probability -- let's pretend that's 51 percent -- of winning

10  on a substantial claim.  Is that --

11       MR. SAMPAT:  Yes.

12       THE COURT:  I'm not sure I understand how you get that

13  out of the case.  I think the problem you have with that is to

14  make that argument you pin cite to a particular page in

15  *Landano* but that particular page in *Landano* is simply reciting

16  the standard set out by the Fifth Circuit circuit.

17       And a couple paragraphs later the circuit says, well,

18  gee, we, the Third Circuit, have set out a standard in *Lucas*

19  previously.  And the *Lucas* standard is not conjunctive.  The

20  *Lucas* standard does not say something about high probability

21  and also extraordinary circumstances.  The *Lucas* standard

22  simply says extraordinary circumstances.

23       So I'm not sure why the *Landano* court's simple

24  citation -- the *Landano* court literally says this is how other

25  courts have done it and then cites the Fifth Circuit's

1  conjunctive standard but then two paragraphs later has what I

2  take to be a contrast with its own pre-*Landano* statement in

3  *Lucas* which is simply about extraordinary circumstances, not

4  about the merits.

5        I'm not sure why I read *Landano* as displacing by mere

6  citation to the Fifth Circuit the Third Circuit's *Lucas*

7  position.

8        MR. SAMPAT:  Your Honor, so we cited -- there are a

9  couple cases that we cited in our March 23rd filing where

10 courts within the circuit have used it as a conjunctive

11 standard.  That's in *Ingram* where the court denied bail after

12 a state prisoner failed to establish both prongs.

13       There's also the *Hudler* case out of the Middle District

14 of Pennsylvania where it was denied.  I'm sorry, Your Honor.

15 I don't mean to --

16       THE COURT:  No, no, no, go on.

17       MR. SAMPAT:  Sure.

18       So *Hudler* was denied on the basis that petitioner had

19 failed to establish a substantial constitutional claim.  I

20 will also note that when we briefed the release motion back in

21 March, the fraud and willful misrepresentation charge wasn't

22 before the Court or had not been briefed in the PI or in the

23 operative pleadings that were tethered to the motion, so we

24 haven't had a chance to actually brief it.

25       We don't think it's necessary because at the end of the

1  day we think this is a discretionary decision obviously, but

2  this is just a separate independent charge that continues to

3  justify Mr. Khalil's detention today.

4      THE COURT:  What I would say that -- I read all the

5  district court opinions you cited and they're thoughtful, of

6  course.  They're my colleagues throughout the circuit thinking

7  this through very carefully, no doubt about it.

8      It's just that when I read *Landano*, I do not see a

9  Third Circuit adapting the Fifth Circuit's conjunctive

10 two-part test.  In fact, I see it as very explicitly drawing a

11 contrast with the Third Circuit's own *Lucas* test, which is

12 simply focused on extraordinary circumstances.

13     I think that -- so I think that my own judgment is that

14 what governs here is the *Lucas* standard, not the *Landano*

15 standard.  The thing that's a little complicated is what

16 extraordinary circumstances mean.  And I appreciate that the

17 Second Circuit in *Mapp v. Reno* has said that extraordinary

18 circumstances means something like circumstances so

19 extraordinary that the habeas writ would be ineffective if

20 bail were not granted.

21     But I don't see that in the Third Circuit's binding

22 *Lucas* decision.  I don't see the extraordinary circumstances

23 are limited to that qualification.

24     I'll go even further.  The *Mapp v. Reno* decision is

25 itself based on an older Second Circuit decision, two of them.

1    One of them is *Iuteri*, I-U-T-E-R-I.  And that seems like one

2    of the cases that *Lucas* explicitly walked away from.

3         So I'm left with two complexities in terms of the

4    standard here.  First, I think *Lucas* controls and not *Landano*.

5    I appreciate that many colleagues or some colleagues in the

6    Third Circuit, other district judges, have seen it perhaps

7    differently; but I think the most faithful read of the

8    circuit's precedence is that *Lucas* controls.

9         I am left with two issues.  The first is extraordinary

10   circumstances as to what?  *Mapp v. Reno* or the Second Circuit

11   based on *Iuteri* says that it's extraordinary circumstances

12   that are specifically tied to the efficacy of a later habeas

13   remedy, but the Third Circuit did not say that in *Lucas* and

14   has not said that in its case law, so far as I have been able

15   to see it.

16        In addition, and I think this is quite important, *Mapp*

17   *v. Reno* requires some showing of meatiness to the underlying

18   claim.  It doesn't seem like *Lucas* requires that.

19        Now, if *Landano* was the law in the Third Circuit, there

20   would need to be some kind of, quote, unquote, high

21   probability showing, but I don't think *Landano* is the law.  I

22   think *Lucas* is the law.

23        Under *Lucas*, what I take away is the extraordinary

24   circumstances do not need to be focused on the preservation of

25   the habeas remedy.  The Third Circuit in *Lucas* left open a

1  broader remit for federal judges considering bail to simply

2  assess extraordinary circumstances and all of the possible

3  permutations that might arise, and the *Lucas* court did not

4  seem to take the step that the Second Circuit did.  That is to

5  say the *Lucas* court did not seem to require that there be some

6  showing of likelihood of success on the merits or some showing

7  of even a substantial claim on the merits.

8       So my judgment is *Lucas* controls here and that *Lucas*

9  has a very broad idea of extraordinary circumstances, not one

10  tethered, as in *Mapp v. Reno*, to the efficacy or non-efficacy

11  of the habeas remedy.  And at least within its four corners

12  *Lucas* does not seem to require any sort of showing that there

13  is a kind of level of strength in the underlying claims.

14       I'll note two other things about *Lucas*.  First of all,

15  it seems to me that the Third Circuit almost surely takes the

16  view -- would take the view, excuse me, that the standard set

17  out for bail in habeas criminal cases is higher than the

18  standard that would apply here, and that's in part based on a

19  simple a fortiori assessment, which is that in a criminal

20  context somebody has, by hypothesis, been convicted with all

21  the guarantees that the Constitution implies.  And there are

22  in the state criminal context imported federalism issues.

23       None of that is present of course in the immigration

24  context.  There are not criminal protections, there is not a

25  criminal judgment, and there are not federalism issues.

1    The a fortiori, by that I mean whatever the standard

2 for release is, in criminal habeas is higher than the standard

3 for release in immigration habeas.

4    The buttress for that a fortiori argument is what the

5 Third Circuit in *Landano* cites, which is Justice Douglas's

6 opinion *in Aronson*, his in-Chambers opinion in 1964.

7    I'll also note that *Landano* and *Lucas* seem hesitant

8 about the idea of tying the standard of -- for granting bail

9 in the habeas context.  They seem hesitant about tying it to

10 the substantive likelihood of success.

11    One of the things that is said in one of those cases is

12 exhaustion doesn't generally turn on whether you have a good

13 claim or not, which is really what we're talking about here.

14    So, bottom line, I think the *Lucas* standard controls,

15 not *Landano*.  I think the *Lucas* standard under the reasoning

16 of Justice Douglas as cited in *Landano* is almost surely higher

17 than the standard that is in play here.

18    The *Lucas* standard is about extraordinary

19 circumstances.  Period.  Full stop.  The *Lucas* standard is not

20 about extraordinary circumstances related to ultimate efficacy

21 of a habeas decision.  That's the Second Circuit's perspective

22 but it's not what *Lucas* says.

23    Finally, *Lucas* is not about the strength of the

24 underlying claim.  That is *Iuteri* out of the Second Circuit,

25 that is *Mapp* out of the Second Circuit, but that is not what

1  the Third Circuit said in *Lucas*.  And of course it's my job to

2  faithfully apply the standard set out by the circuit and not

3  to subtract from them and not to add to them.  That's where I

4  stand on the standard.

5       Mr. Sampat, do you have anything you want to add on any

6  of this?

7       MR. SAMPAT:  Yes, Your Honor, if I may, understanding

8  Your Honor's point that you believe that *Lucas* is the standard

9  and not *Landano*.

10      THE COURT:  Right, right.

11      MR. SAMPAT:  I think it's important to note that if

12  *Lucas* is the standard, anyone would be able to just file a

13  habeas petition and just say their case is different, it's

14  special enough, there's extraordinary circumstances, and that

15  standard is met.

16      I think *Landano* was meant to say that it needs to be

17  tethered to the underlying claims that's raised in the

18  petition itself.  It makes logical sense for -- we think that

19  it makes logical sense to read *Landano* that way because at the

20  end of the day release pending habeas review is, in effect,

21  sort of an injunctive relief.

22      There needs to be some sort of showing that there's a

23  likelihood of success on the merits before we go forward and

24  before release actually results.  What the Third Circuit has

25  said repeatedly is an exceptional form of relief of release on

1  bail pending habeas.

2      THE COURT:  I hear all that, but my responses are

3  twofold.  First, maybe the Third Circuit should have

4  articulated a different standard, but that's ultimately not my

5  job.  My job is to faithfully follow the circuit's standard as

6  I understand it.

7      The second point I would make is extraordinary

8  circumstances is a pretty high standard.  It is certainly the

9  case that litigants all over the country can make any claim

10  they want, but the fact that claims are makeable doesn't mean

11  that claims win, and extraordinary circumstances sets a pretty

12  high bar.

13      The third problem with what you've said about the idea

14  that bail pending a determination is analogous to an

15  injunctive remedy and therefore a likelihood of success is

16  necessary, there are a bunch of problems with that.  I'll take

17  two.

18      Problem one is that the Third Circuit -- forgive me for

19  not recalling if it's in *Landano* or *Lucas*, I think it's in

20  *Landano* -- has explicitly said no to that, has explicitly said

21  we don't think of likelihood of success on the merits as the

22  key issue.

23      The second thing is, the only circuit court that has

24  specifically addressed the question of bail in the habeas

25  context, which is to say the Second Circuit in *Mapp v. Reno*,

1  the only modern circuit that's done it, they too have not

2  followed what you suggested.

3      They haven't required a likelihood of success on the

4  merits.  They have required something quite a bit lower.  They

5  have required something like a substantial claim.  I'm

6  quoting, I think, there.

7      So, maybe, but that's just not the state of the law,

8  and it's the state of the law as it stands today that I'm

9  bound to apply here.

10     The other problem I think you have to deal with is the

11 a fortiori point that I alluded to earlier and that is central

12 to *Landano*'s citation of Justice Douglas, which is that if the

13 standard doesn't include -- and it doesn't, the *Lucas* standard

14 does not include likelihood of success on the merits in a

15 criminal case, why would we imagine a higher standard in an

16 immigration case?

17     Indeed the logic -- not the implicit logic but the

18 explicit logic of *Landano* would seem to be that immigration is

19 a lower standard because, by hypothesis, nobody has received

20 the very strict protections associated with a criminal

21 conviction, including the full range of constitutional rights

22 that are triggered there.

23     So, ultimately, I'm not persuaded by what you're saying

24 on that point, Mr. Sampat, but I appreciate it.

25     Anything else you want to add?

```
1          MR. SAMPAT:  No, Your Honor.  Thank you.

2          THE COURT:  Thank you.

3          So those were a whole bunch of preliminary issues, and

4     they are complicated in this case in part for a reason that

5     Mr. Sampat alluded to.  These are -- extraordinary

6     circumstances a high standard, it's hard to meet, and there

7     are simply not a lot of cases in this area, in part because

8     it's hard to meet and in part because generally this sort of

9     litigation goes forward not in a federal district court but in

10    front of an immigration judge.

11         Ms. Das, I haven't heard from you.  We're now at the

12    merits of your argument with respect to release.  I won't ask

13    you to repeat everything you've said in your papers, but I'd

14    like to hear from you on the extraordinary circumstances

15    argument, anything else you want to say, and then I'll ask

16    Mr. Sampat to be heard as well at that point.

17         MS. DAS:  Thank you, Your Honor.

18         Yes, we certainly are able to address the extraordinary

19    circumstances, which we would essentially put into

20    three buckets at this point.

21         One is certainly the fact that this is a First

22    Amendment case, and the Government's most recent actions

23    underscore our First Amendment concerns, which I will address

24    in a moment.  The other, as you've already noted, is that this

25    is a case where there is extensive evidence in the record,
```

1   much of which goes to flight risk and danger, and that's

2   evidence that the Government has not controverted.

3         Finally, there's a whole set of harms related to what

4   this has meant to Mr. Khalil and his family and the prejudice

5   that further delay would cause him.

6         Taking the first point on the First Amendment issues

7   first, certainly for more than three months the Government has

8   relied on a rarely used and unconstitutionally vague foreign

9   policy ground to justify its detention of Mr. Khalil.

10        When this Court enjoined that detention and removal on

11  that ground, ICE made the extraordinary decision this past

12  Friday not to release Mr. Khalil as it would in an ordinary

13  case but now to detain him on the basis of the separate

14  immigration application charge, a charge that the evidence we

15  presented already shows is rarely, if ever, used as a basis to

16  detain lawful permanent residents like Mr. Khalil.

17        So the Government's latest actions confirm what we have

18  alleged in this petition all along that retaliatory detention

19  is the Government's goal, that the purpose of every step that

20  the Government has taken in this case has been to ensure that

21  Mr. Khalil remains locked away until he is deported as

22  retaliation and punishment for his speech and viewpoint.

23        So at this stage of the case the Court does have the

24  power and the sufficient evidentiary record to grant bail in

25  light of that extraordinary circumstance.  His petition has

1  been verified.  He submitted extensive evidence of the

2  Government's own statements about his protected political

3  speech, the timing and baselessness of these

4  characterizations, and the extraordinary irregularity of the

5  Government's latest justification for his detention.

6      It's clear that this case is core about detention.

7  It is a rare case where there's actually direct evidence of

8  First Amendment retaliation from day one.  The Government's

9  own statements and their supplemental charging document make

10  explicit that they have been targeting Mr. Khalil from the

11  start based on his speech and viewpoint.

12      This Court has made findings with respect to the fact

13  that Mr. Khalil has engaged in protected speech and the fact

14  that the Government has now swapped in what we would argue to

15  be an even weaker justification for his continuing detention,

16  because this Court's injunction has forced them to do so,

17  doesn't break that causal chain.  If anything, it

18  strengthens it.

19      THE COURT:  May I ask you something on that for the

20  moment?

21      MS. DAS:  Yes.

22      THE COURT:  There are two charges here and one of them

23  has been enjoined.  The second charge was not filed last

24  Friday.  It was filed many months ago.  So I'm a little bit

25  not exactly sure what you mean by swapping out a

1  justification.

2      I would imagine -- the Department of Homeland Security,

3  I imagine, saw itself as justified in proceeding on both

4  charges and there's just -- one is now preliminary enjoined

5  and the other one wasn't invented on Friday.  It's been on the

6  books for months.

7      MS. DAS:  Yes, Your Honor.  Absolutely.

8      To be sure -- and this Court has made clear that First

9  Amendment issues regarding the charge itself will require

10  further development, and we, you know, intend to file those

11  submissions promptly.

12      But with respect to detention itself, the Government

13  has only relied on the foreign policy ground for detention and

14  we know that because when in our bail briefing we argued,

15  well, he's not a flight risk and danger and the Government has

16  not contested that in these proceedings, the Government's

17  response was that it was relying on the foreign policy ground,

18  that this was somehow in the category of security cases where

19  flight risk and dangerousness was unnecessary to detention.

20      We also know that based on the Government's letter on

21  Friday that they are taking the position that they are now

22  relying on the immigration application charge as the basis of

23  his detention.  So it's really the Government's actions that

24  are bringing the detention part of this case based on the

25  willful misrepresentation charge to the forefront.

1        But even if this issue has been in the case all

2   along -- and certainly we have argued that retaliation is the

3   goal and that it really doesn't matter which charge the

4   Government is relying on, regardless of whether charges

5   themselves are valid and give the Government discretion to

6   detain an individual in removal proceedings, the First

7   Amendment itself forbids the Government from exercising that

8   discretion in retaliation for someone's speech and the Fifth

9   Amendment forbids the Government from exercising that

10  discretion to punish someone.

11       And given the fact that these issues have been

12  developed in the evidence, that both sides have submitted

13  evidence, including all the immigration filings, this issue

14  has been teed up, and the fact that there is a strong First

15  Amendment issue that will be litigated over the course of this

16  case is an extraordinary circumstance such that Mr. Khalil

17  should not be remaining in detention, having his First

18  Amendment rights be impaired as these issues are further

19  litigated.

20       THE COURT:  What do you do with the argument that

21  Mr. Sampat has made that is essentially the consequences for

22  this petitioner of being detained are, while difficult for him

23  undoubtedly, quite a bit like the consequences for many, many,

24  many detainees?

25       And in terms of showing that they are, quote, unquote,

1  extraordinary as the law requires, why is this petitioner's

2  situation any different or worse than that of many, many, many

3  other people who are in detention who have their own

4  collateral consequences, who have their own life disruptions?

5      MS. DAS:  Well, Mr. Khalil's case is unique because

6  this is a First Amendment case.

7      THE COURT:  I've got you on that.  Bracket that for

8  half a moment if you could, but I took Mr. Sampat to be saying

9  in the brief he filed in March on this subject that the normal

10  extraordinary circumstance is something like a person who is

11  very ill and at the end of their life and they can't wait for

12  a habeas remedy because they will otherwise not make it, they

13  need to go to a hospital or something like that, and that

14  there's nothing like that that you all have put forward with

15  respect to the petitioner here.

16      What do you do with that argument, Ms. Das?

17      MS. DAS:  Our position in this case has been all along

18  that both the retaliation and the punishment are the two

19  impermissible motivations and goals behind what the Government

20  is doing.  And if he has to remain in detention only to get a

21  victory on those claims, you know, several months from now,

22  then the Government wins.

23      If the argument is, no, he should have never been

24  detained, that they are doing this to punish him for speaking

25  out about issues that he cares about, matters of pressing

1  public concern, the fact that he will have to remain in

2  detention for those punitive or retaliatory reasons, that is

3  the extraordinary circumstance and that his ability to live

4  his life freely is the controversy that preceded all of this.

5  That is the status quo to which he should be restored.

6      I think in this case that is not true for every

7  non-citizen who faces detention and there are processes that

8  are available to them in the ordinary course, but for

9  Mr. Khalil this has never been an ordinary immigration case.

10      Our entire theory is that the Government is abusing the

11  ordinary processes of immigration court of putting someone in

12  removal proceedings, of detaining them for a constitutionally

13  improper purpose.

14      And of course in Mr. Khalil's case we have alleged that

15  there are the kinds of concerns that are extraordinary, that

16  the loss that he's already suffered in terms of his ability to

17  be there for the birth of his first child, to attend his

18  graduation.  These are the punitive experiences he's

19  experienced, again, not just in the way that every person who

20  is detained experiences them but because that is part of the

21  punishment.

22      That's what makes this case extraordinary.  I am aware,

23  you know, in my 20 years of representing immigrants of no

24  other case where the Government announced the day that it

25  detains someone that they were detaining them in order to send

 1   a message that their arrest would be the first of many, that

 2   they were going after student protestors.

 3        That chilling effect has made this case an

 4   extraordinary case, and it's something that's been recognized

 5   in the small handful of cases that have emerged over the last

 6   several months that have dealt with similar issues, in the

 7   *Ozturk* case, *Concerti*, *Mahdawi*, *Aditya*, *Muhammad*, these are

 8   all cases where the First Amendment concerns, the chilling

 9   effect, the punitive effect it's having on the individuals

10   have demonstrated extraordinary circumstances.

11        I certainly agree that in the Third Circuit the

12   standard here is a very capacious one and that goes back not

13   just to *Lucas* but to *Johnston v. Marsh*, really talking about

14   the inherent power to grant petitioner's bail in the exercise

15   of the judge's discretion.

16        I think in some of the other cases some of the

17   extraordinary circumstances have been really discussed more as

18   a kind of interest of justice model.  Here we can see, given

19   the extensive record, including the record on lack of a flight

20   risk or dangerousness, of the Government never coming forward

21   with a valid justification for why Mr. Khalil must remain

22   detained while we litigate these very weighty issues.  Those

23   are all extraordinary circumstances that set this case apart.

24        I think one very illustrative case is the *Ozturk* case

25   in many ways.  It's very similar to what we are seeing here.

1   In her case, Ms. *Ozturk*, like Mr. Khalil, she was originally

2   detained based on these foreign policy allegations; but in her

3   case her student visa was revoked and ICE ultimately decided

4   to pursue removal proceedings on the basis of the revoked visa

5   charge alone and not the foreign policy ground.

6        She raised her First Amendment and due process

7   challenges to detention.  Initially the district court in

8   Ms. Ozturk's case concluded it was too soon to consider bail,

9   given the foreign policy allegations and the limited factual

10  record; but after the Government declined to present any

11  evidence to controvert Ms. Ozturk's allegations and

12  submissions, the court granted bail and did so even when the

13  immigration judge had denied bail.

14       It held that Ms. Ozturk had raised substantial claims

15  that her detention violated First Amendment and due process

16  and that there were several extraordinary circumstances,

17  including the chilling effect that her detention had on her

18  speech.

19       So this is a case in which those extraordinary

20  circumstances are clear from every method that the Government

21  has used and every decision they have made in this case to

22  pursue Mr. Khalil's detention and their plan to remove him.

23       THE COURT:  Ms. Das, anything else you want to add?

24       MS. DAS:  I wanted to address the idea about waiting

25  for immigration court bond proceedings.

1    I think, as the Court has already noted, there is no

2  statutory exhaustion requirement in this case.  I would also

3  note that the 1252(d) exhaustion requirements do not apply to

4  detention matters because there's no avenue in which detention

5  issues ever get to a court of appeals on a petition for review

6  because it's not --

7    THE COURT:  Ms. Das, let me pause you there.  I see the

8  argument you're making, and on a blank slate it's not clear

9  how to think about it.  The complexity is that in *DeValle* the

10 Third Circuit suggested that decisions on the way to a final

11 order of removal may require a kind of common law exhaustion.

12   How *DeValle* might or might not play in a detention

13 context and how *DeValle* might or might not work as to that

14 point, as to that point, after the Supreme Court's decision in

15 *Santos-Zacaria*, I don't know the answer to that.  But that's

16 why I presumed arguendo that prudential exhaustion is required

17 in the circumstances; but, as you've heard, I've determined

18 that on the facts of this case, given when the record was

19 built, how thickly the record has been developed, how much

20 time has been put into it, and what the record shows about

21 flight and dangerousness, which are those same two things the

22 immigration judge would need to look to, given all of that, I

23 have concluded that -- even assuming arguendo that there is an

24 exhaustion obligation under *DeValle* there is no need for

25 exhaustion here under the factors laid out by the

1  United States Supreme Court in *Santos-Zacaria* in 2023.

2       So that's where we are on that.  I mention all that at

3  this moment, Ms. Das, because I think that if you want to tell

4  me that there's no exhaustion in the detention -- excuse me,

5  in the habeas bail context, you're gonna have to explain to me

6  why *DeValle* doesn't work.  I don't know if you want to do that

7  or not, but that's the key data point here.

8       MS. DAS:  No, Your Honor.  I simply -- to the extent

9  that there is a prudential exhaustion requirement in the

10  detention context, our position would be that it doesn't stem

11  from 1252.  It's a prudential exhaustion requirement that may

12  stem from general principles, and we would agree that

13  exceptions -- normal exceptions would certainly apply here on

14  this record, so I don't need to belabor that particular point.

15       We are concerned that the ordinary immigration court

16  processes will not provide Mr. Khalil with the opportunity to

17  protect his rights, and certainly this is a case -- and this

18  is something that was also considered in the *Ozturk*

19  decision -- where it's not fair that an immigration court

20  proceeding could ever be a substitute for this Court's

21  consideration of release since an executive branch employee

22  would not be able to address First and Fifth Amendment issues,

23  powerless to consider constitutional claims, and certainly it

24  would be unusual for them to be considering evidence of the

25  executive branch as retaliatory or punitive motives.

1      So it just isn't a substitute for the power that this

2  Court has and the issues that this Court would be considering.

3      Fundamentally, you know, we would just ask that this

4  Court grant Mr. Khalil bail, and, you know, we certainly

5  believe that ordering Mr. Khalil's return to this jurisdiction

6  in the alternative would be appropriate if the Court were not

7  to grant bail.  And I'd be happy to address any concerns the

8  Court has about that.

9      But release at this stage, given the development of the

10  record and the opportunity that both sides have had to explain

11  why Mr. Khalil is being detained and given all of the harms

12  that he suffered over the 104 days that he's been in

13  detention, we hope that this Court will grant his immediate

14  release on bail.

15      THE COURT:  Ms. Das, thank you very much.

16      Mr. Sampat, over to you.

17      MR. SAMPAT:  Thank you, Your Honor.

18      If I may just make a quick point on factual -- a

19  factual point that my friend made on the other side regarding

20  the *Ozturk* case.

21      THE COURT:  Sure.

22      MR. SAMPAT:  If I remember that case correctly, I don't

23  believe Ms. Ozturk was held on the foreign policy ground.  I

24  think there was some debate as to whether she was or was not

25  being held on that ground; but I think at the end of the day

1    when the Government submitted its briefing, it was the fact

2    that she was out of status after her student visa was

3    terminated.  That was the reason that she was detained and

4    placed into proceedings.

5         I wanted to make that point very quickly.

6         As to the extraordinary circumstances, Your Honor, I

7    think it's important to note, at least on the Fifth Amendment

8    issue, that the detention -- detention of aliens has been

9    upheld by the Supreme Court as being constitutional.  It's

10   part of the process.

11        It's integral to determine whether somebody is --

12   should be found removable, is removable, and then is

13   ultimately ordered removed.  I think that's an important point

14   to note as the Court is considering the Fifth Amendment

15   issues.

16        On the First Amendment issues, I'll just note that the

17   Court hasn't ruled on the First Amendment issues yet.

18   Obviously my concern -- you know, the Government's concern

19   with the argument that Mr. Khalil -- that the petitioner is

20   posing here is that it kind of invites a magic word test where

21   petitioners could raise First Amendment claims in habeas and

22   then that by itself would be deemed extraordinary

23   circumstances.

24        I don't think that's what the Third Circuit had in mind

25   when it kept saying that the extraordinary circumstances

1  standard is a very high bar, that that high bar could be

2  circumvented by some sort of artful pleading or coloring their

3  claims in constitutional guard that way.

4       THE COURT:  The problem with that -- look, I think that

5  is potentially your real issue.  And Ms. Das left out one of

6  the key First Amendment cases in this area which is the case I

7  believe she litigated, the *Ragbir* case, in front of the Second

8  Circuit.

9       It is the case that treating First Amendment chilling

10  as potentially a basis for extraordinary circumstances could

11  open the door to more people seeking extraordinary

12  circumstances, but there are two answers to that.

13       The first is, it is then on district judges to not

14  simply accept magic words and be done with it.

15       As you know, Mr. Sampat, I previously found that the

16  petitioner here -- I found as a matter of fact that the

17  petitioner here engaged in, quote, unquote, political speech

18  within the meaning of the Supreme Court's jurisprudence; and I

19  found as a matter of fact that he wishes to and would return

20  to such speech.  So it's not simply a question of magic words.

21       But the other point is that the mere -- we had this

22  back-and-forth, you and I, in our first interaction with

23  Mr. Flentje, but the mere fact that a claim might be made

24  under a standard is not an argument against that standard.

25  It's just a fact of the standard, number one.

1    Number two, I'm not in the standard-making business.

2  I'm in the standard-applying business.  So Ms. Das's argument

3  that First Amendment chilling is an extraordinary

4  circumstances, that argument may work or may not, but the fact

5  that it might doesn't tell me whether it should or should not.

6  It's simply a restatement of the question.

7    Her argument is that First Amendment chilling might

8  count as an extraordinary circumstances, and what you're

9  saying back is, well, if it does, that would allow those

10  claims to go forward.  True, but that doesn't tell me

11  anything.  That just restates the issue.

12    If what it means to tell me is that people could use

13  magic words, well, then, A, it's over to district judges to

14  not simply accept magic words, and, B, you know the factual

15  findings I've made here as to First Amendment speech.

16    I'm not sure I'm fully persuaded by the argument, at

17  least as you've made it until now, on that particular piece.

18    MR. SAMPAT:  I absolutely hear you, Your Honor.  I

19  would just say that, you know, if we're gonna get to the First

20  Amendment issue, we are getting to the merits of his First

21  Amendment claim which then goes back to our point of, like,

22  why just extraordinary circumstances by itself can't be the

23  standard for bail pending -- in a habeas case that needs to be

24  likelihood of success on the merits, as well.  This is how it

25  all -- we think that it all sort of ties together.

1          THE COURT:  I want to just say, Mr. Sampat, that's why

2     we spent so much time discussing the standard.  I appreciate

3     that point, which is to say I have held that the petitioner

4     has failed to develop any likely to succeed argument on

5     anything other than the vagueness ground as to the Secretary

6     of State's determination.  And Ms. Das, 15 minutes ago, noted

7     the petition has been verified.

8          But as we all understand, the petition was very

9     belatedly verified.  It was -- in Mr. Khalil's latest

10    declaration, there was a reference in sentence two or three

11    to:  And, yes, I have gone back and verified the petition.

12         But the point is, in terms of the materials I've had

13    before me in a merits-type context, I have indeed found that

14    there is no factual evidence because at the relevant point no

15    one had put any evidence in front of me, including no verified

16    petition, and no meaningful legal arguments had been made.

17         So I have already held that there is no likelihood of

18    success as developed by the petitioner on those things.

19         So I agree with you, Mr. Sampat, that the standard here

20    matters a great deal, because if the standard requires

21    likelihood of success on an underlying claim, as I've already

22    held, that has simply not been shown by the petitioner to this

23    point.

24         So I think you're right to say it all flows together,

25    but that's of course why it was so important to spend time and

1  explain, in my judgment, why *Lucas* does not involve likelihood

2  of success on the merits and indeed even *Mapp* doesn't.  That's

3  part of how I'm thinking about the situation that the case is

4  currently in.

5          Mr. Sampat, back to you.

6          MR. SAMPAT:  Thank you, Your Honor.  If I may have just

7  a quick moment to just consult my notes.

8          THE COURT:  Of course, of course.  Take your time.

9          MR. SAMPAT:  Thank you.

10          MS. DAS:  Your Honor, I don't want to interrupt

11  Mr. Sampat, but there is a development in the immigration case

12  that's relative.

13          THE COURT:  Hang on for just one second.  Let

14  Mr. Sampat do his thinking and we'll get to it in a half a

15  moment.

16          MS. DAS:  Yes, Your Honor.

17          THE COURT:  Thanks.

18              (Brief pause.)

19          MR. SAMPAT:  Thank you, Your Honor.

20          I don't think we have anything else to add on the

21  extraordinary circumstances point, other than what's in our

22  briefing; but if Your Honor has questions, we're of course --

23  I'm ready to answer them.

24          THE COURT:  Okay.  No.  I appreciate that.

25          Mr. Sampat, while you're looking at your notes, Ms. Das

1  had something that she wanted to bring to all of our

2  attention.

3        Ms. Das, over to you.

4        MS. DAS:  Mr. Khalil's immigration counsel just

5  informed me that the immigration judge has just denied a bond

6  hearing, relying on the foreign policy ground.

7        THE COURT:  Okay.

8        MS. DAS:  So I think that alone is an extraordinary

9  circumstances that would be relevant both to, even if there

10 were at the highest level, the *Landano* substantial

11 constitutional claim that Your Honor has already found.  And

12 it goes to demonstrate that there's no administrative

13 proceeding that will otherwise resolve this being an

14 extraordinary circumstance.

15        It also appears that she's found him removable on the

16 remaining charge and denied asylum, but we can certainly --

17 obviously this is coming in now.  We can send a letter to the

18 Court immediately with these developments.

19        THE COURT:  Right.  I appreciate that.

20        Mr. Sampat, do you know anything about any of that?

21        MR. SAMPAT:  No, Your Honor.  I'm hearing it for the

22 first time right now.

23        THE COURT:  I get it.  If we were in court physically

24 with nobody checking their phones, we wouldn't have known

25 this, but here we are remotely, and at least Ms. Das had some

1   information.  Okay.

2        Ms. Das, we've heard from yourself, we've heard from

3   Mr. Sampat.

4        Anything else that you feel compelled to add at this

5   point?

6        MS. DAS:  Just briefly, Your Honor.

7        I would note that in addition to the verified petition

8   much of the evidence that we referred to in our latest letter

9   also comes from the submissions that were attached to the

10  declaration, I believe at ECF-284, which go to the

11  irregularities around the foreign policy ground, around the

12  misrepresentation charge.

13       And certainly the fact now that it appears that the

14  Government or at least the immigration court is not complying

15  with this Court's injunction is another extraordinary

16  circumstances, so we do believe that the factual record at

17  this stage has been sufficiently developed under any standard

18  that's applicable to bail.

19       THE COURT:  I appreciate all that.

20       I want to learn more before suggesting even for a

21  moment that anyone has not complied with the judgment order,

22  but we'll learn more.

23       Ms. Das, you indicated you would file a letter, and I'm

24  sure you and Mr. Sampat can huddle after today's proceeding

25  just so we have a fuller understanding of what's going on with

1  the immigration judge and what advice is being provided to the

2  immigration judge about the meaning of the Court's preliminary

3  injunction.

4      Let me take you through my thinking as to the

5  compliance with the relevant standards here, which is to say

6  the standards set out in *Lucas* and subject to the full

7  discussion we had earlier about *Landano* and about *Mapp v. Reno*

8  and *Iuteri* and all the rest of it.

9      The first thing that I just want to indicate here is

10 that there is -- you know, here is some of the evidence in the

11 record:

12     That the petitioner is married to a United States

13 citizen, that he is the parent of a child in the United States

14 who is -- the child is itself a United States citizen, the

15 petitioner's wife is employed in the United States, the

16 petitioner has pursued education in the United States, has had

17 United States career plans which may be displaced at this

18 point.  In fact, some of them were displaced, which I

19 previously found.

20     In addition, the petitioner has made himself into a

21 highly public figure from the very get-go of the case.  In the

22 first and timely verified petition, there are references to

23 his speaking to the media, et cetera.

24     All of that suggests very low flight risk, connections

25 to the United States and publicness in terms of his person.

1   There are any number of sources for what I have laid out.

2   They are in the petition itself, they're in the petitioner's

3   various declarations, they're in the petitioner's wife's, one

4   of her declarations, one of them doesn't speak to it.  It's at

5   ECF 56-6.  The first letter speaks to some of these

6   connections to the community, but that's just a portion of it.

7          There is strong evidence of lack of flight risk.  All

8   of this is drawn from sworn affidavits that were put forward

9   March 15, March 20, May 8th, June 4th by petitioner; and as to

10  all of that, the respondents have opted not to controvert any

11  of the evidence.

12         And so I find as a matter of fact that the petitioner

13  here, based on the evidence that has been put in front of me,

14  is not a flight risk.  The respondents have opted not to

15  controvert the evidence, as Ms. Das noted, and the

16  uncontroverted evidence points in only one direction.

17         The second issue here that is relevant -- and I'll

18  come in a moment as to how all of this is relevant -- is

19  danger to the public, danger to the community.

20         Again we're in a place where the petitioner has put in

21  sworn evidence March 15, March 20, May 8th, June 4th, and the

22  respondents have simply opted not to take on any of this

23  evidence.  They haven't argued through affidavits, through

24  declarations, through any other evidentiary means that the

25  evidence put forward by the petitioner is wrong, is

1  unreliable.

2      They haven't attempted to put in their own evidence.
3  They have done nothing of the kind.  And so we're left with
4  what the evidence that has been put forward by the petitioner
5  that is uncontroverted shows.

6      That evidence shows that the petitioner has no criminal
7  record.  And there is some evidence in the record from
8  which -- well, let me just emphasize what it is.

9      Exhibits 93 -- excuse me.  Forgive me.  ECF 93-1, that
10  is ECF 93-1, the first letter and the third letter; ECF 56-1,
11  ECF 56-1, letter 4, letter 7, letter 9.  All of these shed
12  evidentiary light on the petitioner's actions in what everyone
13  assumes is the relevant context.

14      And the evidence that all of those -- excuse me.  What
15  all of that evidence adds up to is a lack of violence, a lack
16  of property destruction, a lack of anything that might be
17  characterized as incitement to violence.

18      All of that is simply uncontroverted here by the
19  respondents.  That evidence has been put before the Court in
20  affidavits, in declarations, in letters that are sworn to, and
21  the respondents have opted to say nothing in response of an
22  evidentiary nature.  And so where we are is similar to where
23  we are, risk of flight.

24      All of the evidence in the record points to lack of
25  danger to the community; that is, all evidence that has been

1  put on by the petitioner.  It might have been challenged as

2  unreliable, it might have been challenged as an incomplete

3  picture, but no such challenge has been made, even as there

4  have been many opportunities for the respondents to do that.

5          So what I find as a matter of fact, given the evidence

6  before me as it's been developed by the petitioner and as the

7  respondents have simply opted not to develop anything on the

8  flipside, is that the evidence, I find, is that the petitioner

9  is not a flight risk, and the evidence that has been presented

10  to me, at least, is that he is not a danger to the community.

11  Period.  Full stop.

12          So, given those findings of fact, that is highly,

13  highly unusual that in those settings the respondents and in

14  particular the Secretary of the Department of Homeland

15  Security would continue to seek the detention of a person in

16  that setting.

17          It is of course the case that in the beginning of a

18  proceeding there is ample room -- and the United States

19  Supreme Court has made this clear in a set of recent opinions.

20  There is ample room for a presumption of flight risk or a

21  presumption of danger to justify short-term detention.

22          And in the first days or weeks or even beyond, the

23  Supreme Court has made clear that that's consistent with the

24  law.  But at this point what we have is a thick record that

25  has not been objected to by the respondents, that has not been

1   supplemented by the respondents, and where we are is that it's

2   not the first day or week or month.  There's been ample time

3   to make a contrary submission if that was wanted.

4        So given the fact that, in my judgment, the standards

5   for detention would clearly not be met in front of an

6   immigration judge, it is highly, highly, highly unusual to be

7   seeking the detention of the petitioner, given the factual

8   record as of today.

9        That unusualness is amplified by the findings of fact

10  that I made during the middle of last week, and those findings

11  of fact were based on three declarations by seasoned, expert

12  practitioners.

13       Those declarations were simply not objected to

14  factually, they were not controverted in any way factually by

15  the respondents, and those added up to the idea that it's

16  overwhelming unlikely, I found, that a lawful permanent

17  resident would be detained on the remaining available charge

18  here -- not "available," the remaining charge here, which is

19  to say a charge of failing to fill out accurately and honestly

20  certain particular pieces of the LPR application, certain

21  particular pieces of the LPR application as to things like

22  groups, et cetera.

23       So where we are is that, given the evidence it is, as I

24  said, highly unusual that there would be detention, which is

25  to say the evidence that I have found as to flight risk and

1    danger.  And layered on top of that is the highly unusual

2    aspect of seeking detention and of keeping someone detained,

3    given the background charges here and in particular the pieces

4    of the LPL application that this lawful permanent resident did

5    not allegedly fill out properly.

6        That's another factor that leans in the direction of a

7    finding of extraordinary circumstances: evidence of no flight

8    risk, evidence of no danger, and evidence that I have already

9    found is that it's overwhelming unlikely that a person would

10   be detained on the charge that is not currently enjoined.

11       There are a couple of other things here.  One of them

12   is that there is an extraordinary circumstance that flows in

13   part from a chilling effect.  I have found previously that

14   this petitioner, as I alluded to with Mr. Sampat a few moments

15   ago, that this petitioner engaged in what counts as political

16   speech under the Supreme Court's jurisprudence and would seek

17   to return to it in a form that is inconsistent with detention,

18   which is to say the petitioner has engaged in protests, and

19   that is something that is not doable from inside of custody.

20       So it's a kind of chilling that is not obviated, for

21   example, by giving an interview from a detention facility or

22   sending a communication from a detention facility.

23       So another part of the extraordinary circumstances

24   calculus here is a finding of fact that I make and that I

25   previously made that the petitioner is being prevented from

1  engaging in his speech and that that chilling effect is

2  another part of the extraordinary circumstance that is here.

3       I also agree that another piece of the extraordinary

4  circumstance is that part of the theory here for release would

5  require assessment by the immigration judge of issues that the

6  immigration judge is almost surely not legally permitted to

7  consider, which is whether or not detention continues to be

8  appropriate or if release is more appropriate when those kinds

9  of questions are bottomed on alleged constitutional

10 violations.

11      It's an extraordinary circumstance if the argument that

12 might be made is one -- if the argument for release that might

13 be made is one that the immigration judge literally cannot

14 address.  That is both an additional argument for

15 non-exhausting remedies but it's also part of what makes this

16 circumstance unusual.

17      The final thing I want to note is that while it seems

18 to me that *Lucas* does not require any showing of some kind of

19 substantialness to the underlying legal claim, I see of course

20 that the law is not thickly developed in this area and that it

21 might be that *Mapp v. Reno* at least in part is relevant; and

22 *Mapp v. Reno* suggests there needs to be some kind of showing

23 as to the underlying merits of the claim.

24      There needs to be some kind of showing that there's

25 something to them, that they're not trivial, that they're

1  serious, et cetera.

2       I don't take *Mapp v. Reno* as suggesting they need to be

3  likely to succeed on the merits, not at all.  If I took *Mapp*

4  *v. Reno* as governing, point one, and if I took *Mapp v. Reno* as

5  requiring likelihood on the merits, point two, well, then,

6  there could be no release here for the petitioner because, as

7  I've already held, there has been no showing by the petitioner

8  of likelihood of success on the merits as to the lawful

9  permitting application charge, but that's not -- *Mapp v. Reno*

10  is not obviously governing and that's not what *Mapp v. Reno*

11  says.  It requires some kind of substantialness but not all

12  the way to likelihood of success on the merits.

13       What I would say as to the claims here, Ms. Das today

14  invokes a First Amendment claim and a due process punishment

15  claim.  The due process punishment claim is based, as we know,

16  on the idea -- and it's in the petition, of course.  It's at

17  pages 25 or 26 of the petition.

18       But the due process punishment idea is that, as the

19  Supreme Court held in the 19th century in the *Wong* case, as

20  it's held more recently in the *Zadvydas* case, the criminal law

21  is for punishment, the criminal law with all of its

22  protections.

23       The civil law, including immigration law -- and that's

24  what those Supreme Court cases hold -- are not a place for

25  punishment.  They're a place for effectuating other government

1    interests.

2         One of the arguments the petitioner has made here is

3    that he is being punished, that there is a disapproval of

4    certain things he has said and done in the past, and that the

5    immigration process is being used not to vindicate the

6    immigration laws but to punish the petitioner for those

7    things.

8         The petition has -- the verified petition has facts

9    along those lines at paragraphs 33 and 73 and 82 and 83 and

10   84.  And when you combine those facts with the current fact,

11   which is that the petitioner -- the respondent, one of them,

12   the Department of Homeland Security Secretary, is detaining

13   and seeking to keep detained the petitioner in the absence --

14   not "in the absence," in the face of thick evidence that has

15   not been controverted as to flight, as to dangerousness, and

16   is keeping and seeking to keep the petitioner detained in

17   light of strong evidence that I have found, that this is

18   overwhelming unlikely to be the ordinary course.

19        All of that, the evidence that strongly suggests that

20   there is no basis for detention here, combined with the

21   paragraphs I've mentioned in the petition at 33 and 73 and 82

22   and 83 and 84, when you put all those together, they suggest

23   that there is at least something to the underlying claim that

24   there is an effort to use the immigration charge here to

25   punish the petitioner, and of course that would be

1  unconstitutional.

2      There is at least enough to that claim that even if

3  *Mapp v. Reno* were to apply here and even if there is some need

4  to show a meaningful move in the direction of meritoriousness

5  in the substantial claim, that part of the *Mapp v. Reno* test

6  would be satisfied.

7      I do not hold that there is a likelihood of success on

8  the merits based on what I have just said.  It's a question

9  that I don't need to reach in light of what I've said about

10  the standard; and it's indeed a question that, as I have made

11  clear in a prior decision, at least in the absence of all the

12  extra things we now have would not have been made out by the

13  petitioner.

14      So my finding is that there are extraordinary

15  circumstances here.  They relate to my findings on risk of

16  flight, my finding on dangerousness to the community, my

17  finding on the overwhelming unlikeliness the detention would

18  be sought in a case of this sort in a context like this one,

19  my finding as to chilling effect, my finding as to the

20  inability of an immigration judge to take on these issues,

21  and, finally, my finding that while it does not rise to the

22  likelihood of success level, the claim that there is a due

23  process violative effort to punish the petitioner is

24  substantial enough that even if *Mapp v. Reno* is in play here,

25  there would be enough as to that claim to justify release.

1      So given all of those factual findings, I'm gonna

2  exercise the discretion that I have to order the release of

3  the petitioner in this case.

4      I don't plan to write an opinion on this.  I will

5  simply issue a very brief release order, and I'll do it

6  shortly, and refer the Court of Appeals, should there be an

7  effort to take an appeal, back to today's transcript.

8      I haven't been reading from an opinion, as I'm sure

9  you've all perceived, so things will be -- I'm sure the

10  transcript will reflect that.  But I'm hopeful that should

11  there be an effort to seek review from the Third Circuit, this

12  will give the Third Circuit a strong sense of my own factual

13  findings and the basis for my exercise of discretion here as

14  well as my decisions as to jurisdiction and exhaustion and the

15  relevant standard.

16      So that's my decision, that the petitioner's motion for

17  release will be granted and that obviates the need for

18  consideration of the petitioner's motion to transfer.

19      Mr. Sampat, let me go to you for half a moment.  Are

20  there any conditions that the respondents would seek be

21  imposed after the entry of the release order?

22      MR. SAMPAT:  Your Honor, I think we would need time to

23  consult with our clients on that to see what conditions would

24  be appropriate, but what we would also ask is, understanding

25  Your Honor's order granting the motion, we would ask that the

```
1   Court stay the effect of that order for seven days so that the

2   respondents could seek emergency appeal and stay if so

3   necessary.

4       THE COURT:  Let's stick with the first one, though,

5   Mr. Sampat.

6       MR. SAMPAT:  Sure.

7       THE COURT:  I would -- the question of the conditions

8   that are imposed upon a release, they're not usually very

9   complicated.  I deal with criminal cases every single day.

10      They're usually about things like limits on where

11  someone might travel to and they're usually about things like

12  surrendering of a passport and they're usually about things

13  like no applications for further travel documents, and that's

14  usually the end of it.

15      I will also say that in my experience those things are

16  usually pretty quickly consented to between the parties.

17  You'll take whatever position you want, of course.  I respect

18  that entirely.  But what I would just suggest is this probably

19  doesn't take a whole lot of consultation with your client.

20      How long do you think you need to figure those things

21  out?

22      MR. SAMPAT:  Your Honor, I think it's a little

23  difficult to say how much time we need.  I'd say probably at

24  least the rest of the day.  Understanding Your Honor's point

25  on the criminal context in criminal proceedings, the
```

1  conditions are pretty quick.

2      I will just note that immigration detention -- when

3  individuals are released, there's report requirements and

4  things like that that we would have to consult with our

5  clients about what would be appropriate, especially in light

6  of the fact --

7      THE COURT:  But my point, Mr. Sampat, is not that it's

8  easy or hard, and I hope I wasn't misunderstood that way, and

9  if I was, my apologies.

10      My point is, these are high-volume affairs and they're

11  pretty standard approaches in our country to release

12  conditions, and so I would urge you to consult very quickly

13  with respect to that because this is not the first time anyone

14  has thought through these issues of what to do with a person

15  who is released.

16      You know, for example, the reporting requirements you

17  alluded to, these are pretty standard operating procedure

18  things.  So let's just -- let's pause for a moment on that.

19      Ms. Das, I'm imagining that you will not have any

20  issues with -- and you'll correct me if I'm wrong.  Just as

21  with the respondents, the position is for you to formulate.

22      But I'm presuming you would not have issues with some

23  reasonable geographic limitations on where the petitioner

24  might go and the need for him to surrender his passport and to

25  not apply for any new travel documents.

1        Would there be any disagreement with those things?

2        MS. DAS:  Your Honor, we would agree to reasonable

3   conditions in terms of travel and the issues related to the

4   passport.  I think in addition to that, we would hope that the

5   order would specify that he should be released on his own

6   recognizance, that there would be no electronic monitoring,

7   and that there would be a 72-hour notice prior to

8   re-detention.

9        Those are some of the grounds that were issued in other

10  cases such as *Chung*, *Concerti*, *Mahdawi*.  They had different

11  formulations of that, but essentially to ensure that the

12  individual could travel and would be released on recognizance

13  without GPS monitoring were particularly important.

14       THE COURT:  Right.  So what I would say is that there

15  has been a thick record developed here with respect to the

16  relevant bail considerations.  There is simply nothing that

17  even begins to suggest that an electronic bracelet is

18  appropriate or necessary.

19       With respect to the 72 hours before re-detention, I

20  don't understand the basis for something like that.  There may

21  be any number of reasons why a person is detained, and I'm not

22  gonna presume that other bases that might be put forward are

23  somehow infirm.

24       The idea of enjoining the United States, slowing it

25  down from doing something it might do when I don't know what

1  that thing it might do is strikes me as not grounded in the

2  record and something that would cause real problems in terms

3  of this Court's ability, for example, under *Lyons* and under

4  the limits of its own injunctive power as to prospective

5  things.

6          So I'm not gonna go that way, Ms. Das.  I will not tell

7  the United States that it can't proceed in certain ways.  If

8  the United States proceeds in certain ways that are illegal,

9  we will take it from there, Ms. Das.

10         MS. DAS:  Thank you, Your Honor.  That's understood.

11 Two quick issues.

12         THE COURT:  Sure.

13         MS. DAS:  With respect to the passport, in our recent

14 experience, he may need that passport to travel back to his

15 home in New York.  So if there could be a period of time by

16 which that has to be surrendered, that would be helpful.

17         THE COURT:  That's exactly why I'm a little bit

18 surprised that this seems complicated.  The normal thing one

19 would have expected would be something like limits on travel

20 from Louisiana back to New York and surrender of passport

21 immediately upon return to New York, something like that.

22         But these are the kinds of things that parties just

23 work out between themselves.  This is not the kind of thing

24 that a judge generally gets involved in.  Because while

25 Mr. Sampat -- and I respect his position -- doesn't agree with

1  where I've ruled, it's not usually very tricky to fix these

2  things between thoughtful lawyers such as yourself, Ms. Das,

3  and such as Mr. Sampat.  I'm confident you all can figure that

4  out.

5          MS. DAS:  Yes, Your Honor.  I think that's what we've

6  done in the normal course.  If Your Honor were willing, we

7  would ask that there be an order of his release immediately

8  and then that release can start getting processed right away,

9  and during that processing time we could work out with the

10  Government if there are -- what those reasonable terms

11  would be.

12          THE COURT:  Mr. Sampat, what is the argument for a

13  seven-day stay?  What is that about?

14          MR. SAMPAT:  Your Honor, that's to give us enough time

15  to process Your Honor's order and go through the necessary

16  channels that we need to to get authorization -- to seek

17  whether or not an appeal is warranted; and if so, then to go

18  through the necessary channels to get authorization to pursue

19  that appeal, Your Honor, and then potentially seek a stay of

20  Your Honor's order at the Third Circuit, as well.

21          THE COURT:  Ms. Das, your view?

22          MS. DAS:  Your Honor, we don't think a stay is

23  warranted for the reasons that Your Honor has already made

24  with respect to the findings.  There's no risk of flight or

25  dangerousness.

1     Ultimately, if the Government prevails on some sort of

2  appeal, it has the ability to re-detain the petitioner, so

3  there's no reason for this Court to stay its order based on

4  the substantial findings it's already made.

5     THE COURT:  Mr. Sampat, what is -- the standard kind of

6  argument for a district judge to stay its own order generally

7  runs through, among other things, the applicant for the stay,

8  this would be you here, being irreparably injured by the

9  non-entry of a stay.

10     What would be the irreparable injury here?

11     MR. SAMPAT:  It is the release, Your Honor.  Obviously

12  we're also seeking -- we're contemplating the appeal of

13  Your Honor's PI order, as well.

14     THE COURT:  Sure.

15     MR. SAMPAT:  So it's whether or not -- that irreparable

16  injury would be the potential that Mr. Khalil would be

17  released and we wouldn't be able to re-detain him.

18     THE COURT:  But the problem with that argument is that,

19  as Ms. Das has pointed out, the factual record here doesn't

20  suggest any risk of flight.  To the extent the United States

21  had that kind of concern, well, the time for putting in

22  evidence on that was not -- it's not today or tomorrow.  It's

23  over the course of these last days and weeks.

24     So if the irreparable injury is the concern that the

25  Third Circuit will undo what I have done and you will not be

1    able to find and re-detain the petitioner, there's just no

2    evidence of that.  And there was ample opportunity for the

3    respondents to build an evidentiary record that might have

4    suggested that.

5         Any other irreparable injury here?

6         MR. SAMPAT:  Nothing that I can find, Your Honor, but

7    I'm consulting my notes, just making sure that I haven't

8    missed anything.

9         THE COURT:  Take your time.  I don't mean to rush you.

10         (Brief pause.)

11         MR. SAMPAT:  Your Honor, just a couple points on

12    irreparable injury.  There's also irreparable injury when

13    courts do enjoin the effectuating of statutes enacted by

14    Congress.  That's *Maryland v. King* at 567 --

15         THE COURT:  But the problem with that, Mr. Sampat, as

16    you know, is that the Second Circuit in *Ozturk* made pretty

17    quick work of that.  I'm not enjoining any statute, far from

18    it.  I'm not saying a statute is unconstitutional, I'm not

19    enjoining a statute, not in the slightest.  I'm simply

20    ordering that a person be granted bail.

21         If it were the case that every time a federal litigant

22    loses a granular decision like a bail decision they could say

23    there's irreparable injury, there would be nothing left to the

24    irreparable injury standard.  It would simply mean that there

25    is a stay of a judicial decision every time a federal litigant

```
 1   loses.  That's not the law.

 2         MR. SAMPAT:  Nothing else to add, Your Honor.  Thank

 3   you.

 4         THE COURT:  All right.  So I'm going to issue a release

 5   order.

 6         Mr. Sampat, I don't want to put you in a difficult spot

 7   in terms of consultation, but what I'm gonna do is there's a

 8   United States magistrate judge on this case who you all have

 9   dealt with a little bit, Judge Hammer, who has been working on

10   the case and who is, like all United States magistrate judges,

11   enormously experienced with respect to issues of where a

12   passport will go, what travel restrictions make sense.

13         I'm really hopeful the parties can simply agree to

14   reasonable restrictions here, but if need be, there will be an

15   order releasing the petitioner by a time certain today subject

16   to conditions that Judge Hammer can impose if the parties are

17   not themselves able to agree to, you know, reasonable

18   conditions together.

19         I think that will allow everybody to have a little bit

20   of time for consultation, but, candidly, these are just not

21   issues that are so terribly complex that they require a great

22   deal more than that.

23         Mr. Sampat, anything that you want to add before we

24   wrap up?

25         MR. SAMPAT:  Not from the Government, Your Honor.
```

1  Thank you for your time this afternoon.

2       THE COURT:  Mr. Sampat, thank you, as always.

3       Ms. Das, from your perspective, anything that you want

4  to add before we wrap up?

5       MS. DAS:  No, Your Honor.  But just to clarify, I

6  understand that some of the conditions we may need to hash out

7  as part of the release order, but our understanding is that

8  Your Honor would be issuing an order that he be released by a

9  time certain today.  And we're hoping that that order would

10  specify that he would not be subject to electronic monitoring

11  and would be allowed to travel to New York with his passport,

12  and then any other conditions that we need to negotiate we

13  could speak to the magistrate judge about.  I just wanted to

14  clarify that point.

15       THE COURT:  Two things:  First, I'm going to write the

16  order.  It will take a few moments to write.  I haven't

17  pre-written it or anything like that.

18       It will direct that the petitioner be released today,

19  subject to the conditions that are set today by the

20  United States magistrate judge.

21       It just seems, to me, pretty straightforward that you

22  all, Ms. Das, and you, Mr. Sampat, should rapidly consult as

23  to these issues so that the United States magistrate judge has

24  the benefit of your thoughts on these subjects and hopefully

25  your agreement.

1    I don't want to micromanage the process.  There are

2  things I don't know.  For instance, I don't know if the

3  petitioner's passport is in his pocket or is somewhere in

4  New York.  There are just things I don't know.

5    Those are not the kind of things that judges should

6  take the first cut at.  Those are things that you all should

7  work together on, but the release order will be drafted

8  shortly by me and it will hit the docket and you'll see it,

9  Ms. Das, and Mr. Sampat, as well.

10    MR. SAMPAT:  Thank you, Your Honor.

11    THE COURT:  As to the stay application, it's simply

12  denied.  The stay factors are ones I understand.  There's no

13  need, I don't think, to cite them here.  One of the two key

14  stay factors -- I'm thinking, for example, of the *Hilton* case,

15  which is the Supreme Court's case from 1987 that relates to

16  this, and *United States v. Smith*, which is the Third Circuit's

17  1987 decision.  The stay applicants here are the respondents

18  and their arguments as to irreparable injury, given the

19  factual record that's been built here, that they haven't

20  contested, there's just not an argument to move for a stay.

21    I appreciate that that means that the respondents will

22  have to work quickly to seek an appeal, should they wish to,

23  but that is a little bit the wages of having not contested

24  over the course of this period the record and having the

25  record lean in one direction with respect to the relative ease

```
 1   of the re-detaining issue should the Third Circuit indicate
 2   that its decision will order him detained.
 3        I also don't think that there's been the requisite
 4   showing by the respondents as to the likelihood of success as
 5   to jurisdiction, as to exhaustion, as to the standard, as to
 6   my factual findings, and as to exercise of discretion as to
 7   detention.
 8        So the application for a stay is denied, as we just
 9   discussed, and an order will follow shortly with respect
10   to the granting of a motion for release.
11        Having said that all, Ms. Das, any final things you
12   wanted to convey, Ms. Das?
13        MR. SAMPAT:  No.  Thank you so much, Judge.
14        THE COURT:  Mr. Sampat, any final things that you
15   wanted?
16        MR. SAMPAT:  Nothing from the Government, Your Honor.
17   Thank you.
18        THE COURT:  Thank you all very much.  And I will
19   prepare the order in a short while.  Thank you all very much.
20   Appreciate it.
21             (Which were all the proceedings held in the
22              above-entitled matter on said date.)
23
24
25
```

1        **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

2

3        I, **Lisa A. Larsen, RPR, RMR, CRR, FCRR,** Official Court

4    Reporter of the United States District Court for the District

5    of New Jersey, do hereby certify that the foregoing

6    proceedings are a true and accurate transcript from the

7    record of proceedings in the above-entitled matter.

8

9

10            */S/Lisa A. Larsen, RPR, RMR, CRR, FCRR*

11            Official U.S. District Court Reporter ~

12                 District of New Jersey

13

14            DATED this June 21, 2025

15

16

17                 *   *   *   *   *

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

       *Petitioner*,

  v.

DONALD TRUMP et al.,

       *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

<u>ORDER</u>

The Petitioner here is Mahmoud Khalil, currently detained by federal immigration authorities in Jena, Louisiana.

The Petitioner's motion at ECF 308 is granted to the extent the motion seeks release on bail from immigration custody.

The motion at ECF 308 is denied as moot to the extent it seeks transfer to New Jersey.

The ECF 308 motion is granted and denied for the reasons stated in court today.

After the Court issued its decision on the ECF 308 motion, the Respondents orally moved for a stay of the decision. The motion was denied for the reasons stated in court.

Pursuant to the Court's decision on the ECF 308 motion, the Petitioner shall be released from immigration custody today.

The release order shall become effective upon two conditions being met. First, the setting of bail conditions by the United States Magistrate Judge. And second, an order from the United States Magistrate Judge indicating that the bail conditions have been met.

The bail conditions here shall not include any obligation that electronic monitoring be put in place or that a bond be

immediately posted.  There is no basis for that in the
evidentiary record the parties have developed.

The bail conditions shall include other requirements that the
United States Magistrate Judge deems appropriate, including as
to those states to which and through which the Petitioner may
travel, and when the Petitioner must surrender his passport or
passports.

IT IS on this 20th day of June, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MAHMOUD KHALIL,

                Petitioner,

        v.

WILLIAM P. JOYCE, *et al.*,

               Respondents.

No. 25 Civ. 1935 (JMF)

SECOND SUPPLEMENTAL DECLARATION OF ACTING FIELD OFFICE DIRECTOR WILLIAM P. JOYCE

---

**SECOND SUPPLEMENTAL DECLARATION OF WILLIAM P. JOYCE**

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.     I am aware that Mahmoud Khalil ("Khalil") has filed an Amended Petition for a Writ for Habeas Corpus before this Court.

3.     As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.      On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.      On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. at 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m. and arrived at 9:20 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States ("Exhibit A").  HSI also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.      Due to the lack of available detention space available to ERO New York, aliens arrested by ICE in that AOR are often detained at facilities in other AORs. This is an operational necessity to prevent overcrowding in ICE facilities.

9.      Orange County Jail in Goshen, New York did not have available detention space to accommodate Khalil and many ICE detention facilities throughout the Northeastern United States

are near or at capacity and engaged in efforts to relocate detained aliens to regions with available bedspace.

10.      Between March 8, 2025, and March 9, 2025, ERO New York transported sixteen detained aliens, including Khalil, from ERO New York's AOR to New Orleans Field Office of Enforcement and Removal Operations ("ERO New Orleans") AOR. Most of these transfers were for ongoing detention, while a small number were being staged for removal.  ERO New Orleans has administrative control of eight different detention facilities, meaning that AOR is often able to accommodate transfers when other AORs are not.

11.      Newark Field Office of Enforcement and Removal Operations ("ERO Newark") indicated that Elizabeth Detention Facility in Newark, New Jersey was experiencing and continues to experience a bedbug issue that prevented them from accepting detainees as full transfers. ERO New York did not request bed space from Philadelphia Field Office of Enforcement and Removal Operations ("ERO Philadelphia") or Buffalo Field Office of Enforcement and Removal Operations ("ERO Buffalo") based on awareness of general paucity of bedspace in those AORs compared to the known availability of bedspace in ERO New Orleans' AOR, as well as the need for those AORs to accommodate their own ongoing operations.

12.      While Khalil was at 26 Federal Plaza, ERO sought and obtained bedspace for Khalil from the ERO New Orleans Field Office.  The bedspace request for Khalil was made at 10:49 p.m. on March 8, 2025.  The travel packet for Khalil and his escorting officers was finalized at 3:57 a.m. on March 9, 2025, with a flight scheduled for 2:35 p.m. on March 9, 2025.

13.      ERO New York was responsible for locating bed space to detain Khalil and made its decisions on where to detain him based solely on operational considerations.

14.     ERO New York did not receive any directives or instructions pertaining to Khalil's detention.

15.     ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff. ICE ERO policy number 11087.2 dictates that absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours.

16.     In compliance with this policy, upon completion of initial processing, Khalil departed 26 Federal Plaza at 1:40 a.m. and ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025.  Elizabeth Detention Facility has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff. As stated above, Khalil could not be housed at Elizabeth Detention Facility long-term due to the bedbug issue, so he remained there only until his flight to New Orleans.

17.     At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

18.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

19.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., Central Time and he has been detained at that detention facility since that time. ICE has no current plans or intentions to transfer Khalil from ERO New Orleans' AOR during the pendency of removal proceedings.

20.    Except for this ongoing lawsuit, ERO New York is not involved in Khalil's

immigration removal proceedings which are pending before the LaSalle Immigration Court in

Jena, Louisiana.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this 17 day of March 2025.



WILLIAM P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

# Exhibit A

DEPARTMENT OF HOMELAND SECURITY

# NOTICE TO APPEAR

DOB: ▮▮▮▮

Event No: ▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮    FINS: ▮▮▮▮    File No: ▮▮▮▮

In the Matter of:

Respondent: MAHMOUD KHALIL _____ currently residing at:

▮▮▮▮

(Number, street, city, state and ZIP code)                    (Area code and phone number)

[ ] You are an arriving alien.

[ ] You are an alien present in the United States who has not been admitted or paroled.

[X] You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

[ ] This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

[ ] Section 235(b)(1) order was vacated pursuant to:    [ ] 8CFR 208.30    [ ] 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY
_____
(Complete Address of Immigration Court, including Room Number, if any)

on   March 27, 2025   at   8:30 AM   to show why you should not be removed from the United States based on the
     (Date)                (Time)

charge(s) set forth above.        TIMOTHY MORAN – Supervisory Special Agent TIMOTHY M MORAN JR   _Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.09 00:41:11 -05'00'_
_____
(Signature and Title of Issuing Officer)

Date:   March 9, 2025 _____   26 Federal Plaza, New York, NY _____
                                              (City and State)

DHS Form I-862 (6/22)                                                          Page 1 of 3

Add.084

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations will be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____          _____
                                                                                    *(Signature of Respondent)*

_____                                    Date: _____
*(Signature and Title of Immigration Officer)*

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 9, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) Refused to sign (VB)                              TIMOTHY M MORAN JR  Digitally signed by TIMOTHY M MORAN JR   Date: 2025.03.09 16:41:28 -05'00'

*(Signature of Respondent if Personally Served)*          TIMOTHY MORAN - Supervisory Special Agent
                                                                                    *(Signature and Title of officer)*

---

DHS Form I-862 (6/22)                                                                                    Page 2 of 3

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO APPEAR

DOB: ▮▮▮▮▮▮

Event No: ▮▮▮▮▮▮▮

**In removal proceedings under section 240 of the Immigration and Nationality Act:**

Subject ID: ▮▮▮▮     FINS: ▮▮▮▮▮     File No: ▮▮▮▮▮▮

In the Matter of:

Respondent:  MAHMOUD KHALIL _____ currently residing at:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Number, street, city, state and ZIP code)                    (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of SYRIA and a citizen of ALGERIA;

3. You were admitted to the United States at unknown place on or about unknown date as a unknown manner;ORYour status was adjusted to that of a lawful permanent resident on November 2024 under section 212 (a)(3)(C) of the Act;

4. The Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States.

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(4)(C)(i) of the Immigration and Nationality Act, as amended, in that the Secretary of State has reasonable ground to believe that your presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:     ☐ 8CFR 208.30     ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

830 PINEHILL RD JENA LA 71342. LASALLE DETENTION FACILITY
(Complete Address of Immigration Court, including Room Number, if any)

on  March 27, 2025  at   8:30 AM   to show why you should not be removed from the United States based on the
   (Date)              (Time)

charge(s) set forth above.        TIMOTHY MORAN - Supervisory Special Agent   TIMOTHY M MORAN JR   Digitally signed by TIMOTHY M MORAN JR Date: 2025.03.08 06:41:15 -05'00'
                                 (Signature and Title of Issuing Officer)

Date:   March 9, 2025              26 Federal Plaza, New York, NY
                                        (City and State)

DHS Form I-862 (6/22)                                              Page 1 of 3

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

**One-Year Asylum Application Deadline:** If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

**Failure to appear:** You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

**Mandatory Duty to Surrender for Removal:** If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

**U.S. Citizenship Claims:** If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

**Sensitive locations:** To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

---

### Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before: _____

_____
*(Signature of Respondent)*

_____
*(Signature and Title of Immigration Officer)*

Date: _____

---

### Certificate of Service

This Notice To Appear was served on the respondent by me on <u>March 9, 2025</u>, in the following manner and in compliance with section 239(a)(1) of the Act.

[X] in person    [ ] by certified mail, returned receipt # _____ requested    [ ] by regular mail

[ ] Attached is a credible fear worksheet.

[ ] Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the _____ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

(X) Refused to sign (VB)

_____
*(Signature of Respondent if Personally Served)*

TIMOTHY M MORAN JR   Digitally signed by TIMOTHY M MORAN JR
Date: 2025.03.09 10:41:28 -05'00'

TIMOTHY MORAN - Supervisory Special Agent
_____
*(Signature and Title of officer)*

---

DHS Form I-862 (6/22)

Page 2 of 3

**Privacy Act Statement**

**Authority:**
The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**
You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**
For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**
Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

DHS Form I-862 (6/22)

U.S. Department of Homeland Security
Immigration and Customs Enforcement

**Additional Charges of Inadmissibility / Deportability**

**In:**    [ x ]  **Removal proceedings under section 240 of the Immigration and Nationality Act**

   [   ]  **Deportation proceedings commenced prior to April 1, 1997, under former section 242 of the Immigration and Nationality Act**

**In the Matter of:**
Alien/Respondent: _____ Mahmoud Khalil _____

File No: _                                                        Address:  830 Pinehill Road, Jena, Louisiana 71342

[ ] - 1.  You are an arriving alien.
[ ] 2.  You are an alien present in the United States who has not been admitted or paroled.
[X] 3.  You have been admitted to the United States, but are removable for the reasons stated below.

There is/are hereby lodged against you the following allegation(s), [   ] in addition to or [X] in lieu of, those set forth in the original charging document:

1.  You are not a citizen or national of the United States;
2.  You are a native of Syria and a citizen of Algeria;
3.  You were admitted to the United States at John F. Kennedy International Airport, Queens, New York, on or about December 20, 2022, as an F-1 nonimmigrant student to attend Columbia University in New York, New York;
4.  Your status was adjusted to that of a conditional lawful permanent resident on November 16, 2024, based on marriage to a U.S. Citizen spouse, under section 245(a) of the Immigration and Nationality Act;
5.  The Secretary of State has determined that your activities and presence in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest;
6.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer;
7.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 3, page 6, you failed to disclose your continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022.
8.  On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question part 8, page 9, you failed to disclose that you were a member of the Columbia University Apartheid Divest (CUAD).

There is/are hereby lodged against you the following charge(s), [X] in addition to or [   ] in lieu of, those set forth in the original charging document:

Section 237(a)(1)(A) of the Immigration and Nationality Act, as amended, in that at the time of entry or of adjustment of status, you were within one or more of the classes of aliens inadmissible by the law existing at such time, to wit: aliens who seek to procure, or have sought to procure, or who have procured a visa, other documentation, or admission into the United States, or other benefit provided under the Act, by fraud or by willfully misrepresenting a material fact, under Section 212(a)(6)(C)(i) of the Act.

Dated: 3/17/2025

_____
(Signature of Deportation Officer)

FORM I-261

Add.090

## Notice to Respondent

**Warning:** Any statement you make may be used against you in removal proceedings.

**Alien Registration:** This copy of the Notice to Appear served upon you is evidence of your alien registration while you are under removal proceedings. You are required to carry it with you at all times.

**Representation:** If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this Notice.

**Conduct of the hearing:** At the time of your hearing, you should bring with you any affidavits or other documents which you desire to have considered in connection with your case. If any document is in a foreign language, you must bring the original and a certified English translation of the document. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing.

At your hearing, you will be given the opportunity to admit or deny any or all of the allegations in the charging document and that you are inadmissible or deportable on the charges contained in the charging document. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government.

You will be advised by the immigration judge before whom you appear, of any relief from removal for which you may appear eligible including the privilege of departing voluntarily. You will be given a reasonable opportunity to make any such application to the immigration judge.

**Failure to appear:** You are required to provide the INS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change you address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the INS.

---

### Certificate of Service

This charging document was served on the respondent on __3/17/25__ , in the following manner in compliance with section 239(a)(1)(F) of the Act.

☒ in person ☐ by certified mail, return receipt requested ☐ by regular mail

to: __830 Pinehill Rd Jena LA 71342__
(Alien's address)

☒ The alien was provided oral notice in the __English__ language of the time and place of his or her hearing and of the consequences of failure to appear as provided in Section 240(b)(7) of the Act.

__Refuse to sign__
(Signature of respondent if personally served)

__[signature]__ DO
(Signature and title of officer)

---

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

Mahmoud KHALIL,

        *Petitioner*,

v.

Donald J. TRUMP, in his official capacity as
President of the United States; William P. JOYCE,
in his official capacity as Acting Field Office
Director of New York, Immigration and Customs
Enforcement; Caleb VITELLO, Acting Director,
U.S. Immigration and Customs Enforcement; Kristi
NOEM, in her official capacity as Secretary of the
United States Department of Homeland Security;
Marco RUBIO, in his official capacity as Secretary of
State; and Pamela BONDI, in her official capacity
as Attorney General, U.S. Department of Justice,

        *Respondents*.

Case No. 25-cv-01935

**AMENDED
PETITION FOR
WRIT OF HABEAS CORPUS
AND COMPLAINT**

## <u>INTRODUCTION</u>

1.      This case concerns the government's targeted, retaliatory detention and attempted removal of a student protestor because of his constitutionally protected speech. Petitioner Mahmoud Khalil is Palestinian, a lawful permanent resident of the United States, and a recent graduate student at Columbia University. Over the last year and a half, Mr. Khalil has been a mediator, an active participant in, and at times the public face of, student protests on Columbia's campus related to Israel's military campaign in Gaza. The Trump administration has made no secret of its opposition to those protests and has repeatedly threatened to weaponize immigration law to punish noncitizens who have participated.

2.      On or before March 8, 2025, Respondents adopted a policy ("the Policy") to retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Marco Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors.

3.      Pursuant to the Policy, Respondent Rubio, the Secretary of State, purportedly made such a determination as to Mr. Khalil (the "Rubio Determination"). Secretary Rubio made this determination based on Mr. Khalil's lawful activity protected by the First Amendment: his participation in protests and his statements regarding Palestine and Israel.

4.      Neither Secretary Rubio nor any other government official has alleged that Mr. Khalil has committed any crime or, indeed, broken any law whatsoever.

5.      Pursuant to the Rubio Determination, the Department of Homeland Security decided to arrest Mr. Khalil, detain him, and place him in removal proceedings. On the evening of March 8, 2025, agents from the Department of Homeland Security ("DHS") arrested Mr. Khalil with no prior notice at his home and initiated proceedings to remove him from this country. After repeatedly transferring him across jurisdictions, the government ultimately detained Mr. Khalil in Louisiana, a thousand miles from his attorneys and his wife, who is a U.S. citizen and due to give birth next month.

6.      During his arrest, the agents stated first that Mr. Khalil's "student visa"

was being "revoked." After learning that he was in fact a lawful permanent resident, they instead stated that status was being "revoked" too.

7.       It later came to light that the Department of Homeland Security was charging Mr. Khalil with being removable based on Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the "Foreign Policy Ground") and the Rubio Determination.

8.       The Rubio Determination and the government's subsequent actions, including its ongoing detention of Mr. Khalil in rural Louisiana, isolating him from his wife, community, and legal team, are plainly intended as retaliation and punishment for Mr. Khalil's protected speech and intended to silence, or at the very least restrict and chill, his speech now and in the future, all in violation of the First Amendment. Indeed, contemporaneous and subsequent statements by administration officials expressly characterize the invocation of this rarely used provision as punishment for Mr. Khalil's lawful and protected speech. The Rubio Determination and Mr. Khalil's unjustified detention also violate his due process rights. Finally, the government's unlawful Policy of targeting noncitizens for removal based on protected speech is arbitrary and capricious and contrary to law in violation of the Administrative Procedure Act, and viewpoint discriminatory in violation of the First Amendment. Accordingly, this Court should vacate the Rubio Determination and the Policy, order Mr. Khalil's immediate release, and set aside the government's unlawful policy.

## **PARTIES**

9.       Petitioner Mahmoud Khalil is a Palestinian, born in a refugee camp in Syria, who holds Algerian citizenship. He is married to a U.S. Citizen, a soon-to-be

father, a lawful permanent resident of the United States with no criminal history, and a Palestinian human rights activist on Columbia University's campus. In May 2025, he will graduate with a master's degree in public administration from the Columbia University's School of International and Public Affairs ("SIPA"), where he has been a student since January 2023. Mr. Khalil and his wife, who is eight months pregnant, live in Columbia's residential housing in New York City.

10.     Respondent Donald J. Trump is named in his official capacity as the President of the United States. In this capacity, he is responsible for the policies and actions of the executive branch, including the Department of State and Department of Homeland Security.   Respondent Trump's address is the White House, 1600 Pennsylvania Ave. NW, Washington, D.C. 20500.

11.     Respondent William P. Joyce is named in his official capacity as the Acting Field Office Director of the New York Field Office for Immigration and Customs Enforcement ("ICE") within the United States Department of Homeland Security. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations and is a custodian of Petitioner. Respondent Joyce's address is New York ICE Field Office, 26 Federal Plaza, New York, New York 10278.

12.     Respondent Caleb Vitello is the Acting Director of ICE. As the Senior Official Performing the Duties of the Director of ICE, he is responsible for the administration and enforcement of the immigration laws of the United States; routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to remove the Petitioner; and as such is a custodian of the Petitioner.

His address is ICE, Office of the Principal Legal Advisor, 500 12th St. SW, Mail Stop 5900, Washington, DC 20536-5900.

13. Respondent Kristi Noem is named in her official capacity as the Secretary of Homeland Security in the United States Department of Homeland Security. In this capacity, she is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(a) (2007); routinely transacts business in the Southern District of New York; is legally responsible for pursuing any effort to detain and remove the Petitioner; and as such is a custodian of the Petitioner. Respondent Noem's address is U.S. Department of Homeland Security, Office of the General Counsel, 2707 Martin Luther King Jr. Ave. SE, Washington, DC 20528-0485.

14. Respondent Marco Rubio is named in his official capacity as the United States Secretary of State. In this capacity, among other things, he has the authority to determine, based on "reasonable" grounds, that the "presence or activities" of a noncitizen "would have serious adverse foreign policy consequences for the United States." Following such a determination, DHS may initiate removal proceedings under 8 U.S.C. § 1227(a)(4)(C)(i) (INA § 237(a)(4)(C)(i).) In addition to his legal responsibilities under Section 237(a)(4)(C)(i), he routinely transacts business in the Southern District of New York and as such is a custodian of the Petitioner. His address is United States Department of State, 2201 C Street, NW, Washington, D.C. 20520.

15. Respondent Pamela Bondi is Attorney General of the United States. In this capacity, she routinely transacts business in the Southern District of New York; is responsible for the administration of the immigration laws pursuant to Section 103(a) of the INA, 8 U.S.C. § 1103(g) (2007); and as such is a custodian of the Petitioner.

Respondent Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530- 0001.

**JURISDICTION & VENUE**

16.     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 2241, Article I, § 9, cl. 2 (the Suspension Clause) and Article III of the U.S. Constitution, the Administrative Procedure Act, 5 U.S.C. § 701 et seq.; and 28 U.S.C. § 2201 (Declaratory Judgment).

17.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

18.     Venue is proper in the Southern District of New York Under 28 U.S.C. § 2241 and 28 U.S.C. § 1391. Petitioner is detained at the direction of Mr. Joyce, and a substantial part of the events giving rise to the claims and relevant facts occurred within this district. Moreover, according to the federal government's official records at the time of filing, Mr. Khalil was detained at 26 Federal Plaza at the time this habeas was initiated. The New York Field Office and Respondent Joyce directed Mr. Khalil's arrest and detention in New York, New York; told his counsel that he was being taken to 26 Federal Plaza in New York, New York; and entered his location on the ICE detainee locator as being in New York, New York. At the time of filing, the detainee locator stated that Mr. Khalil was held in New York, New York, information upon which his counsel reasonably relied to identify his location. To the extent the New York Field Office and Respondent

Joyce moved Mr. Khalil across state lines to New Jersey for a transitory period of time shortly before his habeas was filed, the New York Field Office prevented Mr. Khalil from communicating that information to his counsel in bad faith. Moreover, the New York Field Office then brought Mr. Khalil back across state lines to New York before then transferring him, after the filing of the instant petition, to Louisiana.

## FACTS

*Mr. Khalil's Background*

19.    Petitioner Mahmoud Khalil is Palestinian, but he grew up in a Palestinian refugee camp in Syria because his grandparents were forcibly removed from their ancestral home in Tiberias, Palestine. When war broke out in Syria, his family was again displaced and are now dispersed throughout Europe and West Asia.

20.    Mr. Khalil entered the United States on a student visa in or around December 2022 to pursue a Master's degree in Public Administration from the Columbia University's School of International and Public Affairs ("SIPA"). Mr. Khalil completed his program in December 2024, and has an anticipated graduation date of May 2025.

21.    Mr. Khalil became a Lawful Permanent Resident in 2024. Mr. Khalil and his wife, a U.S. citizen, are expecting their first child next month, in April 2025. Together, they live in an apartment building owned and operated by Columbia University.

*Mr. Khalil's Student Activism and Speech on Matters of Public Concern*

22.    As a Palestinian, Mr. Khalil has felt compelled to be an outspoken

advocate for Palestinian human rights and, since October 2023, has spoken repeatedly about Israel's military operation in Gaza. Mr. Khalil has called Israel's actions in Gaza a genocide and criticized Columbia University for, in his view, financing and in other ways facilitating such violence. Mr. Khalil is committed to peaceful protest and being a voice for his people.

23.     That commitment has taken on many forms. For example, in April 2023, Mr. Khalil became co-president of the Palestine Working Group at the School of International and Public Affairs (SIPA), where he helped organize educational events and lectures on Palestine. In the fall of 2023, Mr. Khalil became president of the Palestinian Student Society at Columbia (DAR), which "serves to engage with and celebrate Palestinian culture, history, and identity."

24.     Additionally, Mr. Khalil has acted as a mediator and negotiator, facilitating dialogue between Columbia University's administration and its students. In this role, Mr. Khalil has advocated for his peers to be treated humanely and fairly by the university, while helping to ensure student safety and the smooth functioning of the university. For example, in the Spring of 2024, Mr. Khalil facilitated negotiations between members of the Gaza Solidarity Encampment[1] and the university administration. Indeed, Mr. Khalil was approached to take on this role because of his prior work at a British Embassy overseas, an internship with the United Nations in New York, as well his established relationships with the university administration.

25.     Mr. Khalil stated in a CNN interview in Spring of 2024 that "as a

---

[1] *See* Isha Banerjee, *Timeline of the Gaza Solidarity Encampment*, Columbia Spectator (May 2, 2024), *available at* https://www.columbiaspectator.com/news/2024/05/02/timeline-the-gaza-solidarity-encampment/.

Palestinian student, I believe that the liberation of the Palestinian people and the Jewish people are intertwined and go hand-by-hand and you cannot achieve one without the other."  Mr. Khalil also explained that the student movement "is a movement for social justice and freedom and equality for everyone."[2]

26.     Mr. Khalil's prominence as an outspoken student activist, along with Columbia University's position as a national focal point of student protests against Israel's military campaign in Gaza over the past year and a half, has propelled Mr. Khalil into the public eye. His visibility has been further amplified through his continued participation in interviews with national and international media outlets, including the BBC and CNN, as well as local press conferences.

27.     Mr. Khalil's speech regarding international law, the obligations that the U.S. and Columbia University have under that law, the human rights of the Palestinian people, and related matters is speech protected by the First Amendment, including because it is speech on matters of public concern and is political speech at the core of the protection of the First Amendment.

28.     Like many student activists advocating for Palestinian rights, Mr. Khalil has endured immense scrutiny and personal attacks by private actors, including doxing and harassment. But until recently, he understood that because of the First Amendment, the government would not be able to retaliate against or punish him for his speech, or silence him by locking him up or banishing him from the country, even if powerful

---

[2] Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN (March 11, 2025), *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html. Chelsea Bailey, *Who is Mahmoud Khalil? Palestinian activist detained by ICE over Columbia University protests*, CNN, *available at*: https://www.cnn.com/2025/03/11/us/mahmoud-khalil-columbia-ice-green-card-hnk/index.html.

government officials disagreed with what he had to say.

***The Federal Government's Hostile Campaign Against Palestinian Rights Advocacy: A Concerted Effort to Silence Protected Political Speech***

29.     In the fall of 2023, students from diverse racial, ethnic, religious, and socioeconomic backgrounds—including Mr. Khalil—began to mobilize on their campuses, many criticizing what they characterized as their universities' and the United States government's unwavering support for Israel's policies. These protests included Jewish students who sought to convey the message that such policies were "not in our name." In response, opponents of these students' messages—including President Donald J. Trump—frequently characterized peaceful protest and any speech in favor of Palestinian rights as inherently  supportive of Hamas and antisemitic. For example, in several instances, he President Trump described a Jewish lawmaker who had criticized Israeli Prime Minister Benjamin Netanyahu as "a proud member of Hamas" and "a Palestinian," using "Palestinian" as a slur.[3]

30.     During his campaign for re-election, President Trump repeatedly vowed to revoke the visas of international students engaged in pro-Palestinian protests or who publicly criticized Israel's actions.

31.     For example, at a rally in Las Vegas on October 28, 2023, Trump pledged to "terminate the visas of all of those Hamas sympathizers, and we'll get them off our

---

[3] Niha Masih, *Trump draws condemnation for using 'Palestinian' as a slur against Schumer*, Washington Post (March 13, 2025), https://www.washingtonpost.com/politics/2025/03/13/trump-schumer-palestinian-slur/. Indeed, in his first term, President Trump also issued Executive Order 13899, titled "Combating Anti-Semitism," which, among other things, adopted a definition of antisemitism that includes plainly protected criticism of Israel and its policies. *See* 84 Fed. Reg. 68779 (Dec. 11, 2019) (including as an example of antisemitism "drawing comparisons of contemporary Israeli policy to that of the Nazis").

college campuses, out of our cities, and get them the hell out of our country."[4]

32.     While the Gaza Solidarity encampments at college campuses took place in the Spring of 2024, Trump promised campaign donors that he would deport pro-Palestinian student demonstrators to get them to "behave." Upon information and belief, at a round table event in New York, he stated, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[5]

33.     Similarly, in a social media post on his official X account on October 15, 2023, then-Senator Marco Rubio, referring to ongoing student protests in support of Palestinians, stated the U.S. should "cancel the visa of every foreign national out there supporting Hamas and get them out of America."[6]

***President Trump Issues Executive Orders to Target Speech of Noncitizen Protestors***

34.     Shortly after assuming office on January 20, 2025, President Trump signed two executive orders aimed at fulfilling the above campaign promises: Executive Order 14161, titled "Protecting the United States from Foreign Terrorists and other National Security and Public Safety Threats," signed on January 20, 2025, and Executive Order 14188, titled "Additional Measures to Combat Anti-Semitism," signed on January

---

[4] Andrea Shalal and Susan Heavey, *Trump administration to cancel student visas of pro-Palestinian protesters*, Reuters (Jan. 29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/.29, 2025), available at: https://www.reuters.com/world/us/trump-administration-cancel-student-visas-all-hamas-sympathizers-white-house-2025-01-29/

[5] *Trump told donors he will crush pro-Palestinian protestors*, Washington Post, available at: https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

[6] Twitter, *available at*: https://x.com/marcorubio/status/1713652113098539120. In the CNN interview he included as part of the same post, then-Senator Rubio stated that "people marching at universities" were "supporters of Hamas" and "need to go."

29, 2025.

**35.** Executive Order 14161 states that it is the United States' policy to "protect its citizens" from noncitizens who "espouse hateful ideology." It further articulates the administration's desire to target noncitizens who "advocate for, aid, or support designated foreign terrorists and other threats to our national security," those who hold "hateful" views, and those who "bear hostile attitudes toward [America's] citizens, culture, government, institutions, or founding principles." The order's broad framing of "hostile attitudes" towards the American government could encompass any form of political dissent, including Palestinian rights advocacy.

36. Executive Order 14188 states that, in order to "combat campus anti-Semitism," the administration will target for investigation "post-October 7, 2023, campus anti-Semitism." The order adopts a definition of antisemitism that includes constitutionally protected criticism of the Israeli government and its policies.[7] In a fact sheet accompanying Executive Order 14188, the White House described the measure as "forceful and unprecedented," specifically targeting "leftist, anti-American colleges and universities." It framed the order as a "promise" to "deport Hamas sympathizers and revoke student visas," sending a clear message to all "resident aliens who participated in pro-jihadist protests" that the federal government "will find you… and deport you."

***The Government Responds to Groups Identifying Noncitizen Protestors for Deportation By Adopting the Unlawful Policy***

37. In response to these Executive Orders and as part of an escalating attack

---

[7] *See supra* note 3 (describing definitions adopted in Executive Order 13899, titled "Combating Anti-Semitism," 84 Fed. Reg. 68779 (Dec. 11, 2019), and reaffirmed in Executive Order 14188).

on the core political speech at issue, prominent groups at Columbia University opposed to Palestinian rights protests began publicizing names of individuals they wanted the government to deport. Specifically, these groups compiled lists of students who had engaged in Palestine-related advocacy and, upon information and belief, submitted these lists to ICE's tip line.[8]

38. For example, Betar USA—a self-described "Zionist activist organization"[9]—has published lists of Columbia student protestors, urging ICE to deport them under the executive orders. In a statement to a media outlet, Betar stated that it had "already submitted names of hundreds of terror supporters to the Trump administration."[10]

39. Betar identified Mr. Khalil, specifically, as one of its targets for deportation, including him on their "deport list." On January 29, the organization posted on social media that ICE is "aware of his home address and whereabouts" and confirmed that they "have provided all his information to multiple contacts."[11]

40. Media reports in March of this year described widespread fear of retaliation for pro-Palestine speech among noncitizen students, noting that the executive

---

[8] https://theintercept.com/2025/02/15/columbia-alumni-israel-whatsapp-deport-gaza-protesters/
[9] https://betarus.org/; https://www.middleeasteye.net/explainers/betar-who-is-far-right-jewish-american-group-blood-gaza
[10] Nicholas Liu, *A pro-Israel group says it gave the Trump administration a list of students to deport*, Salon.com (Jan. 31, 2025), *available at* https://www.salon.com/2025/01/31/pledged-to-deport-pro-palestine--and-a-pro-israel-group-has-already-made-a-list/.
[11] https://x.com/Betar_USA/status/1884796686020550930. This social media post falsely accused Mr. Khalil of saying inflammatory statements. *See id. See also* https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

orders "already appear to be chilling political activism."[12]

41.     Then, the week beginning Monday, March 3, 2025, ICE was spotted on Columbia's campus, increasing fears and further chilling students' ability to speak freely.

42.     That same week, pro-Israel activists reportedly met with members of Congress as well as Secretary of State Rubio, specifically seeking Mr. Khalil's deportation.[13]

43.     On March 7, 2025, Mr. Khalil emailed the Columbia University interim president writing that, "I haven't been able to sleep, fearing that ICE or a dangerous individual might come to my home."[14]

44.     On or before March 8, 2025, Respondents adopted the Policy by which they would retaliate against and punish noncitizens like Mr. Khalil for their participation in protests concerning Israel's military campaign in Gaza. Under the Policy, Respondent Rubio, the Secretary of State, would make determinations that the protestors' presence or activities in the United States would have potentially serious foreign policy consequences for the United States and would compromise a compelling United States foreign policy interest. These determinations would then permit the Department of Homeland Security to seek to detain and deport the protestors

### DHS Arrests Mr. Khalil as a First Implementation of the Policy and a "Blueprint" for Future Investigations and Deportations of Prominent Student Activists

45.     On the evening of March 8, 2025, at approximately 8:30 p.m., Mr.

---

[12]     https://www.npr.org/2025/03/03/nx-s1-5307187/trump-executive-order-visa-pro-palestinian-foreign-students-protests-hamas-hezbollah-israel
[13]     https://forward.com/news/703018/mahmoud-khalil-columbia-cuad-ice/
[14]     https://zeteo.com/p/scoop-emails-show-mahmoud-khalil-ask-columbia-protection-ice

Khalil and his wife were returning to their apartment from an Iftar[15] dinner at a friend's home.

46.    When Mr. Khalil and his wife arrived at their apartment building, two individuals in plain clothes followed them into the lobby of the apartment building, which is owned and operated by Columbia University.

47.    The individuals approached Mr. Khalil and asked, "Are you Mahmoud Khalil?" When Mr. Khalil answered in the affirmative, the men identified themselves as being with the Department of Homeland Security ("DHS") and announced that they had to take Mr. Khalil into custody. Mr. Khalil heard them announce on a radio, "he's here," at which point Mr. Khalil noticed two other individuals approach from inside of the building. Based on their location, they would have required a key or otherwise been given permission to enter the building.

48.    Mr. Khalil asked whether the agents had a warrant and they said that they had one on the phone and that they would show it to him. However, the agents never showed him a warrant. Mr. Khalil asked why they were here and they asserted that Mr. Khalil's visa was revoked. Mr. Khalil explained that he has a green card. At this point, the agents were creating a barrier between Mr. Khalil and his wife. The agents threatened Mr. Khalil's wife that she would also be arrested if she did not comply.

49.    Mr. Khalil called his attorney, Amy Greer. Attorney Greer spoke with an agent who identified himself as Special Agent Elvin Hernandez. Agent Hernandez stated

---

[15] Iftar is the name of the evening meal eaten at sunset by Muslims to break their fast during the holy month of Ramadan.

they had an administrative warrant and that Mr. Khalil's student visa had been revoked by the U.S. Department of State and therefore they were detaining him. Despite several requests by Mr. Khalil to see the warrant, the agents never showed him the administrative warrant.

50. Mr. Khalil's wife then went to the apartment to retrieve Mr. Khalil's immigration documents. She saw another individual in plain clothes on their floor of the apartment building holding a radio.

51. Attorney Greer advised Agent Hernandez that Mr. Khalil is a lawful permanent resident and has the right to due process. Agent Hernandez responded that the Department of State had revoked Mr. Khalil's green card, too, and that he would be brought in front of an immigration judge. Agent Hernandez stated that he would be taking Mr. Khalil to 26 Federal Plaza, the location of the ICE Field Office in Manhattan, New York. When Attorney Greer began to ask more questions, Agent Hernandez hung up on her. When Mr. Khalil requested to call her back, Agent Hernandez refused to allow Mr. Khalil to speak to his attorney again.

52. Mr. Khalil's wife presented the DHS agents with documents confirming Mr. Khalil's status as a lawful permanent resident, handing them to an agent who was speaking on the phone. The agent looked confused when he saw the documents and said, "He has a green card" to the individual with whom he was on the phone. Mr. Khalil's wife heard the agent repeat that they were being ordered to bring Mr. Khalil in anyway.

53. The agents then handcuffed Mr. Khalil and brought him outside where

there were multiple unmarked vehicles waiting. Mr. Khalil's wife asked for the names of the agents, their contact information, and how to reach them to follow up on her husband's detention, but they only advised her that Mr. Khalil would be taken to 26 Federal Plaza and otherwise refused to speak with her. They left her no business card or any information at all as to how to find out where her husband would be taken, on what grounds, or who she could contact.

54.     The night of the arrest, Attorney Greer checked the ICE Detainee Locator ("ICE Locator") several times to confirm her client's location. She first checked the locator at 10:00 p.m. on Saturday, March 8th and found that Mr. Khalil was not yet listed in the system. She checked again at 1:35 a.m. on Sunday, March 9th, and saw that Mr. Khalil was listed as being in custody in New York. The ICE Locator entry also included an instruction to contact the New York field office. At 4:29 a.m. on Sunday, March 9,[16] Attorney Greer checked the locator once more, and the information remained the same. Shortly thereafter, at around 4:40 a.m. on Sunday, March 9th, Attorney Greer filed the original habeas corpus petition in in this case (ECF 2) in the Southern District of New York, based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza. During this time, Mr. Khalil made continuous requests to contact his attorney, including when agents asked him to sign several documents, but he was repeatedly denied.

55.     The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York. Sometime after 9 a.m. on Sunday, the

---

[16] Daylight Saving time began on March 9, meaning that clocks moved forward from 1:59am to 3am over the course of these events.

ICE locator changed to say that Mahmoud was detained in Elizabeth, New Jersey, at the Elizabeth Contract Detention Facility, a detention center privately owned and operated by the corporation CoreCivic. At 9:29 am, Mr. Khalil's immigration attorney attempted to call the Elizabeth facility twice, but no one answered. Around 11:20 a.m., Mahmoud's wife went to the Elizabeth Detention Center to see him, but she was told that Mahmoud was not showing up in the system.

56.    At 1:47 p.m. on Sunday, March 9, after counsel had submitted a G-28 and sent a 1:22 p.m. email to ICE asking to be connected with him immediately, ICE responded by email informing that Mr. Khalil was in the process of being transferred to a detention facility within the New Orleans ERO Field Office, over 1,000 miles away.[17] Counsel emailed the U.S. Attorney's Office for the Southern District of New York, which confirmed that Mr. Khalil was en route to Louisiana. Counsel requested Mr. Khalil's immediate return, but was told that ICE would not consent to his return absent a court order. When Mr. Khalil's counsel attempted to schedule a telephone call with Mr. Khalil—a process that typically occurs the same day or the next day in New York—authorities in the Louisiana ICE detention facility offered a date ten days away.

57.    Mr. Khalil's wife, who is 8-months pregnant, is unable to travel to Louisiana to see Mr. Khalil.

***Mr. Khalil's Experience being Transferred Repeatedly and in Detention in Louisiana***

58.    While at 26 Federal Plaza on the night of March 8, the ICE agents took Mr.

---

[17] According to the copy of the NTA that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours after his arrest.

Khalil's biometrics. As they did so, Mr. Khalil saw an agent approach Agent Hernandez and say, "the White House is requesting an update."

59.     Mr. Khalil was subsequently presented with several documents and asked to sign them, including a Notice to Appear ("NTA") for removal proceedings and a Custody Determination document. Mr. Khalil reviewed the NTA and Custody Determination and, because he did not fully understand the implications of signing them, he requested to speak with his lawyer before doing so. The ICE agent denied his request, prompting Mr. Khalil to refuse to sign.

60.     The copy of the NTA states "YOU ARE ORDERED to appear before the immigration judge of the United States Department of Justice at: 830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM to show why you should not be removed from the United States based on the charges set forth above." The copy is dated March 9, 2025, timestamped at 12:40 a.m., and signed by Supervisory Special Agent Timothy Moran at 26 Federal Plaza, New York, NY.

61.     At some point in the night, Mr. Khalil was transported in handcuffs and shackles to Elizabeth Detention Center in New Jersey ("Elizabeth") but was not allowed to take his belongings—his shoes, jacket, and belt—with him. When Mr. Khalil asked about his belongings, he was told that he would be coming back to 26 Federal Plaza tomorrow, but that he could not spend the night there.

62.     While at Elizabeth, Mr. Khalil again requested to speak with his lawyer, to which the officers responded that he would be allowed to do so after he was processed. Mr. Khalil spent the night in the cold waiting room for processing. Mr. Khalil requested a blanket but was denied. The next morning, as Mr. Khalil reached the front of the line to be

processed, he was informed that processing would not be completed because ICE was coming from New York to transport him.

63.     Around 12 p.m., ICE officers—one of whom Mr. Khalil believes he recognized from the night before at 26 Federal Plaza—handcuffed and shackled Mr. Khalil and placed him in a van. The van had Mr. Khalil's belongings inside that were kept in 26 Federal Plaza. Mr. Khalil was told he was then going to JFK without further clarification.

64.     At JFK, he was transferred to other government agents. None of the agents identified themselves or provided their badge information. At one point, Mr. Khalil noticed one of the agents received a text message instructing not to let his escort, Mr. Khalil, use his phone.

65.     Mr. Khalil took an American Airlines flight from JFK around 2:45 p.m. to Dallas, Texas. During that flight, Mr. Khalil saw one of the officers receive a text message that instructed him not to let Mr. Khalil have a phone call.

66.     Mr. Khalil arrived in Dallas, Texas around 5:30 p.m. and remained there until 9:30 p.m., at which time he was placed on another American Airlines flight—this time to Alexandria, Louisiana.

67.     Mr. Khalil arrived in in Alexandria, Louisiana around 1:00 a.m. on Monday March 10. Upon his arrival, he saw between about four to five agents waiting for him. He was again shackled and placed in handcuffs. He was then placed in an ICE car, driven for about a minute, and then placed in a police car. The agents drove him to Jena, Louisiana.

68.     Throughout this process, Mr. Khalil felt as though he was being kidnapped. He was reminded of prior experience fleeing arbitrary detention in Syria and

forced disappearance of his friends in Syria in 2013. It was shortly after this that Mr. Khalil left Syria.

69.     At no time throughout this process did any of the agents identify themselves.

70.     Mr. Khalil then arrived at the Louisiana Detention Facility, where he was processed again. During his initial medical examination in Elizabeth, Mr. Khalil notified agents that he has an ulcer and needs to take his medication for it every day. Despite this, he was not given access to his medication until Tuesday evening. He sleeps in a bunker without a pillow or blanket. He continues to worry about the wellbeing of 8-month pregnant wife and what will happen to them. He's also very concerned about missing the birth of his first child.   In fact, Mr. Khalil turned down job offers that would have required him to miss the birth of his child.  Throughout his wife's pregnancy, Mr. Khalil has been present for her doctor appointments.

71.     Mr. Khalil also recently secured a coveted job position after four months of searching, and was scheduled to start this role in April of this year. In addition to fearing the loss of his expected salary, Mr. Khalil and his wife planned to obtain medical insurance through this role in order to cover health care costs, including for the birth and care of their expected child. Mr. Khalil continues to worry about the loss of income and health care, especially so close to the expected birth of his child.

72.     It is very important to Mr. Khalil to be able to continue his protected political speech, advocating and protesting for the rights of Palestinians—both domestically and abroad. Indeed, Mr. Khalil was recently invited to go to Copenhagen to

attend the premiere of a documentary in which he is featured and to speak on the panel after the premiere.

### The Government Confirms that Mr. Khalil was Targeted for Deportation Because of His Protected Political Speech, in the First Implementation of their Policy

73.     On March 9, President Trump issued a statement on Truth Social applauding ICE for arresting Mr. Khalil, whom he described as a "Radical Foreign Pro-Hamas Student on the campus of Columbia University." The President warned that Mr. Khalil's arrest was "the first of many to come," declaring that his administration would not tolerate "students at Columbia and other universities across the country who have engaged in pro-terrorist, anti-Semitic, anti-American activity," while promising to "find, apprehend, and deport these terrorist sympathizers from our country."[18]

74.     The White House reposted President Trump's statement on the social media platform X, accompanied by a mug-style graphic featuring an image of Mr. Khalil. Surrounding the photo were the words "ARRESTED BY ICE ON MARCH 9, 2025" and "LED ACTIVITIES ALIGNED TO HAMAS." The White House caption included the phrase "SHALOM, MAHMOUD" before quoting the President's statement.[19]

75.     Secretary of State Marco Rubio stated, "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported."[20]

76.     The following day, the Department of Homeland Security issued a statement through its social media account, X, confirming Mr. Khalil's arrest by ICE was

---

[18] https://truthsocial.com/@realDonaldTrump/posts/114139222625284782
[19] https://x.com/WhiteHouse/status/1899151926777749618
[20] https://x.com/marcorubio/status/1898858967532441945

carried out "in support of President Trump's executive orders prohibiting anti-Semitism, and in coordination with the Department of State." The statement also accused Mr. Khalil of having "led activities aligned to Hamas, a designated terrorist organization" and asserted that both "ICE and the Department of State are committed to enforcing President Trump's executive orders and to protecting U.S. national security."[21]

77.     In a statement to The Free Press on March 10, a White House official stated that Mr. Khalil was a 'threat to the foreign policy and national security interests of the United States' and that the federal government's "basis" for targeting Mr. Khalil was being used "as a blueprint for investigations against other students."[22]

78.     On March 11, in response to an inquiry from the NY Times regarding Mr. Khalil's arrest, a spokesperson for the administration reportedly stated that "United States' foreign policy includes combating antisemitism across the globe and that Mr. Khalil's residency in the nation undermines that policy objective."[23]

79.     At a White House Press Briefing on March 11, Press Secretary Karoline Leavitt responded to questions about the arrest, asserting that the Secretary of State has "the right to revoke a green card or a visa for individuals who serve or are adversarial to the foreign policy and national security interest" and accusing Mr. Khalil of "siding with terrorists."[24]

80.     In a press conference regarding this case on March 12, 2025, Secretary of

---

[21] https://x.com/DHSgov/status/1898908955675357314;
https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/
[22] https://www.thefp.com/p/the-ice-detention-of-a-columbia-student
[23] https://archive.ph/rD4sk#selection-1147.0-1159.428
[24]         https://www.c-span.org/program/white-house-event/white-house-daily-briefing/657022
(timestamp 10:16)

State Rubio stated, "if you tell us that you are in favor of a group like this [Hamas], and if you tell us . . . I intend to come to your country as a student, and rile up all kinds of anti-Jewish . . . anti-Semitic activities," and "if you end up having a green card . . . we're going to kick you out."[25]

81. On March 13, 2025, when asked to justify the government's actions, Troy Edgar, the Deputy Secretary of DHS, did not dispute that Mr. Khalil had not broken any laws and instead asserted that he was "agitating and supporting Hamas" by "put[ting] himself in the middle of the process of basically pro-Palestinian activity." When asked directly if "any criticism of the Israeli government [is] a deportable offense," if "any criticism of the United States [is] a deportable offense," if "any criticism of the government [is] a deportable offense," and if "protesting [is] a deportable offense," Deputy Secretary Edgar did not dispute any of those statements.[26]

### DHS Invokes the INA's Foreign Policy Ground against Mr. Khalil, in violation of the INA and the Constitution

82. Mr. Khalil's counsel did not receive DHS's asserted legal basis for his arrest and detention until the afternoon of Tuesday, March 11, pursuant to an agreement with counsel for the government. His NTA states "the Secretary of State has determined that your presence or activities in the United States would have serious adverse foreign policy consequences for the United States." Citing Section 237(a)(4)(C)(i) of the Immigration and Nationality Act (the Foreign Policy Ground), the NTA further states "the Secretary of State has reasonable ground to believe that your presence or activities in the

---

[25] http://state.gov/secretary-of-state-marco-rubio-remarks-to-press/
[26] NPR, *Morning Edition* (March 13, 2025), *available at* https://www.npr.org/2025/03/13/nx-s1-5326015/mahmoud-khalil-deportation-arrests-trump.

United States would have potentially serious adverse foreign policy consequences for the United States."

83. The Rubio Determination was exclusively motivated by Mr. Khalil's lawful, constitutionally-protected past, current, or expected beliefs, statements, or associations. Public statements by government officials, up to and including the President and Secretary of State, establish that Respondents are punishing, detaining, and attempting to silence Mr. Khalil because of his constitutionally-protected past, current, or expected beliefs, statements, or associations.

84. The Foreign Policy Bar expressly prohibits the Secretary of State from issuing a policy to exclude or condition entry based on a noncitizen's "past, current, or expected beliefs, statements, or associations, if such beliefs, statements, or associations would be lawful within the United States," unless the Secretary personally certifies to Congress that admitting the individual would compromise a compelling U.S. foreign policy interest. *See id.* (citing INA § 212(a)(3)(C)(iii)). Upon information and belief, Secretary Marco Rubio has not provided any certifications regarding a determination under the Foreign Policy Ground concerning Mr. Khalil to the chairs of the House Foreign Affairs, Senate Foreign Relations, and House and Senate Judiciary Committees, as required by 8 U.S.C. § 1182(a)(3)(C)(iv).

85. Nor could he. Legislative history reveals that Congress intended to limit the Executive's authority to exclude noncitizens based on their speech or beliefs. When the Moynihan Amendment was passed in 1987, the Senate Committee warned that "[f]or many years, the United States has embarrassed itself by excluding prominent foreigners

from visiting the United States solely because of their political beliefs." The amendment was intended "to take away the executive branch's authority to deny visas to foreigners solely because of the foreigner's political beliefs or because of his anticipated speech in the United States," while affirming "the principles of the First Amendment." (S. Rep. No. 100–75 at 11, 100th Cong., 1st Sess. (1987), reprinted in 133 Cong. Rec. S2326 (1987)).

86.     Congress further evinced its intent to restrict the Executive's ability to exclude foreign speakers by asserting that such exclusions should not be based solely on "the possible content of an alien's speech in this country," that the Secretary's authority to determine that entry would compromise foreign policy interests should be used "sparingly and not merely because there is a likelihood that an alien will make critical remarks about the United States or its policies," and that the "compelling foreign policy interest" standard should be applied strictly. (H.R. Conf. Rep. No. 101-955, 101st Cong., 2nd Sess. (1990), reprinted in 1990 U.S.C.C.A.N. 6784, 6794).

87.     In the decades since the Foreign Policy Ground was enacted, it appears to have been rarely invoked and reserved for cases involving high-ranking government officials or an alleged terrorist removable on other grounds and subject to high-profile prosecutions in their country of origin. It does not appear to have ever been applied to any person for engaging in First Amendment protected speech.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM**
### **Violation of the First Amendment to the United States Constitution**

88.     Petitioner repeats and re-alleges the allegations contained in the preceding

paragraphs of this Complaint-Petition as if fully set forth herein. The First Amendment to the United States Constitution provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment protects past, present, and future speech, including speech by noncitizens.

89. The Rubio Determination and Policy Mr. Khalil's targeting, arrest, transfer, and ongoing detention violate the First Amendment because they:

• retaliate against and punish Mr. Khalil for his past protected speech;

• prevent him from speaking now (through detention);

• attempt to chill (through past punishment and ongoing threat) or prevent (through eventual removal) his future speech in the United States;

• deprive audiences of his present and future speech on matters of public concern; and

• chill other individuals from expressing views sympathetic to Palestinians.

90. These speech-related consequences are not side effects of an action with some other purpose; they are, instead, the point of the Determination and the government's subsequent actions against Mr. Khalil and are, in government officials' own telling, the result of their disagreement with his protected speech and the viewpoint it expresses.

## SECOND CLAIM
### Violation of the Due Process Clause of the Fifth Amendment to the United States Constitution

91. Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

92. The Constitution establishes due process rights for "all 'persons'

within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Black v. Decker*, 103 F.4th 133, 143 (2d Cir. 2024) (quoting *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)).

93.     The government's detention of Mr. Khalil is wholly unjustified. *See Black*, F.4th at 157 (collecting cases stating that "[w]here an individual's liberty is at stake, the Supreme Court has consistently required the government to justify continued detention by clear and convincing evidence."). The government has not demonstrated that Mr. Khalil—a husband to a U.S. citizen, soon-to-be father to a U.S. citizen, and lawful permanent resident with no criminal history—needs to be detained. *See Zadvydas*, 533 U.S. at 690 (finding immigration detention must further the twin goals of (1) ensuring the noncitizen's appearance during removal proceedings and (2) preventing danger to the community). There is no credible argument that Mr. Khalil cannot be safely released back to his family.

94.     Moreover, Mr. Khalil's detention is punitive as it bears no "reasonable relation" to any legitimate government purpose. *Zadvydas*, 533 U.S. at 690 (finding immigration detention is civil and thus ostensibly "nonpunitive in purpose and effect"). The sole basis of his detention—the Foreign Policy Ground and the Rubio Determination—are unlawful for the reasons discussed *supra*. Here, there is every indication that his "detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons." *Demore v. Kim*, 538 U.S. 510, 532-33 (2003) (Kennedy, J., concurring).

95.      The Policy and the Rubio Determination also violate Mr. Khalil's right to due process. The government's policy of Foreign Policy Ground making such

determinations concerning people like Mr. Khalil—lawful permanent residents, living peacefully in the country who engage in speech advocating for Palestinian rights—is unconstitutionally vague.

## THIRD CLAIM
### Violation of the Administrative Procedure Act and the *Accardi* Doctrine

96.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein. The government has adopted a policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights. This policy is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C), and violates the *Accardi* doctrine and federal agencies' own rules, *see Accardi v. Shaughnessy*, 347 U.S. 260 (1954). In addition, the Secretary of State's determination that Mr. Khalil's "presence or activities would potentially have serious adverse foreign policy consequences for the United States" and "would compromise a compelling United States foreign policy interest" is arbitrary and capricious, an abuse of discretion, contrary to constitutional right, contrary to law, and in excess of statutory jurisdiction. 5 U.S.C.A. § 706 (2)(A), (B), (C).

## FOURTH CLAIM
### Release on Bail Pending Adjudication

97.     Petitioner repeats and re-alleges the allegations contained in the preceding paragraphs of this Complaint-Petition as if fully set forth herein.

98.     This Court has the "inherent authority" to grant bail to habeas petitioners

like Mr. Khalil. *See Mapp v. Reno*, 241 F.3d 221, 230 (2d Cir. 2001) (holding that federal courts have inherent authority to set bail pending the adjudication of a habeas petition when the petition has raised substantial claims and extraordinary circumstances "make the grant of bail necessary to make the habeas remedy effective"). In considering a petitioner's fitness for bail, courts assess (1) "whether the petition raises substantial claims" and (2) "whether extraordinary circumstances exist that make the grant of bail necessary to make the remedy effective." *Elkimya v. Dep't of Homeland Sec.*, 484 F.3d 151, 154 (2d Cir. 2007) (cleaned up).

99.     This petition raises numerous substantial constitutional and statutory claims challenging Mr. Khalil's retaliatory detention. As for the second factor, extraordinary circumstances exist here that make Mr. Khalil's release necessary to make the remedy effective. As long as Mr. Khalil remains in ICE custody, he will be prevented from speaking freely and openly—instead, his speech is severely curtailed and controlled by DHS. And it is effectively impossible for him to speak to the broader public at all. His detention is also preventing him from adequately litigating his removal proceedings, which the government has chosen to justify only in the press. Moreover, Mr. Khalil's wife is eight months pregnant with their first child. Not only is she unable to visit him where ICE has chosen to detain him, in Louisiana, but his continued detention prevents him from caring for her at a critical time and will cause him to miss the birth of his first child. *See, e.g.*, *S.N.C. v. Sessions*, No. 18-CV-7680, 2018 WL 6175902, at *6 (S.D.N.Y. Nov. 26, 2018) (ordering immediate release of petitioner pending consideration of her claim that her abrupt deportation would violate her due process right to an opportunity to be heard on her application and in order to care for her children).

## **PRAYER FOR RELIEF**

WHEREFORE, Petitioner respectfully requests that this Court:

1)      Assume jurisdiction over this matter;

2)      Vacate and set aside Respondents' unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech advocating for Palestinian rights;

3)      Vacate and set aside the Rubio Determination;

4)      Enjoin Respondents from transferring the Petitioner from the jurisdiction of this

        District pending these proceedings;

5)      Order the immediate release of Petitioner pending these proceedings;

6)      Order the release of Petitioner;

7)      Declare that Respondents' actions to arrest and detain Petitioner violate the First Amendment and the Due Process Clause of the Fifth Amendment;

8)      Award reasonable attorneys' fees and costs for this action; and

9)      Grant such further relief as the Court deems just and proper.


Dated: March 13, 2025
New York, New York

                          /s/ *Amy Belsher*
                          Amy Belsher
                          Robert Hodgson
                          Veronica Salama
                          Molly Biklen
                          New York Civil Liberties Union
                          Foundation
                          125 Broad Street, 19th Floor

New York, N.Y. 10004
Tel: (212) 607-3300
abelsher@nyclu.org

*Counsel for Petitioner*

Omar Jadwat
Noor Zafar
Sidra Mahfooz*
Brian Hauss
Brett Max Kaufman
Esha Bhandari
Vera Eidelman
Tyler Takemoto*
American Civil Liberties Union Foundation
125 Broad Street, Floor 18
New York, NY 10004
ojadwat@aclu.org

*Application for admission* pro hac vice *forthcoming*

CLEAR PROJECT
MAIN STREET LEGAL SERVICES, INC.

Ramzi Kassem
Naz Ahmad
Shezza Abboushi Dallal
CUNY School of Law
2 Court Square
Long Island City, NY 11101
(718) 340-4558
ramzi.kassem@law.cuny.edu
naz.ahmad@law.cuny.edu
shezza.dallal@law.cuny.edu
CENTER FOR CONSTITUTIONAL RIGHTS

Baher Azmy
Samah Sisay
Diala Shamas
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6436
bazmy@ccrjustice.org
ssisay@ccrjustice.org
dshamas@ccrjustice.org

DRATEL & LEWIS

Amy E. Greer
29 Broadway, Suite 1412
New York, NY 10006
Phone:(212)732-8805
Fax: (212) 571-3792
Email: agreer@dratellewis.com

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MAHMOUD KHALIL,

                    Petitioner,

       v.

WILLIAM P. JOYCE, *et al.*,

                    Respondents.

No. 25 Civ. 1935 (JMF)

DECLARATION OF ACTING FIELD OFFICE
DIRECTOR WILLIAM P. JOYCE

**DECLARATION OF WILLIAM P. JOYCE**

I, WILLIAM P. JOYCE, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am an Acting Field Office Director ("(A)FOD") in the New York City Field Office of Enforcement and Removal Operations ("ERO New York") at U.S. Immigration and Customs Enforcement ("ICE") within the U.S. Department of Homeland Security ("DHS").

2.     I am aware that Mahmoud Khalil ("Khalil") has filed a Petition for a Writ for Habeas Corpus before this Court.

3.     As the (A)FOD, I am responsible for, among other things, oversight of the civil immigration arrest and detention of aliens in the New York City area. In my role as the (A)FOD, I have access to records maintained in the ordinary course of business by ICE, including documentary records concerning ERO New York and the alien detainees who fall within its responsibility.

4.      I provide this declaration based on my personal knowledge, reasonable inquiry, and information obtained from various records, systems, databases, other DHS employees, and information portals maintained and relied upon by DHS in the regular course of business.

5.      Khalil is a native of Syria and citizen of Algeria who entered the United States under a F1 visa on December 20, 2022.

6.      On November 16, 2024, Khalil obtained Lawful Permanent Resident ("LPR") status as the spouse of a United States citizen.

7.      On March 8, 2025, Special Agents from the ICE Homeland Security Investigations ("HSI") Office of the Special Agent in Charge for the New York Area of Responsibility ("AOR") arrested Khalil at 8:35 p.m. in front of 195 Claremont Avenue in Manhattan, New York, for the purpose of placing him in removal proceedings.  HSI transported him to 26 Federal Plaza at 8:44 p.m.  While at 26 Federal Plaza, HSI served Khalil with a Notice to Appear ("NTA"), which charged him as removable pursuant to 8 U.S.C. § 1227(a)(4)(C)(i), in that the Secretary of State has reasonable grounds to believe that his presence or activities in the United States would have potentially serious adverse foreign policy consequences for the United States.  ICE also served Khalil with a Notice of Custody Determination, notifying Khalil that his detention was governed by 8 U.S.C. § 1226(a) (immigration custody during removal proceedings).

8.      Upon completion of initial processing, ICE transported Khalil to Elizabeth Detention Facility in Newark, New Jersey, where he was physically present and booked into the detention facility at 2:20 a.m. Eastern Standard Time (3:20 a.m. Eastern Daylight Time) on March 9, 2025.

9.      At the time Khalil filed a petition for a writ of habeas corpus in the Southern District of New York, he was detained at Elizabeth Detention Facility in Newark, New Jersey.

10.     Elizabeth Detention Facility in Newark, New Jersey has comprehensive overnight accommodations for detainees such as beds and 24-hour medical staff whereas 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, EOIR hearings, medical treatment, intra-facility movement, or other processing into or out of a facility and it does not have beds or overnight medical staff.

11.     On March 9, 2025, Khalil departed Elizabeth Detention Facility at 11:30 a.m. and was brought to the airport to be transported to the Central Louisiana ICE Processing Facility in Jena, Louisiana.

12.     On March 10, 2025, Khalil was booked into the Central Louisiana ICE Processing Facility at 12:33 a.m., and he has been detained at that detention facility since that time.


I declare under penalty of perjury that the foregoing is true and correct.


Executed this _____ day of March 2025.

WILLIAM P JOYCE     Digitally signed by WILLIAM P JOYCE
Date: 2025.03.12 21:53:13 -04'00'
_____
William P. Joyce
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                               :

MAHMOUD KHALIL,                         :
                                                 :

                      Petitioner,        :
                                                 :                       25-CV-1935 (JMF)

            -v-                     :
                                               :                 <u>OPINION AND ORDER</u>

WILLIAM P. JOYCE et al.,           :
                                               :

                     Respondents.     :
                                                 :
------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

       At the heart of this case is the important question of whether and under what

circumstances the Government may rescind a person's lawful permanent resident status and

remove him from the United States.  It is raised by way of a petition for the writ of habeas

corpus, pursuant to 28 U.S.C. § 2241, that was filed on behalf of Mahmoud Khalil, a graduate

student at Columbia University.  On March 8, 2025, immigration authorities arrested and

detained Khalil, a green card holder and the husband of a United States citizen, based on a

determination by the Secretary of State of the United States that his "presence or activities in the

United States . . . would have potentially serious adverse foreign policy consequences for the

United States."  8 U.S.C. § 1227(a)(4)(C)(i).  In his Petition, Khalil alleges that the Secretary of

State made this determination to "retaliate against and punish" him for his "participation in

protests" on and around Columbia's campus "concerning Israel's military campaign in Gaza."

ECF No. 38 ("Petition"), ¶¶ 2-3.  He argues that his arrest, detention, and prospective removal

violate his First Amendment right to freedom of speech, his Fifth Amendment right to due

process of law, as well as the Administrative Procedure Act, 5 U.S.C. § 706(2).  Petition ¶¶ 88-

99.  He seeks an order directing his release from detention and setting aside the Secretary of State's determination.  *See id.* at Prayer for Relief ¶¶ 2-3, 5-6.

These are serious allegations and arguments that, no doubt, warrant careful review by a court of law; the fundamental constitutional principle that all persons in the United States are entitled to due process of law demands no less.[1]  But before the Court may review Khalil's allegations and arguments, it must confront a threshold question: whether it is the proper tribunal to even consider Khalil's Petition.  Generally, a person challenging his detention through a habeas petition is required to file that petition in the federal district where he is detained at the time of filing and to name as the respondent the custodian detaining him there.  The Supreme Court articulated and applied these "longstanding" rules — known as the "district of confinement" and "immediate custodian" rules — in a case that could be described as even more extraordinary than this one: a habeas petition filed on behalf of Jose Padilla, a United States citizen who was designated an "enemy combatant" and detained by the military.  *See Rumsfeld v. Padilla*, 542 U.S. 426, 449 (2004).  Lower courts, including this Court, have since held that these rules apply to habeas petitions filed by people held in immigration detention, such as Khalil, at least to the extent that they seek release.  Relying on the district-of-confinement and immediate-custodian rules, the Government moves to dismiss Khalil's Petition or to transfer it to the Western District of Louisiana, where he was taken by the Government on March 10, 2025, and has since been detained.  By contrast, Khalil argues that this Court should hear his Petition; in

---

[1]      In many instances, a person who argues that the Government's efforts to remove him from the United States are unlawful must await entry of a final order of removal and then file in the appropriate court of appeals a petition for review of that order.  *See, e.g., Michalski v. Decker*, 279 F. Supp. 3d 487, 492-95 (S.D.N.Y. 2018); *Yearwood v. Barr*, 391 F. Supp. 3d 255, 262-63 (S.D.N.Y. 2019).  The Court need not and does not address whether that is the route that Khalil must take to raise the claims that he brings in his petition here.

the alternative, he argues that it should be transferred to the District of New Jersey, where he was detained at the time that his lawyer filed the Petition, not to the Western District of Louisiana.

For the reasons set forth below, the Court agrees with the Government that Khalil's Petition cannot be heard in this District and agrees with Khalil that it should be transferred to the District of New Jersey, not dismissed or transferred to the Western District of Louisiana. These conclusions flow from the undisputed fact that, at 4:40 a.m. on March 9, 2025, when Khalil's lawyer filed the Petition on his behalf, he was detained in New Jersey. A straightforward application of the district-of-confinement and immediate-custodian rules therefore dictates that Khalil's Petition should have been filed in the United States District Court for the District of New Jersey, not in this Court. Khalil makes various arguments in an effort to avoid that conclusion, most notably seizing on a concurring opinion in *Padilla*, in which Justice Anthony M. Kennedy, joined by Justice Sandra Day O'Connor, observed that he "would acknowledge an exception" to the district-of-confinement and immediate-custodian rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." 542 U.S. at 454 (Kennedy, J., concurring). But it is not clear that Justice Kennedy's opinion is the law of the land; nor has any court ever found that his exceptions applied. In any event, even if Justice Kennedy's exceptions were the law (or the Court were to adopt them), they would not aid Khalil. That is because he has not alleged facts indicating that his transfer from this District to the District of New Jersey — the only transfer relevant to the jurisdictional analysis — was done for an improper purpose or that the Government was not forthcoming about his whereabouts in a way that meaningfully affected his ability to seek, let alone obtain, judicial review of his detention.

For these reasons, elaborated upon below, the Court concludes that it may not entertain Khalil's Petition.  But the Court rejects the Government's requests to dismiss the case or to transfer it to the Western District of Louisiana.  As to the former, transfer, rather than dismissal, is the path that courts usually take in these circumstances.  That path is all the more appropriate in this case, as dismissal would mean vacatur of this Court's order barring Khalil's removal from the United States until his claims can be addressed, *see* ECF No. 9, and thus might allow the Government to frustrate Khalil's effort to obtain judicial review of his claims by removing him from the country before a court could rule.  Moreover, Khalil filed in the wrong district through no fault of his own; his lawyer reasonably relied on the information made available to her by the Government at the time of filing.  As to the latter, the Court concludes that a straightforward application of well-established federal law mandates transfer of the case to the District of New Jersey because, under the immediate-custodian and district-of-confinement rules, it is the one and only district in which Khalil could have filed his Petition at the time this action commenced. Congress has prescribed the district to which this case must be transferred, and it is New Jersey. The Court is no less bound by these laws to transfer to the District of New Jersey than it is bound by the immediate-custodian and district-of-confinement rules to decline jurisdiction.

In many ways, this is indeed an exceptional case, and there is a need for careful judicial review.  Such judicial review is especially critical when, as here, there are colorable claims that the Executive Branch has violated the law or exercised its otherwise lawful authority in an arbitrary and discriminatory manner.  *See Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  But the Supreme Court has made clear that the "longstanding" immediate-custodian and district-of-confinement rules apply without regard for whether a case is "'exceptional,' 'special,' or 'unusual.'"  *Padilla*, 542 U.S. at 449-50.  And in an exceptional case, it is all the more important

for a court to apply well-established principles to the facts, lest emotions or passions interfere with reasoned analysis; that is the essence of the rule of law. For the reasons that follow, the Court concludes that well-established principles call for this Court to transfer Khalil's Petition to the United States District Court for the District of New Jersey, and the Court orders that the case be so transferred forthwith. To preserve the status quo and ensure that Khalil gets an opportunity to have his claims heard in due course, the Court's Order barring the Government from removing Khalil, *see* ECF No. 9, shall remain in effect unless and until the transferee court orders otherwise. It will be up to that court to consider Khalil's claims as well as the motions that he has filed to date in connection with his claims, namely a motion to transfer him from his present place of confinement to a detention facility in this District, ECF No. 11; a motion for release on bail, ECF No. 53; and a motion for preliminary injunctive relief, ECF No. 66.

## RELEVANT FACTS

Many of the facts in this case are hotly contested. For instance, the Petition depicts Khalil — who entered the United States in December 2022 on a student visa to attend Columbia University's School of International and Public Affairs, is married to a United States citizen, and has been a lawful permanent resident since 2024 — as an outspoken but peaceful leader of student protests held at Columbia University against Israel's actions in Gaza since the atrocities of October 7, 2023. Petition ¶¶ 20-29. By contrast, the Government has issued statements describing Khalil as leading "activities aligned to Hamas," "siding with terrorists," and a "threat to the foreign policy and national interests of the United States." *Id.* ¶¶ 74, 76-77, 79. More significant for present purposes, the Secretary of State has made a formal finding that Khalil's "presence or activities in the United States would have serious adverse foreign policy consequences for the United States," *id.* ¶ 82; *see also* ECF No. 48, at 7 (Notice to Appear), and,

on that basis, the Government apparently canceled Khalil's green card and now seeks his removal from the United States, *see* 8 U.S.C. § 1227(a)(4)(C)(i).

Significantly, however, the facts relevant to the threshold question of where this case should be heard — all of which relate to events between March 8 and 10, 2025 — are not really in dispute. On March 8, 2025, at approximately 8:30 p.m., agents from the United States Department of Homeland Security ("DHS") arrested Khalil outside his Columbia University apartment in New York City. Petition ¶¶ 45-48; ECF No. 48 ("Mar. 14, 2025 Joyce Decl."), ¶ 7. The agents approached Khalil and his wife and asked him to confirm his identity. Petition ¶ 47. When he did, the agents identified themselves as DHS agents and declared that they were taking him into custody. *Id.* Khalil asked why the agents were there, to which they replied that Khalil's visa had been revoked. *Id.* ¶ 48. Khalil then called his attorney, Amy Greer, who spoke with one of the agents present — Special Agent Elvin Hernandez — and explained that Khalil is a lawful permanent resident. *Id.* ¶¶ 49-51. Hernandez responded that the State Department had also revoked Khalil's green card and that he would be brought before an immigration judge. *Id.* ¶ 51.[2] The agents handcuffed Khalil, then informed his wife and lawyer that they were taking him to 26 Federal Plaza, the Immigration and Customs Enforcement ("ICE") Field Office in Manhattan. *Id.* ¶¶ 51-53. They proceeded to take him there, arriving at 9:20 p.m. *Id.* ¶ 58; Mar. 14, 2025 Joyce Decl. ¶ 7.

Once Khalil arrived at 26 Federal Plaza, ICE agents took his biometrics. Petition ¶ 58. While there, Khalil overheard an agent say to Agent Hernandez that "the White House is

---

[2]     The Petition alleges that when Khalil's wife presented to one of the DHS agents documents "confirming Mr. Khalil's status as a lawful permanent resident," the agent "looked confused" and said to someone on the telephone: "'He has a green card.'" Petition ¶ 52. Khalil's wife then "heard the agent repeat that they were being ordered to bring Mr. Khalil anyway." *Id.*

requesting an update." *Id.* Khalil was then asked to sign a Notice to Appear ("NTA") for removal proceedings, a document that provides notice of the grounds for a noncitizen's removal from the country, and a Notice of Custody Determination, a document that provides notice of the grounds for a noncitizen's detention during removal proceedings. *Id.* ¶ 59; Mar. 14, 2025 Joyce Decl. ¶ 7. The Notice to Appear ordered Khalil to appear before an immigration judge at "830 Pinehill Rd, Jena, LA, 71342, LASALLE DETENTION FACILITY on March 27, 2025 at 8:30 AM." Petition ¶ 60; *see* ECF No. 48, at 7. The document was dated March 9, 2025, and the issuing officer's signature was timestamped at 12:40 a.m. Petition ¶ 60; *see* ECF No. 48, at 7-8. An ICE agent denied Khalil's request to speak with his lawyer about the Notice to Appear and the Notice of Custody Determination, and Khalil refused to sign the documents. Petition ¶ 59.

In the meantime, Greer began checking ICE's online Detainee Locator in an effort to locate Khalil. She first did so at 10:00 p.m. on March 8, 2025, but Khalil was not yet listed in the system. *Id.* ¶ 54. She checked the Detainee Locator again at 1:35 a.m. on Sunday, March 9, 2025, at which time Khalil was listed as being in custody in New York. *Id.* At 4:29 a.m., Greer checked the Detainee Locator again and observed that Khalil was still listed as being in New York. *Id.*[3] Eleven minutes later, at 4:40 a.m., Greer filed the Petition on Khalil's behalf; she filed it in this District "based on information and belief that ICE was still holding Mr. Khalil at 26 Federal Plaza" (which is located in this District). *Id.*; *see also* ECF No. 2. The Petition named as Respondents William P. Joyce, the Acting Field Office Director of the New York Field Office for ICE; Caleb Vitello, the Acting Director of ICE; Kristi Noem, the Secretary of DHS; and Pamela Bondi, the Attorney General of the United States. *See* ECF No. 2, ¶¶ 2-5. (The Petition has since been amended to name two additional Respondents, Donald J. Trump, the

---

[3]     Although it is immaterial for present purposes, the Court notes that, on March 9, 2025, at 2:00 a.m. (Eastern Standard Time), the time changed to 3:00 a.m. (Eastern Daylight Time).

President of the United States; and Marco Rubio; the Secretary of State, and is now styled "Amended Petition for Writ of Habeas Corpus and Complaint."  *See* Petition ¶¶ 10, 14.)

Significantly, it turns out that Khalil was no longer in the Southern District of New York when Greer filed the Petition.  Declarations filed by the Government — and not disputed by Khalil — reveal that, on March 9, 2025, at 1:40 a.m. (Eastern Standard Time), ICE agents transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility in Newark, New Jersey, into which he was booked at 3:20 a.m. (Eastern Daylight Time — i.e., forty minutes after leaving 26 Federal Plaza).  *See e.g.*, Mar. 14, 2025 Joyce Decl. ¶ 14; *see* ECF No. 32 ("Mar. 12, 2025 Joyce Decl."), ¶ 8.  According to the Government, 26 Federal Plaza is a "Hold Room facility" used only for temporary detention and "does not have beds or overnight medical staff." Mar. 14, 2025 Joyce Decl. ¶ 13.  Further, ICE policy provides that, "absent exceptional circumstances, no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* (discussing ICE ERO policy number 11087.2).  "In compliance with this policy," ICE transported Khalil from 26 Federal Plaza to the Elizabeth Detention Facility.  *Id.* ¶ 14.  The Government explains this move on the ground that, "[d]ue to a lack of detention space available" to ICE's New York Field Office, noncitizens arrested by ICE in the New York City area are frequently detained at facilities located elsewhere.  *Id.* ¶ 8.  It further explains that the Orange County Jail, which is located in this District, "did not have available detention space."  *Id.* ¶ 9.

Although Khalil had left New York by 3:20 a.m. on March 9, 2025, the ICE Detainee Locator was not updated until later that morning.  *See* Petition ¶ 55 ("The next morning, around 8:30 a.m. on Sunday, March 9, the ICE locator indicated that Mr. Khalil was still in New York.").  "Sometime after 9 a.m." that day, the Detainee Locator changed to say — accurately — that he was detained at the Elizabeth Detention Facility in New Jersey.  *Id.*  At 9:29 a.m., Khalil's immigration attorney twice attempted to call the Elizabeth Detention Facility, but no one

answered. *Id.* At around 11:20 a.m. the same day, Khalil's wife went to the Elizabeth Detention Facility to see him, but she was informed that Khalil was not showing up in the system. *Id.*

At 11:30 a.m., agents removed Khalil from the Elizabeth Detention Facility to take him to the Central Louisiana ICE Processing Facility (also known as the LaSalle Detention Facility) located in Jena, Louisiana, where his removal hearing was noticed to occur on March 27, 2025. Mar. 14, 2025 Joyce Decl. ¶¶ 16-17; *see* Petition ¶ 60; ECF No. 48, at 7. The Government explains that the Elizabeth Detention Facility "was experiencing and continues to experience a bedbug issue that prevented [the facility] from accepting detainees as full transfers." Mar. 14, 2025 Joyce Decl. ¶ 11. Therefore, even before Khalil was moved from 26 Federal Plaza to the Elizabeth Detention Facility, the New York ICE office had requested and secured bedspace for Khalil from the New Orleans ICE Field Office and began arranging a flight to transport him there at 2:35 p.m. on March 9, 2025. *Id.* ¶ 12; ECF No. 72 ("Mar. 17, 2025 Joyce Decl."), ¶ 12.[4] The Government maintains that the New York Field Office "was responsible for locating bed space to detain Khalil," that it "did not receive any directives or instructions pertaining to Khalil's detention," and that it "made its decisions on where to detain him based solely on operational considerations." Mar. 17, 2025 Joyce Decl. ¶¶ 13-14.

Around noon on March 9, 2025, agents took Khalil to John F. Kennedy Airport in the Eastern District of New York (presumably passing back through the Southern District of New York en route). Mar. 14, 2025 Joyce Decl. ¶ 16; *see* Petition ¶ 63. At 1:22 p.m., Khalil's counsel emailed ICE in an effort to reach him; at 1:47 p.m., ICE responded — truthfully — by

---

[4] The Government represents that Khalil was one of sixteen detained noncitizens transported from the New York Field Office's area of responsibility to the New Orleans Field Office's area of responsibility between March 8, 2025, and March 9, 2025. Mar. 14, 2025 Joyce Decl. ¶ 10. Most of these transfers were for ongoing detention, as with Khalil, while a "small number" were moved there in preparation for removal from the country. *Id.*

email that Khalil was in the process of being transferred to a detention facility within the New Orleans ICE Field Office's area of responsibility. Petition ¶ 56. Khalil's counsel then contacted the U.S. Attorney's Office for the Southern District of New York, which confirmed that Khalil was en route to Louisiana. *Id.* Meanwhile, at John F. Kennedy Airport, Khalil boarded a flight at around 2:45 p.m. that brought him to Dallas, Texas, in the Northern District of Texas. *See id.* ¶ 65. From there, Khalil was placed on another flight at around 9:30 p.m., which landed in Alexandria, Louisiana, in the Western District of Louisiana, at around 1:00 a.m. on March 10, 2025. *Id.* ¶¶ 66-67. From there, agents drove Khalil to the Louisiana Detention Facility in Jena, Louisiana, in the Western District of Louisiana, into which he was booked at 1:33 a.m. on March 10, 2025. *Id.* ¶¶ 67, 70; Mar. 14, 2025 Joyce Decl. ¶ 17. He remains there today. Mar. 17, 2025 Joyce Decl. ¶ 19. The Government represents that "ICE has no current plans or intentions to transfer Khalil from [that facility] during the pendency of removal proceedings." *Id.*

## DISCUSSION

The "merits of this case" — involving, among other things, the rights of a person lawfully present in the United States to the protections of the First and Fifth Amendments to the United States Constitution — are "indisputably of profound importance." *Padilla,* 542 U.S. at 450 (internal quotation marks omitted). As the Supreme Court has admonished, however, "it is surely just as necessary in important cases as in unimportant ones that courts take care not to exceed their respective jurisdictions established by Congress." *Id.* at 450-51 (internal quotation marks omitted). Thus, before the Court may address the merits of Khalil's important claims, it must address the Government's contention — made in a motion to dismiss or transfer Khalil's Petition — that it is not the proper tribunal to hear those claims. For reasons that follow, the Court agrees with the Government that it may not entertain the merits of Khalil's Petition, and it agrees with Khalil that the proper course is to transfer the Petition to the District of New Jersey.

## A. This Court Lacks Jurisdiction to Consider Khalil's Petition

The Court begins with the central question of whether it may entertain Khalil's Petition given the undisputed fact that he was not in this District when his lawyer filed the Petition.

### 1. Applicable Law

The starting point for analysis is *Rumsfeld v. Padilla*, the Supreme Court's most recent and most relevant decision on the question of where a habeas petition can be heard. *Padilla* involved a United States citizen who was initially detained in the Southern District of New York on a material witness warrant (in connection with a grand jury investigation into the September 11th terrorist attacks), but then transferred into military custody in Charleston, South Carolina upon being designated by President George W. Bush as an "enemy combatant." 542 U.S. at 430. Two days after his transfer to South Carolina, Padilla's lawyer filed a habeas petition, pursuant to 28 U.S.C. § 2241, in the Southern District of New York, naming as respondents the President, the Secretary of Defense, and the Commander of the Consolidated Naval Brig in Charleston, where Padilla was then detained. *Id.* at 432. The Supreme Court granted certiorari to consider, among other things, whether Padilla properly filed his habeas petition in this District. *Id.* at 434. That question, the Court concluded, "br[oke] down into two related subquestions": first, who the proper respondent was for Padilla's petition, and second, where his petition seeking relief against that respondent should have been filed. *Id.*

As to the former, the Supreme Court concluded that both the statutory language of the federal habeas statute and its previous decision in *Wales v. Whitney*, 114 U.S. 564 (1885), confirmed the "longstanding practice" that in a "core" habeas petition challenging "present physical confinement," the proper respondent is the "the warden of the facility where the petitioner is being held," not a "remote supervisory official." *Padilla*, 542 U.S. at 435. The Court called this the "immediate custodian rule." *Id.* In reaching that conclusion, the Supreme

Court rejected the petitioner's argument that its decision in *Ex parte Endo*, 323 U.S. 283 (1944), called for a contrary result.  In *Endo*, the Supreme Court had allowed a habeas petition by a Japanese-American citizen originally interned in California to proceed against the official responsible for her custody in California, even after she was transferred to Utah.  *Padilla*, 542 U.S. at 440.  According to the *Padilla* Court, *Endo* stood only "for the important but limited proposition" that a petitioner's relocation after a "properly file[d]" habeas petition does not deprive a district court of jurisdiction.  *Id*. at 441.

As to the latter subquestion, the Court looked again to the "plain language" of the federal habeas statute — which limits district courts to granting relief "within their respective jurisdictions," 28 U.S.C. § 2241 — to conclude that a habeas petition naming a prisoner's custodian can be filed in only one district: "the district of confinement."  542 U.S. at 442 (internal quotation marks omitted).  "The proviso that district courts may issue the writ only 'within their respective jurisdictions,'" the Court reasoned, "forms an important corollary to the immediate custodian rule in challenges to present physical custody under § 2241.  Together they compose a simple rule that has been consistently applied in the lower courts . . . : Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent and file the petition in the district of confinement."  *Id.* at 447-48.  This "simple rule," the Court continued, "serves the important purpose of preventing forum shopping by habeas petitioners" as well as "district courts with overlapping jurisdiction."  *Id.* at 447.

Applying the immediate-custodian and district-of-confinement rules, the Supreme Court concluded that Padilla's petition could not be heard in the Southern District of New York.  Notably, the Court rejected Padilla's "request for a new exception" to these rules "based upon the 'unique facts' of [the] case."  *Id.* at 441.  The Court rightly acknowledged that Padilla's

detention was "undeniably unique in many respects" but declared that, "at bottom," it was "a simple challenge to physical custody imposed by the Executive — the traditional core of the Great Writ. There is no indication that there was any attempt to manipulate behind Padilla's transfer . . . , and the Government did not attempt to hide from Padilla's lawyer where it had taken him." *Id.* Later in its opinion, the majority explicitly rejected the dissent's view that the Court had previously "made various exceptions to the immediate custodian and district of confinement rules whenever 'exceptional,' 'special,' or 'unusual' cases have arisen." *Id.* at 448. If the dissent's "view were accepted," the majority explained, "district courts would be consigned to making ad hoc determinations as to whether the circumstances of a given case are 'exceptional,' 'special,' or 'unusual' enough to require departure from the jurisdictional rules this Court has consistently applied. We do not think Congress intended such a result." *Id.* at 450.

The majority opinion in *Padilla* was joined by five Justices. But one of those Justices, Justice Kennedy, filed a concurring opinion, joined by Justice O'Connor, to make two points. First, he noted that the rules governing habeas jurisdiction "are not jurisdictional in the sense of a limitation on subject-matter jurisdiction" and instead implicate questions of "personal jurisdiction or venue." *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring). That means both that objections to petitions on those grounds "can be waived by the Government" and that the rules themselves are "subject to exceptions." *Id.* at 452. Second, Justice Kennedy wrote that he "would acknowledge an exception" to the immediate-custodian and district-of-confinement rules "if there is an indication that the Government's purpose in removing a prisoner were to make it difficult for his lawyer to know where the habeas petition should be filed, or where the Government was not forthcoming with respect to the identity of the custodian and the place of detention." *Id.* at 454. If, for example, "the Government had removed Padilla from the Southern District of New York but refused to tell his lawyer where he had been taken," Justice Kennedy

would have concluded that the Southern District of New York "had jurisdiction over the petition. Or, if the Government did inform the lawyer where a prisoner was being taken but kept moving him so a filing could not catch up to the prisoner, again, in [his] view, habeas jurisdiction would lie in the district or districts from which he had been removed." *Id.*

The *Padilla* Court explicitly reserved judgment on whether the immediate-custodian rule applies in the immigration context, *see id.* at 435 n.8, and the Second Circuit has not decided the issue either, *see Henderson v. I.N.S.*, 157 F.3d 106, 128 (2d Cir. 1998). In the years since, however, "a clear majority of courts in this circuit" — including *this* Court, on at least five separate occasions — "have held that the 'immediate custodian' rule applies" to "core" immigration habeas cases in which a petitioner challenges his or her detention pending removal "and that jurisdiction [in such cases] lies only in the district of confinement." *Singh v. Holder*, No. 12-CV-4731 (JMF), 2012 WL 5878677, at *2 (S.D.N.Y. Nov. 21, 2012) (internal quotation marks omitted) (collecting cases); *see Suraiya v. Cioppa*, No. 18-CV-6628 (JMF), ECF No. 18 (S.D.N.Y. Aug. 6, 2018); *Thomas v. Decker*, No. 19-CV-8690 (JMF), ECF No. 26 (S.D.N.Y. Oct. 17, 2019); *Tazu v. Barr*, No. 19-CV-1716 (JMF), ECF No. 16 (S.D.N.Y. Mar. 1, 2019); *Traore v. Decker*, No. 18-CV-7909 (JMF), ECF No. 9 (S.D.N.Y. Sept. 13, 2018); *see also Andoh v. Barr*, No. 19-CV-8016 (PAE), 2019 WL 4511623, at *2 (S.D.N.Y. Sept. 18, 2019) ("The substantial majority of judges in this District to consider this question have reached the same conclusion, holding that a defendant detained in New Jersey who seeks to challenge his detention, even if under the supervision of ICE personnel in this District, must bring a habeas action in the District of New Jersey." (citing *Almazo v. Decker*, No. 18-CV-9941 (PAE), 2018 WL 5919523, at *1 (S.D.N.Y. Nov. 13, 2018) (collecting cases))). By contrast, courts have generally held that for "non-core" habeas proceedings — for example, proceedings in which a

petitioner seeks "a stay of deportation or an adjustment of status" — jurisdiction can be proper outside the district of confinement.  *Singh*, 2012 WL 5878677, at *2 (citing cases).

2. **Analysis**

As Khalil was in New Jersey when his lawyer filed the Petition here, this Court would plainly lack jurisdiction if the immediate-custodian and district-of-confinement rules apply in the normal course.  Khalil presses three arguments to avoid that conclusion, but none of his arguments are persuasive.  The first two can be swiftly rejected.  First, citing the fact that the Supreme Court and the Second Circuit have not addressed whether the immediate-custodian rule applies in the immigration habeas context, Khalil contends that Joyce, the Acting Field Director of the ICE New York Field Office, was his "immediate custodian" at the time of filing because Joyce "took and never relinquished custody over Mr. Khalil" until he arrived in Louisiana.  ECF No. 50 ("Pet.'s Opp'n"), at 12.  But this Court does not write on a clean slate.  As noted above, joining "a substantial majority" of judges in this District, *Andoh,* 2019 WL 4511623, at *2, it has rejected this exact legal argument no fewer than five times.  It is a fundamental rule-of-law principle that like cases must be treated alike.  *See Pepper v. United States*, 562 U.S. 476, 510 (2011) (Breyer, J., concurring in part and concurring in the judgment) ("A just legal system seeks not only to treat different cases differently but also to treat like cases alike.").  That principle requires that the Court adhere to its prior conclusion here, even if the underlying circumstances of this case may be more unusual and more troubling than those in its prior cases.  Put simply, those underlying circumstances are not relevant to the purely legal question of whether, as a general matter, the immediate-custodian rule applies to immigration habeas petitions.

Second, Khalil argues that application of the immediate-custodian and district-of-confinement rules is inappropriate because his Petition asserts both "core" and "non-core" habeas claims.  *See* Pet.'s Opp'n 16-17.  True, in addition to seeking release from detention, he

seeks injunctive and declaratory relief with respect to the Secretary of State's determinations that led to his detention and removal proceedings. *See, e.g.*, *S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 406-07 (S.D.N.Y. 2018) (stating that "challenges to immigration-based detention" are "'core' immigration-based habeas challenges" but "challenges to forms of custody other than physical confinement, such as orders of removal" are not). In support of this argument, Khalil relies on *Calderon v. Sessions*, 330 F. Supp. 3d 944 (S.D.N.Y. 2018), in which a judge of this Court held that a district court may adjudicate "core" habeas claims even where the immediate-custodian and district-of-confinement rules point elsewhere if the petition's accompanying "non-core" claims "predominate," *id.* at 952. As Khalil all but acknowledges, however, *Calderon* is an outlier. *See* Pet.'s Opp'n 17 n.5. Most courts have correctly concluded that its approach "run[s] afoul of *Padilla*'s . . . rule: that 'core' claims must be brought in the district that has territorial jurisdiction over the custodian of the petitioner's present physical detention." *S.N.C.*, 325 F. Supp. 3d at 409; *see, e.g.*, *Sow v. Whitaker*, 18-CV-11394 (GBD) (RWL), 2019 WL 2023752, at *4 (S.D.N.Y. May 8, 2019) (citing cases). "When faced with a 'mixed' petition," these courts have held, "the approach most faithful to *Padilla*" is to order transfer "to the district that has *both* (a) territorial jurisdiction over the immediate custodian and (b) venue and personal jurisdiction over the legal custodian." *S.N.C.*, 325 F. Supp. 3d at 409 (emphasis added).

In any event, Khalil's "mixed petition" argument would almost certainly fail for either of two other reasons as well. First, all of his claims, at bottom, present a challenge to his detention. That is, Khalil seeks to vacate and set aside the Secretary of State's determination that his "presence or activities in the United States" would have "potentially serious foreign policy consequences for the United States" and seeks to enjoin Respondents' allegedly "unlawful Policy of targeting noncitizens for removal based on First Amendment protected speech." Petition ¶ 2; *id.* at Prayer for Relief, ¶¶ 2-3. But if the Court were to grant this relief, it would necessarily

require Khalil's release because without the Secretary of State's determination, Khalil would still be a lawful permanent resident and, as the Government concedes, he could not then "be detained."  ECF No. 71 ("Gov't Reply"), at 9 n.6 (citing 8 U.S.C. § 1226(a), which only authorizes "detention pending removal proceedings").  Thus, Khalil's challenges to the revocation of his lawful permanent residence status are "unavoidably a challenge to [his] detention" and, in the circumstances here, likely "core" claims themselves.  *Andoh*, 2019 WL 4511623, at *3.  And second, even if Khalil's Petition is construed to bring "non-core" claims, it does not follow that they should be heard here.  Instead, as discussed below, the Court would, in that instance, exercise its discretion to ensure that such claims are heard by a court that, unlike this Court, has the authority to consider Khalil's entire Petition.

Khalil's final argument — which relies on Justice Kennedy's concurrence in *Padilla* — is perhaps his most compelling, but it too falls short.  *See* Pet.'s Opp'n 7-12.  For one thing, it is far from clear that Justice Kennedy's opinion is the law of the land.  The majority opinion in *Padilla* "enjoy[ed] the assent of five Justices" — including Justices Kennedy and O'Connor — which means that Justice Kennedy's concurrence cannot be construed as "the holding of the Court."  *Marks v. United States*, 430 U.S. 188, 193 (1977).  And the majority opinion itself referred to Justice Kennedy's proffered "exceptions" to the immediate-custodian rule as only "proposed," not "recognized."  542 U.S. at 435-36 ("No exceptions to this rule, either recognized or proposed, *see post* at 454 (KENNEDY, J., concurring), apply here." (footnote omitted)).  Since *Padilla*, a smattering of district courts have cited Justice Kennedy's opinion, some as if it were binding law.  *See, e.g.*, *Salcedo v. Decker*, No. 18-CV-8801 (RA), 2019 WL 339642, at *2 n.3 (S.D.N.Y. Jan. 18, 2019); *Sow*, 2019 WL 2023752, at *5; *Redding v. Thompson*, No. 17-CV-2740, 2018 WL 850147, at *6 (D. Minn. Jan. 23, 2018); *Xia v. King*, No. 24-cv-2000, 2025 WL 240792, at *2 (D. Minn. Jan 17, 2025); *Russell v. Bureau of Prisons*, No. 20-CV-1082, 2021 WL

7208910, at *4 n.5 (E.D. Ark. Sept. 27, 2021); *Vidal-Martinez v. Prim*, No. 20-CV-5099, 2020 WL 6441341, at *5 n.6 (N.D. Ill. Nov. 3, 2020); *see also Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *8 (D. Colo. June 13, 2024) (describing Justice Kennedy as having "proposed" exceptions to the immediate-custodian rule).  But Khalil does not cite, and the Court has not found, a single example of Justice Kennedy's opinion being applied to award relief.  From the get-go, then, Khalil's final argument rests on a shaky foundation.

Ultimately, however, the Court need not and does not decide whether Justice Kennedy's exceptions are good law because, even if they are, Khalil's attempts to invoke them fall short.  Critically, in determining whether Justice Kennedy's exceptions would apply, the proper focus of the analysis is on the one and only transfer of Khalil with jurisdictional relevance: his transfer from 26 Federal Plaza in this District to the Elizabeth Detention Facility in the District of New Jersey.  After all, it was the Government's transfer and detention of Khalil there in the hours before Khalil's lawyer filed the Petition that, under the "longstanding" rules reaffirmed in *Padilla*, would make this Court an improper forum to adjudicate his claims.  542 U.S. at 449.  In other words, in considering the applicability of Justice Kennedy's proposed exceptions, the central questions are whether (1) "there is an indication that the Government's purpose in removing" Khalil from this District to the District of New Jersey was "to make it difficult for his lawyer to know where the habeas petition should be filed" and (2) whether, at the time of filing, "the Government was not forthcoming with respect to the identity of the custodian and the place of detention."  *Id.* at 454 (Kennedy, J., concurring).  The circumstances surrounding Khalil's later transfer to Louisiana, which post-dated the filing of his Petition, may shed some light on these questions, but they are ultimately secondary to the relevant legal analysis.

First, Khalil does not allege any facts giving rise to the plausible inference that the Government's "purpose" in moving him to New Jersey was "to make it difficult for his lawyer to

know where the habeas petition should be filed." *Id.* At the outset, this Court can attest from its own experience that noncitizens arrested and detained by immigration authorities in New York City are routinely processed at 26 Federal Plaza and then transferred to New Jersey for detention. *See, e.g.*, *see Suraiya*, No. 18-CV-6628 (JMF), ECF No. 17; *Thomas*, No. 19-CV-8690 (JMF), ECF No. 26; *Tazu*, No. 19-CV-1716 (JMF), ECF No. 14; *Traore*, No. 18-CV-7909 (JMF), ECF No. 9. That experience is far from anomalous. *See e.g., Abraham v. Decker*, 18-CV-3481 (CBA), 2018 WL 3387695, at *1 (E.D.N.Y. July 12, 2018) (petitioner arrested in Brooklyn, charged as removable at 26 Federal Plaza, then transferred to a New Jersey detention facility); *Xiu Qing You v. Nielsen*, No. 18-CV-5392 (GBD) (SN), 2020 WL 2837022, at *2 (S.D.N.Y. June 1, 2020) (petitioner arrested in Manhattan, held initially at 26 Federal Plaza, then transferred "[a]fter hours of waiting" to a New Jersey detention facility); *Montrevil v. Decker*, 20-CV-264 (WFK) (LB), 2021 WL 11690690, at *1 (E.D.N.Y. July 19, 2021) (petitioner arrested in Queens, held at 26 Federal Plaza "for several hours," then transferred to a New Jersey detention facility); *Sow*, 2019 WL 2023752, at *1 (petitioner arrested at his home, brought to 26 Federal Plaza, then moved "[l]ater that same day or evening" to New Jersey detention facility).

Against this backdrop, the Court cannot conclude that the Government's transfer of Khalil from New York to New Jersey was done to prevent his lawyer from promptly challenging his detention in federal court. Khalil's lawyers do not allege that they were prepared to file the Petition any earlier than 4:40 a.m. And, within a matter of hours, the Government did truthfully disclose Khalil's whereabouts, first via the online Detainee Locator "[s]ometime after 9 a.m.," Petition ¶ 55, and later that afternoon in communications with Khalil's counsel, *see id.* ¶ 56. What is more, all of this took place on a Sunday between 1:40 a.m. (Eastern Standard Time) and "[s]ometime after 9 a.m." (Eastern Daylight Time) — that is, at a time when the federal courts were closed. It would have been one thing if the Government had covertly transferred Khalil at a

time when federal courts were able and ready to consider a habeas petition. But in this case, Khalil's lawyer could not have obtained immediate relief even if she had known where he was detained at the moment she filed the Petition. Put differently, the Government disclosed Khalil's whereabouts to his lawyer well before any federal court could or would have entertained his Petition. Given these circumstances, there is no basis to conclude that the Government's purpose in transferring Khalil from New York to New Jersey was to frustrate the Great Writ.

That conclusion is compelling even if the Court were not to consider the Government's explanations for Khalil's transfer to New Jersey, but it is nearly inescapable if the Court does. In sworn declarations, the Government attests that the transfer was a function of its standard operating procedures and "operational considerations." Mar. 17, 2025 Joyce Decl. ¶ 13. The declarations affirm that noncitizens arrested by immigration authorities in New York are "often detained at facilities in other [areas of responsibility]" due to the "lack of available detention space" in New York. *Id.* ¶¶ 8-9. They further explain that "ICE's facility at 26 Federal Plaza is a Hold Room facility used for detention of individuals awaiting removal, transfer, . . . intra-facility movement, or other processing into or out of a facility" and that, pursuant to ICE policy, "no detainee should be housed in a Hold Room facility for longer than 12 hours." *Id.* ¶ 15. For these reasons, the Government explains, Khalil was moved to the Elizabeth Detention Facility, which was equipped with "overnight accommodations for detainees such as beds and 24-hour medical staff." *Id.* ¶ 16. Khalil does not controvert these explanations, which are consistent with the Court's experience and the case law cited above.[5]

---

[5] The Government invokes the "presumption of regularity" that attaches to many official acts of public officials. Gov't Reply 6-7 & n.2 (citing *Nat'l Archives and Records Admin. v. Favish*, 541 U.S. 157, 174 (2004)). It is not clear, however, that the presumption is appropriate here. *See Proctor v. LeClaire*, 846 F.3d 597, 608 n.4 (2d Cir. 2017) n.4 ("While we afford prison officials wide-ranging deference in the adoption and execution of policies designed to promote institutional safety, Defendants cite no case, and we cannot find one, that applies such a

Khalil cites the Government's "movement of him across four states" to suggest ICE treated him anomalously.  Pet.'s Opp'n 10-11.  But as discussed above, the only transfer that occurred prior to the filing of the Petition — that is, the only jurisdictionally relevant transfer — was the transfer from the short-term holding facility in New York to the Elizabeth Detention Facility in New Jersey, and Khalil fails to cast doubt on the Government's explanation that this specific transfer was a function of its standard operating procedures.

In any event, considering Khalil's later transfers — on the theory that they shed light on the Government's purpose in transferring him to New Jersey in the first instance — would not warrant a different conclusion.  The practical, and unfortunate, reality is that "the Government regularly transfers detained noncitizens between facilities, often multiple times." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 570 (2022) (Sotomayor, J., concurring in the judgment in part and dissenting in part); *see also Demore v. Kim*, 538 U.S. 510, 554 (2003) (Souter, J., concurring in part and dissenting in part) (explaining that immigration officials "detain, transfer, and isolate aliens away from their lawyers, witnesses, and evidence"); *see also Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 448 (3d Cir. 2021) (noting that "continuous transfer" can "permeate[] the reality of ICE detention").  And transfers to remote locations are routinely made without any prior notice to counsel.  *See Anariba*, 17 F.4th at 448 (discussing how "the Government often repeatedly moves ICE detainees to remote locations far from counsel or their community without informing counsel of the transfer" (internal quotation marks omitted)); *Bell v. Ashcroft*, No. 03-CV-766 (HB), 2003 WL 22358800, at *3 (S.D.N.Y. Oct. 15, 2003)

_____

presumption in a constitutional challenge to state prison officials' periodic review of [Administrative Segregation].  We decline to do so today." (cleaned up)).  Moreover, "the presumption of regularity — to the extent it is not rebutted — requires a court to treat the Government's record as accurate; it does not compel a determination that the record establishes what it is offered to prove."  *Latif v. Obama*, 677 F.3d 1175, 1180-81 (D.C. Cir. 2011).  In any event, the Court need not and does not decide the issue.

(observing that "aliens in federal custody are routinely transferred . . . to other, often far-away, facilities"); *Orantes-Hernandez v. Meese*, 685 F. Supp. 1488, 1500 (C.D. Cal. 1988) ("INS follows a general practice of transferring detained class members from the place of arrest to detention centers located in remote and isolated areas."), *aff'd sub nom. Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990). However unusual or disturbing the circumstances leading to Khalil's arrest and detention may have been, his transfers from facility to facility — and, most critically, from 26 Federal Plaza to the Elizabeth Detention Facility on March 9, 2025 — do not appear to be that unusual. They are certainly not unusual enough for the Court to disregard the "longstanding" district-of-confinement and immediate-custodian rules.

Khalil also contends that the fact that his transfers took place "rapidly" — that is, in under twenty-four hours — "means [the Government's] conduct goes even more to the core of Justice Kennedy's concerns." Pet.'s Opp'n 12. But the swift nature of Khalil's transfer does not help his argument. For one thing, rapid transfers from one immigration detention facility to another also appear to be common, *see, e.g.*, *Xiu Qing You*, 2020 WL 2837022, at *2; *Montrevil*, 2021 WL 11690690, at *1; *Sow*, 2019 WL 2023752, at *1, and Khalil cites nothing to suggest otherwise. For another, to the extent that the core purpose of Justice Kennedy's exceptions is to "prevent the Kafkaesque specter of supplicants wandering endlessly from one jurisdiction to another in search of a proper forum," *Eisel v. Sec. of the Army*, 477 F.2d 1251, 1258 (D.C. Cir. 1973), that purpose is not served where, as here, the Government truthfully disclosed the petitioner's whereabouts within hours (on a Sunday no less) and the transfers concluded in short order. The absence of the gamesmanship with which Justice Kennedy was concerned is only underscored by the fact that, "[a]ccording to the copy of the [Notice to Appear] that Mr. Khalil's Counsel received on March 11, ICE was already preparing to transfer Mr. Khalil to the Central Louisiana ICE Processing Center while he was still detained at 26 Federal Plaza a few hours

after his arrest." Petition ¶ 56 n.17. In short, the full record does not support the idea that "the government played forum games or kept moving [Khalil] so that his filing could not catch up." *Griffin v. Ebbert*, 751 F.3d 288, 290 & n.2 (5th Cir. 2014) (citing *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring)).

Khalil is arguably on firmer ground in seeking to avail himself of Justice Kennedy's second proposed exception — for when "the Government was not forthcoming with respect to the identity of the custodian and the place of detention," *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring) — if only because the exception does not appear to require any showing of improper purpose. But here too, his arguments fall short. Once again, the relevant question is whether the Government was insufficiently forthcoming as to Khalil's detention *in New Jersey*. It was not. At the moment of arrest, the Government truthfully informed Khalil's wife and his attorney that he was being taken to 26 Federal Plaza. *See* Petition ¶¶ 51, 53. Between then and the moment the Petition was filed, Khalil's attorney never asked a Government official for additional information about Khalil's whereabouts. Instead, she relied on ICE's online Detainee Locator, which did not reflect Khalil's transfer from New York to New Jersey for a period of approximately six hours. *See* Petition ¶ 55; *see also* Mar. 17, 2025 Joyce Decl., ¶ 16. But those hours were in the middle of the night on a weekend when, as noted, Khalil's lawyer could not even have obtained the relief that he later sought. Thus, assuming for the sake of argument that the Government was in some way not "forthcoming," as Justice Kennedy used that term, it did nothing to materially frustrate Khalil's access to the Great Writ.

Moreover, the one-time overnight delay in updating the online Detainee Locator, without more, is not enough to support an "inference of Government secrecy." *Padilla*, 542 U.S. at 450 n.17. Although not cited by either party here, ICE's own policies require only that it notify a detainee's lawyer "as soon as practicable on the day of transfer" and "in no circumstances later

than twenty-four (24) hours after the transfer occurs." U.S. ICE, Policy No. 11022.1(5.3)(2)(a) (2012); *see also Sow*, 2019 WL 2023752, at *5 (holding that Justice Kennedy's exception did not apply even where ICE failed to provide notice within twenty-four hours because "there is no allegation that the Government refused to tell [the petitioner's] lawyer where he had been taken" (cleaned up)). And the reality is that "the Government often repeatedly moves ICE detainees to remote locations . . . without informing counsel of the transfer or updating the ICE detainee locator." *Anariba*, 17 F.4th at 448 (internal quotation marks omitted). Plainly, therefore, this is not the exceptional scenario Justice Kennedy imagined, in which "the Government had removed [its detainee] from the Southern District of New York but refused to tell his lawyer where he had been taken." *Padilla*, 542 U.S. at 454 (Kennedy, J., concurring). To the contrary, when Khalil's attorneys next requested information from the Government about his whereabouts on the afternoon of March 9, 2025, they received prompt and accurate replies. *See* Petition ¶ 56.

In short, even if Justice Kennedy's proposed exceptions were good law (or the Court were inclined to adopt them by itself), they would not support Khalil's argument that this Court may entertain his claims. It follows that the district-of-confinement and the immediate-custodian rules apply and that Khalil's Petition is not properly before this Court.[6]

---

[6]     Khalil argues that the Court should allow him "to conduct limited and expedited jurisdictional discovery" in the event that it is "not persuaded to deny the government's motion" to dismiss or transfer. Pet.'s Opp'n 17. But "a habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). And discovery here is not warranted because, as noted above, the facts relevant to the limited questions currently facing the Court — most notably, that Khalil was detained in the District of New Jersey when his lawyer filed the Petition — are not in dispute. If the Court were inclined to accept the Government's argument for transfer to the Western District of Louisiana, perhaps the case for jurisdictional discovery would be stronger given Khalil's insinuation that the White House was directly involved in the plan to move him there, *see* Petition ¶ 58; *see also* Pet.'s Opp'n 11, and the fact that, in the space of less than twenty-four hours, the Government hauled Khalil through at least six different districts (one likely twice): the Southern District of New York, the District of New Jersey, the Eastern District of New York, the Northern District of Texas, the Central District of Louisiana, and the Western District of

**B. The Case Must Be Transferred to the District of New Jersey**

That is not the end of the analysis.  Instead, the lack of habeas jurisdiction in this District raises the questions of whether the Court should dismiss the case or transfer it to another district and, if the latter, to which district the case should be transferred.  The Government argues that the Court should dismiss the case or, in the alternative, transfer it to the Western District of Louisiana on the theory that the Western District of Louisiana is the district in which Khalil is presently confined and, thus, the only district in which he could now bring his claims (at least to the extent they are "core" claims).  ECF No. 31 ("Gov't Mem."), at 9.  Khalil, on the other hand, opposes dismissal and argues that transfer to the District of New Jersey is appropriate.  Pet.'s Opp'n 19.  The Court agrees with Khalil.

For starters, it is important to note that the district-of-confinement and immediate-custodian rules are "not jurisdictional in the sense of a limitation on subject-matter jurisdiction," *Skaftouros v. United States*, 667 F.3d 144, 146 n.1 (2d Cir. 2011) (internal quotation marks omitted), but rather akin to "personal jurisdiction or venue rules," *Gooden v. Gonzales*, 162 Fed. App'x 28, 29 (2d Cir. 2005) (summary order); *see also Rivera-Perez v. Stover*, — F. Supp. 3d —, No. 23-CV-1348 (SRU), 2024 WL 4819250, at *5 (D. Conn. Nov. 18, 2024) (noting that courts have construed the immediate-custodian rule to raise questions of venue or personal jurisdiction, not subject-matter jurisdiction); *see generally Padilla*, 542 U.S. at 434 n.7 ("The word 'jurisdiction,' of course, is capable of different interpretations.  We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court.").  That is significant because, if the Court lacked subject-matter jurisdiction, dismissal (albeit without prejudice) would likely be the proper result.  *See, e.g.,*

---

Louisiana.  But because, for the reasons discussed below, the Court rejects the Government's argument for transfer to Louisiana, it need not and does not address that question.

*Durant, Nichols, Houston, Hodgson & Cortese-Costa P.C. v. Dupont*, 565 F.3d 56, 62-63 (2d Cir. 2009); *Katz v. Donna Karan Co., L.L.C.*, 872 F.3d 114, 121 (2d Cir. 2017).[7] But because the issue is one of either personal jurisdiction or venue, it is well established — and undisputed by the Government — that the Court has the discretion to transfer the case to another district rather than dismiss. *See, e.g.*, *SongByrd*, 206 F.3d at 179 n.9; *see also* Gov't Reply 12.

In the circumstances presented here, there are at least three reasons to exercise that discretion. First and foremost, as the Government acknowledges, a "prompt resolution" of this important case is "imperative." Gov't Reply 14-15. Requiring Khalil to refile his Petition (and his additional requests for relief, *see* ECF Nos. 11, 53, 66) would result in unnecessary delay. Second, dismissal would prejudice Khalil in several important ways. *See, e.g.*, *Cruz-Aguilera v. I.N.S.*, 245 F.3d 1070, 1074 (9th Cir. 2001) (considering "whether the failure to transfer would prejudice the litigant" in deciding between dismissal and transfer); *Liriano v. United States*, 95 F.3d 119, 122 (2d Cir. 1996) ("In determining whether a transfer is in the interest of justice, the equities of dismissing a claim when it could be transferred should be carefully weighed."). Dismissal would mean vacatur of the temporary relief this Court granted to Khalil, *see* ECF No. 9, and would allow for Khalil's expedited removal from the country before his claims could even be adjudicated. Requiring Khalil to refile his petition in the Western District of Louisiana (the only district in which a *new* petition could be filed) would also mean litigating far from his lawyers, from his eight-months-pregnant wife, and from the location where most (if not all) of the events relevant to his petition took place. *See* ECF No. 11, at 1-3. Finally, the record makes

---

[7]    That said, 28 U.S.C. § 1631 — which provides that, when a "court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action . . . to any other such court . . . in which the action or appeal could have been brought at the time it was filed" — would arguably provide a basis for the Court to transfer Khalil's petition even if the defect were one of subject-matter jurisdiction. *See, e.g.*, *SongByrd, Inc. v. Est. of Grossman*, 206 F.3d 172, 179 n.9 (2d Cir. 2000).

plain that Khalil's lawyers filed the Petition in this District based on a good-faith and reasonable

belief that he was then detained here. Transfer is thus appropriate to ensure that Khalil is not

"penalized by . . . 'time-consuming and justice-defeating technicalities.'" *Goldlawr, Inc. v.*

*Heiman*, 369 U.S. 463, 467 (1962); *see, e.g.*, *Liriano*, 95 F.3d at 122 (observing that the "good

faith" filing of an action in an improper forum is a "[f]actor[] militating for a transfer" rather

than dismissal).[8]

　　　To which district, then, should the case be transferred? To answer that question, the

Court must look, in the first instance, to the statute — enacted by Congress in 1948 — that

governs the transfer of a civil case from "a district in which is filed a case laying venue in the

wrong . . . district." 28 U.S.C. § 1406(a); *see SongByrd, Inc.*, 206 F.3d at 179 n.9 (observing that

"a district court lacking both personal jurisdiction and proper venue" may transfer a case

pursuant to Section 1406(a) "to a district where both defects [are] avoided"). Curiously, the

parties failed to cite, let alone discuss, Section 1406(a) in their initial briefs addressing whether

and to where this case should be transferred. In response to an Order from the Court directing

them to do so, however, the parties both acknowledge (or, at least, do not dispute) the

applicability of the statute. *See* ECF No. 70, at 5; Gov't Reply 14; *see also* ECF No. 63.[9] And in

any event, cases in which district courts have relied on Section 1406(a) to transfer immigration

habeas cases filed in the wrong district are legion. *See, e.g.*, *Conlin v. United States*, No. 23-CV-

3272 (LTS), 2024 WL 458285, at *2-3 (S.D.N.Y. Jan. 11, 2024); *Casiano v. N.Y. State Niagara*

---

[8]　　Additionally, to the extent that this Court has jurisdiction to adjudicate any "non-core" claims raised in Khalil's petition, dismissal of the Petition in its entirety is plainly unwarranted.

[9]　　It follows that the parties have forfeited any argument against application of Section 1406(a). *See, e.g.*, *Whitehurst v. Staten Island Univ. Hosp.*, No. 18-CV-1090 (ARR), 2018 WL 11218905, at *2 (E.D.N.Y. July 24, 2018) ("An argument is waived or abandoned if a party fails to make it." (internal quotation marks omitted)).

*Cnty.*, No. 24-CV-3850 (LTS), 2024 WL 3318225, at *1 (S.D.N.Y. June 17, 2024); *Bynum v. N.J.*, No. 24-CV-618 (LTS), 2024 WL 1023210, at *1 (S.D.N.Y. Feb. 26, 2024); *Moussaoui v. Biden*, No. 25-CV-691 (JGK), 2025 WL 457804, at *2 (S.D.N.Y. Jan. 28, 2025); *Darboe v. Ahrendt*, 442 F. Supp. 3d 592, 596 (S.D.N.Y. 2020); *see also, e.g.*, *United States v. Posey*, No. 16-CR-87 (RJA), 2023 WL 7124522, at *2 (W.D.N.Y. Oct. 30, 2023) (noting a court's "broad discretion" under Section 1406(a) "to transfer a habeas case to the proper judicial district").

Section 1406(a) provides for transfer "to any district . . . in which [the case] *could have been brought*." *Id.* (emphasis added). By its plain terms, therefore, the statute calls for transfer of Khalil's Petition to the District of New Jersey, the only district in which — due to the immediate-custodian and district-of-confinement rules — his "core" claims "could have been brought" at 4:40 a.m. on March 9, 2025. *See, e.g.*, *Alvarado v. Gillis*, No. 22-CV-10082 (JLR) (KHP), 2023 WL 5417157 (S.D.N.Y. Aug. 3, 2023), *report and recommendation adopted,* 2023 WL 5396499 (S.D.N.Y. Aug. 22, 2023) (ordering transfer of an immigration habeas petition to the district where the petitioner was detained at the time of filing); *Ali v. DHS/ICE/Dep't of Justice*, No. 19-CV-8645 (LGS), 2020 WL 3057383, at *2 (S.D.N.Y. June 9, 2020) (same); *Persaud v. ICE*, No. 04-CV-282 (FB), 2004 WL 1936213, at *1 (E.D.N.Y. Aug. 31, 2004) ("Although petitioner is currently confined in Alabama, at the time that he filed this petition he was confined in the Western District of Louisiana. Accordingly, the Court orders the petition to be transferred to the United States District Court for the Western District of Louisiana."); *cf. Fuentes v. Choate*, No. 24-CV-1377 (NYW), 2024 WL 2978285, at *10-11 (D. Colo. June 13, 2024) (observing that when transfer is necessary due to improper venue under *Padilla*, "many courts choose to transfer habeas cases" to the district where the action "could have been brought at the time it was filed or noticed"). Indeed, the Court cannot do otherwise because where, as here, "a federal statute covers the point in dispute," "that is the end of the matter; federal courts

are bound to apply rules enacted by Congress with respect to matters over which it has legislative power." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988) (cleaned up).

Relying on *Padilla*, the Government argues instead for transfer to the Western District of Louisiana, Khalil's present district of confinement. The "proper course," it insists, is "to transfer this case to the Western District of Louisiana — *i.e.*, the only district where Khalil could refile a petition today . . . . Put simply, 'jurisdiction lies in only one district: the district of confinement.'" Gov't Mem. 10 (quoting *Padilla*, 542 U.S. at 443). In *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960), however, the Supreme Court rejected a nearly identical argument with respect to 28 U.S.C. § 1404(a), which provides — in nearly identical language — for transfer of a civil case to another "district . . . where it might have been brought." There, the petitioners argued that "the phrase 'where it might have been brought' should be held to relate not only to the time of the bringing of the action, but also to the time of the transfer." *Id.* at 342. "We do not think," the Court declared, "the . . . phrase 'where it might have been brought' can be interpreted to mean . . . 'where it may now be *rebrought*, with defendants' consent.'" *Id.* (emphasis added). Section 1404(a) "is unambiguous, direct and clear, and . . . the unequivocal words of § 1404(a) and the legislative history establish that Congress indeed meant what it said." *Id.* (cleaned up). The same can be said for Section 1406(a).

*Padilla* does not affect that conclusion. To the contrary, it is fatal to the Government's argument because it dictates that, at "the time of the bringing of the action," *id.* at 342, habeas "jurisdiction lies in only one district: the district of confinement," *Padilla*, 542 U.S. at 443. At that time, of course, Khalil was confined in the District of New Jersey, not in the Western District of Louisiana. Moreover, to the extent that *Padilla* discusses the jurisdictional effect of prisoner relocation at all, it says that a prisoner's transfer after a petition is filed does not deprive a court that would otherwise have jurisdiction of the ability to adjudicate his petition. *See id.* at

441.  Finally, *Padilla* does not address the effect of Section 1406(a), the plain language of which is just as binding on courts as the plain language of the statute that the Supreme Court there applied.  The *Padilla* decision thus offers guidance about where a habeas petition is properly filed in the first instance, but it leaves open where a case should be transferred when, as here, a petition is filed in the wrong venue and the petitioner's present district of confinement differs from his district of confinement at the time of filing.

        The Government's related argument that "the transfer statutes," including Sections 1404(a) and 1406(a), "do not independently vest courts with jurisdiction they would otherwise lack," Gov't Reply 14, suffers from a similar misunderstanding of *Padilla*.  No statute is required to "vest" the District of New Jersey with otherwise-absent jurisdiction because habeas jurisdiction is "not jurisdictional in the sense of a limitation on subject-matter jurisdiction." *Padilla*, 542 U.S. at 451 (Kennedy, J., concurring); *see also Skaftouros*, 667 F.3d at 146 n.1 (same).  And as the *Padilla* Court's discussion of *Endo* makes clear, the fact that a detainee has been transferred away from a district that otherwise has jurisdiction to hear his or her claims does not necessarily deprive that district of habeas jurisdiction.  *See Padilla*, 542 U.S. at 441.

        In short, applying the plain language of Section 1406(a), the Court concludes that Khalil's "core" habeas claims — those seeking his release from detention — must be transferred to the District of New Jersey, the one and only district in which he could have filed them when he did.  As discussed above, that arguably includes all of Khalil's claims.  But to the extent that Khalil's Petition also includes "non-core" claims over which this Court would have jurisdiction, transfer of those claims to the District of New Jersey is also appropriate, albeit under Section 1404(a).  That statute authorizes transfer of a case "[f]or the convenience of parties and witnesses, in the interest of justice . . . to any [] district or division where it might have been brought."  28 U.S.C. § 1404(a).  In deciding whether transfer is warranted under Section 1404(a),

courts consider various factors, including "the convenience to parties," "the convenience to witnesses," "where the case can be tried more expeditiously and inexpensively," and "the interests of justice." *Pierce v. Coughlin*, 806 F. Supp. 426, 428 (S.D.N.Y. 1992) (internal quotation marks omitted). Applying those factors, courts have transferred cases when an "action raising identical issues is pending" in another district, *Williams v. City of New York*, No. 03-CV-5342 (RWS), 2006 WL 399456, at *1 (S.D.N.Y. Feb. 21, 2006), or when transfer is otherwise required of "some, but not all, of the . . . claims in a given case," *JM Smith Corp. v. AstraZeneca Pharms. L.P.*, No. 19-CV-7233 (CM), 2020 WL 4605241, at *9 (S.D.N.Y. Aug. 11, 2020); *see also Jewell v. Music Lifeboat*, 254 F. Supp. 3d 410, 415 (E.D.N.Y. 2017) ("Rather than continue the case piecemeal, I also transfer the remaining claims . . . pursuant to 28 U.S.C. § 1404(a).").

Here, the relevant factors counsel in favor of transferring any remaining claims over which this Court might have jurisdiction to the District of New Jersey. As the Court discussed above, Khalil's claims challenging the Secretary of State's determination that he is removable are inextricably intertwined with his "core" habeas claims. Given that Khalil must litigate his "core" claims in New Jersey, it would be both more "convenient" for all involved and "in the interests of justice" for the New Jersey court to resolve any "non-core" claims that he may bring as well. *See, e.g.*, *Convergence Technologies (USA), LLC v. Microloops Corp.*, 711 F. Supp. 2d 626, 642 (E.D. Va. 2010) ("It is well-settled that transfer under § 1404(a) is generally in the interest of justice if a decision not to transfer would lead to courts rendering inconsistent judgments on the same issue."); *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent"). Accordingly, the Court concludes that — pursuant to Section 1406(a) or a combination of that statute and Section 1404(a) — transfer of

Khalil's entire Petition to the District of New Jersey is necessary and appropriate.

## CONCLUSION

In sum, the Court DENIES the Government's motion to dismiss Khalil's Petition but GRANTS its motion to transfer, albeit to the District of New Jersey, not to the Western District of Louisiana.[10]  That conclusion is compelled by well-established rules and principles that this Court is bound to follow.  First, given the undisputed fact that Khalil was detained in the District of New Jersey at the time his lawyer filed the Petition, this Court lacks jurisdiction over most, if not all, of Khalil's claims.  Second, given that the District of New Jersey is the one and only district in which Khalil could have filed his Petition when he did, the statutes that govern transfer of civil cases from one federal district court to another dictate that the case be sent there, not to the Western District of Louisiana.  Put simply, the law precludes this Court from reaching the merits of Khalil's claims, as serious and important as they may be, and it mandates that the Court allow a tribunal with jurisdiction to take the matter up from here.

To be clear, "when an action is transferred, it remains what it was; all further proceedings in it are merely referred to another tribunal, leaving untouched whatever has been already done." *Magnetic Eng'g & Mfg. Co. v. Dings Mfg. Co.*, 178 F.2d 866, 868 (2d Cir. 1950).  This transfer is no different.  It will be up to the transferee court in New Jersey to consider not only Khalil's Petition, over which it alone has jurisdiction, but also the various motions that Khalil has filed to

---

[10]    Khalil's pro forma request for leave to amend his Petition in the event the Court concludes that it cannot be heard in this District, *see* Pet.'s Mem. 19-20, is denied.  First, the defect in most, if not all, of Khalil's claims is substantive, so amendment would be futile.  *See, e.g., Roundtree v. NYC*, No. 19-CV-2475 (JMF), 2021 WL 1667193, at *6 (S.D.N.Y. Apr. 28, 2021) (collecting cases).  Second, Khalil does not suggest that he possesses any facts that could cure the jurisdictional problems with his Petition.  *See, e.g., Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014) ("A plaintiff need not be given leave to amend if he fails to specify how amendment would cure the pleading deficiencies in his complaint."), *aff'd*, 619 F. App'x 34 (2d Cir. 2015) (summary order); *accord TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014).

date in connection with his Petition, namely his motion to move him from the Western District of

Louisiana to a detention facility in this District (or perhaps now New Jersey), ECF No. 11; his

motion for immediate release on bail, ECF No. 53; and his motion for preliminary injunctive

relief, ECF No. 66.  To avoid any unnecessary delay, the briefing schedules in effect for those

motions, *see* ECF Nos. 29, 43, shall remain in effect unless and until the transferee court orders

otherwise.  And to ensure that Khalil gets an opportunity to have his Petition and these motions

considered by a court in the normal course — and to preserve the status quo — the Court's

March 10, 2025 Order barring the Government from removing him (to which the Government

has never raised an objection and which the Government has not asked the Court to lift in the

event of transfer) shall similarly remain in effect unless and until the transferee court orders

otherwise.  *See, e.g.*, *Burke v. People*, No. CIV.A. 04-4404, 2004 WL 2381198, at *2 (E.D. Pa.

Oct. 25, 2004) ("The court also ordered that the stay of removal remain in place until further

order of the transferee court.").

The Clerk of Court is directed to terminate ECF No. 30 and to transfer this case to the

United States District Court for the District of New Jersey.  Further, consistent with the

Government's own request, the Clerk of Court is directed to do so immediately, without regard

for Local Civil Rule 83.1, which provides that "the Clerk [of Court], unless otherwise ordered,

shall upon the expiration of seven (7) days effectuate the transfer of the case to the transferee

court."  *See* Gov't Mem. 9 n.3 ("Should the Court transfer the case, to minimize any delay in

having the case heard in the proper forum, the government respectfully requests that the Court

waive the seven-day waiting period contained in Local Civil Rule 83.1.").

SO ORDERED.

Dated: March 19, 2025
      New York, New York

_____
JESSE M. FURMAN
United States District Judge

```
                    UNITED STATES DISTRICT COURT
                      DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,                       .
                                      .
        Petitioner,                   .
                                      . Case No. 25-cv-01963
vs.                                   .
                                      . Newark, New Jersey
JOYCE, et al.,                        . June 20, 2025
                                      .
        Respondents.                  .
                                      .


              TRANSCRIPT OF MOTION FOR BAIL
          BEFORE THE HONORABLE MICHAEL A. HAMMER
              UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via teleconference):

 For the Petitioner:      ALINA DAS, ESQ.
                          New York University (NYU) School of
                          Law
                          NYU Immigrant Rights Clinic
                          245 Sullivan Street, 5th Floor
                          New York NY 10012
                          (212) 998-6430

                          BAHER AZMY, ESQ.
                          Center For Constitutional Rights
                          666 Broadway, 7th Floor
                          New York, NY 10012
                          (212) 614-6464




Audio Operator:

Transcription Service:     KING TRANSCRIPTION SERVICES, LLC
                           3 South Corporate Drive, Suite 203
                           Riverdale, NJ  07457
                           (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

2

```
 1   (APPEARANCES continued)

 2   For the Petitioner:      JEANNE LOCICERO, ESQ.
                              ACLU of New Jersey
 3                            P.O. Box 32159
                              570 Broad Street, 11th Floor
 4                            Newark, NJ 07102
                              (973) 854-1715
 5

 6   For the                  DHRUMAN YOGESH SAMPAT, ESQ.
     Respondents:             DOJ-CIV
 7                            Office of Immigration, General
                              Litigation & Appeals
 8                            P.O. Box 878
                              Ben Franklin Station
 9                            Washington DC, DC 20044
                              (202) 532-4281
10
                              Also present:  Arthur Wilson and
11                            Alanna Duong

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                         I N D E X
 2

 3
                                                        Page
 4
        Proceedings                                     4
 5
        The Court's Ruling                              21
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                  (Commencement of proceedings)

 2

 3                  THE COURT:  All right.  Good afternoon, everyone.

 4  This is Judge Hammer.

 5                  We are on the record in Mahmoud Khalil v. Donald J.

 6  Trump, et al., Civil No. 25-1963.

 7                  Who do I have on behalf of Petitioner?

 8                  MS. DAS:  Good afternoon, Your Honor.  This is

 9  Alina Das from NYU Immigrant Rights Clinic on behalf of

10  Mr. Khalil.

11                  And I'm joined by a couple of colleagues as well.

12                  THE COURT:  That's fine.  If they want to put their

13  appearances on the record, they're certainly welcome to do

14  so, or, if not, that's fine too.

15                  MS. LOCICERO:  Good afternoon, Your Honor.  This is

16  Jeanne Locicero from the --

17                  THE COURT:  All right.  So --

18         (Simultaneous conversation)

19                  THE COURT:  I'm sorry.

20                  Go ahead, Ms. Locicero.  Sorry about that.

21                  MS. LOCICERO:  Good afternoon.  I'm just putting my

22  name on the record.  Jeanne Locicero from the ACLU of New

23  Jersey on behalf of Petitioner.

24                  THE COURT:  Thank you.

25                  And do we have anybody else for Petitioner?
```

```
 1              MR. AZMY:  Yes, Your Honor.  Baher Azmy, A-z-m-y,

 2    from the Center for Constitutional Rights on behalf of

 3    Petitioner.  Thank Your Honor.

 4              THE COURT:  All right.

 5              And then how about for Respondent?

 6              MR. SAMPAT:  Good afternoon, Your Honor.  This is

 7    Dhruman Sampat on behalf of the Respondents.

 8              I'm joined by my colleague Arthur Wilson and Alanna

 9    Duong, but they won't be entering -- they don't need to enter

10    their appearance for the record.  I'll be handling the

11    hearing.

12              THE COURT:  All right.  Thank you.

13              So I know the hearing was before Judge Farbiarz

14    earlier today.  The order just went up on the docket.  I've

15    spoken with Judge Farbiarz several times; so this should be a

16    relatively simple affair.

17              I understand Judge Farbiarz had directed the

18    parties to confer regarding release conditions.

19              Have the parties had an opportunity to confer?  Do

20    we have joint recommendations?

21              MS. DAS:  Your Honor, this is Alina Das for

22    Petitioner.

23              We sent a proposal to Mr. Sampat from earlier today

24    and are waiting to hear back.

25              THE COURT:  All right.  Since we're all together
```

 1  now, just try and expedite this because Judge Farbiarz was

 2  clear with me about two things:  One, he does want Mr. Khalil

 3  released today.  Two, one of the conditions, which we'll have

 4  to talk through the logistics, as a necessary precondition of

 5  that, is the surrender of passports and travel documents.

 6          So why don't we start -- since I don't have the

 7  conditions that you propose, Ms. Das, why don't we start with

 8  what Petitioner's proposing.

 9          MS. DAS:  Yes, Your Honor.

10          So our proposal would be that there would be no GPS

11  monitoring, which the Court had already ordered.

12          THE COURT:  Right.

13          MS. DAS:  And, further, we propose that his release

14  not include any reporting requirements and no travel

15  restrictions within the United States.

16          And we understand that Judge Farbiarz would like

17  the passport surrender to be part of these conditions, and so

18  on that basis, we would want our client's green card to be

19  returned to him and a certified copy of the passport or other

20  domestic travel document so that he is able to travel within

21  the United States.

22          THE COURT:  So he would have the green card

23  returned to him, since that's his identity, but that doesn't

24  facilitate travel; right?

25          MS. DAS:  That's right, Your Honor.  And in our

1   experience, there would need to be some other type of travel

2   document, which ICE has produced for other clients in similar

3   situations in the past.

4           THE COURT:  Okay.

5           I'm sorry.  You said a certified copy of what?

6           MS. DAS:  Of the passport, or it could be a similar

7   travel document.

8           THE COURT:  Why does he need that?

9           MS. DAS:  Either/or, in our experience, is required

10  for him to be able to board a plane, that the green card

11  isn't necessarily sufficient for him to be able to travel,

12  even within the U.S.

13          THE COURT:  Well, why does he need to be able to

14  board a plane?

15          MS. DAS:  Well, he's currently in Louisiana --

16          THE COURT:  Right.

17          MS. DAS:  -- and his home is in New York.

18          THE COURT:  Right.

19          MS. DAS:  Also, he has family in Michigan -- the

20  grandparents of his newborn son.

21          THE COURT:  Okay.  I spoke with Judge Farbiarz.

22  The issue of him having the ability to fly is, I think, a

23  real concern for Judge Farbiarz.  He may need to take other

24  alternate arrangements to get home, such as a train.  I

25  recognize that poses additional logistical concerns.

 1            But His Honor was clear with me, he had real

 2    concerns about the ability to fly and believed there should

 3    at least be some measure of control over that.

 4            So I think that is going to be problematic.

 5            I agree with you, though, on the return of the

 6    green card, because that's likely going to be necessary even

 7    to -- for train travel, to return from Louisiana back to New

 8    York.

 9            What's the Government's position?

10            MR. SAMPAT:  Good afternoon, Your Honor.

11            So our general -- our general procedures are that

12    Mr. Khalil wouldn't get his passport back now.

13            However, I do have it, on behalf of my client, that

14    we would be -- that we can have a certified copy of his

15    support provided --

16        (Simultaneous conversation)

17            THE COURT:  Okay.

18            MR. SAMPAT:  Let me just make sure I'm properly

19    representing their position.

20            That we can -- ICE can provide a certified copy of

21    the passport, which is what they've done in other cases.

22            THE COURT:  Okay.  So this has been done, and this

23    is something that the Government, understanding you're

24    reserving all rights concerning Judge Farbiarz's order, but

25    the Government would agreed to that release condition?

```
1            MR. SAMPAT:  That it would be -- we wouldn't be
2    providing his passport back, yes.
3            THE COURT:  Right.
4            MR. SAMPAT:  And that we would provide a certified
5    copy instead, yeah, of course.
6            THE COURT:  And I assume the Government has no
7    issue with the green card?
8            MR. SAMPAT:  Could you give me one moment.
9            THE COURT:  Sure.
10           MR. SAMPAT:  Thanks.
11           Apologies for the delay, Your Honor.
12           So we just received a removal order from the
13   immigration judge, so we're trying to sort of pin down what
14   our normal procedures are with returning a green card in
15   these sorts of circumstances.
16           THE COURT:  Okay.
17           MR. SAMPAT:  So, unfortunately, we can't take a
18   position on that right now.  We're have -- we'll confer with
19   our client to try to get back on that.
20           The other thing, understanding -- I'll just -- I
21   want to make the record on this is just that we continue to
22   object that there's no GPS monitoring.  Obviously, we
23   understand Judge Farbiarz has said that no GPS monitoring is
24   required.
25           THE COURT:  Understood.
```

1           MR. SAMPAT:  And then the additional -- the

2    additional condition would be that Mr. Khalil would update

3    his address within 48 hours.  Sorry.  Give me one moment.

4           Oh, sorry.

5           Mr. Khalil -- we would ask that Mr. Khalil provide

6    an updated address for DHS before he's released.  But then

7    upon his release and upon his return to New York, we would

8    ask that the Court impose a requirement that he report to an

9    ICE office within 48 hours.

10          THE COURT:  What's the Petitioner's position on

11   reporting to the ICE office?

12          MS. DAS:  We would object to that condition,

13   Your Honor.  We don't think that that is necessary in terms

14   of any sort of showing that he needs to report to ICE,

15   particularly given the judge's previous findings about lack

16   of flight risk and danger.

17          It's also not something that has been required in

18   the other cases, such as -- or at least with respect to

19   Mahdawi and Khan Suri.

20          So we object to any sort of reporting requirements

21   here.

22          We would also, you know, note that in -- as a

23   substitute for that, certainly, the Petitioner is fine if the

24   order includes a specification that he attend all court

25   hearings in this case, you know, unless excused by the Court,

1   if that's the concern.

2          And we would also note on the travel question --

3   and I understand you've had the conversation with Judge

4   Farbiarz directly and would certainly know better than I, my

5   impression about the way he talked about the passport during

6   the hearing was a concern about international travel or

7   leaving the United States but not necessarily domestic

8   travel.

9          THE COURT:  Okay.

10         MS. DAS:  And so we would just want him to be

11  able -- to fly back home would be much safer for him and to

12  have that direct flight than being on a train.

13         So we hope that, unless we're misunderstanding, you

14  know, we think that would be helpful to clarify.

15     (Simultaneous conversation)

16         THE COURT:  Hold on.  Hold on one second, Ms. Das.

17         I'm sorry.

18         Somebody else is talking in the background.  Can

19  you please put yourself on mute.  Thank you.

20         I'm sorry, Ms. Das.

21         So, okay, understanding -- and the certified copy

22  would allow -- of the passport would allow domestic travel.

23  Is that right?

24     (Simultaneous conversation)

25         MS. DAS:  That's my understanding that there are

1   some airlines that are fine with just a green card but some

2   will require the passport in addition.

3           THE COURT:  My concern is whether that will

4   facilitate international travel.

5       (Simultaneous conversation)

6           THE COURT:  I'm sorry.  If somebody else -- if you

7   are not on mute, please put yourself on mute.  I continue to

8   hear background noises, including as I'm speaking.  Okay.

9           Will the certified copy of the passport allow

10  international travel?  That's the concern I think -- more of

11  the concern which Judge Farbiarz had?

12          MS. DAS:  If that is the concern, then we would

13  certainly take a domestic travel document.  The Government

14  can provide a domestic travel letter.

15          THE COURT:  Mr. Sampat, is that true?

16          MR. SAMPAT:  I think we can.  But I will just say I

17  think we're okay providing a certified copy of the passport

18  to facilitate travel for the purpose.

19          And obviously with geographic limitations saying

20  that he can't travel internationally, especially in light of

21  the fact that he now has an order --

22          THE COURT:  All right.

23          MR. SAMPAT:  -- or he has an order of removal, I

24  should say.  Sorry.  Let me be clear.

25          THE COURT:  Okay.  So it would be a certified copy

1   of the passport with a prohibition on international travel;

2   is that correct?

3          Mr. Sampat?

4          MR. SAMPAT:  Sorry, Your Honor.  Can you give me

5   one moment?  I'm just conferring.

6          THE COURT:  Of course.  Of course.

7          MR. SAMPAT:  Sorry, Your Honor.

8          So we would want a -- so what we would say is that

9   the certified copy should help facilitate Mr. Khalil's travel

10  back to New York.  We would ask that the Court impose a

11  geographic limitation with no international travel with the

12  exception for requiring Mr. Khalil to self-deport upon a

13  final order of removal.

14         So if that -- so meaning if the certified copy

15  would facilitate the self-deportation or the self-removal

16  pursuant to that condition, we would have no objection to

17  that.

18         THE COURT:  Ms. Das?

19         MS. DAS:  Yes, Your Honor.

20         I think our concern is just to allow him to be able

21  to travel domestically.

22         And so we're fine with the prohibition on

23  international travel.  And whether there's a specification

24  about self-deportation in the order or if it simply says that

25  the Government is free to, you know, seek a modification of

1  that condition in the future, we would be fine with that.

2          I did want to clarify that my co-counsel has

3  informed me that --

4      (Simultaneous conversation)

5          MALE SPEAKER:  Why are you protecting Islamo

6  fascists?

7          MS. DAS:  Hello?

8      (Simultaneous conversation)

9          THE COURT:  Sir, I would ask you to please mute.

10 Thank you.

11         Go ahead, Ms. Das.

12         MS. DAS:  Okay.  Thank you, Your Honor.

13         So my co-counsel has just informed me that counsel

14 for Mr. Khalil has his passport.  So we would need to

15 surrender it pursuant to the order --

16     (Simultaneous conversation)

17         MALE SPEAKER:  He is an Islamo fascist.  Why are

18 you protecting him?  He is an Islamo fascist --

19         THE COURT:  Please stop.  Please stop.

20         MALE SPEAKER:  -- and a Jew hater.

21         THE COURT:  Sir.  Sir.

22         MALE SPEAKER:  -- who is still making discontent on

23 Columbia's campus.

24         THE COURT:  Sir.  Sir.

25         MALE SPEAKER:  Why are you protecting Jew haters

```
 1   and Jew killers?

 2              THE COURT:  Sir, stop frustrating these

 3   proceedings, or I'll take them offline.

 4              All right.  So -- I'm sorry, Ms. Das.

 5              Counsel for Mr. Khalil --

 6              MS. DAS:  For Mr. Khalil.

 7              THE COURT:  -- has -- right.

 8              MS. DAS:  -- has the passport.

 9              THE COURT:  -- has the passport.

10              MS. DAS:  His Louisiana local counsel has his

11   passport.

12              THE COURT:  Okay.

13              MS. DAS:  And we are able to surrender it.  We

14   could do that upon arriving in New York if that is easiest to

15   effectuate the Government's order -- or the Court's order.

16              THE COURT:  Where is counsel located?

17              MS. DAS:  Counsel is located in New Orleans.

18              THE COURT:  Why can't counsel tender it now to the

19   U.S. Attorney for New Orleans or for Eastern District of

20   Louisiana.

21              MS. DAS:  Let me check if she's available to do

22   that, Your Honor.

23              She is actually on her way to Jena now, and her

24   estimated time of arrival is 5:30.

25              THE COURT:  Okay.  All right.
```

```
 1              To get Mr. Khalil?

 2              MS. DAS:  Yes, to meet him at the facility.

 3              THE COURT:  Okay.  All right.

 4              MS. DAS:  Mr. Khalil also has local counsel from

 5   New York, who is currently with him at the facility as well,

 6   who can help facilitate things on the ground.

 7              THE COURT:  Okay.  So let me ask, for both

 8   Petitioner and Respondent, what's the most efficient way to

 9   surrender Mr. Khalil's passport and surrender it to who?  In

10   other words, let me give you my thinking on this.  As long as

11   the lawyer has it and understands that it's not to be

12   provided to Mr. Khalil or any member of Mr. Khalil's

13   family -- in other words, the only time that the lawyer parts

14   with or tenders the passport is to an appropriate government

15   official, then that needn't -- that needn't delay the release

16   of Mr. Khalil, recognizing that it's Friday, almost

17   4:00 o'clock.

18              But I just want to talk through with the parties

19   and have a mutual understanding as to whom that lawyer will

20   be handing the passport off to and when.

21              MS. DAS:  Yes, Your Honor.  We are certainly fine

22   with that, to have counsel keep the passport and tender it to

23   whomever the Government would like to designate.  That could

24   be an official in Louisiana if the Government prefers, or

25   certainly in New York --
```

 1           (Simultaneous conversation)

 2                THE COURT:  Yeah, that's reasonable.  That is very

 3    reasonable.

 4                Mr. Sampat, it's really your call.  Mr. Khalil's

 5    lawyer could surrender it to an ICE official at the facility

 6    that they're on their way to now or to some other designated

 7    official.

 8                What's the Government's position?

 9                MR. SAMPAT:  Your Honor, we would ask that they

10    surrender the passport at the ERO office in New Orleans.  I

11    think that's just standard operating procedure, and we've

12    gotten confirmation from our client that that would be

13    acceptable.

14                THE COURT:  Okay.

15                Is that something -- I don't know the layout or

16    logistics of New Orleans.

17                Is that in the same building as where Mr. Khalil

18    is?

19                MR. SAMPAT:  No, but --

20           (Simultaneous conversation)

21                THE COURT:  -- I guess.

22                MR. SAMPAT:  I'm sorry, Your Honor.  I didn't mean

23    to cut you off.

24                THE COURT:  No, no, no.  That was on me.

25                I'm saying is this something that will happen today

1    as part of picking Mr. Khalil up?  Or is this something we

2    should reasonably expect to happen, the attorney to do on

3    Monday as first item of business on Monday.

4             MR. SAMPAT:  So I -- we would need it before he

5    travels outside of Louisiana.

6             THE COURT:  Okay.

7             MR. SAMPAT:  So this way he could be provided the

8    certified copy, so if that can happen today.

9             And this is also all pretty clear in terms of what

10   Mr. Khalil's travel plans are to return to New York,

11   obviously, and how quickly he would be moving.

12            THE COURT:  Right.  Okay.

13            All right.  Any other conditions?  I think I have

14   that in hand, then.

15            I'll start with you, Ms. Das, anything else for

16   Petitioner?

17            MS. DAS:  Well, the one concern I have about --

18   we're perfectly fine getting this to an individual in

19   Louisiana.  I just would like to confirm with the Government

20   that that -- that the New Orleans ERO or an official in

21   Jena -- because I understand them to be not that close to

22   each other -- that they would be available if it takes a

23   couple of hours to process him.  If there's anyone that this

24   could be provided to in Jena, I think that would expedite,

25   you know, producing the certified copy and ensuring that he

1  can leave the facility and make a flight today.

2              THE COURT:  Mr. Sampat, how about that?  That seems

3  very reasonable to me.

4              And, obviously, Judge Farbiarz has been quite clear

5  about Mr. Khalil being released today.

6              MR. SAMPAT:  Absolutely, Your Honor.  My co-counsel

7  is currently on the phone with DHS right now to confirm

8  that's okay.  So if you don't mind giving us a moment.

9              THE COURT:  Yes, of course.

10             MR. SAMPAT:  Thank you.

11             Your Honor, Jena -- Mr. Khalil and his attorneys

12  can submit the -- can surrender the passport at Jena.  That's

13  perfectly acceptable to the Government.

14             THE COURT:  Good.  Thank you.

15             MS. DAS:  And, Your Honor, to address whether any

16  other conditions --

17             THE COURT:  Yes.

18             MS. DAS:  -- are necessary, my understanding is

19  that upon surrendering that passport, ICE would be providing

20  a certified copy of the passport and his green card --

21             THE COURT:  Right.

22             MS. DAS:  -- so he'll be able to travel --

23             THE COURT:  Yes.

24             MS. DAS:  -- and that he would be able to travel to

25  New York by flight as needed.

1           THE COURT:  Yes.

2           MS. DAS:  And that the only other condition is that

3    he would need to update his address within -- I believe it

4    was 48 hours; is that correct?

5           THE COURT:  On release, and then the other part

6    with the 48 hours was report to ICE, which I'll address in a

7    moment.

8           All right.

9           Mr. Sampat, anything else for the Government?

10          MR. SAMPAT:  Yes, Your Honor.

11          We would just say on the green card piece, we

12   continue to object on returning that just because he's now

13   subject to an order of removal.  It's only upon if he were to

14   win on appeal that that could be returned.  So we would

15   continue to object that the Court require the Government to

16   return it.

17          MS. DAS:  Well, Your Honor, just on that point, a

18   lawful permanent resident does not lose their green card

19   status until a final order of removal has been entered, which

20   is when the Board of Immigration Appeals rules on an

21   immigration matter.  So even if the immigration judge has

22   entered a final -- an order of removal on her end, he still

23   hasn't lost his lawful permanent resident status or his right

24   to his green card until his plan for appeal has expired or he

25   appeals and the BIA affirms the immigration judge's order.

1          And there's been litigation on this issue that ICE

2    does have to provide proof of green card status for lawful

3    permanent residents through the entirety of their

4    administrative removal proceedings.

5          THE COURT:  Understood.

6          Okay.  Well, I want to start out by saying, I

7    appreciate how well counsel have worked together to come up

8    with a set of conditions in this very late afternoon Friday

9    to comply with Judge Farbiarz's order, even as I recognize

10   the Government maintains continuing objections to it, and I

11   certainly appreciate Mr. Khalil's counsel working hard as

12   well to effectuate the order that Judge Farbiarz entered

13   today.

14         So I'm going to order that Mr. Khalil be released

15   upon his counsel surrendering the passport to Jena today.  At

16   that time, the Government will provide Mr. Khalil with a

17   certified copy of the passport.  That certified copy will

18   contain a prohibition on international travel.

19         The Government may modify subsequently, if

20   necessary, for self-deportation.

21         I am going to also order, if I hadn't already said

22   it, that the Government also provide Mr. Khalil his green

23   card.  I understand that the immigration judge has entered an

24   order of removal.  But as Ms. Das points out, until such time

25   as the Board of Immigration Appeals rules or Mr. Khalil's

```
 1   time to appeal the immigration judge has been exhausted,

 2   there's been no final order of removal.

 3          If, of course, there's a final order of removal

 4   that is entered, then the Government will take that action

 5   they deem appropriate vis-à-vis the green card.

 6          I'm going to limit Mr. Khalil's travel within the

 7   continental United States as follows:  His travel shall be

 8   limited to New York and Michigan -- New York, of course, is

 9   where he lives; Michigan is where he has family -- as well as

10   New Jersey and Louisiana for any necessary attorney visits

11   and court appearances.  As I said, no international travel.

12          I am not going to require Mr. Khalil to report to

13   an ICE office.  My understanding of Judge Farbiarz's ruling

14   today, as reflected in his order, is that he did not see in

15   the record evidence, any basis, for that degree of scrutiny.

16          I will require, though, Mr. Khalil to update his

17   address to DHS within 48 hours of arriving in New York.

18          And then, finally, Mr. Khalil must attend all court

19   hearings, absent an order of the court for that particular

20   proceeding to the contrary.

21          All right.

22          What I would like is, once all of the conditions

23   have been met, when -- what time do we think that this will

24   happen where Mr. Khalil's counsel will surrender the passport

25   and he will have the certified copy of the passport and the
```

```
 1   green card given back to Mr. Khalil?  Do we have an estimate?

 2              MS. DAS:  Your Honor, from our end in terms of the

 3   timeline, we believe counsel will be available for the

 4   passport at 5:30.  So if we could say that all of these

 5   matters need to be concluded by 6:00, that would be best.

 6              And one other thing, if you're willing to entertain

 7   it, Your Honor --

 8         (Simultaneous conversation)

 9              THE COURT:  I'm sorry.  Wait, Ms. Das, before I

10   forget -- I'm so sorry.

11              6:00 o'clock Eastern Standard Time; right?  I only

12   ask because Louisiana is --

13              MS. DAS:  That's a great question.  I believe -- I

14   believe that's the case.

15              Let me -- I will just quickly check with colleagues

16   so that we're not getting our wires crossed to make sure that

17   is feasible.

18              So -- sorry -- it would be 6:00 o'clock Central

19   Standard Time.

20              THE COURT:  Okay.

21              MS. DAS:  So 7:00 o'clock --

22              THE COURT:  Understood.

23              MS. DAS:  -- Eastern time.

24              Thank you for clarifying that.  That was helpful.

25              And the other thing that our client is hoping
```

1    Your Honor would consider is including Washington, D.C. in

2    the list of places he can travel to because he's engaged

3    quite a bit with Congress and would like the ability to speak

4    with various representatives there.

5            THE COURT:  Any objection by the Government?  I

6    would limit it to travel to D.C. for congressional or

7    lobbying purposes.

8            Mr. Sampat, any objection?

9            MR. SAMPAT:  I'll just note that the Government

10   objects.  That's not -- we don't think that's what Judge

11   Farbiarz meant by his release order, but, you know, we

12   understand.  If that's what the Court's inclined to order,

13   then, you know, we'll just note our objection.

14           THE COURT:  All right.  Fair enough.  So noted.

15           All right.  What I would appreciate is simply if

16   the parties could, once this has been completed, just filing

17   a short letter on the docket that tells the Court it's been

18   completed.  All right?

19           MS. DAS:  Yes, Your Honor.

20           MR. SAMPAT:  Of course, Your Honor.

21           And if I may -- sorry -- I only meant to -- I

22   thought you -- I thought the Court wanted me to respond only

23   to the travel point.

24           But I did want to note that it may be difficult to

25   get things done by 6:00 P.M.  We're not -- we're trying to

```
 1   inquire as to when the certified copy of the passport can be
 2   ready to be provided to Mr. Khalil.  Obviously, we're going
 3   to do -- we're moving expeditiously and noting that --
 4   knowing that Judge Farbiarz wanted Mr. Khalil released today.
 5            But --
 6        (Simultaneous conversation)
 7            THE COURT:  Right.  He was quite adamant about
 8   that.
 9            MR. SAMPAT:  Yeah, of course.
10            My co-counsel's currently on the phone with our
11   client agency to try to figure out what we could obtain there
12   and what timeline we might be able to provide.
13            I also did want to note our continued objection to
14   providing Mr. Khalil his green card, again knowing that --
15            THE COURT:  Yes.
16            MR. SAMPAT:  -- Your Honor's willing to -- has
17   already ordered that it be provided.  We don't think
18   that's -- again, we don't think that's contemplated by Judge
19   Farbiarz's order.  We think it exceeds the scope --
20            THE COURT:  Objection noted.
21            MR. SAMPAT:  Yeah.
22            If you give me one moment, Your Honor, I'll confirm
23   with my co-counsel, and I'll get back to you on timing.
24            THE COURT:  That's fine.  Thank you very much.
25            MR. SAMPAT:  Your Honor, and so I think we should
```

 1  be able to get things done pretty quickly upon the passport

 2  being surrendered.

 3          So I would set maybe 6:30 to give a little bit of

 4  buffer, just in case.

 5          THE COURT:  Fair enough.

 6          MR. SAMPAT:  The one thing I will also note on the

 7  green card and returning Mr. Khalil's green card, we believe

 8  that the green card may be onsite at Jena and could be

 9  returned to him.  If not, it may be in New York.  So we're

10  running that down.

11          So if --

12          THE COURT:  All right.

13          MR. SAMPAT:  -- if the condition of returning the

14  green card doesn't precede his release, then I think we're

15  okay.

16          THE COURT:  Yeah, right.  And I think Ms. Das will

17  agree that the green card return itself is not a precondition

18  for his release.

19          Right, Ms. Das?

20          MS. DAS:  That's correct, Your Honor.

21          THE COURT:  And that the Government be required to

22  return it to --

23      (Simultaneous conversation)

24          THE COURT:  Right.  The Government be required to

25  return it to Mr. Khalil expeditiously.

1          I just see no reason why that would hold up his

2     release.  I think that would be quite inconsistent with Judge

3     Farbiarz's order; right?

4          MS. DAS:  Yes, and we would want to specify that it

5     would be returned to Mr. Khalil's counsel specifically.

6          THE COURT:  The green card?

7          MS. DAS:  Yes.  If it's not in Jena.  I think that

8     we would be able to come in, if it's in New York, to be able

9     to get it on his behalf.

10         But the -- our understanding is that the green card

11    is in -- and -- I'm sorry -- I think it's Jena.  The green

12    card is in Jena.

13         THE COURT:  All right.

14         I'm sorry.  Forgive me one other thing.

15         How do you spell -- I want to make sure I get it

16    right in the order.

17         Jena is spelled -- how is -- I know it's an

18    acronym, but what is it? -- G-I-N -- it's not G-I-N-A.  I

19    thought it was J-E-N-N-A?

20         MS. DAS:  Oh, sorry.  I think it's the city itself.

21    J-e-n-a.  And the facility -- the name of the facility is I

22    believe Central Louisiana ICE Processing Center.

23         THE COURT:  Is that correct, to your understanding,

24    Mr. Sampat?

25         MR. SAMPAT:  Yeah, I believe that is correct.  I

```
 1   know the spelling is correct.  I can confirm that.

 2             THE COURT:  Okay.  Fair enough.

 3             All right.  Thank you very much.

 4             Ms. Das, anything else for you today on behalf of

 5   Mr. Khalil?

 6             MS. DAS:  No, Your Honor.

 7             And just to confirm, it's New York, Michigan, and

 8   D.C.; is that correct?

 9             THE COURT:  New York, Michigan, D.C. for

10   legislative lobbying, and then New Jersey, Louisiana, for

11   court appearances or attorney visits.

12             MS. DAS:  All right.  Thank you.

13             THE COURT:  Right?

14             All right.

15             Mr. Sampat, anything else for the Government other

16   than that you object to the return of the green card?

17             MR. SAMPAT:  The ongoing objection on the lack of

18   GPS monitoring and the travel to D.C.

19             THE COURT:  Right.

20             MR. SAMPAT:  But I think we've covered our

21   objections, Your Honor.

22             THE COURT:  Noted.

23             All right.  Thank you very much, everybody.

24             We'll adjourn.

25             I will -- I'm going to put an order that
```

```
 1  memorializes this.  Please give me -- in the interests of
 2  efficiency and expedience, and recognizing it's after
 3  4:00 o'clock on a Friday Eastern Standard Time, I'm going to
 4  do it myself as a text order as opposed to, of course, a
 5  formal order.  I'm only doing that to get it up on the docket
 6  as quickly as possible.
 7          All right?  Other than that, I wish everybody a
 8  good weekend.  Thank you very much.  We're adjourned.
 9          MS. DAS:  Thank you, Your Honor.
10          MR. SAMPAT:  Thank you, Your Honor.
11              (Conclusion of proceedings)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          Certification

2        I, SARA L. KERN, Transcriptionist, do hereby certify

3   that the 30 pages contained herein constitute a full, true,

4   and accurate transcript from the official electronic

5   recording of the proceedings had in the above-entitled

6   matter; that research was performed on the spelling of proper

7   names and utilizing the information provided, but that in

8   many cases the spellings were educated guesses; that the

9   transcript was prepared by me or under my direction and was

10  done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12  the parties hereto nor am I in any way interested in the

13  outcome hereof.

14

15

16

17

18  s/ *Sara L. Kern*                          June 24, 2025
    _____    _____
19  Signature of Approved Transcriber              Date

20

21
    Sara L. Kern, CET**D-338
22  King Transcription Services, LLC
    3 South Corporate Drive, Suite 203
23  Riverdale, NJ  07457
    (973) 237-6080
24

25

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MAHMOUD KHALIL,

      *Petitioner*,

  v.

WILLIAM P. JOYCE et al.,

      *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION**

**Table of Contents**

I.    **Background**
    A. **The Facts**
    B. **Procedural History**
    C. **The Motion**
    D. **The Response**
II.   **The Question**
III.  **The Court's Approach**
IV.  **Section 1252(b)(9) Does Not Apply Here**
    A. **Section 1252(b)(9)**
       1.   **The Statute**
       2.   **The Question**
       3.   **The Answer**
          a)  **"Action"**
          b)  **"To Remove"**
          c)  **"Under This Subchapter"**
          d)  **"Arising From"**
    B. **The Text**
    C. **Chehazeh**

V.   **If Section 1252(b)(9) Applies Here**

    A.  **EOHC**

    B.  **Administrative Law**

        1.  **Structure**

        2.  **Thunder Basin**

    C.  **EOHC In Context**

    D.  **Massieu**

    E.  **Conclusion**

VI.  **Meaningful Review**

    A.  **Legal Remedies**

    B.  **Factual Development**

    C.  **Expertise**

    D.  **Conclusion**

        1.  **Public Concern**

        2.  **First Amendment Speed**

            a)  **Administrative Proceedings**

            b)  **State Prosecutions**

            c)  **The Supreme Court**

            d)  **Prior Restraints**

            e)  **Implications**

        3.  **AADC**

        4.  **Axon**

VII.  **Section 1252(g)**

VIII. **The Policy**

IX.   **Conclusion**

*    *    *

A lawful permanent resident is held in immigration custody, and federal officials have begun proceedings before an immigration judge to remove him from the United States.

The lawful permanent resident has moved for a preliminary injunction, claiming that one of the charges against him is unconstitutional and that this Court should therefore order him released.

2

In response, federal officials argue that the motion should be denied, in part because this Court cannot hear the case. Certain statutes, they say, strip the Court of jurisdiction.

The jurisdictional argument is not persuasive.  This Opinion explains why.

## I.   **Background**

### A.   **The Facts**

A lawful permanent resident[1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6; Second Supplemental Declaration of Acting Field Office Director William P. Joyce ("Joyce Declaration") (ECF 72) ¶¶ 6-7.

While in custody, he was handed various forms.  See Declaration of Mahmoud Khalil ("Khalil Declaration") (ECF 73-1) ¶¶ 4-6; Joyce Declaration ¶ 7.

These said two main things.

First, that federal officials were seeking to remove him from the United States based on 8 U.S.C. § 1227(a)(4)(C)(i), of which more in a moment.  See Joyce Declaration ¶ 7.

And second, that as part of that process he had to appear before an immigration judge.[2]  See Khalil Declaration ¶ 5.

The proceedings before the immigration judge are now underway.

\*    \*    \*

---

[1]  Mahmoud Khalil.  A lawful permanent resident is a person who has "been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws[.]"  8 U.S.C. § 1101(a)(20).

[2]  Removing a lawful permanent resident from the United States generally requires a hearing.  See 8 U.S.C. § 1229a.  Those typically go forward before an immigration judge.  See id. § 1229a(a)(1); 8 C.F.R. § 1240.10(a).  An immigration judge is an "attorney[] whom the Attorney General appoints as [an] administrative judge[] . . . to conduct specified classes of proceedings, including [removal] hearings under section 240 of the [Immigration and Nationality Act]."  8 C.F.R. § 1003.10(a).

3

At an immigration court hearing earlier this month, the immigration judge assessed federal officials' argument that the lawful permanent resident should be removed from the United States under 8 U.S.C. § 1227(a)(4)(C)(i).

Under that statute, "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."

The immigration judge referred to a memorandum from the Secretary of State to the Secretary of the Department of Homeland Security. See Audio Recording of Hearing (April 11, 2025) ("April 11 Audio Recording") at 1:34:40 to 1:34:48.

In the memo, the Secretary of State wrote that he had "determined" that the Petitioner was "deportable" under Section 1227(a)(4)(C)(i). See Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security ("Determination") (ECF 198-1) at 1.

Based on the memo, the immigration judge ruled that the requirements of Section 1227(a)(4)(C)(i) had been met and that the lawful permanent resident could therefore be removed from the United States. See April 11 Audio Recording at 1:37:46 to 1:38:25.

\* \* \*

There are further immigration court proceedings to come.

For example, an appeal of the immigration judge's decision might be taken to the Board of Immigration Appeals.[3]

---

[3] The Board of Immigration Appeals "function[s] as an appellate body charged with the review of . . . administrative adjudications under the [Immigration and Nationality Act]." 8 C.F.R. § 1003.1(d)(1). It can hear appeals from a variety of decisions made by immigration judges. See id. § 1003.1(b). The Attorney General can review the decisions of the Board of Immigration Appeals. See id. § 1003.1(d)(7)(i), (h). Sometimes, the Attorney General opts to do so. See, e.g., Matter of Coronado Acevedo, 28 I. & N. Dec. 648 (A.G. 2022); Matter of B-Z-R-, 28 I. & N. Dec. 563 (A.G. 2022); Matter of A-C-A-A-, 28 I. & N. Dec. 84 (A.G. 2020); Matter of O-F-A-S-, 28 I. & N. Dec. 35 (A.G. 2020).

4

Add.194

And more proceedings have been scheduled before the immigration judge.[4]

**B.   Procedural History**

The lawful permanent resident filed a habeas corpus petition in a federal district court.

From here, he is called "the Petitioner."  The various people he named in his habeas petition are referred to, collectively, as "the Respondents."[5]

*    *    *

The Petitioner filed his case in New York, but it was transferred to New Jersey.  See Khalil v. Joyce, 2025 WL 849803 (S.D.N.Y. Mar. 19, 2025).

In New Jersey, the Respondents moved to dismiss the case, arguing it should go forward in Louisiana, where the Petitioner is in custody.  The motion was denied.  The Court held that

---

[4]  In addition to the Section 1227(a)(4)(C)(i) charge, federal officials have also pressed a second charge in immigration court against the lawful permanent resident, for allegedly not disclosing certain information when he applied for lawful permanent resident status.  See Additional Charges of Inadmissibility/Deportability at 1.  Federal officials are also seeking to remove the lawful permanent resident from the United States based on the failure-to-disclose charge.  See id.  The immigration judge has scheduled a proceeding for next month on that charge.

[5]  The Respondents are listed in the Petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

5

habeas jurisdiction is proper in New Jersey.  See Khalil v. Joyce, 2025 WL 972959 (D.N.J. Apr. 1, 2025).[6]

But as the Court noted: there are "other jurisdictional hurdles."  Khalil v. Joyce, 2025 WL 1019658, at *1 n.2 (D.N.J. Apr. 4, 2025).

This Opinion considers them.

### C.    **The Motion**

The Petitioner has moved for a preliminary injunction.  See ECF 66.

Through this motion, he asks the Court to order three things.  See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief ("Motion for Preliminary Injunction") (ECF 124) at 9-10.

*    *    *

First, and as noted above, the Secretary of State has determined that the Petitioner's presence and activities in the United States "would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest."  Determination at 1.  And based on the Secretary's determination, the immigration judge has ruled that the Petitioner can be removed from the United States.  See April 11 Audio Recording at 1:37:46 to 1:38:25.

The Petitioner asks the Court to order that the Secretary's determination be set aside, vacated.  See Motion for Preliminary Injunction at 9.

The determination, the Petitioner argues, was made in retaliation for statements the Petitioner made on political

---

[6]  The Respondents asked the Court of Appeals to review this decision, and the Petitioner has opposed that request.  See Petition for Permission to Appeal an Interlocutory Order of the United States District Court for the District of New Jersey Pursuant to 28 U.S.C. § 1292(b) at 1-2, Khalil v. President U.S. (No. 25-08019); Opposition to Petition for Permission to Appeal an Interlocutory Order of the U.S. District Court for the District of New Jersey Pursuant to 28 U.S.C. § 1292(b) at 1-3, Khalil v. President U.S. (No. 25-08019).

issues, and this retaliation violates the First Amendment.  <u>See</u>
<u>id</u>. at 10-18.[7]

\*     \*     \*

<u>Second</u>, the Petitioner alleges that the Respondents are pursuing
a policy to "to arrest, detain, and seek to remove noncitizens
who engage in expressive activities . . . supporting Palestinian
rights," <u>id</u>. at 4, --- and that it is because of this policy
that federal official are seeking to remove him from the United
States.  <u>See</u> <u>id</u>.

The Petitioner asks the Court to order that the policy be
stopped.  <u>See</u> <u>id</u>. at 9-10.

The policy violates the First Amendment, the Petitioner says,
because it is premised on "viewpoint discrimination," <u>id</u>. at 19
--- it operates against people who take one view in certain
public debates, but not those who take other views.

And the policy also violates the Fifth Amendment, the Petitioner
says, because it is too vague --- and due process requires

---

[7]  Two things.  <u>First</u>, the Petitioner also argues that the
Secretary's determination is unconstitutionally vague.  <u>See</u>
Motion for Preliminary Injunction at 23-24.  (But note that the
Petitioner does not argue in his petition that Section
1227(a)(4)(C)(i) is <u>itself</u> unconstitutionally vague.)  <u>Second</u>,
in a footnote in one of his legal briefs, the Petitioner
references the second charge against him, the one based on his
alleged failure to make certain disclosures in his lawful-
permanent-resident application.  <u>See</u> Petitioner's Reply in
Support of Motion for Preliminary Injunctive Relief ("Reply
Brief") (ECF 175) at 16 n.11.  But there is no reference to this
in the habeas petition.  <u>See</u> <u>Salas</u> v. <u>Warren</u>, 2019 WL 3423534,
at \*1 n.1 (D.N.J. July 30, 2019) (declining to consider claims
that the petitioner raised in his traverse, rather than his
petition); <u>Quang Van Nguyen</u> v. <u>Wenerowicz</u>, 2013 WL 6473264, at
\*6 (E.D. Pa. Dec. 10, 2013) (similar, as to claims first raised
in a reply brief); <u>accord</u>, <u>e.g.</u>, <u>Carrascosa</u> v. <u>McGuire</u>, 520 F.3d
249, 264 (3d Cir. 2008); <u>St. John</u> v. <u>Ashcroft</u>, 43 F. App'x 281,
282 (10th Cir. 2002); <u>Bracken</u> v. <u>Dormire</u>, 247 F.3d 699, 702 (8th
Cir. 2001).  Nor does the legal brief purport to seek relief
from the Court based on the second charge.  No challenge to the
second charge is before the Court.

7

precision, so that people can know in advance what the government might seek to do. See id. at 16.

*   *   *

Third and finally, the Petitioner says he is being detained by immigration authorities in retaliation for the public statements he has made, see id. at 33, and also to "chill" him from making other statements. See id. This, the argument goes, violates the Petitioner's First Amendment rights --- and the Court should therefore order the Petitioner released from custody. See id. at 9.

### D.    **The Response**

The Petitioner, as noted, has sought a preliminary injunction as to each of the three things set out above.

In doing so, the Petitioner is asking for a remedy at an early stage of this case, before it runs its typical and full course.[8]

To win a preliminary injunction, a litigant must show a number of things.

One of them: that he is "likely" to be the ultimate winner --- when the case is over and done, and reaches its normal finish line. See, e.g., Starbucks Corp. v. McKinney, 602 U.S. 339, 345 (2024).

The Respondents argue that the Petitioner has not met this standard. See Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction ("Opposition Brief") (ECF 156) at 8-32.

As to why, some of the Respondents' arguments focus on the merits of the case. See id. at 23-32.

Others zero in on the Court's power over the case --- in particular, on a set of statutes that the Respondents say take away this Court's jurisdiction. See id. at 8-21.

## II.  **The Question**

"Jurisdiction is, as always, the 'first and fundamental question.'" Baymont Franchise Sys., Inc. v. Narnarayandev, LLC,

---

[8]  For example, there has been no discovery to this point, or testimony.

8

348 F.R.D. 220, 227 (D.N.J. 2024) (quoting <u>Great S. Fire Proof Hotel Co.</u> v. <u>Jones</u>, 177 U.S. 449, 453 (1900)).

This is because a court that does not have jurisdiction does not have power over a case.  It cannot decide the merits, <u>see</u> <u>Steel Co.</u> v. <u>Citizens for a Better Env't</u>, 523 U.S. 83, 94 (1998), and so it should not speak to them.

Against this backdrop, the Court will consider in this Opinion solely whether it has jurisdiction.  Merits issues (and other issues, like venue) will be taken up later.

\*     \*     \*

Begin the jurisdictional analysis by getting a fuller sense of the main issue that is on the table.

The Court starts off with jurisdiction here.

The habeas corpus statute gives federal district courts jurisdiction over habeas cases, <u>see</u> 28 U.S.C. § 2241(a), and this is a habeas case.  <u>See</u> Second Amended Petition ("Petition") (ECF 162) ¶ 20.

Moreover, the Court has previously ruled that it has habeas jurisdiction over this case in particular.  <u>See</u> <u>Khalil</u>, 2025 WL 972959.

The question, then, is this: does anything take away the Court's jurisdiction?

The Respondents say yes, and they point to two "jurisdiction-stripping" statutes.  <u>See</u> Opposition Brief at 9–20, 23.

The statutes are in Title 8 of the United States Code, at Section 1252(g) and Section 1252(b)(9).  Their current versions became law in 2005.[9]

If these statutes do <u>not</u> strip away this Court's habeas jurisdiction, then things stay as they were and this Court resolves the case.

If these statutes <u>do</u> strip away this Court's habeas jurisdiction, then the way forward is different.  The front-line review will be done by the immigration courts.

---

[9]  Another statute is invoked, too.  <u>See</u> Opposition Brief at 20–21.  But it is mostly irrelevant here, and is therefore taken up only later, in Part VIII.

Either way, though, the <u>next</u> rung up on the ladder is the same. Whoever does the first-cut look, this Court or the immigration courts, what follows is review in a federal court of appeals (and after that, review would be possible in the Supreme Court).[10]

### III. **The Court's Approach**

The Court first takes up the Respondents' argument that Section 1252(b)(9) strips jurisdiction.

Section 1252(b)(9), it is said, prevents this Court from considering the Petitioner's claim that the Secretary of State's determination under Section 1227(a)(4)(C)(i) was unconstitutional.

Out of the gate, this Section 1252(b)(9) argument looks strong. <u>See</u> Part IV.A.

But ultimately, it is not persuasive.

This is because Section 1252(b)(9) applies only <u>after</u> a final order of removal has been entered by the immigration courts. The words of the statute say so. <u>See</u> Part IV.B. And so has the Third Circuit.[11] <u>See</u> Part IV.C.

But no final order of removal has been entered in this case. Therefore, Section 1252(b)(9) does not apply.

---

[10] The text refers to immigration <u>courts</u> because, as noted in footnote 3, certain rulings from immigration judges can be appealed to the Board of Immigration Appeals. Review by a federal court of appeals generally takes place only <u>after</u> the Board of Immigration Appeals has ruled. <u>See</u>, <u>e.g.</u>, <u>Dia</u> v. <u>Ashcroft</u>, 353 F.3d 228, 234 (3d Cir. 2003). If this Court has jurisdiction and is responsible for initially handling the case, any appeal would be to the federal court of appeals for the Third Circuit. <u>See</u> 28 U.S.C. § 1291. If this Court does not have jurisdiction and the immigration courts therefore do the ground-floor review, then any appeal would be to the federal court of appeals for the circuit that covers Louisiana, where the Petitioner is held; that is the Fifth Circuit. <u>See</u> 8 U.S.C. § 1252(b)(2).

[11] In a case called <u>Chehazeh</u> v. <u>Attorney General of the United States</u>, 666 F.3d 118 (3d Cir. 2012).

*     *     *

There is, though, a wrinkle.

In another case,[12] the Third Circuit has suggested that Section
1252(b)(9) can apply, as here, <u>before</u> a final order of removal
has been entered by the immigration courts.

But even on the assumption that the second case is controlling,
Section 1252(b)(9) does not remove jurisdiction from this Court
as to the Secretary of State's determination.

Under the second case, Section 1252(b)(9) strips jurisdiction
from a federal district court over a claim only when that claim
could still get "meaningful" federal court review later ---
after the immigration courts have wrapped up their work, and the
claim then goes to a federal court for the first time, a federal
court of appeals.  <u>See</u> Part V.

But in this case, that sort of <u>delayed</u> federal court review
would not be "<u>meaningful</u>" federal court review.

This is for two reasons.

First, because there would be little to show for any such delay.
Usually, the immigration courts can tee things up for the
federal court of appeals, by providing a remedy for any illegal
conduct, by finding the facts, and by applying their distinctive
expertise.  But the immigration courts cannot do any of that as
to the Secretary of State's determination.  <u>See</u> Part VI.A to
Part VI.C.

And second, the law requires sped-up judicial review of First
Amendment claims of the kind the Petitioner raises here.  That
is not consistent with delaying federal court review until after
the immigration courts have finished their work and the case
then moves to a federal court of appeals.  <u>See</u> Part VI.D.

*     *     *

Next, the Court considers the Respondents' argument that Section
1252(g) cuts off review here of the Secretary of State's
determination.

---

[12]   <u>EOHC</u> v. <u>Secretary United States Department of Homeland
Security</u>, 950 F.3d 177 (3d Cir. 2020).

11

Add.201

But the Section 1252(g) argument does not work.  It runs aground
on the plain words of the statute and the Supreme Court's main
decision in this area.[13]  See Part VII.

*     *     *

Finally, the Court considers the alleged policy that the
Petitioner has challenged --- and assesses whether Section
1252(b)(9) or Section 1252(g) take away jurisdiction from this
Court to consider it.

As to the policy, the jurisdiction-stripping argument is not
persuasive for most of the same reasons it was not persuasive as
to the Secretary's determination, plus a few more.  See Part
VIII.[14]

**IV.   Section 1252(b)(9) Does Not Apply Here**

Get underway now with the jurisdictional analysis.

The Respondents' first argument is that Section 1252(b)(9)
removes this Court's jurisdiction to consider the Petitioner's
request for an injunction vacating the Secretary of State's
determination.  See Opposition Brief at 9-14.

At first, this argument looks strong.  See Part IV.A.

But in the end, it does not work.  Section 1252(b)(9) does not
apply in cases like this one, in which a final order of removal
has not been entered by the immigration courts.  See Part IV.B.
And the Third Circuit has confirmed as much.  See Part IV.C.

Bottom line: Section 1252(b)(9) is irrelevant here.  It applies
to post-order-of-removal cases, and this is a pre-order-of-
removal case.

**A.   Section 1252(b)(9)**

To start off, bracket for a few moments the question of whether
Section 1252(b)(9) does or does not apply to pre-order-of-
removal cases like this one.  Assume, instead --- and throughout

---

[13]   The decision is Reno v. American-Arab Anti-Discrimination
Committee, 525 U.S. 471 (1999).

[14]   There is also a third statute. Its impact is marginal, and it
is considered briefly in Part VIII.

12

this Part IV.A --- that Section 1252(b)(9) applies to such cases.

Under the statute, there is a four-part test for deciding whether Section 1252(b)(9) removes jurisdiction over a given claim.  See Part IV.A.2.

Applying that test, the Court concludes that Section 1252(b)(9), assuming that it applies, would strip away this Court's jurisdiction over the Petitioner's claim that the Secretary of State's determination is unconstitutional.  See Part IV.A.3.

That sets the stage for the question taken up in Part IV.B and in Part IV.C: does Section 1252(b)(9) apply in pre-order-of-removal cases like this one?

### 1.   **The Statute**

Begin, as always, with the words Congress used in the law it passed.  See Lawson v. FMR LLC, 571 U.S. 429, 440 (2014); United States v. Turkette, 452 U.S. 576, 580 (1981).

Here, those words are "clear and distinct," Martin v. Hunter's Lessee, 14 U.S. (1 Wheat.) 304, 339 (1816), so they must be enforced as written.  See Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (collecting cases).

And their effect here is unmissable.  If Section 1252(b)(9) applies, there is no jurisdiction in this Court over the Petitioner's challenge to the Secretary of State's determination.

\*      \*      \*

In relevant part, Section 1252(b)(9) says:

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9).

\*      \*      \*

13

This part of Section 1252(b)(9) does not itself say when and where the "judicial review" it mentions is to take place.

But other parts of Section 1252 do. They make clear that the "judicial review" alluded to in Section 1252(b)(9) is conducted <u>only</u> by federal courts of appeals, with federal district courts having no role. And the court of appeals' review kicks in after the immigration courts are done with their work --- after the Board of Immigration Appeals has affirmed the immigration judge's order or after the time for appealing to the Board has run out.[15]

## 2.   <u>The Question</u>

As set out just above, if "judicial review" is covered by Section 1252(b)(9), then that review must happen <u>only</u> later (after the immigration courts have finished their work) and <u>only</u> elsewhere (in the federal court of appeals, not here).

---

[15]  The sources for the statements in the text are laid out here. As to <u>when</u> the "judicial review" alluded to in Section 1252(b)(9) takes place: that review is of "an order of removal under subsection (a)(1)," <u>id</u>. § 1252(b); subsection (a)(1) clarifies that an "order of removal" is "a <u>final</u> order of removal," <u>id</u>. § 1252(a)(1) (emphasis added); and an order of removal becomes "final" on the earlier of "a determination by the Board of Immigration Appeals affirming such order" or "the expiration of the period in which the alien is permitted to seek review of such order by the Board of Immigration Appeals." <u>Id</u>. § 1101(a)(47)(B); <u>Yusupov</u> v. <u>Att'y Gen. of U.S.</u>, 518 F.3d 185, 195 (3d Cir. 2008), <u>as amended</u> (Mar. 27, 2008). As to <u>where</u> "judicial review" will go forward: in a federal court of appeals, <u>see</u> 8 U.S.C. § 1252(a)(5), and in particular in the court of appeals that sits in "the judicial circuit in which the immigration judge completed the proceedings." <u>Id</u>. § 1252(b)(2); <u>see</u> <u>Castillo</u> v. <u>Att'y Gen. of U.S.</u>, 109 F.4th 127, 129 (3d Cir. 2024). And critically: court of appeals review will be the "[e]xclusive means of review." 8 U.S.C. § 1252(a)(5). Exclusive means exclusive. The federal "judicial review" described in Section 1252(b)(9) will happen <u>only</u> in a court of appeals. That rules out a place in the process for the district court.

The question, then, is this: is the judicial review the Petitioner seeks here, of the Secretary of State's determination, covered by Section 1252(b)(9)?

If it is not covered, then Section 1252(b)(9) is no hurdle to this Court keeping jurisdiction.

If it is covered, Section 1252(b)(9) strips jurisdiction --- and review by this Court would be out of bounds.

*     *     *

To answer the question, look to the front end of Section 1252(b)(9), the part <u>before</u> the word "shall."

Again, Section 1252(b)(9):

> Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter <u>shall</u> be available only in judicial review of a final order under this section.

8 U.S.C. § 1252(b)(9) (emphasis added).

What judicial review is covered by the first half of the sentence?

"Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter[.]"   <u>Id.</u>

In other words, Section 1252(b)(9) kicks in when four conditions are met:

> 1. There is "any action . . . or proceeding,"
> 2. "to remove an alien from the United States,"
> 3. "under this subchapter," and
> 4. judicial review is sought as to "a[] question[] of law and fact" that "aris[es] from" such "action" or "proceeding."

Below, the Court ticks through these --- and concludes that each of the four boxes is checked.

15

What this means: Section 1252(b)(9) covers judicial review of
the Secretary of State's determination --- and so, if Section
1252(b)(9) applies in the first place,[16] that Section prevents
this Court from assessing the Secretary's determination.

### 3.   **The Answer**

Section 1252(b)(9), as noted, spins off a four-part test for
deciding whether judicial review of a claim is covered by the
statute.  See Part IV.A.2.

As shown below, each part of the test is satisfied.[17]

### a)   **"Action"**

Is the Secretary's determination an "action" or "proceeding"
within the meaning of Section 1252(b)(9)?

The Court's conclusion: it is an "action."

At around the time of Section 1252(b)(9)'s initial enactment in
1996, authoritative sources understood "action" broadly.[18]

The Oxford English Dictionary defined "action" as "a thing done,
a deed."  Action, n., sense 3.a, Oxford English Dictionary (2d

---

[16]  Recall: that is assessed below, in Part IV.B and Part IV.C.

[17]  Section 1252(b)(9)'s key terms are not defined by the
statute.  See 8 U.S.C. § 1101(a) (defining other terms in the
statute).  Therefore, the Court looks to the ordinary and
contemporary meanings of the words Congress used in the Section.
See Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014).
This includes referring to time-of-enactment dictionaries, both
general and legal.  See, e.g., Sandifer, 571 U.S. at 227;
Taniguchi v. Kan Pac. Saipan, Ltd., 566 U.S. 560, 566–67 (2012);
see also Khalil, 2025 WL 972959, at *17.

[18]  Section 1252(b)(9) was first passed in 1996, and its current
version dates to 2005.  Why the focus on 1996?  Because that is
when the relevant sentence of Section 1252(b)(9) was passed.
See Illegal Immigration Reform and Immigrant Responsibility Act
of 1996, Pub. L. No. 104-208, 110 Stat. 3009.  In 2005, more
words were added to Section 1252(b)(9) to specify that it
reached habeas jurisdiction.  See REAL ID Act of 2005, Pub. L.
No. 109-13, 199 Stat. 305.  But none of those words is at issue
in this Opinion.

16

ed. 1989).  And a leading legal dictionary went roughly the same way.  See Action, Black's Law Dictionary (6th ed. 1990) ("something done.").

In making his determination, formalized through a memorandum, the Secretary of State took an action.  Writing or approving a memo is not something that just happens; it takes doing --- the "do[ing]" of "something."

The inquiry could end there.

And it would, except that something else reinforces the conclusion that the Secretary's determination is an "action." Namely, Congress put the word "any" before the word "action"; the statute says "any action."  8 U.S.C. § 1252(b)(9) (emphasis added).

And putting "any" before a word confirms it must be understood in an inclusive way, to reach the outer edge of its possible orbit.

A year after Section 1252(b)(9) first became law, for example, the Supreme Court said: "Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'"  United States v. Gonzales, 520 U.S. 1, 5 (1997) (quoting Webster's Third New International Dictionary 97 (1976)).

This wide-angle view of "any" matches up with a long line of Supreme Court cases.

In Collector of Internal Revenue v. Hubbard, 79 U.S. 1, 15 (1870), for example, the Supreme Court interpreted a statute that said certain tax suits shall not "be maintained in any court."  79 U.S. at 3.  It was "quite clear" that "any court" meant any court, federal or state.  Id. at 15.

More recently, the Court reaffirmed that "any" "ordinarily 'refers to a member of a particular group or class without distinction or limitation' and in this way 'implies every member of the class or group.'"  SAS Inst., Inc. v. Iancu, 584 U.S. 357, 362 (2018) (cleaned up) (quoting Any, Oxford English Dictionary (3d ed. 2016)); see also United States v. Alvarez-Sanchez, 511 U.S. 350, 358 (1994).

\*     \*     \*

Bottom line:

17

The Secretary of State's determination was a decision made as to the Petitioner, and it culminated in a physical thing in the world -- the memorandum that reflects the determination.  The determination was "something done," and that is what "action" means.

And whatever possible doubt there might be is dissipated by Congress' use of "any action."  Per that phrase, Section 1252(b)(9) covers all actions --- without qualification, nothing carved out.

This conclusion, that the Secretary's determination is an "action," is linguistically obvious.

So much so that the Petitioner seems to see things in the same way.  In making his determination, the Petitioner writes in his legal brief, the Secretary "had taken [an] action." Motion for Preliminary Injunction at 17 (emphasis added); see also id. at 1, 7, 13 (describing the challenged conduct as an "action").

$$*\qquad*\qquad*$$

The first of the four Section 1252(b)(9) boxes is checked.  The Secretary's determination counts as an "action."

$$*\qquad*\qquad*$$

Before moving on, note a possible counterargument.

Namely, it might be argued that Section 1252(b)(9) refers only to an "action" of the legal sort --- as in, say, a civil action, or some other kind of lawsuit.  After all, one of the basic definitions of "action" is "[a] legal process or suit."  Action, n., sense 8, Oxford English Dictionary (2d ed. 1989).

If this were the right understanding of Section 1252(b)(9), the Secretary's determination could not be chalked up as an "action."  The determination is "a thing done."  Action, n., sense 3, Oxford English Dictionary (2d ed. 1989).  But it is not a lawsuit.

This sort of reading, though, does not make sense.

For starters, Section 1252(b)(9) does not speak of "bringing" an action, but of "tak[ing]" one.

In everyday English, people "take action" all the time.  But people do not "take a civil action" --- they bring one.

18

That is how the words have been used for centuries. See, e.g., id. (quoting 1 Tomlins, Law Dictionary (1809)) ("A man attainted of treason . . . cannot bring an action.").

And to see the proof: across 200 years, the U.S. Reports contain 136 mentions of a "civil action brought" --- but none of a civil action "taken." Cf. Delligatti v. United States, 145 S. Ct. 797, 813 (2025) (Gorsuch, J., dissenting) ("[A]nalyzing 'how particular combinations of words are used in a vast database of English prose' can shed light on how ordinary people understand statutory terms.") (quoting Facebook, Inc. v. Duguid, 592 U.S. 395, 412 (2021) (Alito, J., dissenting)).

Moreover, to read "action" in its legal sense would make redundant another term in Section 1252(b)(9) --- "proceeding."

"Proceeding" covers a part of the legal process. See Proceeding, Black's Law Dictionary (6th ed. 1990) ("[T]he form and manner of conducting juridical business before a court or judicial officer."); Proceeding, vbl. n., sense 3, Oxford English Dictionary (2d ed. 1989) ("The instituting or carrying on of an action at law[.]"); see also Waetzig v. Halliburton Energy Servs., Inc., 145 S. Ct. 690, 698–99 (2025) (surveying definitions of "proceeding").

As the Supreme Court confirmed this Term: "'proceeding' encompasses all steps in an action." Waetzig, 145 S. Ct. at 699.

If "proceeding" sweeps in the full arc of "an action," as the Supreme Court's recent opinion suggests, then "action" --- if it is understood in its legal sense --- would be fully encompassed within "proceeding."

The two words would cover the same thing. They would become redundant. One or the other would be reduced to surplus, an unnecessary bit of add-on. And reading statutes to create redundancies and surplus --- that is not how things are supposed to go. See Bufkin v. Collins, 145 S. Ct. 728, 741 (2025); Waetzig, 145 S. Ct. at 699; Marbury v. Madison, 5 U.S. (1 Cranch) 137, 174 (1803).

And note a final point.

On the few occasions it has discussed Section 1252(b)(9), the Supreme Court has used "action" in its general sense --- not in any legal sense. See, e.g., Jennings v. Rodriguez, 583 U.S.

19

281, 293 (2018) (suggesting that placing someone in detention is an "action"); Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483 (1999) ("AADC") (similar).

In a nutshell: the possible counterargument sketched out here does not work.  As used in Section 1252(b)(9), "action" means what it usually does.  It does not mean a lawsuit.[19]

### b)    "To Remove"

The first of the four Section 1252(b)(9) boxes is checked.  See Part IV.A.3(a).  The Secretary of State's determination was an "action taken."

The next question: was the "action taken to remove an alien from the United States"?  8 U.S.C. § 1252(b)(9) (emphasis added).

It was.

The key word in the quoted phrase is "to."

As used with the verb "remove," "to" signals "purpose or intention."  To, sense B.I, Oxford English Dictionary (2d ed. 1989).

And the cases confirm what the dictionaries say.  See, e.g., Loughrin v. United States, 573 U.S. 351, 354-55 (2014)

---

[19]  To be sure, courts sometimes analyze a word with reference to its neighbor.  See Jones v. United States, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase gathers meaning from the words around it.") (cleaned up); see also Jarecki v. G.D. Searle & Co., 367 U.S. 303, 307 (1961); Amy Coney Barrett, Congressional Insiders and Outsiders, 84 U. Chi. L. Rev. 2193, 2197 n.11 (2017).  And so it might be argued here that "proceeding" (which undoubtedly has a legal meaning) should be taken to overspill itself, and to color the meaning of the neighboring "action" --- leaving "action" with some legalistic hues (a civil action, a lawsuit).  But that does not work.  If "action" and "proceeding" are each assigned a legal-shaded meaning, the words become redundant.  Courts often look to contextual clues to avoid superfluous readings.  See, e.g., United States v. Kaluza, 780 F.3d 647, 659 (5th Cir. 2015).  But they have rejected contextual arguments that create redundancy. See, e.g., Waetzig, 145 S. Ct. at 699; Arcadia v. Ohio Power Co., 498 U.S. 73, 78 (1990).

(concluding that "to obtain" in 18 U.S.C. § 1344 signals
"inten[t]"); <u>Allison Engine Co.</u> v. <u>U.S. ex rel. Sanders</u>, 553
U.S. 662, 668 (2008) (concluding that "to get" in the relevant
statute "denotes purpose").

*     *     *

Given the above, the question is this: was the Secretary of
State's determination (an "action") done ("taken") with the
purpose or intention ("to") of removing an alien from the United
States"?

Yes, clearly.

When a Secretary of State says he has "reasonable ground[s] to
believe" that a person's "presence or activities in the United
States . . . would have potentially serious adverse foreign
policy consequences for the United States"[20] --- that statement
has only one known function in our law.

And that function is to seek the person's removal from the
United States.  <u>See</u> 8 U.S.C. § 1227(a)(4)(C)(i) ("[a]n alien"
who meets the criteria quoted just above "is deportable.").

The memo that formalizes the Secretary's determination confirms
this.

Its "subject" line says that it concerns "[r]emovability
[d]eterminations" under the immigration laws.  <u>See</u> Determination
at 1.

The first paragraph of the memo explains that the Secretary has
deemed the Petitioner to be a "deportable alien[]" under the
removal statute.  <u>See</u> <u>id</u>.  The second paragraph lays out the
Secretary's understanding of the relevant statute.  <u>See</u> <u>id</u>.  And
the last paragraph asserts that the Petitioner's "presence" in
the United State would harm American foreign policy.  <u>See</u> <u>id</u>. at
1-2.

In short: under Section 1252(b)(9), "to remove an alien from the
United States" means to act with the intent or purpose to remove
someone.  And that was the purpose of the Secretary's
determination.

---

[20]  That is in essence what the Secretary's determination says
here.  <u>See</u> Determination at 1-2.

21

### c)   <u>**"Under This Subchapter"**</u>

Next: Section 1252(b)(9) applies when the claim in question "aris[es] from any action taken . . . under this subchapter."

The subchapter in question is Subchapter II of Chapter 12 of Title 8 --- the part of the Immigration and Nationality Act that spans Section 1151 to Section 1382.

And the Secretary made his determination under 8 U.S.C. § 1227(a)(4)(C), which is part of Subchapter II.

So the Petitioner's claim, which challenges the Secretary's determination, "aris[es] from an[] action taken . . . under this subchapter."

### d)   <u>**"Arising From"**</u>

To this point, the Court has concluded that the Secretary's determination was (a) an action taken (b) to remove an alien from the United States (c) under the relevant subchapter.

That leaves a fourth and final question.

Judicial review is sought here to enjoin the Petitioner's detention as a violation of the First Amendment.  <u>See</u> Petition ¶¶ 89-90.

Does assessment of that "question[]. . . aris[e] from an[] action taken [the Secretary's determination] to remove an alien [the Petitioner] from the United States"?

Yes.

The Supreme Court has recently debated what "arising from" means in Section 1252(b)(9).  <u>See</u> <u>Jennings</u>, 583 U.S. 281.  How tight must the nexus be between A and B to say that B arises from A?

Whatever the answer to that question might be in the abstract, there can be no doubt that review of the legality of the Petitioner's detention "aris[es] from" the Secretary's determination.

The two are tightly yoked together.  The Secretary of State's determination is not tangential to the detention of the Petitioner or his removal under Section 1227(a)(4)(C)(i).  Quite the opposite.  The determination is what allows removal to go forward in the first place --- indeed, it has <u>only</u> that purpose under the law, and it is the <u>only</u> piece of evidence put forward

22

before the immigration courts in support of a Section 1227(a)(4)(C)(i) removal.

\*   \*   \*

To sum up:

Built into Section 1252(b)(9) is a four-part test for deciding whether judicial review is or is not covered.

Here, that test is satisfied, for the reasons set out above.[21]

---

[21]  And also: this conclusion gets support from two statements about Section 1252(b)(9) in AADC.  There, the Supreme Court said that Section 1252(b)(9) "channels judicial review of all" relevant "decisions and actions, 525 U.S. at 483 (emphasis in original), to the immigration courts and the court of appeals. And Section 1252(b)(9) is a "zipper" clause, that "says 'no judicial review in deportation cases unless this section provides judicial review.'"  Id. at 482.  These statements strengthen the conclusion that the Secretary's determination is covered by Section 1252(b)(9).  But they should not be treated as definitively fixing the meaning of Section 1252(b)(9). First, subsequent cases have limited these statements.  Justice Alito's Jennings plurality opinion, for example, construed Section 1252(b)(9) as allowing for judicial review of prolonged immigration detention in a federal district court, see 583 U.S. at 294-95 --- and that would seem to be at odds with the quotes from AADC.  Second, the AADC statements about Section 1252(b)(9) were dicta; the holding in AADC was about the meaning of a different immigration-related provision, 8 U.S.C. § 1252(g). See 525 U.S. at 473.  And third, when the AADC Court said that Section 1252(b)(9) covers "all" actions and decisions, see id. at 483, it was rejecting an argument that Section 1252(g) covers all actions from the beginning ("commence[ment]") to the end ("execut[ion]" of removal orders).  See AADC, 525 U.S. at 482-83.  Section 1252(g) could not mean that, the Court reasoned, because Section 1252(b)(9) already does.  See id. at 483.  But even if 1252(b)(9) covers all actions between commencement and execution, it might arguably have nothing to say about the Secretary of State's determination --- because that is a pre-commencement step.  All of this said, though, the AADC statements tip the scales, at least to an extent, toward the conclusion that the Secretary's determination is covered by Section 1252(b)(9).  After all, Supreme Court dicta carry special weight.  See, e.g., Singh v. Uber Techs. Inc., 939 F.3d 210, 223 (3d Cir. 2019).  And the AADC Section 1252(b)(9)

23

What this means: <u>assuming</u> that Section 1252(b)(9) applies here
in the first place, this Court has no jurisdiction to consider
the Petitioner's claim as to the Secretary's determination.

Is this assumption right?  Take that up now.

**B.    The Text**

The words of Section 1252(b)(9) seem to cover the Petitioner's
challenge to the Secretary's determination.  <u>See</u> Part IV.A.

But the analysis that supports this conclusion, <u>see id</u>., is
zoomed in to a fault.  Pan out to see the rest of the statute,
and what becomes clear is this: Section 1252(b)(9) does not
apply here as a categorical matter.  It does not reach cases
like this one, in which a final order of removal has not been
entered.

                        *      *      *

Section 1252(b)(9) is part of Section 1252(b), and Section
1252(b) starts with a lead-in.

> With respect to review of an order of
> removal . . . , the following requirements
> apply:

From there, Section 1252(b) runs through a set of numbered
"requirements," 1252(b)(1), (b)(2), and so on --- out to (b)(9).

With that structure in mind, look to some relevant parts of
Section 1252(b):

> **(b) Requirements for review of orders of
> removal**
>
> With respect to review of an order of
> removal . . . , the following requirements
> apply:

---

statements are not <u>pure</u> dicta; they take some steps down the
road in the "holding" direction.  This is because the <u>AADC</u>
Court's broad reading of Section 1252(b)(9) may have been a
necessary element of the Court's actual holding, as to the scope
of Section 1252(g).  <u>See</u> 525 U.S. at 483.  And logically
necessary and explicitly invoked steps along the way to a
holding can be binding.  <u>See</u>, <u>e.g.</u>, <u>Seminole Tribe of Fla.</u> v.
<u>Florida</u>, 517 U.S. 44, 67 (1996).

24

**(1) Deadline**

The petition for review must be filed not later than 30 days after the date of the final order of removal.

**(2) Venue and forms**

The petition for review shall be filed with the court of appeals for the judicial circuit in which the immigration judge completed the proceedings . . . .

**(3) Service**

  **(A) In general**

  . . . The petition shall be served on the Attorney General and on the officer or employee of the [federal immigration agency] in charge of the . . . district in which the final order of removal . . . was entered. . . .

**(4) Scope and standard for review**

Except as provided in paragraph (5)(B)--

(A) the court of appeals shall decide the petition only on the administrative record on which the order of removal is based, . . . .

[ . . . ]

**(9) Consolidation of questions for judicial review**

Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.  Except as otherwise provided in this section, no court shall have jurisdiction, by habeas

25

Add.215

> corpus . . . , or by any other provision
> of law (statutory or nonstatutory), to
> review such an order or such questions of
> law or fact.

Looking to the full statute is required, and always has been.[22]

Doing so here makes clear that Section 1252(b)(9) has no bearing on this case.

Section 1252(b)(9) speaks to cases in which judicial review goes forward <u>after</u> the immigration courts enter a final order of removal.

But Section 1252(b)(9) does not purport to say anything about what happens when --- as here --- judicial review takes place <u>before</u> an order of removal is entered.

                    *     *     *

The point is clear from the get-go.

The title of Section 1252(b) says that the Section, which includes Section 1252(b)(9), is about "Requirements for review of orders of removal."

These words assume that an order of removal has <u>already</u> been entered.  After all, "review" means to "look at a thing again." <u>Review</u>, v., sense 1, <u>Merriam-Webster</u>, https://www.merriam-webster.com/dictionary/review (accessed Apr. 17, 2025); <u>accord</u>, <u>e.g.</u>, <u>Review</u>, v., sense 2, <u>Oxford English Dictionary</u> (2d ed. 1989) ("view, inspect, or examine a second time or again").

---

[22] <u>See</u> <u>The Mary Ann</u>, 21 U.S. 380, 387 (1823) ("[T]hose rules for construing statutes, which are dictated by good sense, and sanctioned by immemorial usage, . . . require that the intent of the Legislature shall have effect, which intent is to be collected from the context[.]"); <u>United States</u> v. <u>Fisher</u>, 6 U.S. (2 Cranch) 358, 386 (1805) ("It is undoubtedly a well established principle in the exposition of statutes, that every part is to be considered, and the intention of the legislature to be extracted from the whole."); <u>accord</u> <u>Gundy</u> v. <u>United States</u>, 588 U.S. 128, 141 (2019); <u>Nat'l Broad. Co.</u> v. <u>United States</u>, 319 U.S. 190, 214-16 (1943); <u>Durousseau</u> v. <u>United States</u>, 10 U.S. (6 Cranch) 307, 314 (1810); <u>Oneale</u> v. <u>Thornton</u>, 10 U.S. (6 Cranch) 53, 68 (1810); <u>see</u> <u>also</u> 1 William Blackstone, <u>Commentaries</u> *59.

And there can be no looking "again" at a thing (here, an order
of removal) that does not already exist.  If a movie is not out
until next year, a newspaper might run a preview.  But the
review comes after the fact --- after the filming and editing
are wrapped up and someone can sit and watch the final product.

Bottom line: Section 1252(b)'s heading ("Requirements for review
of orders of removal") shows that Section 1252(b)(9) kicks in
after a final order has been entered, not before.[23]

                          *     *     *

Other parts of Section 1252(b) point in the same direction.

Start from the top, with the Section 1252(b) lead-in.

It says that "[w]ith respect to review of an order of
removal . . . , the following requirements apply."  8 U.S.C.
§ 1252(b) (emphasis added).  And as noted, one of those
"requirements" listed under that Section is 1252(b)(9).

The clear implication:  Section 1252(b)(9) is about "review of
an order of a removal," not about a situation in which review
might take place before such an order exists.

Move now to the first substantive part of Section 1252(b),
Section 1252(b)(1).

Section 1252(b)(1) lays down a deadline for when a person must
act if he or she wants to seek out the judicial review that is
the subject of Section 1252(b): "The petition for review [in the

---

[23]  And note: in the context of Section 1252(b), courts routinely
reason from the language Congress used in the various statutory
headings.  See EOHC v. Sec'y U.S. Dep't of Homeland Sec., 950
F.3d 177, 186 (3d Cir. 2020) ("That is also why the provision is
captioned 'Consolidation of Questions for Judicial Review.'")
(cleaned up); see also Gonzalez v. U.S. Immigr. & Customs Enf't,
975 F.3d 788, 810 (9th Cir. 2020); Aguilar v. U.S. Immigr. &
Customs Enf't Div. of Dep't of Homeland Sec., 510 F.3d 1, 9 (1st
Cir. 2007); Singh v. Gonzales, 499 F.3d 969, 977 (9th Cir.
2007); Saint Fort v. Ashcroft, 329 F.3d 191, 198 (1st Cir.
2003); Mahadeo v. Reno, 226 F.3d 3, 12 (1st Cir. 2000); Flores-
Miramontes v. INS, 212 F.3d 1133, 1139 (9th Cir. 2000); Cath.
Soc. Servs., Inc. v. INS, 182 F.3d 1053, 1060 (9th Cir. 1999),
on reh'g en banc, 232 F.3d 1139 (9th Cir. 2000); cf. Cunningham
v. Cornell Univ., 2025 WL 1128943, at *6 (U.S. Apr. 17, 2025)
(in a different context, looking to statutory headings to
resolve possible doubt about statutory construction).

27

Add.217

court of appeals] must be filed not later than 30 days after the date of the final order of removal."

This timeline assumes that a final order of removal has been entered.  It happened.  It was done on a certain "date," and the 30-day countdown goes from there.

And note: Section 1252(b) provides no deadline for a court challenge that might be brought before the entry of a final order of removal.  Why not?  Because Section 1252(b) does not cover those sorts of challenges.

Walk through the statute and see more of the same.

Under Section 1252(b), the court challenge is to go forward in "the judicial circuit in which the immigration judge completed the proceedings."  Id. § 1252(b).  That makes sense if Section 1252(b) covers situations in which an order of removal has been entered.  But not if it also speaks to the period before an order has been entered.  At that point, the "proceedings" before the immigration judge are not "completed."  They are underway.

And along the same lines:

Why would Congress require service where "the final order of removal . . . was entered," id. § 1252(b)(3), if it meant for Section 1252(b) to cover situations in which there was not yet a final order of review that had been "entered"?

Why would Congress limit review "only" to "the administrative record on which the order of removal is based," 8 U.S.C. § 1252(b)(4)(A), if the review takes place before an order of removal, "based" on the record, has been entered?

In sum, a broader look shows that Section 1252(b)(9) comes online after an order of removal has been entered by the immigration courts.

Therefore, Section 1252(b)(9) does not purport to say anything about what might happen in cases like this one, cases that are brought before a final order of removal is entered.

The upshot: Section 1252(b)(9) has no role to play here, and so it cannot strip this Court of jurisdiction.

*     *     *

A final note.

28

On the understanding sketched out just above, Section 1252(b)(9) has an important role to play.

It tells federal district courts that, <u>after</u> an order of removal is finalized, they are not part of the mix.  The immigration courts will do the front-line work.  And the work of Article III judicial review belongs to the court of appeals, and fully.  An issue here or there --- those cannot be plucked out by a district court for its own review.

By conveying this message, Section 1252(b)(9) "streamlines" review, as courts have observed that it aims to.  See <u>Nken</u> v. <u>Holder</u>, 556 U.S. 418, 424 (2009); <u>F.J.A.P.</u> v. <u>Garland</u>, 94 F.4th 620, 628 (7th Cir. 2024); <u>Patel</u> v. <u>U.S. Att'y Gen.</u>, 971 F.3d 1258, 1269 (11th Cir. 2020), <u>aff'd sub nom.</u> <u>Patel</u> v. <u>Garland</u>, 596 U.S. 328 (2022); <u>Cooper Butt ex rel Q.T.R.</u> v. <u>Barr</u>, 954 F.3d 901, 906 (6th Cir. 2020).

And it also cuts off "piecemeal" litigation, another of its core purposes.  See <u>Gicharu</u> v. <u>Carr</u>, 983 F.3d 13, 18 (1st Cir. 2020); <u>Jama</u> v. <u>Dep't of Homeland Sec.</u>, 760 F.3d 490, 496 (6th Cir. 2014); <u>Chehazeh</u> v. <u>Att'y Gen. of U.S.</u>, 666 F.3d 118, 131 (3d Cir. 2012); <u>Aguilar</u> v. <u>U.S. Immigr. & Customs Enf't</u>, 510 F.3d 1, 9 (1st Cir. 2007).

But Section 1252(b)(9) does those things only where it applies --- and that is <u>after</u> orders of removal have been entered, not, as here, <u>before</u>.[24]

---

[24]  But it might be argued: this cannot be all.  Even <u>without</u> Section 1252(b)(9), few district judges would have imagined that they could review an issue that is brought to them while a court of appeals is already handling the overall case.  But this ignores the state of the law before Section 1252(b)(9) was passed in 1996.  See, <u>e.g.</u>, <u>Delligatti</u>, 145 S. Ct. at 806-07 (looking to a "[legal] principle [that] was well established" when a statute was enacted to inform interpretation of the statute).  In 1983, the Supreme Court held that "final orders" of removal "include[] all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing." <u>INS</u> v. <u>Chadha</u>, 462 U.S. 919, 938 (1983) (cleaned up).  This leaves behind a good many issues.  It might have been taken to imply that the court of appeals, when it reviews a final order of removal, takes up only a subset of

                        *       *       *

Here, the Petitioner does not seek judicial review of an order
of removal.  None has been finalized.  And therefore, Section
1252(b)(9) does not prevent this Court from considering the
Petitioner's claim that the Secretary's determination must be
set aside as unconstitutional.

"Jurisdictional rules . . . should be 'clear and easy to
apply.'"  Axon Enter., Inc. v. FTC, 598 U.S. 175, 212 (2023)
(Gorsuch, J., concurring) (quoting Hamer v. Neighborhood Housing
Servs. of Chi., 583 U.S. 17, 25 (2017)).  This one is.

    **C.    Chehazeh**

Do cases support the reading of Section 1252(b)(9) laid out just
above?

At the Supreme Court, there is no binding authority.  A majority
of Justices has not directly passed on the question one way or
another.[25]

_____

questions ("all matters on which the validity of the final order
is contingent") --- with room left for a district court to look
into other issues related to a case that is brought before it.
See Nasrallah v. Barr, 590 U.S. 573, 582 (2020) (making a
closely similar point in another immigration-law context).
Section 1252(b)(9), where it applies, shuts the door on that
sort of thinking --- because it says that review in the court of
appeals occupies virtually the whole playing field of possible
issues, well beyond those that the order of removal was
"contingent" on.  Court of appeals review covers "[j]udicial
review of all questions of law and fact, including
interpretation and application of constitutional and statutory
provisions, arising from any action taken or proceeding brought
to remove an alien."  8 U.S.C. § 1252(b)(9).

[25]  In short passages here and there, various Justices have
weighed in.  A dissent from Justice Breyer, joined by Justices
Ginsburg and Sotomayor, suggests that Section 1252(b)(9) applies
only to review of orders of removal that have already been
entered.  "Jurisdiction . . . is unaffected by 8 U.S.C.
§ 1252(b)(9), which by its terms applies only 'with respect to
review of an order of removal under § 1252(a)(1).'  The

                              30

But the Supreme Court addressed Section 1252(b)(9) in passing in an earlier case.

And based on that Supreme Court case, and based on an earlier decision of its own, the Third Circuit has held that Section 1252(b)(9) applies only <u>after</u> a final order of removal has been entered --- and such an order, as noted, has not been entered here as to the Petitioner.

The Third Circuit's analysis and holding as to Section 1252(b)(9) is quoted here in full:

> [T]he Supreme Court has noted that § 1252(b)(9) is subject to the limitations of § 1252(b), and, therefore, "applies only 'with respect to review of an order of removal under subsection (a)(1).'" <u>INS</u> v. <u>St. Cyr</u>, 533 U.S. 289, 313, (2001) (quoting 8 U.S.C. § 1252(b)). Section 1252(b)(9), "by its own terms," does not bar review of an order "not subject to judicial review under § 1252(a)(1)," <u>St. Cyr</u>, 533 U.S. at 313, and § 1252(a)(1) describes only "review of a final order of removal." <u>See</u> 8 U.S.C. § 1252(a)(1) ("Judicial review of a final order of removal . . . is governed only by chapter 158 of title 28, except as provided in sub[s]ection (b) of this section . . . ."). Section 1252(b)(9), therefore, requires only that, when there is

respondents challenge their detention without bail, not an order of removal." <u>Jennings</u>, 583 U.S. at 355 (Breyer, J., dissenting) (cleaned up). On the other hand, a dissent from Justice Thomas, joined by Justice Alito, seems to suggest the opposite view, that Section 1252(b)(9) limits district-court review even before an order of removal has been entered. "[Section] 1252(b)(9) covers all 'questions of law and fact' that an immigration judge must decide as a result of the Government's decision to initiate removal proceedings against an alien." <u>Nasrallah</u>, 590 U.S. at 590 (Thomas, J., dissenting). And note that a concurrence from Justice Thomas, joined by Justice Gorsuch, necessarily rests on the idea that Section 1252(b)(9) applies even before orders of removal are entered. <u>See</u> <u>Jennings</u>, 583 U.S. at 319-21 (Thomas, J., concurring). For more on <u>Jennings</u>, see Part IV.A.3(d).

31

an order of removal under subsection (a)(1),
review of any issues related to that order
must be consolidated into a single petition
for review and cannot be brought piecemeal.
One may not, for instance, follow a petition
for review with a habeas petition or a
petition for a writ of mandamus.

Although St. Cyr issued prior to the REAL ID
Act, the REAL ID Act did not modify
§ 1252(b) or the instruction that
§ 1252(b)(9) "applies only 'with respect to
review of an order of removal under
subsection (a)(1).'" St. Cyr, 533 U.S. at
313 (quoting 8 U.S.C. § 1252(b)). Since
that time, both the Ninth and Eleventh
Circuits have held that, when a person is
not seeking review of "an order of removal
under subsection (a)(1)," the limitations of
§ 1252(b)(9) do not apply. See Singh v.
Gonzales, 499 F.3d 969, 978 (9th Cir. 2007)
("By virtue of its explicit language . . .
1252(b)(9) applies only to those claims
seeking judicial review of orders of
removal."); Madu v. Att'y Gen., 470 F.3d
1362, 1367 (11th Cir. 2006) (explaining that
"section 1252(b)(9) applies only with
respect to review of an order of removal"
and that the REAL ID Act "did not expand the
scope of § 1252(b)(9) by making it
applicable to cases other than those
involving 'review of an order of removal'"
(internal quotation marks omitted)); cf.
House Conference Report on the REAL ID Act,
H.R. Rep. No. 109-72, at 175, 2005
U.S.C.C.A.N. 240, 300 ("Section 106 would
not preclude habeas review over challenges
to detention that are independent of
challenges to removal orders. Instead, the
bill would eliminate habeas review only over
challenges to removal orders.").

While we have not written precedentially on
the scope of § 1252(b)(9) after the REAL ID
Act, we have addressed the effect of nearly

identical language in § 1252(a)(5). In
Kumarasamy v. Attorney General, we
considered whether a habeas petition that
was before us on appeal when the REAL ID Act
came into effect should be converted into a
petition for review pursuant to 8 U.S.C.
§ 1252(a)(5).  453 F.3d 169, 172 (3d Cir.
2006).  That subsection states that a
"petition for review filed with an
appropriate court of appeals . . . shall be
the sole and exclusive means for judicial
review of an order of removal."  8 U.S.C.
§ 1252(a)(5).  The petitioner in Kumarasamy
had not been seeking review of an order of
removal but was seeking habeas relief,
claiming that his deportation was illegal
"because there was no order of removal."
453 F.3d at 172 (emphasis in original).  We
held that § 1252(a)(5) did not apply,
because that provision pertained only to
"judicial review of an order of removal."
Id. (emphasis in original).  Our holding in
Kumarasamy supports the conclusion that,
because § 1252(b) refers only to "review of
an order of removal under subsection
(a)(1)," it, and its subsections, are
inapplicable when there is no such order.

Not all courts agree with the conclusion
reached by the Ninth and Eleventh Circuits
and suggested by us in Kumarasamy.  The
First Circuit held in Aguilar v. United
States Immigration & Customs Enforcement
that "the reach of section 1252(b)(9) is not
limited to challenges to singular orders of
removal."  510 F.3d 1, 9 (1st Cir. 2007).
The reasoning of Aguilar, however, appears
to conflict with the Supreme Court's
explicit instruction in St. Cyr, 533 U.S. at
313 ("Section 1252(b)(9) applies only 'with
respect to review of an order of removal
under subsection (a)(1).'"), and with the
language of § 1252(b) ("With respect to
review of an order of removal under

33

Add.223

subsection (a)(1) of this section, the
following requirements apply . . . .").  We
therefore join with the Ninth and Eleventh
Circuits and hold that § 1252(b)(9) applies
only "with respect to review of an order of
removal under subsection (a)(1)."  8 U.S.C.
§ 1252(b).  Because Chehazeh is not seeking
review of any order of removal --- as there
has been no such order with respect to him -
-- § 1252(b)(9) does not preclude judicial
review.

Chehazeh, 666 F.3d at 131–33 (cleaned up).

This is all but dispositive.

There is no order of removal in this case.  And so Section
1252(b)(9) does not apply under Chehazeh.  "Because [the
Petitioner] is not seeking review of any order of removal --- as
there has been no such order with respect to him ---
§ 1252(b)(9) does not preclude judicial review."  Id.

                    *     *     *

Might Chehazeh be distinguished from this case on factual
grounds?

Chehazeh, after all, was an "unusual" case, id. at 121, focused
on the Board of Immigration Appeals' decision to sua sponte
reopen a decision.  See id.

Perhaps, it might be argued, Chehazeh does not apply to the more
typical case, where a person in a removal proceeding seeks
federal district court review before the immigration court
proceedings have run their course.

But that sort of distinction seems to have been considered and
rejected by the Third Circuit in EOHC v. Secretary United States
Department of Homeland Security, 950 F.3d 177 (3d Cir. 2020).

There, people in removal proceedings went to the district court.
See id. at 180.  Up against Chehazeh, the federal-government
appellees argued that that case should be limited to its facts.
See Brief for Appellees at 37, EOHC, 950 F.3d 177 (No. 19-2927).
But the Third Circuit did not seem to accept this position.
This was the EOHC court's only mention of Chehazeh:

> [Section 1252(b)(9)] does not reach "claims
> that are independent of, or wholly
> collateral to, the removal process," like
> "claims that cannot effectively be handled
> through the available administrative
> process." Aguilar, 510 F.3d at 11; accord
> J.E.F.M. v. Lynch, 837 F.3d 1026, 1032 (9th
> Cir. 2016) (collecting cases); Reply Br. 16
> (interpreting Chehazeh v. Att'y Gen. of the
> U.S., 666 F.3d 118 (3d Cir. 2012)); Oral
> Arg. Tr. 20–21.

EOHC, 950 F.3d at 186.

Now look to the page of the Reply Brief that was cited as
"interpreting" Chehazeh. It reads, in part: "the government's
argument that this Court should 'limit Chehazeh to its facts'
. . . is misplaced. Instead, . . . the applicability of section
1252(b)(9) depends on the nature of the claim being considered."
Reply Brief for Appellants at 16, EOHC, 950 F.3d 177 (No. 19-
2927).

It appears that the EOHC court, by citing this page of the
brief, meant to signal that it rejected any cabining of Chehazeh
to its facts.

                    *    *    *

Might it be argued that Chehazeh has been implicitly overruled
by the Supreme Court's decision in Jennings?

This seems unlikely.

The Third Circuit in EOHC referenced Chehazeh, as noted.  See
EOHC, 950 F.3d at 186.  And it also discussed Jennings at
length.  See id. at 185–86.  If Jennings overruled Chehazeh,
would EOHC not have said so?

And more directly: there is no reason to think Jennings pushed
aside Chehazeh.

To see why, look first to the facts of Jennings.

Noncitizens in immigration custody had been detained for more
than six months without bond hearings, and they argued this was
illegal under various statutes.  See id. at 290.  Those statutes

applied to certain noncitizens --- those who had not received a final order of removal.  See id. at 291, 299, 303.[26]

Jennings, then, was like Chehazeh --- a pre-order-of-final-removal case.

As to jurisdiction, what did the Supreme Court rule in Jennings? Did Section 1252(b)(9) strip jurisdiction or not?

The answer is not straightforward, because the Jennings Court fragmented on the jurisdictional question.  See id. at 284. Eight justices took part and there were three opinions; none commanded a majority.  See id. at 284, 292.

How to decide what to take away from this?  When "a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds."  Marks v. United States, 430 U.S. 188, 193 (1977) (cleaned up); see generally Richard M. Re, Beyond the Marks Rule, 132 Harv. L. Rev. 1942 (2019).

But this "Marks rule" is not clarifying here.[27]

---

[26]   In the district court, one of the noncitizens sought certification of a subclass under 8 U.S.C. § 1231(a), which governs the "[d]etention . . . of aliens ordered removed."  See Jennings, 583 U.S. at 291.  But the court of appeals held that this subclass could not be certified, see id., and the Supreme Court did not revisit that decision.  See id. at 291–92.  So the case before the Court concerned only detention of people who had not been ordered finally removed.

[27]   As a general matter, the Marks rule can apply to jurisdictional holdings.  See, e.g., United States v. Donovan, 661 F.3d 174 (3d Cir. 2011); United States v. Johnson, 467 F.3d 56 (1st Cir. 2006); United States v. Gerke Excavating, Inc., 464 F.3d 723 (7th Cir. 2006).  It just does not shed light here, as will be seen in a moment. (Note that the Marks rule may be especially hard to apply to a jurisdiction-stripping statute, because it is not obvious what the right baseline is.  Are the "narrower grounds" those that narrow the reach of the statute (and therefore expand federal court jurisdiction)?  Or are the "narrower grounds" those that expand the reach of the statute (and therefore narrow federal court jurisdiction)?  Cf. Johnson, 467 F.3d at 63–64.)

36

<u>Chehazeh</u> held that, as a categorical matter, Section 1252(b)(9) does not apply before entry of an order of removal.  <u>See</u> 666 F.3d at 133.

But on that question, there is no <u>Jennings</u> majority to cobble together using <u>Marks</u>.

As noted, eight Justices took part in <u>Jennings</u>.  <u>See</u> 583 U.S. at 284.

Two Justices, with Justice Thomas writing, held that Section 1252(b)(9) <u>can</u> apply before a final order of removal exists. <u>See</u> <u>id</u>. at 317–18 (Thomas, J., concurring).

Three Justices, with Justice Breyer writing, suggested that it <u>cannot</u> apply before a final order of removal exists.  <u>See</u> <u>id</u>. at 355 (Breyer, J., dissenting).

And three Justices, with Justice Alito writing, took no explicit stance on the question.

Rather, Justice Alito's opinion held that Section 1252(b)(9) did not control the particular case before the Court --- because detention without a bail hearing did not "aris[e] from" actions to remove the noncitizens, as Section 1252(b)(9) requires.  <u>See</u> <u>id</u>. at 292–95.

But nothing can be read into Justice Alito's opinion as to whether Section 1252(b)(9) might <u>otherwise</u> apply before an order of removal; therefore, no holding of his can join that of another opinion, via the <u>Marks</u> rule, to make a majority.

This is for two reasons.

<u>First</u>, "[q]uestions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."  <u>Cooper Indus., Inc.</u> v. <u>Aviall Servs., Inc.</u>, 543 U.S. 157, 170 (2004); <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>More</u>, 7 U.S. (3 Cranch) 159, 172 (1805) (Chief Justice Marshall making this point at oral argument as to jurisdiction).

Justice Alito took no "position," <u>Marks</u>, 430 U.S. at 193, on whether Section 1252(b)(9) could or could not categorically have applied if the statute's "arising from" language had fit the case before the Court.

So why impute a position to him?

37

And all the more so because Justice Alito's opinion noted that the parties had not briefed "the scope" of Section 1252(b)(9), see Jennings, 583 U.S. at 294, and so, as Justice Alito put it, his opinion declined "to provide a comprehensive interpretation" of Section 1252(b)(9), ruling only that the statute did not apply given the facts at hand. See id. at 294.

To see the second point, start by noting that when an explicit ruling (call it "CD") necessarily rests on an implicit logical proposition (call it "AB") --- then both CD and AB can count as rulings. See footnote 21 (discussing this).

If Justice Alito's explicit ruling (CD) was that jurisdiction was stripped in Jennings because of Section 1252(b)(9)'s language, then that would logically rest on the implicit idea (AB) that Section 1252(b)(9) applied in the first place.

But that is not where Justice Alito's opinion came down.

It held that, because of Section 1252(b)(9)'s language, jurisdiction was not stripped --- and that ruling does not rest on a logically necessary sense that Section 1252(b)(9) applied. After all, Justice Alito could have reached the same result (no jurisdiction strip) regardless of his answer to the question of whether Section 1252(b)(9) does or does not categorically apply to pre-order-of-removal cases.[28]

---

[28] The second point in the text is abstract. Unpack it a bit more here. The complexity is this: AB may typically get analyzed before conclusion CD is reached; but whether AB is necessary to conclusion CD --- that depends. To see why, imagine this statute: "if a person is an employee, she cannot be discriminated against --- and if she is discriminated against, the employer is liable and must pay." Under the statute, whether a person is an employee will usually be analyzed before deciding whether she has been discriminated against. But is a holding as to whether she is an employee logically implicit in a holding as to whether the employer must pay? Sometimes yes, sometimes no. If the court holds she was discriminated against and that the employer must pay, then that must logically rest on a particular resolution of the prior question, as to whether person was an employee. After all, if she was not an employee, how could the employer have broken the statute and now be expected to pay? But if the court holds she was not discriminated against, and the employer need not pay, that does

38

* * *

In sum: even after deploying the <u>Marks</u> rule, it cannot be said that a <u>Jennings</u> majority spoke to the <u>Chehazeh</u> question --- let alone implicitly overruled the Third Circuit's <u>Chehazeh</u> opinion.

## V. **If Section 1252(b)(9) Applies Here**

Where things stand:

The Respondents argue that Section 1252(b)(9) pulls away jurisdiction, such that this Court cannot consider the Petitioner's motion to enjoin the Secretary's determination.

That argument looks solid at first. <u>See</u> Part IV.A.  But look to all of Section 1252(b), and the argument melts away. Section 1252(b)(9) is in play only when an order of removal has been entered.  That is what the statute says.  <u>See</u> Part IV.B. And that is what the Third Circuit has held.  <u>See</u> Part IV.C.

Therefore, Section 1252(b)(9) does not apply here --- there is no order of removal.

But there is an important difficulty.

To see it, compare (a) <u>Chehazeh</u> and (b) <u>EOHC</u>, two Third Circuit cases that have been mentioned at various points above.

* * *

_____

not logically need to have been based on any particular decision on the question of whether the person was an employee.  Why not? Because the ruling (no pay) would come out the same way regardless of how the employee question was answered.  Another way to see this is to think about arguments made <u>arguendo</u>. Justice Alito in <u>Jennings</u> could have said "assuming <u>arguendo</u> that Section 1252(b)(9) can generally apply to pre-order-of-removal cases, the statute's language does not apply to this case --- and so there is no jurisdiction strip here."  But for his part, Justice Thomas in <u>Jennings</u> could not have said "assuming <u>arguendo</u> that Section 1252(b)(9) can generally apply to pre-order-of-removal cases, its language applies to this case --- and so there is a jurisdiction strip here."  For Justice Alito's bottom-line conclusion, the categorical question of whether Section 1252(b)(9) applies is not logically necessary and therefore can be assumed away <u>arguendo</u>; for Justice Thomas' bottom-line conclusion, the categorical question is logically necessary --- and therefore cannot be bracketed for later.

39

Add.229

Chehazeh holds that Section 1252(b)(9) applies only when an
order of removal has been entered.  The long excerpt above, see
Part IV.C, shows that.

Move now to EOHC.

It, too, was an immigration case.  And it held that Section
1252(b)(9) precluded the district court from hearing a
particular claim --- even though no order of removal had been
entered.  See EOHC, 950 F.3d at 180.

Chehazeh and EOHC appear to pull in opposite directions.

Does Section 1252(b)(9) apply when there is, as here, no order
of removal?

Chehazeh seems to say no.  EOHC seems to say yes.

If Chehazeh controls, then Section 1252(b)(9) is not on the
table in this case.  It is categorically irrelevant.
Jurisdiction is not affected by it.  See Part IV.B and IV.C.

But if EOHC controls, Section 1252(b)(9) potentially does apply
here --- and if it does, there is a solid textual case, see
Part IV.A, that it strips this Court of jurisdiction.

*     *     *

How to proceed?

The Court closely reviews EOHC, and concludes that it stands for
this principle: the question of whether Section 1252(b)(9)
allows a federal district court to hear a claim that has been
brought to it depends on whether the claim could get "meaningful
review" if federal court review is delayed out into the future -
-- as will happen if the federal district court is divested of
jurisdiction by Section 1252(b)(9), and the case is then sent
the immigration courts route.  See Part V.A.[29]

In other words:

Under EOHC, Section 1252(b)(9) strips jurisdiction if later
review in the federal court of appeals, after the immigration
courts are done, would be meaningful.  But Section 1252(b)(9)

---

[29]  Recall: if a claim must first go to the immigration courts,
federal court review of the claim will happen only later, in a
federal court of appeals, after the immigration courts have done
their work.

does not strip jurisdiction if post-immigration-courts review would not be meaningful.

On this reading, EOHC essentially applies the Supreme Court's general administrative law jurisprudence in the particular context of immigration law --- and that makes sense, given that immigration law, in this area, is a part of the administrative law family. See Part V.B.

And on this reading, EOHC is fully consistent with one of the Third Circuit's key relevant precedents --- the opinion authored by then-Judge Alito in Massieu v. Reno, 91 F.3d 416 (3d Cir. 1996). Massieu applied the same body of general administrative law jurisprudence that EOHC does. See Part V.C.

\*   \*   \*

The question of how the referenced "meaningful review" issue plays out in this case is taken up in Part VI.

For now, though, start with EOHC, and move on to administrative law more generally and then to Massieu.

### A.   EOHC

This is what the EOHC case was about:

A father and his minor daughter came to the United States from Guatemala.  See EOHC, 950 F.3d at 181.

Federal officials began removal proceedings.  See id.  The Board of Immigration Appeals eventually entered a stay of removal, see id., but the father and his daughter became concerned that they would be moved to Mexico, see id., to wait things out there while American immigration courts assessed whether they should be removed back to Guatemala.[30]  See id.

The father and his daughter filed a habeas petition in Pennsylvania.  See id.  They pressed a set of claims, and as to each one the Third Circuit asked the same question: can this claim go forward in the federal district court?  Or do jurisdiction-stripping statutes take away that possibility,

---

[30]  This was during the period when the federal government applied a protocol to send noncitizens to Mexico while they waited for removal proceedings.  See EOHC, 950 F.3d at 181.

requiring the claim to run down the immigration-court track? See id. at 184.

To answer these questions, EOHC relied on this principle: that Section 1252(b)(9) allows claims to be brought in a federal district court now if there could not be "meaningful" judicial review of those claims later --- after the immigration courts have finished their work and a federal court (the court of appeals) then gets involved.  See id. at 180 ("When a detained alien seeks relief that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court."); see also id. at 186–87 (invoking meaningful review as to Section 1252(b)(9); cf. id. at 189-90 (invoking meaningful review as to other jurisdiction-stripping provisions).

In immigration law, involvement by an Article III federal court is typically a late-in-the-process thing.  See id. at 180. Immigration courts handle the case at Time 1, and a federal court (a court of appeals) gets involved for the first time only at Time 2.  See id.

But, EOHC holds, if waiting until Time 2 would undermine "meaningful" federal court review --- then that review can be hurried up, and a "detained alien" can first go to a federal court, a federal district court, at Time 1, rather than have the immigration courts take the initial look, with federal court review to take place only afterwards (in a federal court of appeals).

In that circumstance, Article III judicial review --- usually pushed out into the future as a job for a federal court of appeals --- is pulled back into the present, and is undertaken by a federal district court (whose work is later reviewed by a federal court of appeals).

*     *     *

How does this principle work in practice?

The EOHC father and daughter claimed that they would be temporarily moved to Mexico, to wait there for the immigration courts' decision in their removal proceedings.  See id. at 181. Such a claim, EOHC held, can be taken up right away by a federal district court, consistent with Section 1252(b)(9).  See id. at 187.

42

Why?

Because, per EOHC, there can be no "meaningful" consideration later of such a claim by a court of appeals, after the immigration courts have wrapped up their work.  By then, the father and daughter could already have been in Mexico for years, and those years would have been lost.  See id. at 186-87.  "Now-or-never" claims, id. at 186, as that one was, can go forward now in a federal district court because they fit into a broader umbrella category --- claims that cannot later be "meaningful[ly]" reviewed when they would ordinarily make their way to a federal court of appeals.

And take a second example, to see the flip side of the coin.

The EOHC father and daughter also claimed that being moved to Mexico would fray their relationship with their lawyer, which would violate their statutory right to counsel at an eventual removal hearing.  See id. at 187-88.

EOHC, citing Section 1252(b)(9), held that this claim could not be brought right away in federal district court.[31]

Why not?

Because the claim could get "meaningful" review later --- as the court of appeals looked back on what happened at the removal hearing, with an eye on any damage that may have been done to the attorney-client relationship.  See id. at 188 ("[T]he court of appeals can redress any deprivation of counsel in the removal proceedings before the alien is removed.").

### B.    Administrative Law

In a nutshell, EOHC held that Section 1252(b)(9) does not take jurisdiction away from federal district courts when the alternative --- going the standard route, to the immigration courts and then to a federal court of appeals --- would undermine "meaningful" judicial review.

EOHC indicated that its approach flowed from a broad range of sources --- statutory text, a recent Supreme Court decision, and a set of presumptions.  See id. at 184-86.

---

[31]  This was a pre-order-of-removal claim.

43

And that approach is also closely consistent with broader principles of administrative law --- the legal family that, in this context, immigration law is part of.

### 1.  **Structure**

To begin seeing this, start with the classic picture of adjudication in the federal system.

On the ground floor is a federal district court.  Then the next level up is a federal court of appeals.  And finally the Supreme Court sits atop the pyramid.

But the classic picture is not everywhere the current one.

In administrative law, for example, the federal district court is often swapped out, its place taken by an administrative court.

In cases related to the SEC, the FTC, the EPA, the FDA, and the FCC, the rungs on the ladder often look like this: an agency administrative judge (or an administrative law judge, or some other non-Article III official), does the front-line dispute resolution.  And after that is done, the case plugs back into the standard system --- with the administrative judge's decision then reviewed by an Article III court, the federal court of appeals.  See Federal Appeals Jurisdiction and Practice § 15:1 (2025 ed.); 2 Charles H. Koch & Richard Murphy, Admin. L. & Prac. § 5:10 (3d ed. 2024).

*    *    *

There was a time when immigration detention was commonly reviewed using the classic tools of American adjudication.

A person in custody typically (though not always) started off in the federal district court, seeking a habeas corpus writ.  See Carlson v. Landon, 342 U.S. 524, 531-32 (1952); Fong Haw Tan v. Phelan, 333 U.S. 6, 8 (1948); U.S. ex rel. Tisi v. Tod, 264 U.S. 131, 132-33 (1924); Chin Yow v. United States, 208 U.S. 8, 13 (1908); Yamataya v. Fisher, 189 U.S. 86, 87 (1903).

But the plates began to shift during the mid-20th century.

New jurisdictional statutes became law.[32]

And now, immigration law looks in some basic ways like a branch of administrative law.

Cases generally go in the first instance to immigration judges, see 8 C.F.R. § 1003.10, and immigration judges are roughly akin to other administrative judges.  See footnote 2; 2 Fed. Proc., L. Ed. § 2:159.  And as with administrative judges, immigration judges' decisions are ultimately funneled out of the agency --- for relatively late-in-the-process review by a federal court, a courts of appeals.  See 8 U.S.C. § 1252(a)(5).

Bottom line: immigration disputes are resolved using many of the same basic structures as bread-and-butter administrative disputes, like those involving the SEC, FTC, or FDA.

The next section begins to explain why this similarity matters.

### 2.   __Thunder Basin__

The key question covered by this Opinion is this: under Section 1252(b)(9), must the Petitioner's constitutional challenge to the Secretary of State's determination go forward in the first instance before this Court or before the immigration courts?

At its core, this question is a variant on an everyday set of administrative law questions --- questions that are spun off by administrative-agency adjudication that, as the prior section shows, makes use of the same basic structure (agency adjudication, followed by federal court of appeals review) as modern immigration law.

Look here at how administrative law generally handles issues of this sort, and then return, later, to immigration law and to EOHC.

---

[32]  After the passage of the Immigration and Nationality Act of 1952, there was some back and forth over where deportation orders might be reviewed.  See Brownell v. We Shung, 352 U.S. 180, 186 (1956); Shaughnessy v. Pedreiro, 349 U.S. 48, 51 (1955); Heikkila v. Barber, 345 U.S. 229, 235-36 (1953).  But this was mostly smoothed out by the passage of the 1961 amendments to the INA, which made review in the federal courts of appeals the "sole and exclusive procedure" for judicial review of final orders of deportation.  See Act of Sept. 26, 1961, Pub. L. No. 87-301, 75 Stat. 650, 651.

\*       \*       \*

As a matter of administrative law:

What to do if a litigant tries to sue in federal district court, but a separate system of administrative-agency courts has been set up?  Does she get to stay in the federal district court, or must she move over to the agency's courts, and await federal court review in the court of appeals?

The Supreme Court has answered these questions in a string of cases involving the Mine Safety and Health Administration, the Public Company Accounting Oversight Board, the Merit Systems Protection Board, and the Federal Trade Commission.

The anchor case in the chain is Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994), and so the law in this area often goes by the shorthand of "Thunder Basin."

Thunder Basin law in a nutshell:

If Congress has explicitly pulled jurisdiction away from the federal district courts, the case goes to the agency for first-cut adjudication there.  See Axon, 598 U.S. at 185; Adorers of the Blood of Christ v. FERC, 897 F.3d 187, 195 (3d Cir. 2018); accord, e.g., Jarkesy v. SEC, 803 F.3d 9, 15 (D.C. Cir. 2015); Cochran v. SEC, 20 F.4th 194, 205 (5th Cir. 2021); Bank of La. v. FDIC, 919 F.3d 916, 923 (5th Cir. 2019); Jones Brothers, Inc. v. Sec'y of Lab., 898 F.3d 669, 675 (6th Cir. 2018); E. Bridge, LLC v. Chao, 320 F.3d 84, 88 (1st Cir. 2003).

But if Congress has not explicitly pulled jurisdiction away from the federal district courts, ask: is it "fairly discernible" that Congress intended for claims to go to administrative courts as opposed to federal district courts?  See Elgin v. Dep't of Treasury, 567 U.S. 1, 10 (2012); Free Enter. Fund v. Pub. Co. Acct. Oversight Bd., 561 U.S. 477, 489 (2010); see also Axon, 598 U.S. at 185.[33]

_____

[33]  This question is mainly answered as matter of statutory interpretation --- with an eye, for example, on text and purpose.  See Elgin, 567 U.S. at 10; Free Enter. Fund, 561 U.S. at 489; Thunder Basin, 510 U.S. at 207; Adorers, 897 F.3d at 195; accord, e.g., Cochran, 20 F.4th at 199–205; Bank of La., 919 F.3d at 923; Hill v. SEC, 825 F.3d 1236, 1242 (11th Cir. 2016); Tilton v. SEC, 824 F.3d 276, 281 (2d Cir. 2016); Bennett

If the answer to the step-one "fairly discernible" question is "no," then the case stays in federal district court.

If the answer to the "fairly discernible" question is "yes," then the focus narrows, to the particular "type" of claim that is in play --- and whether (now, step-two) Congress wanted that type of claim to make its first stop in a federal court or before an administrative adjudicator. See Axon, 598 U.S. at 186; Elgin, 567 U.S. at 22; Free Enter. Fund, 561 U.S. at 489; Thunder Basin, 510 U.S. at 208; Adorers, 897 F.3d at 195; Kreschollek v. S. Stevedoring Co., 78 F.3d 868, 873 (3d Cir. 1996); accord, e.g., Cochran, 20 F.4th at 206; Tilton v. SEC, 824 F.3d 276, 281 (2d Cir. 2016); Bennett v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015); Ne. Erectors Ass'n of BTEA v. Sec'y of Lab., Occupational Safety & Health Admin., 62 F.3d 37, 40 (1st Cir. 1995).

To answer this "type" question, courts are to look to whether agency-first adjudication would: (1) supply "meaningful review"; (2) draw on agency expertise; and (3) run through issues that are core, rather than collateral. See Axon, 598 U.S. at 184-85; Elgin, 567 U.S. at 15; Free Enter. Fund, 561 U.S. at 489; Thunder Basin, 510 U.S. at 212-13; accord, e.g., Bank of La., 919 F.3d at 923; Hill v. SEC, 825 F.3d 1236, 1241 (11th Cir. 2016); Tilton, 824 F.3d at 281; Bennett, 844 F.3d at 181; Jarkesy, 803 F.3d at 17; Bebo, 799 F.3d at 769.

Of these three, "meaningful review" is by far the most important. See Bennett, 844 F.3d at 183 n.7; Hill, 825 F.3d at 1245; Tilton, 824 F.3d at 282; Bebo, 799 F.3d at 774.

Can there be "meaningful review" if Article III review is deferred until after the administrative court finishes its work and hands things over to the federal court of appeals?

Or does "meaningful review" require that the claim be heard, now, in the federal district court?[34]

---

v. SEC, 844 F.3d 174, 181 (4th Cir. 2016); Bebo v. SEC, 799 F.3d 765, 769 (7th Cir. 2015).

[34] Saying yes to this question would bypass Congress' broader choice to send claims to the agency's courts. But it would do so on the theory that Congress would have wanted a particular "type" of claim to go forward first in the federal district

47

## C.   __EOHC In Context__

Come back now to the __EOHC__ case, and see it in light of the broader administrative law principles laid out just above.

__EOHC__ was an immigration-adjudication case.

And as discussed, the basic structure of immigration adjudication is closely similar to the structure of administrative adjudication more generally.   __See__ Part V.B.1.

No surprise, then, that in those closely related contexts, similar questions are answered in roughly the same way.

The questions:

Do the relevant statutes mean that a case stays in federal district court?  Or do they mean that a case is channeled in the first instance to agency tribunals, like SEC, FTC, or immigration courts --- and only after they are done with their work does the case potentially go to federal court, a federal court of appeals?

The answer:

Under __Thunder Basin__ (for administrative law in general) and under __EOHC__ (for immigration law in particular) the answer is largely the same: it depends on whether delayed federal court review is consistent with the imperative of "meaningful review."

__The key point__: __EOHC__ was, in essence, applying general administrative law rules (the __Thunder Basin__ rules) to closely related immigration law questions.

And __EOHC__ applied __Thunder Basin__ systematically.

__EOHC__ precisely invoked __Thunder Basin__'s step-one test.   __Compare__ __Thunder Basin__, 510 U.S. at 207 ("In cases involving delayed judicial review . . . , we shall find that Congress has allocated initial review to an administrative body where such intent is __fairly discernible__.") (emphasis added) (cleaned up), __with__ __EOHC__, 950 F.3d at 188 ("We look to whether the congressional intent to preclude judicial review is __fairly discernible__ in the statutory scheme.") (emphasis added) (cleaned up).

---

court if that is the way to get "meaningful review."   __See__ __Thunder Basin__, 510 U.S. at 212─13.

EOHC undertook the basic step-one analysis prescribed in Thunder Basin.  Compare Thunder Basin, 510 U.S. at 207 (to get at the question of Congressional intent, looking to a "statute's language, structure, and purpose"), with EOHC, 950 F.3d at 188 ("In discerning that intent, we look at the statute's 'text, structure, and purpose.'") (quoting Elgin, 567 U.S. at 10).

And, as has been noted, EOHC focused on the main Thunder Basin step-two concern --- "meaningful" judicial review.  Compare Thunder Basin, 510 U.S. at 207 ("Whether a statute is intended to preclude initial judicial review is determined from . . . whether the claims can be afforded meaningful review."), with EOHC, 950 F.3d at 180, 186, 189-90.[35]

*    *    *

In applying the Thunder Basin rules,[36] why did EOHC land on the "meaningful review" rule?

Per the Thunder Basin line of cases, that is the standard to use when Congress has not said in an "explicit" way that certain

---

[35]  EOHC also cited a source that mentioned one of the other two Thunder Basin factors.  Compare Thunder Basin, 510 U.S. at 212 ("[t]his Court previously has upheld district court jurisdiction over claims considered wholly collateral to a statute's review provisions"), with EOHC, 950 F.3d at 186 (citing the appellants' reply brief at 16 --- which noted that "claims independent of or collateral to the removal process are excluded").

[36]  Too much should not be made of the fact that EOHC did not cite Thunder Basin or explicitly invoke its two-step analysis.  EOHC cited Elgin, see EOHC, 950 F.3d at 188, and that is a key case in the Thunder Basin line.  More fundamentally, the question of whether review will be "meaningful" --- and therefore whether federal court review should be deferred in favor of agency review --- has long been a part of administrative law's DNA.  See Axon, 598 U.S. at 192; McNary v. Haitian Refugee Ctr., 498 U.S. 479, 496 (1991); Mathews v. Eldridge, 424 U.S. 319, 341 (1976); Goldberg v. Kelly, 397 U.S. 254, 262-63 (1970).  It long predates Thunder Basin and was clearly part of the EOHC court's thinking.  Compare EOHC, 950 F.3d at 186 (citing McNary for the proposition that there was no jurisdiction-stripping over certain claims when "meaningful judicial review . . . would [otherwise] be foreclosed"), with Thunder Basin, 510 U.S. at 213-14 (reasoning from McNary).

49

types of cases must go to an administrative court.  See Part
V.B.1.

Presumably, the EOHC court did not view Congress as having
provided sufficiently "explicit" direction as to whether certain
cases must first go to immigration courts.[37]

                        *       *       *

In a nutshell: to determine whether to apply Section 1252(b)(9)
to a given claim, EOHC applied Thunder Basin, and in particular
its "meaningful review" test.

**D.   Massieu**

EOHC sits atop Thunder Basin --- and foregrounding this only
emphasizes the close continuity between EOHC and one of the
Third Circuit's key precedents in this area, Massieu.

To see the point, look now to Massieu.

During the mid-1990s, the federal government sought to remove a
Mexican national, Mario Ruiz Massieu, from the United States.
See Massieu v. Reno, 91 F.3d 416, 417-19 (3d Cir. 1996).

This was to be done based on a determination made by Secretary
of State Warren Christopher, using the same law invoked in this
case to seek the removal of the Petitioner.  See id. at 418.

Massieu sued, and Judge Barry, then of this Court, ruled that
she had jurisdiction over the case.  See Massieu v. Reno, 915 F.

---

[37]  And such a conclusion is not surprising.  After all, the
argument that there is an "explicit" congressional directive as
to where cases should go rests largely on Section 1252(b)(9).
But Chehazeh held that in this "type" of case, a pre-order-of-
removal case, Section 1252(b)(9) is inapplicable.  And in any
event, the Justices have suggested a range of different views as
to whether Section 1252(b)(9) applies before entry of an order
of removal.  See footnote 25.  That suggests that the
explicitness test is not met, especially against the backdrop of
the various presumptions against jurisdiction-stripping that
EOHC leaned on.  See 950 F.3d at 184.

Supp. 681, 697 (D.N.J. 1996), rev'd, 91 F.3d 416 (3d Cir. 1996).[38]

The Third Circuit, per then-Judge Alito, reversed.  See Massieu, 91 F.3d at 425.  It held that the case needed to first go to the immigration courts.  See id.

The Third Circuit in Massieu came to that conclusion by analyzing the case using the two-step Thunder Basin doctrine described above in Part IV.B.

First, Judge Alito looked to text, purpose, and other sources to decide if Congress had expressed a "fairly discernible" intent to send the case to an immigration judge in the first instance, and not to a federal district judge.  See id. at 420.

And the Massieu court then went to the second step, moving through each of the required Thunder Basin factors --- the critical "meaningful review" factor, plus the "collateral" and "expertise" factors.  See id. at 422.

                    *    *    *

Massieu is relevant here in three main ways.

                    *    *    *

First, Massieu is very similar to this case.

The Respondents go so far as to say it is "on all fours."  See Opposition Brief at 12.  And there is a lot to that.  Massieu involved the same statute as this case (what is now 8 U.S.C. § 1227(a)(4)(C)(i)) and the same question as this case (in what court should the claim start?).

Whether Massieu controls the outcome here is taken up in the next Part.

                    *    *    *

Second, Massieu, as noted, is closely consistent with EOHC.

EOHC and Massieu land in the same place --- on a concern for "meaningful review" as a key touchstone for deciding whether a

---

[38]  On the merits, Judge Barry held that 8 U.S.C. § 1251(a)(4)(C)(i) (now 8 U.S.C. § 1227(a)(4)(C)(i)) is unconstitutionally vague.  See Massieu, 915 F. Supp. at 703. The Petitioner here has not made that argument.  See footnote 7.

case must go to the immigration courts before a federal district
court.

EOHC and Massieu thus point in the same direction.

Each suggests that, on the assumption that Section 1252(b)(9)
applies here,[39] this Court must conduct a Thunder Basin-type
analysis, and with an emphasis on Thunder Basin's most important
factor --- "meaningful" judicial review.[40]

                           *    *    *

Third and finally, Massieu undermines any argument that the
immigration laws in some "explicit" way require that this case
be sent now to the immigration courts.

After all, if the immigration laws were explicit on that point,
then Judge Alito's opinion would not have done what it did.  It
would not have conducted a Thunder Basin analysis --- because
that is called for only when the relevant laws are not
explicit.[41]

---

[39]  See Part IV.B and Part IV.C.

[40]  EOHC and Massieu are no outliers.  Federal courts often rely
on Thunder Basin to decide whether a claim should be heard in
immigration courts or in the federal district court.  See, e.g.,
Miriyeva v. U.S. Citizenship & Immigr. Servs., 9 F.4th 935, 939
(D.C. Cir. 2021); Adi v. Mayorkas, 2022 WL 267989, at *7 (N.D.
Ill. Jan. 28, 2022); O.A. v. Trump, 404 F. Supp. 3d 109, 136
(D.D.C. 2019); Ramirez v. U.S. Immigr. & Customs Enf't, 338 F.
Supp. 3d 1, 37 (D.D.C. 2018); Jafarzadeh v. Nielsen, 321 F.
Supp. 3d 19, 30-31 (D.D.C. 2018); Jafarzadeh v. Duke, 270 F.
Supp. 3d 296, 308 (D.D.C. 2017); see also J.E.F.M. v. Lynch, 837
F.3d 1026, 1035-36 (9th Cir. 2016); Aguilar, 510 F.3d at 11; cf.
Duron v. Johnson, 898 F.3d 644, 647 (5th Cir. 2018).

[41]  And the point can be seen more directly, too.  For the key
proposition, Massieu cited a federal-common-law rule and a
treatise, not an explicit statutory provision.

          Even where an alien is attempting to prevent
          an exclusion or deportation proceeding from
          taking place in the first instance and is
          thus not, strictly speaking, attacking a
          final order of deportation or exclusion, it

Add.242

To be sure, the immigration laws have changed a good deal since
Massieu was handed down in 1996.

But the three main statutes that Judge Alito reasoned from
remain on the books, and in substantively similar form.

The main one was 8 U.S.C. § 1105a(c) (1996) ("[A]n order of
deportation . . . shall not be reviewed by any court if the
alien has not exhausted the administrative remedies[.]").

It has since been revised, with the current version at 8 U.S.C.
§ 1252(d)(1) ("A court may review a final order of removal only
if . . . the alien has exhausted all administrative remedies.").

But the two statutes "state[] the same requirements in
essentially the same language." Duvall v. Elwood, 336 F.3d 228,
231 (3d Cir. 2003). Indeed, the Third Circuit has held that
Massieu's analysis still governs Section 1252(d)(1). See id. at
232.

And the two other statutes that Massieu relied on also remain on
the books, tweaked here and there but substantively the same.
Compare 8 U.S.C. § 1105a(a) (1996) ("the sole and exclusive
procedure for . . . the judicial review of all final orders of
deportation" is through a petition for review), and 8 U.S.C.

_____

is well settled that "judicial review is
precluded if the alien has failed to avail
himself of all administrative remedies," one
of which is the deportation or exclusion
hearing itself. See, e.g., Xiao v. Barr,
979 F.2d 151, 153 (9th Cir. 1992); see also
3 Charles Gordon & Stanley Mailman,
Immigration Law and Procedure § 81.02[2], at
81-26-28 (1996) ("A person against whom a
deportation proceeding is brought may feel
that the proceeding is unjustified and
illegal but generally has no right to go to
court immediately to stop the proceeding.
Congress has provided an administrative
device for passing upon an alien's
deportability, and generally there must be a
final administrative ruling before judicial
review can be initiated.").

Massieu, 91 F.3d at 421.

§ 1252(b) (1996) ("[T]he [administrative] procedure so prescribed shall be the sole and exclusive procedure for determining the deportability of an alien under this section."), with 8 U.S.C. § 1252(a)(5) ("[A] petition for review filed with an appropriate court of appeals . . . shall be the sole and exclusive means for judicial review[.]"), and 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States.").

And the most relevant new, post-Massieu statute --- Section 1252(b)(9) --- either does not apply to this case, per Chehazeh, or does not provide explicit enough direction.  See footnote 37.

### E.  Conclusion

Pause now briefly to see where things stand:

The Third Circuit in Chehazeh held that Section 1252(b)(9) does not apply to cases like this one, in which no order of removal has been entered.  Therefore, Section 1252(b)(9) is irrelevant here, and does not strip this Court of jurisdiction.  See Part IV.

But even if Section 1252(b)(9) were understood to apply here, as EOHC might suggest, see Part V.A, that Section would apply only when sending a case to the immigration courts is consistent with the Thunder Basin requirement of "meaningful review."

That was the approach the Third Circuit took in EOHC, see Part V.B and Part V.C, and that is consistent with the Third Circuit's approach in Massieu.  See Part V.D.

So assuming arguendo that Section 1252(b)(9) applies here, the question is this: would this case get the required "meaningful review" if it starts out in immigration court, as opposed to here?

Take that up in the next Part.

### VI.  Meaningful Review

Immigration courts are tasked with doing important work on behalf of our country.  According to recent statistics, for example, there are almost four million pending immigration cases spread out across 700 or so immigration judges.  See Pending

Cases, New Cases, and Total Completions, Exec. Off. for Immigr.
Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025);
Office of the Chief Immigration Judge, Exec. Off. for Immigr.
Rev., https://perma.cc/8H5S-EPW6 (accessed on Apr. 29, 2025).

But different institutions are built for different tasks and
given different tools.

Immigration courts are not legally permitted to provide the
relief (striking down the Secretary of State's determination)
that the Petitioner seeks here.  See Part VI.A.

And immigration courts cannot be expected to undertake the fact-
finding that may potentially be required to evaluate the
Petitioner's claim that the Secretary's determination is
unconstitutional.  See Part VI.B.

To be sure, immigration courts routinely tee up constitutional
issues for eventual review by federal courts of appeals --- even
when the immigration courts themselves lack the power to remedy
the alleged violation.

But the immigration courts cannot do that here --- in part
because of a prior Board of Immigration Appeals decision.  See
Part VI.C.

What this adds up to: the immigration courts could not
meaningfully develop this case, legally or factually.
Therefore, the period that might be spent before those courts
will not advance the ball.

In some circumstances, that may be just how it has to be.  Cases
can take a while to resolve.  And sending cases to the
immigration courts is typically required even when doing so will
accomplish only a modest amount.

But in this case, what can be accomplished is much less than
that.

And a period of delay while this case is pending before the
immigration courts, knowing that there will be little or nothing
to show for it --- that does not work.

The reason is this: the Petitioner's core argument is that his
free speech rights are being violated, now.  See Part VI.D.

And the Supreme Court has held over and over again, in numerous
contexts, that meaningful review of First Amendment claims
generally means rapid, prioritized review.  See id.

That is not consistent with postponing federal court
consideration of the Petitioner's First Amendment claims.

Begin seeing all of this just below.

**A.** <u>**Legal Remedies**</u>

As has been discussed, the Petitioner claims that the Secretary
of State's determination is a product of First Amendment
retaliation, and that this Court should therefore enter an order
to vacate it.  <u>See</u> Motion for Preliminary Injunction at 9-10;
<u>see also</u> Petition ¶¶ 88-90.

Can the immigration courts do this?

The Respondents say the answer is no.[42]

Under the heading "The IJ Cannot Vacate the Secretary of State's
Determination or Issue the Requested Injunction," they say:

> The authority of immigration judges comes
> from the INA and regulations.  The INA
> provides that an immigration judge "shall
> conduct proceedings for deciding the
> inadmissibility or deportability of an
> alien."  The immigration judge has the
> authority to determine removability and to
> adjudicate requests for certain forms of
> relief from removal.  The INA and
> implementing regulations do not provide the
> immigration judge with general injunctive or
> equitable authority.  Thus, an immigration
> judge cannot order the Secretary of State to

---

[42]  Were the Petitioner seeking to invalidate Section
1227(a)(4)(C)(i) on constitutional grounds, which he is not, <u>see</u>
footnotes 7 and 38, the immigration courts would lack the power
to do that, too.  <u>See</u> <u>In re Salazar-Regino</u>, 23 I. & N. Dec. 223,
231 (BIA 2002) ("We have long declared that we lack authority to
rule on the constitutionality of the statutes we administer.");
<u>see also</u> <u>Johnson</u> v. <u>Robison</u>, 415 U.S. 361, 368 (1974)
("[A]djudication of the constitutionality of congressional
enactments has generally been thought beyond the jurisdiction of
administrative agencies."); <u>accord</u>, <u>e.g.</u>, <u>Breinza-Schettino</u> v.
<u>Att'y Gen. of U.S.</u>, 221 F. App'x 140, 144-45 (3d Cir. 2007);
<u>Nehme</u> v. <u>INS</u>, 252 F.3d 415, 421 (5th Cir. 2001); <u>Liu</u> v. <u>Waters</u>,
55 F.3d 421, 426 (9th Cir. 1995).

> take or not take any action regarding the
> type of foreign policy determination at
> issue here.

Respondents' Letter (Apr. 11, 2025) (ECF 190) at 2 (cleaned up).

\*     \*     \*

But this way of thinking is too formalistic.

When a court is asked to put a stop to allegedly illegal behavior that is happening out in the world, the request is usually framed as an ask for an injunction.

But things are different when a judge is asked to issue an order as to a matter happening right before her, in her own courtroom.

Imagine a judge overseeing a criminal prosecution.  Drugs were seized (but there was no warrant), and a confession was made (but there were no Miranda warnings).

The defendant might want an order from the court suppressing the evidence, so that the jury cannot learn of it.  Order that the drugs be excluded as the fruit of a Fourth Amendment violation, the defendant will say.  And order that the confession be put aside, as the product of a Fifth Amendment breach.

But the defendant, seeking an order, will not describe this as a request for an injunction (which is, after all, a kind of order).[43]

---

[43]  One reason is this: an injunction generally issues only based on a sense, among other things, that the public interest demands it.  See, e.g., Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010); Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 20 (2008); eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006); see also Samuel L. Bray, The System of Equitable Remedies, 63 UCLA L. Rev. 530, 585–86 (2016).  A defendant wants to argue that drugs should be suppressed because the search was illegal.  He does not want to also have to argue that suppressing the drugs is a good from the perspective of the public interest.  (And equitable claims are especially difficult to make out in any number of other ways, too.  For example, at least some suppression orders likely could not issue as injunctions because the defendant, seeking to suppress what is his own contraband, see Rakas v. Illinois, 439 U.S. 128, 133–34

All of this implies that the right question here is not whether the immigration courts can <u>enjoin</u> the Secretary's determination as being the result of a violation of the First Amendment --- but rather whether the immigration courts can <u>suppress</u> the Secretary's determination as a violation of the First Amendment.

And a suppression framing makes sense on the facts of this case.

After all, the Secretary of State's determination is evidence (indeed, the only evidence) put forward in support of the Department of Homeland Security's effort to remove the Petitioner under Section 1227(a)(4)(C)(i).

And evidence obtained at Time 2 is sometimes ordered suppressed at Time 3 because it was gathered at Time 1 in violation of the Fourth Amendment or the Fifth.  So why not the First?

The immigration courts, as noted, do not have power to <u>enjoin</u> the Secretary of State's determination on the grounds that it violates the First Amendment.

But do they have the power to <u>suppress</u> the Secretary's determination on those same grounds?

                    *    *    *

Shifting the framing clarifies the question to ask.  But it does not change the answer.

The reason: with a caveat taken up below in footnote 46, the Supreme Court has held that in removal proceedings the Fourth Amendment exclusionary rule is not available; evidence obtained in violation of the Fourth Amendment can come in.  <u>See</u> <u>INS</u> v. <u>Lopez-Mendoza</u>, 468 U.S. 1032, 1034 (1984).

Part of the explanation is that the immigration courts, per the Supreme Court in <u>Lopez-Mendoza</u>, were built to quickly determine whether someone is removable --- not to ask and answer broader questions, such as whether someone else violated the Constitution.  <u>Lopez-Mendoza</u>:

---

(1978), could not make the "clean hands" showing that equity typically requires.  <u>See</u> <u>Precision Instrument Mfg. Co.</u> v. <u>Auto. Maint. Mach. Co.</u>, 324 U.S. 806, 814 (1945); <u>Johnson</u> v. <u>Yellow Cab Transit Co.</u>, 321 U.S. 383, 387 (1944); <u>see</u> <u>also</u> Bray at 581.)

> The INS currently operates a deliberately
> simple deportation hearing system,
> streamlined to permit the quick resolution
> of very large numbers of deportation
> actions, and it is against this backdrop
> that the costs of the exclusionary rule must
> be assessed.  The costs of applying the
> exclusionary rule, like the benefits, must
> be measured at the margin.

> [In 1984] [t]he average immigration judge
> handles about six deportation hearings per
> day.  Neither the hearing officers nor the
> attorneys participating in those hearings
> are likely to be well versed in the
> intricacies of Fourth Amendment law.  The
> prospect of even occasional invocation of
> the exclusionary rule might significantly
> change and complicate the character of these
> proceedings.

Id. at 1048.

In support of its approach, the Lopez-Mendoza Court quoted the
Board of Immigration Appeals, which was also opposed to Fourth
Amendment exclusion remedies in immigration courts.  The Board,
as quoted by the Supreme Court:

> Absent the applicability of the exclusionary
> rule, questions relating to deportability
> routinely involve simple factual allegations
> and matters of proof.  When Fourth Amendment
> issues are raised at deportation hearings,
> the result is a diversion of attention from
> the main issues which those proceedings were
> created to resolve, both in terms of the
> expertise of the administrative decision
> makers and of the structure of the forum to
> accommodate inquiries into search and
> seizure questions.  The result frequently
> seems to be a long, confused record in which
> the issues are not clearly defined and in
> which there is voluminous testimony. . . .
> The ensuing delays and inordinate amount of
> time spent on such cases at all levels has
> an adverse impact on the effective

> administration of the immigration
> laws. . . .  This is particularly true in a
> proceeding where delay may be the only
> "defense" available and where problems
> already exist with the use of dilatory
> tactics.

Id. at 1048-49 (quoting Matter of Sandoval, 17 I. & N.
Dec. 70, 80 (BIA 1979)).

Building the record for a Fourth Amendment suppression challenge
would not always very dramatically "change and complicate"
removal hearings.  See id. at 1048.

After all, in many cases the Fourth Amendment suppression
evidence would come in wholly through the immigration agents who
made the relevant arrest in the first place.  See id. at 1043
("[T]he agency officials who effect the unlawful arrest are the
same officials who subsequently bring the deportation action.").

But even given that, the Supreme Court determined in Lopez-
Mendoza that the "diversion of attention" implicit in Fourth
Amendment suppression hearings weighed against allowing Fourth
Amendment suppression motions to be made in immigration
proceedings.  See id. at 1048-49.

But if Fourth Amendment suppression motions cannot generally be
made --- then surely First Amendment suppression motions have no
place, either.

If a Fourth Amendment suppression hearing (typically involving
testimony from arresting immigration agents) is a bridge too
far, then a First Amendment suppression hearing (which in this
case could conceivably seek testimony from our country's top
officials) is also a bridge too far --- and then some.

\*     \*     \*

The conclusion set out just above is buttressed from two sides.

First, look to the one on-point case in this area.  The Second
Circuit was asked whether immigration courts can consider a
First Amendment suppression argument.  Its answer was no.  See
Montero v. INS, 124 F.3d 381 (2d Cir. 1997) ("We decline [the]
invitation to fashion an exclusionary rule for evidence obtained
in violation of an individual's First Amendment rights.")
(citing Lopez-Mendoza).

And <u>second</u>, look to what the immigration judge in this
case said about the scope of her powers.[44]

Before the immigration judge, the Petitioner made various
motions to compel discovery. For example, he moved to issue a
subpoena to the Secretary of State, as well as to compel the
production of certain documents.[45]

But the immigration judge denied those motions.

She said the authority of immigration judges "is very limited to
two things. Is [the Petitioner] removable from the United
States, and does he have relief available to him from removal if
he is found removable." Audio Recording of Hearing (April 8,

---

[44] In deciding whether "meaningful review" can be conducted
before an administrative court, federal courts routinely look to
what the administrative court has in fact actually done. Take
<u>Jarkesy</u> v. <u>SEC</u>, 803 F.3d 9 (D.C. Cir. 2015). There, an
investment advisor filed suit in a federal district court,
pressing constitutional claims. Could an SEC administrative law
judge provide meaningful review? Yes, the D.C. Circuit
answered. <u>See</u> <u>id.</u> at 28. How to know? Because the D.C.
Circuit had <u>read</u> the administrative law judge's decisions and
observed that she had "considered and rejected" the plaintiff's
arguments. <u>Id</u>. Another example: in <u>Aguilar</u> v. <u>U.S. Immigration
and Customs Enforcement Division</u>, 510 F.3d 1 (1st Cir. 2007),
the First Circuit asked whether the petitioners could have
gotten "effective relief" for their right-to-counsel claims
through the immigration courts. Yes, the First Circuit held.
<u>Id</u>. at 14. "The proof" was that during the removal proceedings
"each petitioner who requested a continuance for the purpose of
retaining counsel received one." <u>Id</u>. And a final example. The
Fifth Circuit considered whether the Federal Deposit Insurance
Corporation's administrative proceedings could adequately assess
claims that the "enforcement proceedings were tainted by
constitutional violations." <u>See</u> <u>Bank of La.</u>, 919 F.3d at 926.
Yes. Part of why: the administrative law judge, per the Fifth
Circuit, had written a "lengthy, detailed, and well-reasoned
opinion" on the claims, such that it was clear that the
proceedings qualified as "meaningful judicial review." <u>Id</u>.

[45] It appears that this was likely understood as connected to a
First Amendment issue. <u>See</u> April 11 Audio Recording at 23:50 to
25:24.

2025) ("April 8 Audio Recording") at 21:12 to 21:24; <u>see</u>
Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

And the immigration judge suggested that to the extent any
constitutional issues were being raised, she could not take them
on.  <u>See</u> April 11 Audio Recording at 1:35:35 to 1:36:00 ("I
understand . . . that you would like to challenge the authority
of the Secretary of State . . . , but you will need to take that
up with Congress.  This court is without jurisdiction to
entertain challenges to the validity of such laws under the
Constitution."); <u>see also</u> April 8 Audio Recording at 21:12 to
21:24; Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

Finally, as to seeking a subpoena for the Secretary of State,
the immigration judge said of the Petitioner that he was "in the
wrong court for that."  April 8 Audio Recording at 20:55-58; <u>see</u>
Petitioner's Letter (Apr. 11, 2025), at 3 n.4.

                    *     *     *

In a nutshell:

The Petitioner seeks here an injunction vacating the Secretary
of State's determination.  But the immigration courts cannot
issue injunctions.  And they cannot suppress evidence (like the
Secretary's determination) on First Amendment grounds.  That
conclusion is based on an analogy to Fourth Amendment
suppression, an on-point Second Circuit decision, and the
immigration judge's approach here.[46]

---

[46]  A final note.  In <u>Lopez-Mendoza</u>, a plurality of the Court,
not a majority, said this: "we do not deal here with egregious
violations of Fourth Amendment or other liberties that might
transgress notions of fundamental fairness and undermine the
probative value of the evidence obtained."  468 U.S. at 1050-51.
This left the door open, and a number of circuits have held that
suppression is indeed available in immigration courts when the
Fourth Amendment is violated in sufficiently "egregious" or
"widespread" ways.  <u>See</u>, <u>e.g.</u>, <u>Corado-Arriaza</u> v. <u>Lynch</u>, 844 F.3d
74, 77 (1st Cir. 2016); <u>Almeida-Amaral</u> v. <u>Gonzales</u>, 461 F.3d
231, 235 (2d Cir. 2006); <u>Yoc-Us</u> v. <u>Att'y Gen. U.S.</u>, 932 F.3d 98,
111 (3d Cir. 2019); <u>Yanez-Marquez</u> v. <u>Lynch</u>, 789 F.3d 434, 450
(4th Cir. 2015); <u>Puc-Ruiz</u> v. <u>Holder</u>, 629 F.3d 771, 778 (8th Cir.
2010); <u>Martinez-Medina</u> v. <u>Holder</u>, 673 F.3d 1029, 1033-34 (9th
Cir. 2011).  Other circuits have suggested openness to such an

## B.   **Factual Development**

As noted just above, the immigration courts cannot give the Petitioner the legal relief he seeks as to the Secretary of State's allegedly unconstitutional determination.  Whether through injunction or suppression --- the immigration courts cannot push aside the Secretary's determination.

But in some cases, a person is suing to get a statute invalidated as it applies to him.

And most of the time (if not all of the time) that is not something that an agency court is legally empowered to do.

---

exception.  See, e.g., United States v. Navarro-Diaz, 420 F.3d 581, 587 (6th Cir. 2005).  Maybe it could be argued that the "egregious" exception leaves room for First Amendment suppression in this case?  The argument would presumably run like this: (a) the Lopez-Mendoza plurality allowed for the possibility of an "egregious" Fourth Amendment suppression exception, (b) the exception does in fact exist, (c) it should be extended to the First Amendment suppression context in general, and (d) to this "egregious" case in particular.  If this argument is persuasive, then maybe the immigration courts could provide a First Amendment suppression remedy here.  But the argument does not work.  The reason: link (b) in the chain cannot hold up.  The immigration judge here is in Louisiana, so any review will be to the Fifth Circuit, see 8 U.S.C. § 1252(b)(2), whose precedent will control.  See Ballesteros v. Ashcroft, 452 F.3d 1153, 1157 (10th Cir. 2006).  And the Fifth Circuit has flatly held that "[i]t is well established that the fourth amendment exclusionary rule is not to be applied in deportation proceedings."  Mendoza-Solis v. INS, 36 F.3d 12, 14 (5th Cir. 1994).  (Some other Fifth Circuit cases seem to go the other way, and to treat an "egregious" Fourth Amendment suppression exception as a part of the law.  But one is dicta in a Bivens case.  See De La Paz v. Coy, 786 F.3d 367, 376 (5th Cir. 2015).  And the rest are cases not selected for publication.  See Escobar v. Holder, 398 F. App'x 50, 53 (5th Cir. 2010); Gonzalez-Reyes v. Holder, 313 F. App'x 690, 695 (5th Cir. 2009); Verduzco-Contreras v. Gonzalez, 160 F. App'x 406, 408 (5th Cir. 2005).  Under the Fifth Circuit's rules, see 5th Cir. R. 47.5, unpublished cases are out of bounds.)

But even in those sorts of circumstances, federal courts often
require that the case be sent first to an administrative court.
See Elgin, 567 U.S. at 17; Thunder Basin, 510 U.S. at 215;
Massieu, 91 F.3d at 426; accord, e.g., Hill, 825 F.3d at 1245;
Tilton, 824 F.3d at 279, 290; Bennett, 844 F.3d at 176, 184;
Bebo, 799 F.3d at 767, 771; Nat'l Taxpayers Union v. U.S. Soc.
Sec. Admin., 376 F.3d 239, 243-44 (4th Cir. 2004).

There are a number of reasons why.

One of them: even if the agency's courts cannot themselves
deliver the requested remedy, they can prepare the field --- by
finding the facts, so that a federal court of appeals will have
a solid record to work from when it gets the case.  See Elgin,
567 U.S. at 19-20; accord, e.g., Bank of La., 919 F.3d at 927;
Chau v. SEC, 665 F. App'x 67, 71 (2d Cir. 2016); Hill, 825 F.3d
at 1249; Jarkesy, 803 F.3d at 21-22; Bebo, 799 F.3d at 773.

But in this case, the immigration courts would not be able to do
the fact-finding that a federal court of appeals would need down
the road.

The Court explains why here.

                    *    *    *

To see the limits of the immigration courts' fact-finding, try
to peer around the corner --- to predict the sorts of factual
issues that may possibly come up as the case unfolds.[47]

One of those issues is suggested by the Respondents, and it
provides a helpful example of the fact-finding difficulties that
the immigration courts would encounter in this case.

The Petitioner claims that his detention is the product of First
Amendment retaliation.  See Motion for Preliminary Injunction at
3; see also Petition ¶¶ 88-90.  But the Respondents say that
this argument "is likely to fail."  Opposition Brief at 28.

The reason why: to make out a retaliatory-detention claim under
the First Amendment, the Respondents say, the Petitioner must
show that there was no probable cause for his arrest.  See

---

[47]  The discussion in this section assumes that fact-finding is
necessary.  But the Court has not developed views on whether
this case can be resolved on the papers, or will require
evidentiary development.

<u>Nieves</u> v. <u>Bartlett</u>, 587 U.S. 391, 402 (2019) (cited by the Opposition Brief at 28).

But, the Respondents argue, the Petitioner cannot make that showing. <u>See</u> Opposition Brief at 28. The Secretary of State's determination and the Petitioner's alleged failure-to-disclose on his lawful permanent resident application are said to be "facially valid reasons" to remove him from the country. <u>Id</u>. at 28.

Therefore, the Respondents' argument goes, federal officials had probable cause to detain the Petitioner --- and under <u>Nieves</u>, cited just above, his First Amendment argument hits a quick dead end. <u>See id</u>.

Moreover, the Respondents argue, the Petitioner has not tried to use the exception to all this that the Supreme Court suggested in <u>Nieves</u>. <u>See id</u>. at 28–29.

Under that exception, the Petitioner may not actually need to establish an absence of probable cause. Per the <u>Nieves</u> Court: "The no-probable-cause requirement should not apply when [the Petitioner] presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." 587 U.S. at 407.

Look just a bit over the horizon, and it seems possible that the Petitioner could try to press a selective-enforcement defense --- contending, presumably, that other "similarly situated individuals" have not been the subject of a Section 1227(a)(4)(C)(i) determination by the Secretary of State.

To make out this defense, the Petitioner would potentially seek some discovery --- as to others, for example, against whom enforcement actions may not have been taken, and perhaps as to the decision-making process of senior federal officials.

Can the immigration courts provide "meaningful" factual development as to those issues?

It is hard to see how they could.

The Supreme Court, after all, has suggested that even narrow-gauge Fourth Amendment suppression hearings are not a good fit for the tight focus of the immigration courts. <u>See</u> <u>Lopez-Mendoza</u>, 468 U.S. at 1046–50.

65

And as noted above, the immigration judge in this case herself declined to permit any discovery. See April 8 Audio Recording at 20:55-58 (stating the Petitioner was "in the wrong court" for obtaining a subpoena of the Secretary).[48]

\*   \*   \*

Given the limits of fact-finding in the immigration courts, federal courts have sometimes taken up immigration claims, rather than require them to wind their way through agency courts.

---

[48] Selective enforcement can be raised as a kind of defense to a defense, as in Nieves: does selective enforcement undermine the probable cause defense to a First Amendment retaliation claim? But selective enforcement can also be raised in more garden-variety affirmative contexts: was a person targeted for immigration enforcement in the first place based on selective enforcement? See Ragbir v. Homan, 923 F.3d 53, 62, 67 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227 (2020); AADC, 70 F.3d at 1052; Massieu, 91 F.3d at 418. Can the immigration courts draw on their experience when it comes to building out the second sort of selective-enforcement case to develop a factual record as to selective enforcement that is raised in the first context? Not really. The reason is that affirmative selective-enforcement claims are very rarely handled by the immigration courts. For nearly 30 years, such claims have largely been unavailable to noncitizens without lawful status in the United States. See AADC, 525 U.S. at 488 ("[A]n alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."). And even before AADC foreclosed many selective-enforcement claims, immigration courts generally steered clear of them --- largely to avoid trenching on federal immigration officials' discretion. See Matter of Merced, 14 I. & N. Dec. 644, 645 (BIA 1974); Matter of Lennon, 15 I. & N. Dec. 9, 12 (BIA 1974), overruled on other grounds by Matter of Esqueda, 20 I. & N. Dec. 850 (BIA 1994); Matter of Geronimo, 13 I. & N. Dec. 680, 681 (BIA 1971); see also Corredor v. Holder, 481 F. App'x 442, 444 (10th Cir. 2012); Cortez-Felipe v. INS, 245 F.3d 1054, 1057 (9th Cir. 2001); AADC, 70 F.3d at 1055; Johns v. Dep't of Just., 653 F.2d 884, 889 (5th Cir. 1981); Lopez-Telles v. INS, 564 F.2d 1302, 1304 (9th Cir. 1977) ("The immigration judge is not empowered to review the wisdom of the INS in instituting the proceedings. His powers are sharply limited[.]").

For example, in McNary v. Haitian Refugee Center, Inc., 498 U.S. 479 (1991), the respondents challenged certain INS amnesty procedures in a federal district court.  See 498 U.S. at 487–88. But did they have to go through the immigration courts first?

No, the Supreme Court held.

The case was a "pattern and practice case," because it challenged "[a] pattern of . . . unconstitutional practices." Id. at 497 (cleaned up).

Pattern-and-practice cases require a "substantial amount of evidence," and an immigration judge adjudicating one particular case would not have been able to gather it.  Id.  This would leave the federal court of appeals in a bad spot; it "would be in [no] position to provide meaningful review of the type of claims raised."  Id.

So the Supreme Court's decision: no need for the case to go to the immigration courts --- keep it in the federal district court.  See id. at 494.

McNary is not directly on-point.

But it speaks to the idea that when it comes to "meaningful" development of the factual record --- and the knock-on question of whether adjudication in the immigration courts is required --- federal courts do not need to turn a blind eye to a common-sense reality.[49]

And that is this: immigration courts are mainly built for close-to-the-ground fact-finding.  Not for fleshing out the record as to potentially sweeping claims --- related to "pattern and practice" issues, McNary, 498 U.S. at 497, for example, or selective enforcement.

And sweeping claims are plainly what the Petitioner is pressing here.[50]

_____

[49]  See generally Tennessee v. Dep't of Educ., 104 F.4th 577, 606 (6th Cir. 2024) (suggesting that "practical realities" influence whether there is "meaningful review" under Thunder Basin).

[50]  As briefly alluded to above, immigration courts are high-volume affairs.  As of March 2025, there were around 3.9 million cases in the backlog.  See Pending Cases, New Cases, and Total

67

* * *

As to the fact-finding difficulties here for the immigration courts, consider briefly a final added point.

One of the Petitioner's core arguments is that he is being retaliated against under a policy formulated by the most senior officials in the federal government. See Motion for Preliminary Injunction at 3; see also Petition ¶¶ 29-36.

More on that allegation later, in Part VIII.

For now, note that there is at least a potential argument under the Supreme Court's decision in Lozman v. Riviera Beach, 585 U.S. 87, 100-01 (2018), that the existence of such a policy could undo the argument the Respondents have made here --- namely, the argument that probable cause is a full defense to an arrest made in retaliation for First Amendment activity. See Opposition Brief at 28.

This means that the salience of the Nieves question (was there probable cause such that First Amendment retaliation may not matter?) could potentially turn under Lozman on the answer to an earlier and broader question (was there an official policy of retaliation?).

---

Completions, Exec. Off. for Immigr. Rev., https://perma.cc/L659-S8P5 (accessed on Apr. 29, 2025). Roughly 360,000 of those cases were added in 2025. See id. This has an everyday impact. Per a 2022 congressional report, some immigration judges reported having nearly 5,000 pending cases; others reported they heard 80 cases each day. Holly Straut-Eppsteiner, Cong. Rsch. Serv., R47077, U.S. Immigration Courts & the Pending Cases Backlog 22 (2022); cf. Malets v. Garland, 66 F.4th 49, 59 (2nd Cir. 2023) ("We have repeatedly recognized the extraordinary caseload burdens faced by IJs."); Abulashvili v. Att'y Gen. of U.S., 663 F.3d 197, 208 (3d Cir. 2011) ("We readily acknowledge that an IJ's position is an impossibly demanding and challenging one."). The typical fact-finding in these cases does not appear extensive. When a person is detained, the first hearing seems to typically be the only one. See Ingrid Eagly & Steven Shafer, Detained Immigration Courts, 110 Va. L. Rev. 691, 756 (2024). (Part of why: while discovery tools exist, see 8 C.F.R. §§ 1003.10(b), 1003.35, they are rarely used in practice. See Geoffrey Heeran, Shattering the One-Way Mirror: Discovery in Immigration Court, 79 Brook. L. Rev. 1569, 1582-84 (2014).)

68

If fact-finding is one day required as to such a policy --- whether it exists, what its scope might be, whether it led to the Petitioner's detention --- it cannot be done in a "meaningful" way by the immigration courts, for reasons that have already been discussed (and that were the focus of the Supreme Court's "pattern and practice" decision in McNary).

But that is only the tip of the iceberg.

Deciding, for example, whether Lozman applies to a case like this one, involving only federal officials, may require some complex legal judgments about constitutional questions that have not yet been resolved in all federal circuits. See, e.g., Novak v. City of Parma, 932 F.3d 421, 429 (6th Cir. 2019) (suggesting that Lozman is only relevant as to claims against municipalities).

And that question may need to be answered at the threshold of any fact-finding, to determine the scope of discovery.

If Lozman applies, the Petitioner may try to prove up a policy --- and to seek out evidence accordingly.

And if Lozman does not apply, then maybe what matters is only proof as to probable cause and selective enforcement --- which may imply a different (though still potentially wide) scope for discovery.

\* \* \*

Bottom line: the immigration courts cannot be expected to supply sufficiently substantial fact-finding as to the allegations in this case.

And the threshold questions that may determine the scope of any possible discovery seem to themselves require knowledge as to complex areas of constitutional law, areas that are removed from the legal issues the immigration courts typically consider.[51]

---

[51] The "meaningful review" test is designed to get a handle on what Congress' intent for a certain "type" of case might have been. See Thunder Basin, 510 U.S. at 212. In terms of how factual development might go forward --- would Congress have wanted a case like this one to be handled by the immigration courts? The first proposed subpoena here was to a cabinet official, and the allegations in this case quote statements made

69

### C. __Expertise__

The focus to this point has been on what the immigration courts could accomplish in this case.

Could they grant the Petitioner the legal relief he seeks? Could they substantially develop the factual record?

The Court's answer has been no to each question. See Part VI.A and Part VI.B.

The implications of this are taken up in Part VI.D, which considers whether the Petitioner could get the required "meaningful review" of his claim if it first goes to the immigration courts.

Before getting there, though, take a quick detour --- to see the impact here of a decision of the Board of Immigration Appeals.

\*     \*     \*

"Meaningful review" is the most important of the Thunder Basin factors. See Part V.B.2.

But there are two others.

---

about the Petitioner by the President. See Petition ¶¶ 73, 74. It is unclear at this point whether discovery might be needed here. See footnote 47. But if it is, note that the federal courts have evolved any number of potentially relevant doctrines in this area. See, e.g., United States v. Morgan, 313 U.S. 409, 422 (1941) (as to an agency action, a cabinet secretary "should never have been subjected to" a deposition); In re U.S. Dep't of Educ., 25 F.4th 692, 700 & n.1 (9th Cir. 2022) (suggesting that "[t]he rules for when a court may allow the questioning of a cabinet secretary" "rest on a constitutional foundation") (cleaned up); see also In re United States, 985 F.2d 510, 512 (11th Cir. 1993); Simplex Time Recorder Co. v. Sec'y of Lab., 766 F.2d 575, 586 (D.C. Cir. 1985); Kyle Eng'g Co. v. Kleppe, 600 F.2d 226, 231 (9th Cir. 1979). These aim to strike a fine balance between the legitimate needs of parties seeking evidence and the legitimate needs of senior federal officials --- whose time is pressed and whose work files are likely to be especially sensitive, such that they will require special judicial protection as to any discovery. It seems unlikely that Congress would have thought that a case of this "type," raising these sorts of evidentiary issues, should go before the immigration courts, which lack experience with them.

\*     \*     \*

The first is whether the claims in question are "wholly
collateral to the statute's review provisions." Axon, 598 U.S.
at 186 (cleaned up).

The claim as to the Secretary's determination is not collateral.
It is "the vehicle by which [the Petitioner] seek[s] to"
challenge his removal proceedings, Elgin, 567 U.S. at 22 --- and
per the statutory "review provisions," those are the
"challenge[s]" that are generally supposed to go before the
immigration courts.

\*     \*     \*

The second Thunder Basin factor relates to whether the agency's
expertise can be brought to bear if a certain claim goes to it
first.  See Axon, 598 U.S. at 194; Elgin, 567 U.S. at 22; Free
Enter. Fund, 561 U.S. at 491.

If agency expertise can be brought to bear, that is a reason to
think Congress wanted claims of the relevant "type" to go to the
agency's courts (here, the immigration courts).

But in this case, "agency expertise" would have virtually no
role to play as to any immigration court assessment of the
Secretary of State's determination.

This Part VI.C explains why.

\*     \*     \*

Agency adjudicatory bodies are experts in the laws they
routinely use, plus nearby bodies of law.

SEC adjudicators, for example, can be expected to be fluent in
the Securities Act of 1933 and the Securities Exchange Act of
1934.  And they are almost surely experts on related subjects,
too.  Common-law fraud, for example.

Immigration courts plainly have deep expertise in immigration
law.

But the Petitioner claims that the Secretary of State's
determination is the product of First Amendment retaliation.
See Petition ¶¶ 8, 89; Motion for Preliminary Injunction at 10-
18.

And First Amendment issues have little or no place on an
immigration judge's docket.  See Part VI.A.  It follows that

71

Add.261

there is no reason to think immigration courts have special expertise in First Amendment law.  See Axon, 598 U.S. at 194 (describing constitutional claims as outside the administrative agency's area of expertise); Free Enter. Fund, 561 U.S. at 491 (similar).

But agency expertise can still potentially be brought to bear.

Indeed, the Thunder Basin "agency expertise" factor can weigh in favor of upfront adjudication in the agency's courts --- even when the legal theory that undergirds the claim is not one as to which an agency adjudicator has any expertise.  See Elgin, 567 U.S. at 22-23; Rydie v. Biden, 2022 WL 1153249, at *8 (4th Cir. Apr. 19, 2022).

But while that is true in general, in this particular case the "agency expertise" factor does not point to the immigration courts.

\*     \*     \*

To see why, start with the idea that an agency adjudicator's decision, informed by special expertise, can helpfully move the case along by eliminating the need for later federal court intervention.

Take as an example Elgin v. Department of Treasury, 567 U.S. 1 (2012).

There, federal employees were fired because they did not register for the draft, and they sued.  See id. at 6-7.  Their argument: their termination for failure to register was unconstitutional because, among other things, the draft discriminated against men based on sex.  See id. at 7.

Analyzing the Thunder Basin factors, the Supreme Court ruled that the case needed to first be adjudicated by the relevant agency, the Merit Systems Protection Board.[52]  See id. at 8.

---

[52]  "The Merit Systems Protection Board . . . is a[n] . . . agency in the executive branch charged with protecting federal employees against improper employment-related actions," including "favoritism, or engaging in reprisals against whistleblowers."  Jon O. Shimabukuro & Jennifer A. Staman, Cong. Rsch. Serv., R45630, Merit Systems Protection Board (MSPB): A Legal Overview (2019) (summary page).

72

The Board did not have expertise on the underlying constitutional issue.  See id. at 22.  But the Court noted that the Board might be able to wrap up the case by applying its expertise to "threshold" issues, without the need for a court to later take up the constitutional question.  See id.

For example, one of the fired employees had not been formally fired --- instead, he argued that he had been "constructive[ly] discharge[d]."[53]  Id. at 23.

If this employee was not in fact constructively discharged, the constitutional challenge to his firing would no longer exist --- because it could no longer be said that he was fired.  See id.

And that, per the Supreme Court, was a reason to let the case run down the agency-adjudication track.  See id.  After all, the question of whether a person is or is not constructively discharged is "unique to the employment context" and therefore "falls squarely within the [Board's] expertise."  Id. at 22-23.[54]

\*     \*     \*

With this background in mind, turn back now to this case.

Are there "threshold" issues here, id. at 22, that the immigration courts could resolve, and that might put an end to the Petitioner's First Amendment challenge?

Yes, it would seem.

After all, the Secretary of State determined that there were "reasonable ground[s] to believe [the Petitioner's presence or

---

[53]  Constructive discharge refers to "[a]n employer's creation of working conditions that leave a particular employee or group of employees little or no choice but to resign."  Discharge, sense 7, Black's Law Dictionary (12th ed. 2024) (defining "constructive discharge").

[54]  For other cases making this same point, see, for example, Bank of La. v. FDIC, 919 F.3d 916, 929 (5th Cir. 2019) ("[T]he [agency] could have mooted the [plaintiff's] constitutional claims by finding the [plaintiff] innocent of the statutory violations it was accused of committing."), and Jarkesy v. SEC, 803 F.3d 9, 29 (D.C. Cir. 2015) ("[T]he agency could moot the need to resolve [the constitutional question] by finding that he did not commit the securities-law violations of which [the plaintiff] stands accused.").

73

activities in the United States] would have potentially serious
adverse foreign policy consequences for the United States." 8
U.S.C. § 1227(a)(4)(C)(i).

Maybe the immigration courts could hold that there were in fact
<u>not</u> "reasonable grounds" --- and if so, the Petitioner's claim
would be resolved on that basis, without the need for a federal
court to decide whether the Secretary's determination amounted
to First Amendment retaliation.

And indeed, after the Third Circuit sent Massieu's case to the
immigration courts, that is precisely what happened.

The immigration judge looked behind the curtain of the Secretary
of State's "reasonable grounds" determination --- and said the
evidence was not there.  <u>See</u> <u>In re Ruiz-Massieu</u>, 22 I. & N. Dec.
833, 835-36 (BIA 1999).

But that was not the end of the road.

The Board of Immigration Appeals took it from there, and held
that what the immigration judge had done was not allowed.  Per
the Board, the Secretary's determination under 8 U.S.C.
§ 1227(a)(4)(C)(i) is like a prior criminal conviction --- it
must be treated as a given if it seems solid-enough on its face,
with no possibility of getting under the hood and examining its
underlying factual basis.

> In the scheme adopted by Congress, the
> Secretary of State's determination as
> outlined in section 241(a)(4)(C)(i) [8
> U.S.C. § 1227(a)(4)(C)(i)] of the Act is
> equivalent to a duly certified record of
> criminal conviction by a state or federal
> court. . . .
>
> [The alternative] would necessarily require
> the Immigration Judge and this Board to
> intrude into the realm of foreign
> policy. . . .
>
> For an example, we need only look to the
> opinion in the present case.  The
> Immigration Judge held that the [Immigration
> and Naturalization] Service must produce
> more than clear, unequivocal, and convincing
> evidence that the Secretary of State held a

74

facially reasonable opinion that the alien's
presence would have adverse foreign policy
consequences.  She required the Service to
convince her by clear, unequivocal, and
convincing evidence that the Secretary's
opinion is reasonable.  The Immigration
Judge found that the Service had not shown
that the opinion of the Secretary of State
is reasonable.  Consequently, in the absence
of further evidence, she substituted her
judgment for that of the Secretary of State.
This standard of inquiry would entangle the
Immigration Court in matters of foreign
policy and involve that court in weighing
the importance of various factors in an area
in which it has no special expertise.  Such
an in-depth examination could well require
the Service to proffer secret or
confidential information and expert
witnesses, or involve a deposition of the
Secretary of State.  There is no indication
that Congress contemplated an Immigration
Judge, or even the Attorney General,
overruling the Secretary of State on a
question of foreign policy.

Id. at 844-45.[55]

In short: "it is . . . the opinion of the Secretary [of State]
that decides the issue," id. at 845 n.13 --- and because of the
above-quoted ruling from the Board of Immigration Appeals in
Ruiz-Massieu, there would be next to nothing for an immigration
court to do in this case.  The reasonableness of the Secretary's
determination might have been a "threshold" matter for the

---

[55]  Ruiz-Massieu is binding on immigration judges, see 8 C.F.R.
§ 1003.1(g)(1), and serves as precedent for future Board of
Immigration Appeals proceedings regarding the same issue.  See
id. § 1003.1(g)(2); see also April 11 Audio Recording at 1:34:30
to 1:36:00 (holding that Ruiz-Massieu bound the immigration
court).

75

immigration courts.  <u>Elgin</u>, 567 U.S. at 22.  But after the <u>Ruiz-Massieu</u> decision, no longer.[56]

*     *     *

Are there other reasons why agency expertise might matter?

Yes.  Take up here the main added possible reason, and then consider a second one below in footnote 57.

An agency's narrowing construction of a statute might potentially obviate the need for a federal court to later reach the relevant constitutional issues.  <u>See</u> <u>id.</u> at 23 (a "challenged statute may be one that the [agency] regularly construes, and its statutory interpretation could alleviate constitutional concerns"); <u>see also</u> <u>Jarkesy</u>, 803 F.3d at 29 ("[T]he [agency] could offer an interpretation of the securities laws in the course of the proceeding that might answer or shed light on [the plaintiff's] [constitutional] challenge.  As our court has previously observed, there are precious few cases involving interpretation of statutes authorizing agency action in which our review is not aided by the agency's statutory construction.") (cleaned up); <u>Am. Fed'n of Gov. Emps., AFL-CIO</u> v. <u>Trump</u>, 929 F.3d 748, 761 (D.C. Cir. 2019) (similar).

Imagine, for example, if the immigration courts took first crack at this case --- and construed 8 U.S.C. § 1227(a)(4)(C)(i) as providing a basis for removal only if the Secretary of State's

---

[56]  There might <u>sometimes</u> be fact-finding work for the immigration courts to do in cases like this one.  For example, there may be a dispute as to whether the Secretary personally made the relevant determination.  That could take fact-finding, and the immigration courts could do it.  <u>Cf.</u> <u>In re Ruiz-Massieu</u>, 22 I. & N. Dec. at 845 n.13.  And that possibility was part of why Judge Alito thought the <u>Massieu</u> case should be sent to the immigration courts.  <u>See</u> <u>Massieu</u>, 91 F.3d at 426.  But no one seems to be disputing the Secretary of State's personal involvement here.  Indeed, the Petitioner goes the other way --- and affirmatively alleges that there was a good deal of personal involvement from the Secretary in this case.  <u>See</u> Petition ¶¶ 2-3, 33, 75, 80, 83.  (Note that the Secretary does not <u>always</u> need to be personally involved in passing on a determination.  Only when his determination is based on speech that would be First Amendment-protected.  <u>See</u> 8 U.S.C. §§ 1227(a)(4)(C)(ii), 1182(a)(3)(C)(iii).  But the immigration courts have no special expertise on that First Amendment gating question.)

76

determination was not based on any sort of retaliation whatsoever.

That could switch things up, transforming a constitutional question into an immigration law question. The constitutional question (was the Secretary's determination the product of First Amendment retaliation?) would become one of immigration law (was the Secretary's determination the product of "any sort of retaliation," as defined by the immigration courts?).

And if so, it might make sense to allow the immigration courts to assess the case first --- under what will, by hypothesis, be their own standard.

But the Board of Immigration Appeals has already construed Section 1227(a)(4)(C)(i), and it has not opted to give it a limiting construction of any kind.

And in any event, a limiting agency construction would carry less weight now that the Board of Immigration Appeals decisions no longer get strong deference. Compare Bautista v. Att'y Gen. of U.S., 744 F.3d 54, 58 (3d Cir. 2014), abrogated on other grounds by Torres v. Lynch, 578 U.S. 452 (2016) (Board of Immigration Appeals decisions get Chevron deference), and Rodriguez-Avalos v. Holder, 788 F.3d 444, 448-49 (5th Cir. 2015) (same), with Loper Bright Enters. v. Raimondo, 603 U.S. 369, 412 (2024) ("Chevron is overruled.").

*   *   *

Bottom line: the immigration courts would be unable to apply their expertise here to resolve any substantial threshold matter --- and they would be unable to interpret the immigration laws in a way that would later receive strong deference from a federal court.

In light of this, the Thunder Basin "agency expertise" factor tilts the scales toward the conclusion that Congress did not intend for immigration courts to handle this "type" of case in the first instance.[57]

___

[57] Per the Supreme Court in Axon, the expertise factor "reflect[s] . . . the point of special review provisions --- to give the agency a heightened role in the matters it customarily handles, and can apply distinctive knowledge to." 598 U.S. at 186. But "the point" of the structure created by Congress for

77

### D.  **Conclusion**

As to the Secretary of State's determination, the immigration courts cannot provide the Petitioner with the legal relief he seeks.  See Part VI.A.  They cannot be expected to knock out any fact-finding that might potentially be necessary.  See Part VI.B.  And they cannot bring their special expertise to bear in a substantial way.  See Part VI.C.

Does this mean that if this case starts off in the immigration courts, the Petitioner cannot get "meaningful review" --- and that, under Section 1252(b)(9), this Court should therefore retain jurisdiction?[58]

To answer, go back for a moment to the key cases.

\*      \*      \*

Recall that, in Elgin, employees were fired for not signing up for the draft.  See 568 U.S. at 6–7.  The Supreme Court held that the employees could not sue first in the federal district court.  They would have to go down the administrative track, per a statute --- even though they could not get constitutional relief there.  See id. at 13–14.

Or look back to Massieu.

The underlying statute, essentially the same one that is at issue here, was challenged as unconstitutional.

---

immigration claims was not just to build up and lean on expertise --- but also to keep the tide of immigration cases from swamping the federal courts and displacing a good deal of their work on other cases.  See Robbie Clarke, Reaffirming the Role of the Federal Courts, 17 Wash. & Lee J. Civ. Rts. & Soc. Just. 463, 474–75 & n.65 (2011).  But any precedent that might be set by this case does not implicate such concerns.  It is much too unusual for that.  Because of the Board of Immigration Appeals' Ruiz-Massieu decision, for example, there is virtually nothing for the immigration courts to do here.  And the sensitive and sprawling nature of the discovery that might potentially be required makes this case an especially serious misfit for immigration courts fact-finding.

[58]  Recall: the Court here is proceeding on the assumption that Section 1252(b)(9) applies in the first place.  See Part IV.

But the immigration judge's hands were tied.  She was "not authorized to consider the constitutionality of the statute." 91 F.3d at 424.

The result?  Same as in <u>Elgin</u>.  The Third Circuit held that the noncitizen would have to go to the immigration courts and then over to the court of appeals, rather than seek immediate relief in the district court.  <u>See id</u>. at 422.

\*   \*   \*

These precedents loom large.  They suggest that going to the administrative courts is necessary --- even when they cannot be the litigation's main event.

But in the end, the Court's conclusion is this: neither the Supreme Court's <u>Elgin</u> decision nor the Third Circuit's <u>Massieu</u> decision dictates the outcome here.

Those cases are different than this one.

\*   \*   \*

The first difference has already been discussed.

In <u>Elgin</u> and <u>Massieu</u>, the administrative courts could realistically be expected to push things forward.

They could gather facts.  They could bring to bear their distinctive expertise.

The cases would take longer to make it to federal court --- a first trip there, to the federal court of appeals, could go forward only after the administrative adjudication was done.

But the time in <u>Elgin</u> and <u>Massieu</u> would have been well spent. The administrative courts' work (fact-finding, using their expertise) would have set the table for the federal court of appeals to make its constitutional decision.

But in this case, the time in the immigration courts cannot be expected to advance the ball.

If there needs to be fact-finding here, it may potentially be sprawling, and it may potentially involve sensitive evidence, or (renewed) requests to depose senior officials.  <u>See</u> Part VI.B.

And the scope of discovery may depend not on questions of immigration law, but on questions of constitutional law, both procedural (for example: what are the limits on subpoenaing a

79

cabinet official?) and substantive (for example: is there a "policy" exception under <u>Lozman</u> to the <u>Nieves</u> First Amendment-retaliation framework?).  <u>See</u> <u>id</u>.

This is not the kind of fact-finding work the immigration courts have been built for.  <u>See</u> <u>id</u>.

And in this case, the immigration courts would also have no real chance to deploy their special expertise.  The Board of Immigration Appeals has already held that the Secretary of State's determination is conclusive.  This binds the immigration courts.  And it means that, for those courts at least, there is no room to examine the underlying basis of the Secretary's determination.  <u>See</u> Part VI.C.

There is, in short, little that the immigration courts can be expected to accomplish in this case.

The requirement of "meaningful review" under <u>Thunder Basin</u>, <u>Elgin</u>, and <u>Massieu</u> can accommodate a slower road to federal court.  But those cases envision that along the way things will get done.  Facts will be found, law will be interpreted, expertise will be used.  <u>See</u> <u>Thunder Basin</u>, 510 U.S. at 214-15; <u>Elgin</u>, 567 U.S. at 22-23; <u>Massieu</u>, 91 F.3d at 426.

The work in the administrative court may end the case.  And if not, then the time will have been <u>used</u>.  The journey (in the administrative courts) will shape the final destination (review in federal court).

But <u>Elgin</u> and <u>Massieu</u> do not purport to speak to a case like this one.  In those cases, the administrative court route meant that extra time would pass --- but for a purpose.

Here, the situation would be different.  Time would pass, yes, and perhaps a great deal.  But there would be little to show for it.

* * *

Take now a second way in which this case is different from <u>Elgin</u> or <u>Massieu</u>.

Start with the basic distinguishing point, <u>see</u> Part VI.D.1, and then look to its implications from three related perspectives. <u>See</u> Part VI.D.2 to Part VI.D.4.

### 1.   __Public Concern__

The Petitioner alleges that the Secretary of State's determination amounts to retaliation for his First Amendment-protected statements.

There was nothing like that in <u>Elgin</u>.  The petitioners there were federal employees who had not registered for the draft. <u>See</u> 567 U.S. at 6–7.

And there was nothing like that in <u>Massieu</u>, where the plaintiff was a former senior Mexican official whose presence had become a thorn in the side of U.S.-Mexico relations.  <u>See</u> <u>Massieu</u>, 915 F. Supp. at 712 (quoting Letter from Warren Christopher, Sec'y of State, to Janet Reno, Att'y Gen.) (Oct. 2, 1995) (failure to return the plaintiff "to Mexico . . . would be a major setback for . . . our combined efforts to chart a new and effective course of U.S.-Mexican relations").[59]

Before getting to why this difference matters, note briefly the Petitioner's speech-related allegations.

That he had spoken at press conferences and on TV.  <u>See</u> Petition ¶ 26.  That he had helped lead two university student groups, at least one of which puts on public lectures.  <u>See</u> <u>id</u>. ¶ 23.  And that the subject of all this was the current violence in the Middle East and the Petitioner's views on it --- Israel has committed a "genocide," the Petitioner has said, <u>id</u>. ¶ 22; Columbia University, where he was a student, is "financing and in other ways facilitating it," he has said, <u>id</u>.; and the United States is on the wrong side of the line.  <u>See</u> <u>id</u>. ¶ 29.

---

[59]   The <u>Massieu</u> complaint alleged that "the deportation proceeding evidence[d] selective enforcement in retaliation for Mr. Ruiz Massieu's exercise of his First Amendment right to criticize the Mexican political system."  <u>Massieu</u>, 915 F. Supp. at 689.  But that was the first and last appearance of the First Amendment in <u>Massieu</u>.  It was not invoked in the opinion of the district court, in the appellants' or appellee's briefs on appeal, or in the opinion of the court of appeals.  <u>See</u> <u>generally</u> <u>Massieu</u>, 915 F. Supp. 681; <u>Massieu</u>, 91 F.3d 416; Appellants' Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414627; Appellee's Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414626; Appellants' Reply Brief, <u>Massieu</u> v. <u>Reno</u>, 91 F.3d 416 (3d Cir. 1996) (No. 96-5125), 1996 WL 33414628.

Per the Supreme Court, speech on matters of public concern "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Snyder v. Phelps, 562 U.S. 443, 452 (2011).

Was the Petitioner's alleged speech about a "public concern"?

Speech "deals with matters of public concern when it can be fairly considered as relating to any matter of political . . . concern to the community." Id.

The Petitioner's public statements about the Middle East conflict meet that test. See, e.g., id. at 454 (holding that protest signs as to United States military policy were "political" and "of public import"); see also Rankin v. McPherson, 483 U.S. 378, 386 (1987); Navab-Safavi v. Glassman, 637 F.3d 311, 313, 316 (D.C. Cir. 2011); Dunn v. Carroll, 40 F.3d 287, 291–92 (8th Cir. 1994).

And speech can be a matter of public concern when it is "a subject of legitimate news interest," Snyder, 562 U.S. at 452, including as to "all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." Time, Inc. v. Hill, 385 U.S. 374, 388 (1967); accord, e.g., Lane v. Franks, 573 U.S. 228, 241 (2014); Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 103–04 (3d Cir. 2022); O'Laughlin v. Palm Beach Cnty., 30 F.4th 1045, 1051–52 (11th Cir. 2022).

The Petitioner's public statements meet that test, too

In short: the Petitioner's speech was on a subject of "public concern" --- and that sort of speech gets "special protection." Snyder, 562 U.S. at 452.

\*    \*    \*

Moreover, the Petitioner alleges not only that he was detained by immigration officials because of his speech --- but also that this detention is having an effect now, in the present.

A direct effect --- because detention prevents the Petitioner from speaking publicly. See Petition ¶¶ 89, 99.[60]

---

[60] See generally Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024) ("There is no dispute that an arrest constitutes conduct sufficient to deter a person of ordinary firmness from

82

Add.272

And an indirect effect --- because detention deters the
Petitioner (and others) from speaking.  See id. ¶ 89.[61]

This sort of here-and-now impact on speech weighs heavily.

That is because "[t]he loss of First Amendment freedoms, for
even minimal periods of time, unquestionably constitutes
irreparable injury." Elrod v. Burns, 427 U.S. 347, 373 (1976)
(plurality opinion); see Ne. Pa. Freethought Soc'y v. Cnty. of
Lackawanna Transit Sys., 938 F.3d 424, 442 (3d Cir. 2019); B.H.
ex rel. Hawk v. Easton Area Sch. Dist., 725 F.3d 293, 323 (3d
Cir. 2013); see also 11A Charles Alan Wright & Arthur R. Miller,
Federal Practice and Procedure § 2948.1 (3d ed. 2025); cf.
Tandon v. Newsom, 593 U.S. 61, 64 (2021); Roman Cath. Diocese of
Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020); Dombrowski v.
Pfister, 380 U.S. 479, 485–86 (1965); Tenafly Eruv Ass'n, Inc.
v. Borough of Tenafly, 309 F.3d 144, 178 (3d Cir. 2002).

And this is because "[t]he timeliness of political speech" ---
the type of speech at issue here --- "is particularly
important." Elrod, 427 U.S. at 374 n.29 (citing Carroll v.
President & Comm'rs of Princess Anne, 393 U.S. 175, 182 (1968);
Wood v. Georgia, 370 U.S. 375, 391 (1962)).

Our law's response to a here-and-now impact on political speech
has been the same across the board: no unnecessary delay.

Deal thoughtfully and thoroughly with the speech issue.  But
deal with it on a faster-than-usual timeline.

Begin seeing this below, and its import for this case.

---

exercising her constitutional rights.") (cleaned up), cert.
denied sub nom. Murray-Nolan v. Rubin, 144 S. Ct. 2560 (2024);
cf. Speech First, Inc. v. Whitten, 145 S. Ct. 701, 703 (2025)
(Thomas, J., dissenting from the denial of certiorari)
(discussing various things that "may cause students to self-
censor") (cleaned up).

[61] Since the 1960s, the law has called this sort of First
Amendment deterrence a "chilling effect." See Dombrowski v.
Pfister, 380 U.S. 479, 487 (1965); see also, e.g., Counterman v.
Colorado, 600 U.S. 66, 75 (2023) (describing that certain rules
may "chill, or deter, speech outside their boundaries").

## 2. <u>First Amendment Speed</u>

Move here through four separate legal contexts, each distinct from the next, in which the unifying thread was only this: here-and-now speech impacts cannot be left out there, waiting too long for judicial review.

### a) <u>Administrative Proceedings</u>

Look first to <u>Oestereich</u> v. <u>Selective Service System Local Board No. 11, Cheyenne</u>, 393 U.S. 233 (1968).

There, a student protested against the Vietnam War. <u>See</u> <u>id</u>. at 234. Soon afterwards, the draft board withdrew an exception he was entitled to and called him up for induction into the military. <u>See</u> <u>id</u>. at 234-35.

The student sued to stop his enlistment; the district court dismissed his complaint, and the court of appeals affirmed. <u>See</u> <u>id</u>. at 235. The reason: judicial review would be available, if only later on. <u>See</u> <u>Oestereich</u> v. <u>Selective Serv. Sys. Loc. Bd. No. 11, Cheyenne</u>, 390 F.2d 100, 100 (10th Cir.).

The Supreme Court reversed. <u>See</u> <u>Oestereich</u>, 393 U.S. at 239.

A statute barred judicial review of the draftee's classification before he was inducted. That was "unambiguous," the Supreme Court said. <u>Id</u>. at 235.

And there was no doubt that judicial review would <u>someday</u> be available, as the court of appeals had said --- either as "a defense in a criminal prosecution" brought against the student for not registering, or on a "habeas corpus [petition] after induction." <u>Id</u>.

But the Supreme Court held that a literal reading of the law might be "out of harmony . . . with constitutional requirements." <u>Id</u>. at 238. The draft board's actions, the Court explained, were no different in this sense "from a case where induction of a[] . . . clearly exempt person is ordered . . . to retaliate against the person because of his political views." <u>Id</u>. at 237.

And given this concern about "retaliat[ion]" for "political views," the Supreme Court did not make the student wait for his day in court, either as a habeas petitioner after his enlistment or as a criminal defendant after his refusal to enlist. <u>See</u> <u>id</u>.

at 238.  Rather, per the Court, he could go to court right away.
See id.

### b)   State Prosecutions

The next example starts with this: a long-standing statute that
tells federal courts that they cannot generally enjoin a state
court proceeding.  See 28 U.S.C. § 2283.

But sometimes, very rarely, to ward off a First Amendment chill
--- they can.

In Dombrowski v. Pfister, 380 U.S. 479 (1965), civil rights
activists faced criminal prosecution.  See id. at 482.  State
prosecutors accused them of belonging to a Communist front ---
allegations that allegedly "frightened off potential members and
contributors."  Id. at 488.

In federal district court, the activists sought an injunction
against the officials.  See id. at 482.  The court dismissed
their complaint, see id., but the Supreme Court reversed.  See
id. at 483.

There was good reason not to intervene in the prosecution.
Federalism concerns, always important, were top of mind.  See
id. at 484.  So too were less-intrusive ways of resolving the
case.  State courts and prosecutors, after all, are sworn to
honor the Constitution, just as federal officials are, see id.,
and any miscarriage of justice could be promptly appealed,
perhaps up to the Supreme Court.  See id. at 485.  In the
meantime, a state court might moot the matter by acquitting the
defendants.  See id.

But all of that would come too late, the Supreme Court said.  By
then, the First Amendment harm would have been done.

"The chilling effect upon the exercise of First Amendment rights
may derive from the fact of the prosecution, unaffected by the
prospects of its success or failure."  Id. at 487. "Even the
prospect of ultimate failure of such prosecutions by no means
dispels their chilling effect on protected expression."  Id. at
494.  The Supreme Court ordered the district court to enjoin
prosecution.  See id. at 497.

To be sure, Dombrowski has been whittled a long way back.

Under Younger v. Harris, 401 U.S. 37 (1971), Dombrowski no
longer means that a chilling effect can "by itself justify

85

federal intervention." <u>Id</u>. at 50.  Nonetheless, <u>Younger</u>
reiterated that intervention may be proper when there is bad
faith or harassment on the part of a state.[62]  <u>See</u> <u>id</u>. at 53.
And even without that, "[t]here may, of course, be extraordinary
circumstances in which the necessary irreparable injury can be
shown."  <u>Id</u>.

But <u>Dombrowski</u> and <u>Younger</u> remain relevant.

In those cases, as in <u>Oestereich</u>, the need in the First
Amendment context for speed was a powerful counterweight ---
heavy enough, at least sometimes, to overcome important
countervailing concerns, including the need for federal courts
to wait, out of respect for the judgment of state officials and
judges (in <u>Dombrowski</u>); of federal draft boards (in <u>Oestereich</u>);
and, in both cases, the judgment of Congress, which had passed
on-point statutes that told the courts to hold back.

### c)  <u>The Supreme Court</u>

Turn now to the Supreme Court, and one of the statutes passed by
Congress that shapes its jurisdiction, 28 U.S.C. § 1257.

Section 1257 allows the Supreme Court to hear "<u>[f]inal</u> judgments
. . . rendered by the highest court of a State."  <u>Id</u>. (emphasis
added).

But when a First Amendment "chill" may be in the air, the
Supreme Court has read Section 1257 as allowing review of a <u>non</u>-
final judgment.  <u>See</u>, <u>e.g.</u>, <u>Fort Wayne Books, Inc.</u> v. <u>Indiana</u>,
489 U.S. 46, 55-57 (1989); <u>Nat'l Socialist Party of Am.</u> v. <u>Vill.
of Skokie</u>, 432 U.S. 43, 44 (1977); <u>Neb. Press Ass'n</u> v. <u>Stuart</u>,
423 U.S. 1327, 1329 (1975) (Blackmun, J., in chambers); <u>Mia.
Herald Pub. Co.</u> v. <u>Tornillo</u>, 418 U.S. 241, 246-47 & n.6 (1974);
<u>Mills</u> v. <u>Alabama</u>, 384 U.S. 214, 221-22 (1966) (Douglas, J.,
concurring).

For an example, look to <u>Fort Wayne Books</u>.

There, two bookshops sold graphic magazines.  <u>See</u> <u>State</u> v.
<u>Sappenfield</u>, 505 N.E.2d 504, 504 (Ind. Ct. App. 1987), <u>aff'd and</u>

---

[62]  The <u>Dombrowski</u> Court did not define "bad faith" but suggested
it includes "discriminatory enforcement or the use of
impermissible criteria for prosecution, such as a defendant's
. . . political beliefs."  Owen M. Fiss, <u>Dombrowski</u>, 86 Yale
L.J. 1103, 1115 (1977) (citing <u>Dombrowski</u>, 380 U.S. at 490).

86

remanded sub nom. <u>Fort Wayne Books, Inc.</u> v. <u>Indiana</u>, 489 U.S. 46
(1989).  State prosecutors charged the shops' owner with
distributing obscene material.  And that provided a basis for
state-law RICO charges.  <u>See Fort Wayne Books, Inc.</u>, 489 U.S. at
53.

The trial court threw out the racketeering counts for being
unconstitutionally vague.  <u>See</u> <u>id</u>.  The Indiana Court of Appeals
reversed --- and the Indiana Supreme Court decided not to take
up the case.  <u>See</u> <u>id</u>.

The federal Supreme Court granted certiorari and then paused to
take stock of its jurisdiction.  <u>See</u> <u>id</u>. at 54.

The jurisdictional question was a hard one.  In criminal law,
the rule of finality generally requires a conviction and a
sentence before an appeal can be taken.  <u>See</u> <u>id</u>.  But neither
box was checked.  <u>See</u> <u>id</u>.  Normally, then: no Supreme Court
jurisdiction under the statute.  <u>See</u> <u>id</u>.

But the Supreme Court determined that the First Amendment
required "immediate review," meriting an exception to the
general rule.  <u>See</u> <u>id</u>. at 55.

A too-long wait, the Court explained, could chill speech.
"Whichever way we were to decide on the merits, it would be
intolerable to leave unanswered, under these circumstances, an
important question of freedom of the press under the First
Amendment."  <u>Id</u>. at 56.  Leaving the question unsettled "could
only further harm the operation of a free press."  <u>Id</u>.

### d)    <u>Prior Restraints</u>

One more example.

A prior restraint is government censorship that cuts off speech
before it makes it to the public.  It is a restraint (of speech)
that is prior (to publication).

Prior restraints are "immediate and irreversible," <u>Neb. Press
Ass'n</u> v. <u>Stuart</u>, 427 U.S. 539, 559 (1976), and presumptively
unconstitutional.  <u>See</u> <u>Se. Promotions, Ltd.</u> v. <u>Conrad</u>, 420 U.S.
546, 558 (1975).

Nonetheless, the First Amendment allows for some prior
restraints --- but only when judicial review is almost
immediately available.  <u>See</u> <u>Vance</u> v. <u>Universal Amusement Co.</u>,
445 U.S. 308, 309 (1980); <u>Se. Promotions, Ltd.</u>, 420 U.S. at 560;

87

Freedman v. Maryland, 380 U.S. 51, 58–59 (1965); Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963).

Why?  To quickly dissipate any freedom-of-speech chill.

Take as the example the Freedman case.

A few years before, the Court had decided that the First Amendment allowed some prior restraints on movies.  See Freedman, 380 U.S. at 54 (citing Times Film Corp. v. City of Chi., 365 U.S. 43 (1961)).

Now, in Freedman, the Court considered the constitutionality of a Maryland law that prohibited screening a disapproved movie "unless and until," in the Court's words, "the exhibitor undertakes a time-consuming appeal to the Maryland courts and succeeds in having the Board's decision reversed."  Id. at 54–55.

That did not clear the bar.

The Court held that a movie-censorship scheme could survive constitutional scrutiny only under various conditions.  One: fast recourse to a court.  See id. at 58–59.

But the Maryland law "provide[d] no assurance of prompt judicial determination," id. at 60, and the only reported appeal of a movie-censorship decision at that point showed that it took six months --- longer than the two days the Court suggested was appropriate in another state's scheme.  See id. at 55, 60.  Fear of a "chilling effect" drove the Court's thinking.  See id. at 59–61.  And the Maryland statute was struck down as unconstitutional.

### e)  Implications

These cases are, intentionally, pulled from all over the map. They show something that suffuses our law, in many of its different corners --- that when it comes to here-and-now First Amendment injuries, the law requires a faster pace.

And note this: in many ways, the questions taken up by the Supreme Court in the cases set out above were harder than the issue before the Court today.

To accommodate the First Amendment's need for faster-than-usual judicial review, must a state law be struck down as

88

unconstitutional, as in the case of the Maryland licensing scheme?

Must an exception be carved into a federal law, like the "unambiguous" statute that determined whether a federal court could take the draft-registration case?  Or the Supreme Court's jurisdictional statute?  Or the statute that tells federal courts not to enjoin state court proceedings?

These are big lifts.

Declaring a statute unconstitutional is always a fateful act, the very last resort.  See, e.g., Mistretta v. United States, 488 U.S. 361, 384 (1989).  And statutes are generally to be read as they were written, not with judge-made exceptions bored into them.

But as in the cases sketched out above, the Supreme Court time and again has done those very things, to accommodate the First Amendment's need for a quicker pace.

For the questions addressed in this Opinion, much less is at stake.

No one says here that too much delay means that a statute must be struck down as violating the First Amendment.  And no one says that a law on the books must be re-read, so as to match up with constitutional values.

Rather, delay matters here only as a reason to do something much less intrusive than all that --- as a way of understanding how to apply the law that we already have.

That law requires consideration of whether later federal court review would still be "meaningful" enough.  See Part V.

Here, it would not be.

Come back again to what the Supreme Court has said: "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." Elrod, 427 U.S. at 373.  And: "[t]he timeliness of political speech" --- which is in play here --- "is particularly important." Id. at 374 n.29.

For judicial review to be "meaningful," it must hew to these principles.

89

Add.279

But judicial review that tells the Petitioner to wait until the immigration courts are done does not do that.

Not because First Amendment concerns always compel this result. But because they do here, in this case.

One core reason why: for reasons that are particular to this case, see Part VI.A to Part VI.C, the time spent in the immigration courts would accomplish next to nothing.

The Petitioner would not be able to seek the legal relief he asks for. See Part VI.A. The factual record could not be substantially developed. See Part VI.B. The immigration courts' special expertise could not be brought to bear. See Part VI.C.[63]

Delay to ensure thoughtful consideration of hard issues is permissible. Necessary, even.[64]

---

[63] A caveat. There is some relief that may be available to the Petitioner --- applying for asylum, for example, or the withholding of removal. If an immigration judge grants any of this relief, that could be "potentially dispositive," as Massieu suggested. 91 F.3d at 425. It is unclear how any such requests for relief might play out, or whether they would become unavailable if this Court retains jurisdiction. But one way or another, the possibility of asylum or withholding moves the needle, but not far enough to alter the conclusion here.

[64] See N.Y. Times Co. v. United States, 403 U.S. 713, 753 (1971) (Harlan, J., dissenting) (arguing that "difficult" First Amendment questions "should have led the Court to shun such a precipitate timetable"); id. at 752 (Burger, C.J., dissenting) ("We all crave speedier judicial processes but when judges are pressured as in these cases the result is a parody of the judicial function."); Tunick v. Safir, 209 F.3d 67, 88 (2d Cir. 2000) (certifying case to state court while acknowledging that "in many First Amendment cases . . . the constitutional rights involved are significantly damaged, if not altogether lost, by the delay entailed in certification"); cf. United States v. Coburn, 2025 WL 729969 (D.N.J. Mar. 6, 2025).

90

But not delay that may be long.  That will serve little real
practical purpose.  And that we can see, now, will come and go
with little to show for the wait.[65]

### 3.  **AADC**

To see the "meaningful review" issue here from another angle,
look to a case, AADC, that bubbled up through the federal courts
during the 1980s and 1990s.

---

[65]  It is hard to say how long the immigration courts would take.
See footnote 50.  And averages would almost surely fail to tell
the story, in part because courts tend to prioritize important
constitutional cases.  See, e.g., Care One, LLC v. NLRB, 680 F.
Supp. 3d 540, 549 (D.N.J. 2023).  But this much is clear: if
this case does not go to the immigration courts, federal court
review will continue now.  If it goes to the immigration courts
first, the process has more steps to it --- immigration judge,
then Board of Immigration Appeals, and only then a federal
court, a court of appeals.  And in the end, the immigration
courts route may be longer than that.  The Respondents have
suggested that one way to do any needed fact-finding here might
be for the federal court of appeals, when it gets the case, to
remand it to a federal district court --- which would then
presumably send it back up to the court of appeals for a
decision.  See Respondents' Letter (Apr. 10, 2025) (ECF 185) at
3.  It is not clear why the Respondents mention this
possibility.  Maybe because of a felt sense that, if this case
requires fact-finding, the immigration courts may not be the
right forum.  See Part VI.B.  But one way or another, a fact-
finding remand only folds in another round of back and forth ---
and therefore an extra dollop of delay.  (And note another
potential issue.  When the factual record is not well developed
coming out of the immigration courts, federal courts of appeals
sometimes bounce the case back down for fact-finding by an
immigration court or a federal district court.  But the Supreme
Court has suggested this may not be allowed in cases like this
one --- and the problem may be jurisdictional.  See AADC, 525
U.S. at 488 n.10.  This might imply a serious, down-the-road
issue with going the immigration courts route --- a lack of
solid factual development by the time the case hits the federal
court of appeals (because the immigration courts are not built
for fact-finding in a case like this) but with no ready way to
fix the problem (because a remand may encounter a non-waivable
legal hurdle).)

91

Federal officials sought to deport eight noncitizens, at first on grounds related to their speech.  See AADC, 525 U.S. at 473.  But the speech-related charges were dropped.  See id.  And what was left behind included removal charges based on two of the noncitizens' membership in an alleged terror organization, plus six of the noncitizens' status violations, for issues like overstaying a visa and failing to maintain student status.  See id. at 473.  (There was evidence that all eight noncitizens were involved in helping to finance the terror group.  See id. at 475.)

As here, various statutes seemed to require going to the immigration courts before a federal court could get involved.

But the noncitizens argued to the Supreme Court that federal court review "would come too late to prevent the 'chilling effect' upon . . . First Amendment rights" --- and so the statutes that funneled cases to the immigration courts should be read in light of the "doctrine of constitutional doubt,"[66] and "interpret[ed] . . . in such fashion as to permit immediate review of the[] [First Amendment] claims."  Id. at 488.

But the Supreme Court, per Justice Scalia, rejected this argument.

How?  By breaking new ground and resolving a consequential legal question --- holding that the eight noncitizens had no underlying First Amendment selective-enforcement claim because they had no legal status in the United States.  See id. at 489.[67]

With that holding made, the doctrine of constitutional doubt could no longer impact how jurisdiction-channeling statutes might be interpreted --- because there was no longer any possibility of a constitutional violation.

Why did the Court choose to resolve the First Amendment selective-enforcement claim?

---

[66] This doctrine "counsel[s] that ambiguous statutory language be construed to avoid serious constitutional doubts."  FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009).

[67] The selective-enforcement question was so new that no on-point precedents existed to guide the Court.

The answer is not crystal clear. But it seems likely to have been this: because the Court viewed the alternative on the table as presenting an even closer question of constitutional law.

And that brings things back to this case.

The alternative before the AADC Court was to hold that a federal court could not hear the noncitizens' here-and-now First Amendment claim until the immigration courts got first crack. Justice Ginsburg argued for this position in her concurrence, see id. at 492 (Ginsburg, J., concurring), based on a narrowed-down reading of some of the cases discussed above in Part VI.D --- narrowed readings that evidently did not convince the Court. Per the majority:

> Instead of resolving this constitutional
> question [about First Amendment selective
> enforcement], Justice Ginsburg chooses to
> resolve the constitutional question whether
> Congress can exclude the courts from
> remedying an alleged First Amendment
> violation with immediate effects, pending
> the completion of administrative
> proceedings. It is not clear to us that
> this is easier to answer than the question
> we address --- as is evident from the fact
> that in resolving it Justice Ginsburg relies
> almost exclusively on cases dealing with the
> quite different question of federal-court
> intervention in state proceedings. (Even in
> that area, most of the cases she cites where
> we did not intervene involved no claim of
> present injury from the state action --- and
> none involved what we have here: an
> admission by the Government that the alleged
> First Amendment activity was the basis for
> selecting the individuals for adverse
> action. Cf. Dombrowski v. Pfister, 380 U.S.
> 479, 487–488, n. 4 (1965).) The one case
> not involving federal-state relations in
> fact overrode a congressional requirement
> for completion of administrative proceedings
> --- even though, unlike here, no immediate
> harm was apparent. See Oestereich v.
> Selective Serv. System Local Bd. No. 11, 393

93

U.S. 233 (1968). Justice Ginsburg counts the
case as one for her side on the basis of
nothing more substantial than the Court's
characterization of the agency action at
issue as "blatantly lawless," id., at 238.
See post, at 948 (opinion concurring in part
and concurring in judgment).

Nor is it clear that the constitutional
question Justice Ginsburg addresses has
narrower application and effect than the one
we resolve. Our holding generally deprives
deportable aliens of the defense of
selective prosecution. Hers allows all
citizens and resident aliens to be deprived
of constitutional rights (at least where the
deprivation is not "blatantly lawless")
pending the completion of agency
proceedings.

Id. at 488 n.10 (cleaned up).

Justice Scalia's majority opinion, as quoted at length above,
plainly rested on the idea that there was a real possibility
that it is unconstitutional to divert people with here-and-now
First Amendment claims into the immigration courts, at the cost
of pushing off into the future their day in federal court.

And the question seemed vexed enough that the Supreme Court,
rather than wade in, worked to skirt the issue, by resolving
another novel constitutional claim --- whether noncitizens
without lawful status can press a First Amendment selective-
enforcement claim.

If, per the Supreme Court, delayed consideration in federal
court of a First Amendment claim might be unconstitutional ---
then that is a strong argument for taking what is a much smaller
step, for opting not to delay federal court consideration of a
First Amendment claim in the first place.

And all the more so in this case.

Not just because of how little can realistically be accomplished
here in the immigration courts. See Part VI.A to Part IV.C.

But also because of how this case lines up against AADC.

In <u>AADC</u>, there were allegations of membership in a terror group and evidence of financial support to it.  <u>See</u> 525 U.S. at 474–75.  Here, no such information has been put before the Court.

And in <u>AADC</u>, the noncitizens did not have lawful status.  <u>See</u> <u>id</u>. at 488, 491–92.  Here, the Petitioner does, <u>see</u> Petition ¶¶ 1, 9, 21 --- and that could make a meaningful First Amendment difference, as the Court held in <u>AADC</u>.  <u>See</u> 525 U.S. at 488, 491–92.

In short: if delayed federal court uptake of a First Amendment claim raised a serious constitutional issue in <u>AADC</u>, is that not a powerful reason to steer away from such delay here?

### 4. <u>Axon</u>

Finally, look to the Supreme Court's recent decision in <u>Axon Enterprise, Inc.</u> v. <u>Federal Trade Commission</u>, 598 U.S. 175 (2023).

<u>Axon</u> was a case like this one.  It involved a set of statutes that seemed to require that the case be sent to the administrative courts, before any federal court involvement.  <u>See</u> <u>id</u>. at 181.

To decide where the case should start off, the Supreme Court asked "whether preclusion of district court jurisdiction 'could foreclose all meaningful judicial review.'"  <u>Id</u>. at 190 (quoting <u>Thunder Basin</u>, 510 U.S. at 212–13).

The <u>Axon</u> Court's answer: it depends.

Typically, a party can get meaningful judicial review even if a district court never becomes involved in the case.  Review of agency action by a court of appeals, following an administrative proceeding --- that is generally enough.  <u>See</u> <u>id</u>. at 190.

But not always.

Not, per the Supreme Court, when there is a "here-and-now" injury --- one that will be "impossible to remedy once the proceeding is over, which is when appellate review kicks in."  <u>Id</u>. at 191.

In <u>Axon</u>, the plaintiffs argued that they were "being subjected to unconstitutional agency authority --- a proceeding by an unaccountable [FTC] ALJ."  <u>Id</u>. (cleaned up).  That was a here-and-now constitutional injury, the Supreme Court held.  <u>See</u> <u>id</u>.

95

A court of appeals could later vacate any FTC order that might issue, but it could never unwind the clock and undo the harm of being subjected to the FTC proceeding in the first place. "Judicial review . . . would come too late to be meaningful." Id.

But is that not also true of having speech allegedly frozen (through detention) and chilled (because of the fear that detention causes)?

Yes.

If being subjected to proceedings before an allegedly unconstitutional decision-maker is a here-and-now injury, as Axon held --- then so too is it a here-and-now injury to allegedly lose out on core First Amendment rights.

                    *     *     *

To see the point in sharper relief, move away for a moment from First Amendment issues.

Administrative law has sometimes allowed claimants to bypass agency adjudicators and try to remedy harms now --- if those claims could not realistically be addressed later, at the moment when the federal court would ordinarily step in.

In Mathews v. Eldridge, 424 U.S. 319 (1976), for example, the Supreme Court allowed the respondent to bring a due-process challenge to the lack of a pre-termination hearing for disability benefits --- despite the Social Security Act requiring the exhaustion of administrative remedies.  See id. at 327-28.  In light of the respondent's physical state and need for benefits, the Court observed that "an erroneous termination would damage him in a way not recompensable through retroactive payments."  Id. at 331.

And in Kreschollek v. Southern Stevedoring Co., 78 F.3d 868 (3d Cir. 1996), a longshoreman got hurt on the job and was cut off from his disability payments.  Id. at 870.  The Third Circuit allowed him to challenge the constitutionality of part of a federal statute in the district court, rather than wait to be heard in a court of appeals after the administrative process.  See id.  Making him wait would be like having no "effective judicial review" at all, since the longshoreman would be without any income in the meantime.  Id. at 874-75.

These harms, which seem (and are) irreparable, opened the doors to federal courthouses, even though that meant skipping over agency adjudication.

What do harms of this sort have in common?

The underlying principles can be boiled down in a number of different ways.

But the First Circuit has captured part of the doctrine well. It noted that under Thunder Basin, "effective" judicial review becomes unavailable --- such that immediate judicial review makes sense --- "where the compliance costs are so onerous that complying with the regulation [while the administrative proceeding continues] will cause irreparable harm." E. Bridge, LLC, 320 F.3d at 90 (collecting cases).

If this is right, is not alleged suppression of political speech the archetypal "irreparable harm"? And if so, is that not an argument for allowing those sorts of claims to go straight to federal court?

\*       \*       \*

The basic remedy for unconstitutional curbs on political speech is an injunction, and often an early one. The harm is irreparable. It needs to stop now. Letting the speech suppression go on, with only the promise of a delayed and after-the-fact damages remedy --- that does not cut it.

Cases routinely hold this. See N.Y. Times Co. v. United States, 403 U.S. 713, 714 (1971); Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 128 (3d Cir. 2023); Amalgamated Transit Union Loc. 85, 39 F.4th at 108; Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth., 975 F.3d 300, 317 (3d Cir. 2020); Ne. Pa. Freethought Soc'y, 938 F.3d at 442; Hawk, 725 F.3d at 323; K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 113 (3d Cir. 2013); Stilp v. Contino, 613 F.3d 405, 409 & n.4 (3d Cir. 2010); Swartzwelder v. McNeilly, 297 F.3d 228, 231, 242 (3d Cir. 2002); Abu-Jamal v. Price, 154 F.3d 128, 136 (3d Cir. 1998); In re Asbestos Sch. Litig., 46 F.3d 1284, 1294-95 (3d Cir. 1994); GJJM Enters., LLC v. City of Atl. City, 293 F. Supp. 3d 509, 520 (D.N.J. 2017); Am. Broad. Cos., Inc. v. Wells, 669 F. Supp. 2d 483, 489 (D.N.J. 2009); Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist., 233 F. Supp. 2d 647, 666 (D.N.J. 2002), aff'd, 386 F.3d 514 (3d Cir. 2004); LCN Enters., Inc. v. City of Asbury Park, 197 F. Supp. 2d 141, 153

97

(D.N.J. 2002), as amended (Apr. 5, 2002); Lysaght v. State of
N.J., 837 F. Supp. 646, 653–54 (D.N.J. 1993); Citizens United
for Free Speech II v. Long Beach Twp. Bd. of Comm'rs, 802 F.
Supp. 1223, 1237–38 (D.N.J. 1992); Telco Commc'ns, Inc. v.
Barry, 731 F. Supp. 670, 684 (D.N.J. 1990); Gannett Satellite
Info. Network, Inc. v. Twp. of Pennsauken, 709 F. Supp. 530, 535
(D.N.J. 1989); E-Bru, Inc. v. Graves, 566 F. Supp. 1476, 1480
(D.N.J. 1983).

And this is a core commitment of our law, at work in any number
of other ways.[68]

---

[68]   Two examples.  First, another part of the First Amendment,
the Free Exercise Clause, works in much the same way.  In Roman
Catholic Diocese of Brooklyn v. Cuomo, 592 U.S. 14 (2020), for
instance, the Supreme Court considered some of New York's Covid-
era restrictions on First Amendment-protected religious
activity.  The Court explained that the harm was "unquestionably
. . . irreparable."  Id. at 18 (quoting Elrod, 427 U.S. at 373).
So long as the state's rules were in place, religious
obligations could not be properly fulfilled.  See id. at 19.
The plaintiffs might have later won on the merits; but their
eventual win would have come too late to undo the harm suffered
to their religious life while time passed.  So the Court moved
to preliminarily enjoin New York's restrictions on religious
services, reaffirming along the way that First Amendment
injuries are here-and-now injuries.  See id. at 69.  And a
second example: in opinions on applications for emergency stays,
Justices have routinely reiterated the urgency of First
Amendment relief.  See CBS, Inc. v. Davis, 510 U.S. 1315, 1318
(1994) (Blackmun, J., in chambers); Neb. Press Ass'n, 423 U.S.
at 1329; Neb. Press Ass'n v. Stuart, 423 U.S. 1319, 1323 (1975)
(Blackmun, J., in chambers); Times-Picayune Pub. Corp. v.
Schulingkamp, 419 U.S. 1301, 1309 (1974) (Powell, J., in
chambers).  In CBS, Inc., for instance, a state court enjoined a
news outlet from airing footage of a meat-packing plant,
reasoning that it was wrongfully obtained and could lead to the
plant's closure.  See 510 U.S. at 1315–16.  The news outlet then
applied to the Supreme Court for an emergency stay, hoping to
air the tape that evening.  See id. at 1315.  Sitting as a
Circuit Justice, Justice Blackmun granted the stay.
"[I]ndefinite delay of the broadcast will cause irreparable harm

Many of the cited cases are in the end simply about timing.

Over and over again in First Amendment cases, courts issue injunctions --- because a person whose speech is suppressed cannot be asked to wait until the far end of the road for a remedy.  The harm along the way is irreparable.  It cannot be fixed later.

But if it is too much to wait from the beginning of a case (when, say, a preliminary injunction might be entered) until its end (when there might be a damages payout or permanent relief) --- then what of waiting months or even years for the case to get off the ground in the first place, while it winds its way through the immigration courts?

\*     \*     \*

Per the Supreme Court in <u>Axon</u>, bypassing administrative courts can be allowed when there is a "here-and-now" injury that will be "impossible to remedy" "once the [administrative] proceeding is over."  598 U.S. at 191.

That implies that this case should be heard, now, in federal court.

First Amendment harms, as alleged here, are routinely said to cause "irreparable injury."  In <u>Axon</u>'s phrase, they cause injuries that are "impossible to remedy."

First Amendment harms, as alleged here, are often said to warrant preliminary and early relief.  Because in <u>Axon</u>'s words, later, "once the proceeding is over," will be too late.

And First Amendment harms, as alleged here, are classic in-the-moment injuries.  <u>Axon</u> speaks of "here-and-now" injuries.  <u>See</u> <u>id</u>. at 191.  And that is what First Amendment injuries are, and have always been understood to be.

In <u>Axon</u>, the Supreme Court concluded, the claimants "will lose their rights not to undergo the complained-of agency proceedings if they cannot assert those rights until the proceedings are over."  <u>Id</u>. at 192.

So too here.

---

to the news media that is intolerable under the First Amendment," he wrote.  <u>Id</u>. at 1318.

Add.289

The Petitioner says his First Amendment rights are now being
violated.  He will lose them and he will keep losing them if he
must wait for federal court review.  In the Court's judgment: he
does not have to.  The Petitioner's claims may or may not be
meritorious.  But our law allows them to be heard, now, in
federal court.

*   *   *

Section 1252(b)(9) does not bar jurisdiction because it does not
apply to pre-order-of-removal cases like this one.  See Part IV.

But if Section 1252(b)(9) does apply to cases like this one, it
divests jurisdiction only when later federal court review would
be "meaningful."  Here, it would not be.  Therefore, Section
1252(b)(9) does not strip this Court of jurisdiction to review
the Petitioner's challenge to the Secretary of State's
determination.  See Part V and Part VI.

## VII.  Section 1252(g)

Move on now to another statute.

The Respondents say that Section 1252(g) prevents consideration
of the Petitioner's First Amendment claim as to the Secretary's
determination.  See Opposition Brief at 14.

Section 1252(g) reads:

> [N]o court shall have jurisdiction to hear
> any cause or claim by or on behalf of any
> alien arising from the decision or action by
> the Attorney General to commence
> proceedings, adjudicate cases, or execute
> removal orders against any alien under this
> chapter.

8 U.S.C. § 1252(g).

The Supreme Court construed this provision in AADC --- and
narrowly.

The Supreme Court rejected the parties' understanding of Section
1252(g) "as covering all or nearly all deportation claims."
AADC, 525 U.S. at 478.  Unlike Section 1252(b)(9), Section
1252(g) was not an expansive "zipper clause."  Id. at 482.

> In fact, what § 1252(g) says is much
> narrower.  The provision applies only to

100

Add.290

> three discrete actions that the Attorney
> General[69] may take: her decision or action to
> <u>commence</u> proceedings, <u>adjudicate</u> cases, or
> <u>execute</u> removal orders.

<u>Id</u>. at 482 (emphasis in original) (cleaned up).

<u>AADC</u>'s view of Section 1252(g) as a tightly drawn provision has
been reaffirmed by a Supreme Court plurality.  <u>See</u> <u>Jennings</u>, 583
U.S. at 841 (<u>AADC</u> "did not interpret [Section 1252(g)'s]
language to sweep in any claim that can technically be said to
'arise from' the three listed actions of the Attorney General.
Instead, we read the language to refer to just those three
specific actions themselves.").

And the Third Circuit has landed on the same approach,
emphasizing just how narrow-gauged Section 1252(g) is.  <u>See</u> <u>Tazu</u>
v. <u>Att'y Gen. U.S.</u>, 975 F.3d 292, 296 (3d Cir. 2020) ("Section
1252(g) does not sweep broadly.  It reaches only these three
specific actions, not everything that arises out of them."); <u>see</u>
<u>also</u>, <u>e.g.</u>, <u>Chehazeh</u>, 666 F.3d at 133-35; <u>Garcia</u> v. <u>Att'y Gen.</u>
<u>of U.S.</u>, 553 F.3d 724, 728-29 (3d Cir. 2009).

*        *        *

Section 1252(g) does not bar consideration here of the Secretary
of State's determination.

The reason is this: the determination is not one of the "three
specific actions," <u>Tazu</u>, 975 F.3d at 296, covered by the
statute, and it is not an exercise of "prosecutorial
discretion."  <u>AADC</u>, 525 U.S. at 489.

*        *        *

Cross the last two "specific actions" off the list.

The Secretary of State's determination is not "a decision or
action" to "execute," 8 U.S.C. § 1252(g), a removal order.
Indeed, no such order has been entered.

---

[69]  The reference to "Attorney General" should now be read as
"Secretary of Homeland Security," given the post-Section 1252(g)
creation of the Department of Homeland Security.  <u>See</u> <u>Johnson</u> v.
<u>Guzman Chavez</u>, 594 U.S. 523, 527 n.1 (2021); <u>La. Forestry Ass'n</u>
<u>Inc.</u> v. <u>Sec. U.S. Dep't of Lab.</u>, 745 F.3d 653, 660 n.3 (3d Cir.
2014); 6 U.S.C. § 557.

And the Secretary's determination is not "a decision or action"
to "adjudicate" a case.  Id.  The Secretary is not a judicial
officer, and the relevant statutes do not suggest he has the
power to control immigration judges.

                            *    *    *

Come now to the last of the three "specific actions."

Is the Secretary of State's determination a "decision or action
by the [the Secretary of Homeland Security] to commence
proceedings"?

To ask this question is to answer it.

The determination is an "action."  See Part IV.A.3(a).  But it
is an action by the Secretary of State, not what Section 1252(g)
requires: an "action by the [Secretary of Homeland Security]."

There is no way to whistle past this textual problem.  See Est.
of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 476 (1992)
(referencing the "basic and unexceptional rule that courts must
give effect to the clear meaning of statutes as written").

The textual problem cinches things --- and it is also a surface
indication of a deeper issue.

Per the Supreme Court, Section 1252(g)'s aim was to give the
Secretary of Homeland Security the space she needs to make the
choices she must --- about enforcement priorities, for example,
or allocation of finite resources.  These are classic questions
of prosecutorial discretion, and they are generally for
prosecutors to work through for themselves.

Per the Supreme Court: "Section 1252(g) was directed against a
particular evil: attempts to impose judicial constraints upon
prosecutorial discretion."  AADC, 525 U.S. at 485 n.9.[70]

But the Secretary of State does not exercise prosecutorial
discretion here.  He takes his step --- he makes his
determination --- and then it is over to the Secretary of
Homeland Security, for her to make her choice.

---

[70]  See generally United States v. Texas, 599 U.S. 670, 679
(2023) (noting that the "principle of enforcement discretion
over arrests and prosecutions extends to the immigration
context," and describing the "problems raised by judicial review
of the Executive Branch's arrest and prosecution policies").

There were, in short, two distinct moving pieces here --- (a) the Secretary of State's determination as to the Petitioner, and then (b) the act of "prosecutorial discretion" that followed. Section 1252(g), by its terms, covers only (b).  But what the Petitioner is challenging is (a).

The two distinct steps are there on the face of the Secretary's memo, which marks the handover from the Secretary of State's area of responsibility to the Secretary of Homeland Security's.

The memo is addressed from him to her.  See Determination at 1.

It reports the Secretary of State's conclusion.  See id. ("I have determined that . . . [the Petitioner] . . . [is a] deportable alien[.]").

And it then looks to the next steps --- which are the Secretary of Homeland Security's to undertake.  See id. ("I understand that [a Homeland Security component] now intends to initiate removal charges[.]").

And all of this makes sense under the various relevant statutes.

A Section 1227(a)(4)(C)(i) determination from the Secretary of State makes a noncitizen "deportable."  8 U.S.C. § 1227(a)(4)(C)(i).

"Deportable" means can be deported, "[]able" to be deported.

Who then decides whether someone who can be deported will be removed?  The Secretary of Homeland Security.

> Any alien . . . in and admitted to the United States shall, upon the order of the [Secretary of Homeland Security], be removed if the alien is within one of more of the following classes of deportable aliens.

8 U.S.C. § 1227(a) (emphasis added).[71]

---

[71]  In exercising her power, the Secretary of Homeland Security generally has wide discretion.  See, e.g., Arizona v. United States, 567 U.S. 387, 396 (2012); AADC, 525 U.S. at 483-84; Texas v. United States, 809 F.3d 134, 165-66 (5th Cir. 2015); Martinez-Garcia v. Ashcroft, 366 F.3d 732, 735 (9th Cir. 2004); Costa v. INS, 233 F.3d 31, 37 (1st Cir. 2000).

In a nutshell: the Secretary of State's determination was its
own step; it was taken separate from, and before, the Secretary
of Homeland Security's "decision or action to commence
proceedings."  AADC, 525 U.S. at 482 (cleaned up).

But jurisdiction is stripped by Section 1252(g) only as to the
decision made by the Secretary of Homeland Security, see id. ---
and the Petitioner's challenge here is not to that.  Rather, it
is to the earlier decision, made by the Secretary of State.

Jurisdiction is not stripped.  See, e.g., N. Am. Butterfly
Assoc. v. Wolf, 977 F.3d 1244, 1260 (D.C. Cir. 2020); Jafarzadeh
v. Nielsen, 321 F. Supp. 3d 19, 29 (D.D.C. 2018); Young Sun Shin
v. Mukasey, 547 F.3d 1019, 1024 (9th Cir. 2008); Wong v. United
States, 373 F.3d 952, 965 (9th Cir. 2004), abrogated on other
grounds by Wilkie v. Robbins, 551 U.S. 537 (2007); Humphries v.
Various Fed. USINS Emps., 164 F.3d 936, 944 (5th Cir. 1999);
Castellar v. Nielsen, 2018 WL 786742, at *10 (S.D. Cal. Feb. 8,
2018); Abdur-Rahman v. Napolitano, 814 F. Supp. 2d 1087, 1096
(W.D. Wa. 2010); Hafeez v. Dorochoff, 2007 WL 4300582, at *2
(N.D. Ill. Nov. 30, 2007); cf. Tazu, 975 F.3d at 298.

## VIII.    **The Policy**

The Court has considered and rejected the Respondents' argument
that, under Section 1252(b)(9) and Section 1252(g), it lacks
jurisdiction over the Petitioner's challenge to the Secretary of
State's determination.  See Part IV to Part VII.

Citing the same statutes, the Respondents also say there is no
jurisdiction over the Petitioner's request for an injunction to
stop a certain alleged policy.  See Opposition Brief at 1, 8,
14.

This argument does not work.  To see why, start with the
background.

                          *    *    *

The Petitioner alleges that the Respondents have "adopted a
policy . . . to retaliate against and punish noncitizens like
[the Petitioner] for their participation in protests concerning
Israel's military campaign in Gaza."  Petition ¶ 2.

In particular:

            On or before March 8, 2025, Respondents
            adopted the Policy by which they would

> retaliate against and punish noncitizens
> like [the Petitioner] for their
> participation in protests concerning
> Israel's military campaign in Gaza.  Under
> the Policy, Respondent Rubio, the Secretary
> of State, would make determinations that the
> protestors' presence or activities in the
> United States would have potentially serious
> foreign policy consequences for the United
> States and would compromise a compelling
> United States foreign policy interest.
> These determinations would then permit the
> Department of Homeland Security to seek to
> detain and deport the protestor.

<u>Id</u>. ¶ 44.

Per the Petitioner, he was detained by federal officials "as a first implementation of the policy and a 'blueprint' for future investigations and deportations of prominent student activists." <u>Id</u>. at 13 (cleaned up).

The alleged policy, in short, is broader than the Secretary's determination as to the Petitioner, since it is said to include determinations as to others.  It is also broader than the Petitioner's detention, since it is said to envision detention of others.

\*    \*    \*

The argument that Section 1252(b)(9) and Section 1252(g) strip jurisdiction as to the alleged policy is not persuasive.

This is for the reasons explained above as to the Secretary's determination, <u>see</u> Part IV to Part VII, plus some others.

These do not need to be belabored, but tick through them quickly here.

<u>First</u>, while the Secretary's determination amounts to a Section 1252(b)(9) "action," <u>see</u> Part IV.A.3(a), it is a good deal harder to say that a policy is an "action" --- especially a policy that, as alleged, does not have sharply marked edges. <u>Cf</u>. Opposition Brief at 8 (describing the alleged policy as "an ill-defined initiative").

<u>Second</u>, if Section 1252(b)(9) applies here, meaningful fact-finding as to the policy will be harder yet in the immigration

courts.  See Part VI.B.  The policy, for example, is broader
than the Secretary's determination, and therefore could require
discovery as to a broader range of subjects.[72]

Third and finally, Section 1252(g) focuses on exercises of
"prosecutorial discretion."  See Part VII.  But the alleged
policy is an extra step removed from the decision of the
Department of Homeland Security to initiate removal proceedings
here.  The Secretary of State's determination came before the
Department of Homeland Security's removal-proceedings decision.
And the policy is alleged to predate the determination.

*     *     *

In short, there is no jurisdictional bar to the Court taking up
here the Petitioner's request for an injunction to stop the
alleged policy.[73]

---

[72]  Fact-finding complexities may be part of why courts routinely
hold that claims about a broad government policy --- like the
one alleged here --- are not barred by Section 1252(b)(9), and
therefore should go forward in federal court from the start.
See Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591
U.S. 1, 19 (2020); Texas v. United States, 126 F.4th 392, 417
(5th Cir. 2025); Casa de Md. v. U.S. Dep't of Homeland Sec. 924
F.3d 684, 697 (4th Cir. 2019); Nava v. Dep't of Homeland Sec.,
435 F. Supp. 3d 880, 885–86, 895 (N.D. Ill. 2020); O.A., 404 F.
Supp. 3d at 135–38; cf. Daud v. Gonzales, 207 F. App'x 194, 200
(3d Cir. 2006).

[73]  The Respondents also invoke another jurisdictional bar, 8
U.S.C. § 1226(e), but only as to the Petitioner's request for an
injunction to release him from detention.    See Opposition Brief
at 20-21.  This has no bearing here now.  Section 1226(e) bars
judicial review as to detention "under this section," a section
that covers detention "pending a decision on whether the alien
is to be removed from the United States."  8 U.S.C. § 1226(e)
(emphasis added); see generally e.g., Jennings, 583 U.S. at 306;
Velasco Lopez v. Decker, 978 F.3d 842, 848 (2d Cir. 2020);
Quinteros v. Warden Pike Cnty. Corr. Facility, 784 F. App'x 75,
76–77 (3d Cir. 2019); Hernandez v. Sessions, 872 F.3d 976, 981–
82 (9th Cir. 2017); Padilla-Ramirez v. Bible, 882 F.3d 826, 829–
30 (9th Cir. 2017); Sylvain v. Att'y Gen. of U.S., 714 F.3d 150,
154 (3d Cir. 2013); Castellano v. Holder, 337 F. App'x 263, 268
n.3 (3d Cir. 2009); Gayle v. Napolitano, 2013 WL 1090993, at *2

## IX.  Conclusion

In circumstances like this one, federal courts have recently
split as to whether jurisdiction is stripped.  Compare Taal v.
Trump, 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025) (yes),
with Ozturk v. Trump, 2025 WL 1145250, at *15 (D. Vt. Apr. 18,
2025) (no).

This Court concludes that jurisdiction is not stripped over the
Petitioner's claims that the Secretary of State's determination
and the alleged policy are unconstitutional.

Section 1252(b)(9) is irrelevant.  It takes away federal
district court jurisdiction only after an order of removal has
been entered.  But none has been entered here.  See Part IV.

And even if Section 1252(b)(9) might apply when, as here, no
order has been entered, that provision strips jurisdiction only
when delayed review would amount to "meaningful review."   See
Part V.  Here, it would not.  See Part VI.

As to Section 1252(g), that pulls away jurisdiction over
"specific actions" by the Secretary of Homeland Security --- not
over actions by the Secretary of State, like his determination
here, and not over across-the-board policies, like the one
alleged here.  See Part VII and Part VIII.

This Court has habeas jurisdiction over this case.  See Khalil,
2025 WL 1019658.  And as set out in this Opinion, that
jurisdiction is intact.  It has not been removed.

---

(D.N.J. Mar. 15, 2013); Baguidy v. Elwood, 2012 WL 5406193, at
*4 (D.N.J. Nov. 5, 2012).  If the Court holds that the
Constitution forbids removal of the Petitioner based on a
particular charge, then, apart from an appeal from that holding,
there will no longer be a "pending . . . decision on whether the
alien is to be removed from the United States" --- because the
"decision" would have been made by this Court's determination
that it would be unconstitutional to remove him.  Therefore, at
that point, there will be no available argument that Section
1226(e) bars release.  To be sure, Section 1226(e) might be
relevant if the Court were to consider ordering the release of
the Petitioner without first finding that a charge against him
is unconstitutional.  But that circumstance can be addressed
when and if it comes up.

107

Orders as to next steps in this case will follow shortly.

DATE: April 29, 2025

_____
Michael E. Farbiarz, U.S.D.J.

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**IMMIGRATION COURT**
**JENA, LOUSIANA**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | IN REMOVAL PROCEEDINGS |
| | ) | |
| **Mahmoud KHALIL** | ) | File No.: ███████████ |
| | ) | |
| **Respondent** | ) | |
| _____ | ) | |

CHARGES:          Section 237(a)(4)(C)(i) of the Immigration and Nationality Act
                  Section 237(a)(1)(A) of the Immigration and Nationality Act

APPLICATIONS:     ████████████████████████████████████

**ON BEHALF OF THE RESPONDENT:**          **ON BEHALF OF THE DEPARTMENT:**
Marc Van Der Hout, Esq.                   Numa Metoyer, Deputy Chief Counsel

---

## DECISION AND ORDER OF THE IMMIGRATION JUDGE

### I. PROCEDURAL & FACTUAL HISTORY

On March 9, 2025, the U.S. Department of Homeland Security, Immigration and Customs Enforcement (Department or DHS) served Mahmoud Khalil (Respondent) with a Notice to Appear (NTA) alleging that: (1) he was not a citizen or national of the United States; (2) he was a native of Syria and a citizen of Algeria; (3) he was admitted to the United States at an unknown place on or about an unknown date [in] [an] unknown manner; [and] his status was adjusted to that of a lawful permanent resident on November 2024 under section 212(a)(3)(C) of the Act; and (4) the Secretary of State determined that his presence or activities in the United States would have serious adverse foreign policy consequences for the United States. Based on these allegations, the Department charged the Respondent as removable pursuant to section 237(a)(4)(C)(i) of the Immigration and Nationality Act (Act or INA). Exh. 1.

On March 17, 2025, the Department filed Form I-261, Additional Charges of Inadmissibility/Deportability, with allegations in lieu of those set forth in the original charging document. Exh. 2. The Department alleged that: (1) the Respondent was not a citizen or national of the United States; (2) he was a native of Syria and a citizen of Algeria; (3) he was admitted to the United States at John F. Kennedy International Airport, Queens, New York, on or about December 20, 2022, as an F-1 nonimmigrant student to attend Columbia University in New York, New York; (4) Respondent's status was adjusted to that of a conditional lawful permanent resident

on November 16, 2024, based on [his] marriage to a U.S. Citizen spouse, under section 245(a) of the Immigration and Nationality Act; and (5) the Secretary of State had determined that his activities and presence in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest.

The Department further alleged: (6) the Respondent's Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9,[] failed to disclose that he was a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer; (7) on his Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 3, page 6, he failed to disclose his continuing employment as a Program Manager by the [Syrian] Office in the British Embassy in Beirut beyond 2022; and (8) on his Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question part 8, page 9, the Respondent failed to disclose that he was a member of the Columbia University Apartheid Divest (CUAD). Based on these allegations, the Department lodged an additional charge pursuant to INA § 237(a)(1)(A). Exh. 2.

The Respondent appeared with counsel at an initial master calendar hearing on March 21, 2025. At that hearing, the Respondent, through counsel, conceded the proper service of the charging documents and waived a formal reading of the charges and explanation of rights. Per the Respondent's counsel's request, the hearing was reset to April 8, 2025, for attorney preparation.

At the master calendar hearing on April 8, 2025, the Respondent, through counsel, denied all the allegations and charges in the NTA and Form I-261. The Court set a deadline for April 9, 2025, for the Department to submit evidence regarding the Respondent's removability. The Court reset the hearing for a contested removability hearing on April 11, 2025.

At the hearing on April 11, 2025, the Court heard arguments on removability from both parties. The Respondent, through counsel, filed a Motion to Terminate. Exh. 12. At this hearing the Court sustained the charge of removability under INA § 237(a)(4)(C)(i) and held in abeyance the charge under INA § 237(a)(1)(A). The Court set a call-up date for April 23, 2025, for the Department to respond to the Respondent's Motion to Terminate, additional submissions related to the charge held in abeyance, and for any and all applications for relief from removal on the charge sustained.

On April 21, 2025, the Department filed its response to the Respondent's Motion to Terminate. Exh. 12b. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. On April 24, 2025, the Respondent, through counsel, filed a reply to the Department's response to the Motion to Terminate. Exh. 12c.

On April 25, 2025, the Court denied the Motion to Terminate and issued a scheduling order, scheduling the individual merits hearing for May 22, 2025, with a call-up date for documents 10 days before the scheduled individual merits hearing, in accordance with the Immigration Court

Practice Manual.

On May 12, 2025, the Respondent's counsel filed: 780 pages of evidence; a Motion to Present Video Testimony by Witnesses at the Individual Calendar Hearing on May 22, 2025; a witness list identifying six witnesses, four expert witnesses and two additional witnesses to present testimony at the May 22, 2025, hearing. Exh. 19, Exh. 20, and Exh. 21.

On May 12, 2025, the Department filed: a Notice of Background Checks; ███████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████

On May 16, 2025, the Respondent's counsel filed a Motion for a Three-Week Continuance of the Hearing. Exh. 25.

On May 19, 2025, the Respondent's counsel filed: a Renewed Motion To Terminate; 720 pages of additional evidence in response to the Department's submission on May 12, 2025; Written Objections to Evidence Submitted by the Department; a Motion to Compel Presence of Adverse Witnesses to Appear for Testimony, and a Motion to Issue Subpoena to Government Witnesses Alternative Motions for Depositions and for Interrogatories; and an Opposition to the Department's Motion To Pretermit. Exh. 24a, 26, 27, 27a, 28, and 29.

On May 20, 2025, the Respondent's counsel filed a list of legal team members to observe the hearing on May 22, 2025, via Webex and list of family members and legal team members attending the hearing in person. Exh. 31.

On May 20, 2025, the Department filed an Opposition to the Respondent's Motion to Terminate and an Opposition to the Respondent's Motion for Continuance. Exhs. 25a and 26a.

On May 21, 2025, the Respondent's counsel filed a Reply to the Department's Opposition to the Respondent's Motion to Terminate and a Reply to the Department's Opposition to the Respondent's Motion to Continue. Exhs. 25b and 26b.

On May 21, 2025, the Department filed an Opposition to Respondent's Motion to Compel Presence of Adverse Witnesses to Appear for Testimony, and to Issue Subpoenas to Government Witnesses and Alternative Motions for Depositions and for Interrogatories. Exh. 29a.

On May 22, 2025, the Respondent's counsel filed a list of additional family and friends attending the hearing on May 22, 2025. Exh. 32.

At the individual merits hearing on May 22, 2025, the Court orally denied the Department's Motion to Pretermit, the Respondent's Motion to Continue, and the Respondent's Renewed Motion to Terminate on the record. ██████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████████████████ The Court also received testimony from Dr. Muriam Davis, Ms. Leila Hilal, Dr. Lisa Wedeen, and Professor Khaled Elgindy, all tendered

as expert witnesses. At the conclusion of testimony, the parties jointly requested to submit written closing statements. The Court held the record open for the written closing statements and at the request of the Respondent's counsel the Court also agreed to accept a letter the Respondent testified he wrote and submitted to a newspaper. The Court set a deadline for June 2, 2025, for these submissions. Both the Respondent and the Department filed written closing statements on June 2, 2025. Exhs. 34 and 35. The Court now issues this written decision addressing the Respondent's removability and applications for relief.

## II.   REMOVABILITY

The Department bears the burden in establishing by clear and convincing evidence the charge of removability lodged against an alien. *See* INA § 240(c)(3)(A); 8 C.F.R. § 1240.8(a). Clear and convincing evidence is a "more than the preponderance of the evidence standard." *Matter of Patel*, 19 I&N Dec. 774, 783 (BIA 1988).

### A.  Removability pursuant to INA § 237(a)(4)(C)(i)

Pursuant to INA § 237(a)(4)(C)(i), "an alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable."

There is long-standing, published case law found in *Matter of Ruiz-Massieu*, 22 I&N Dec. 833 (BIA 1999), where the BIA addressed the charge at issue. In support of the instant charge, the Department provided a letter from the United States Secretary of State, Marco Rubio. See Exh. 7. The BIA has held that a letter from the Secretary of State conveying the Secretary's determination that an alien's presence in this country would have potentially serious adverse foreign policy consequences for the United States, and stating facially reasonable and bona fide reasons for that determination, is presumptive and sufficient evidence that the alien is deportable under section 237(a)(4)(C)(i) of the Act, and the Department is not required to present additional evidence of removability.

Congress assigned the Secretary of State unilateral judgment regarding adverse foreign policy consequences. While the Respondent's counsel challenges the authority of the Secretary of State to make that determination, this Court is obligated to apply the laws as written by Congress and is without jurisdiction to entertain challenges to the validity of such laws under the Constitution. *Ruiz-Massieu*, 22 I&N Dec. at 843.

"In the scheme adopted by Congress, the Secretary of State's determination as outlined in the INA is equivalent to a duly certified record of criminal conviction by a state or federal court." *Ruiz-Massieu*, 22 I&N Dec. at 844. The requirements of administrative due process are satisfied once the respondent is notified that the basis for the charge against him is a determination by the Secretary of State under the authority granted by Congress. *Id.*

Moreover, "there is no indication that Congress contemplated an Immigration Judge, or even the Attorney General, overruling the Secretary of State on a question of foreign policy." *Ruiz-*

*Massieu*, 22 I&N Dec. 845. "This standard of inquiry would entangle the Immigration Court in matters of foreign policy and involve this court in weighing the importance of various factors related to foreign policy." *Id.* Such an in-depth examination could well require the Department of Homeland Security to proffer secret or confidential information and expert witnesses or involve a deposition from the Secretary of State, which this Court is neither inclined nor authorized to do. *Id.* Despite being urged to do so by the Respondent's counsel, the Court will not expand the authority delegated to the Immigration Judge by the Attorney General, to include authority over functions, powers, and duties expressly assigned to the Secretary of State by Congress in the realm of foreign policy. *Ruiz-Massieu*, 22 I&N Dec. at 846.

As such, this Court finds that based on Exhibit 7, the letter from the Secretary of State explaining his determination that the Respondent's presence here has potentially serious adverse foreign policy consequences for the United States, and setting forth the reasons for those conclusions, is facially reasonable and gives bona fide reasons for that determination. Thus, the Department has met its burden to establish removability by clear and convincing evidence, that the Respondent is removable under section 237(a)(4)(C)(i) of the Act as charged in the Notice to Appear and the Court sustains this charge of removability.

## B.  Removability pursuant to INA § 237(a)(1)(A)

An alien who at the time of entry or adjustment of status was inadmissible under INA § 212(a)(6)(C)(i), for seeking or having sought to procure or having procured a visa, other documentation, admission into the United States, or other benefit under the INA, by fraud or willfully misrepresenting a material fact, is removable. *See* INA §§ 237(a)(1)(A), 212(a)(6)(C)(i). In the case of an alien who has been admitted to the United States, the Department has the burden of establishing by clear and convincing evidence that he is removable as charged. INA § 240(c)(3)(A); 8 C.F.R. § 1240.8(a) (2017).

The INA does not define "fraud," but the BIA has defined it as "false representations of a material fact made with knowledge of its falsity and with intent to deceive the other party." *Matter of G-G*, 7 I&N Dec. 161, 164 (BIA 1956). Specifically, for a representation to constitute fraud, a deceived party must believe the representation and act upon it to his or her disadvantage. *Id.* In contrast, "willful misrepresentation" only requires a (1) false representation of a material fact (2) made with knowledge of its falsity. *Matter of Kai Hing Hui*, 15 I&N Dec. 288, 290 (BIA 1975)). The intent to deceive is not a required element for a willful misrepresentation of a material fact. *Id.*

It is well-settled that a misrepresentation is material if the alien is inadmissible on the true facts or if it tends to shut off a line of inquiry which is relevant to the alien's eligibility, and which might have resulted in a proper determination that he be inadmissible. *See Matter of Ng*, 17 I&N Dec. 536, 537 (BIA 1980) *(citing Matter of S & B-C-*, 9 I&N Dec. 436 (BIA 1960; A.G. 1961)). A false statement is "material" if it could have a natural tendency to end a possible line of questioning or otherwise influence the decision of the immigration officer. *Kungys v. United States*, 485 U.S. 759, 772 (1988); *Matter of D-R-*, 27 I&N Dec. 445, 450 (BIA 2011); *Njenga v. Barr*, 831 F. App'x 123, 124 (5th Cir. 2020). Moreover, it is not necessary for the government to

show that the statement actually influenced the agency, only that the misrepresentation was capable of affecting or influencing the government's decision. *D-R-*, 27 I&N Dec. at 450; *United States v. Matsumaru*, 244 F.3d 1092, 1101 (9th Cir. 2001).

The Department lists three allegations in support of the charge lodged pursuant to INA § 237(a)(1)(A): allegations 6, 7, and 8 listed in the I-261. Exh. 2. The Court will address each allegation separately.

## 1. Allegation #6

Allegation 6 as listed on the I-261 reads that: "On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024 and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member of the United Nations Relief and Works Agency for Palestinian Refugees (UNRWA) from June through November 2023, as a political affairs officer".

It is important to note here that part 8, page 9, of the Form I-485 reads as follows: "Have you **EVER** been a member of, involved in, or in any way associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world including any military service?"

It is not contested, and the Respondent concedes that he was an intern for UNRWA from June 1 to August 31, 2023, on a full-time basis and transitioned to a part time schedule from September 1 to November 30, 2023. Respondent's own testimony demonstrated that UNRWA is not a membership-based organization. The Respondent was involved and associated with UNRWA for approximately six months and failed to disclose this association and participation with the organization at part 8, page 9 on Form I-485.

The test for whether concealments or misrepresentations are material is whether they had a natural tendency to influence the decision of the immigration officer. The Respondent argues that this failure to disclose was not willful, however the intent to deceive is not a required element for a willful misrepresentation of a material fact, but by omitting this information, regarding his internship with UNRWA, the Court finds the Respondent shut off a line of inquiry that would predictably have disclosed other relevant facts regarding his activities with UNRWA. As such, the Court finds this allegation is sustained by clear and convincing evidence.

## 2. Allegations #7

As to allegation 7, the Department alleged that in response to the question at part 3, page 6 of the Form I-485, the Respondent failed to disclose his continuing employment as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022. In support of this allegation, the Department filed a document from the Society for International Development – United States 2025 Annual Conference, where the Respondent was to be a presenter. Exh. 7a, Tab D. The document stated that the Respondent works as a Program Manager at the Syria Office in the British Embassy in Beirut.

The Respondent, through counsel, asserts that he did not fail to disclose the dates of his employment as Program Manager by the Syria Office in the British Embassy in Beirut, and that his employment concluded in 2022. The Respondent presented a letter from the British Embassy in Beirut, indicating his employment contract ended on December 1, 2022, rebutting the Department's allegation. Exh. 13, Tab H. After reviewing the evidence presented by the parties, the Court finds that the Department failed to meet its burden to establish by clear and convincing evidence the Respondent's continued employment as Program Manager at the Syria Office in the British Embassy in Beirut beyond 2022. Thus, allegation 7 is not sustained.

### 3. Allegation #8

Allegation 8 reads that: "On your Form I-485, Application to Register Permanent Residence or Adjust Status, signed on March 26, 2024, and mailed on March 29, 2024, in response to the question at part 8, page 9, you failed to disclose that you were a member the Columbia University Apartheid Divest (CUAD)."

It is important to note here that part 8, page 9, of the Form I-485 reads as follows: "Have you **EVER** been a member of, involved in, or in any way associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world including any military service?"

In support of this allegation, the Department submitted a copy of several news articles that indicated that the Respondent was a lead negotiator for CUAD. He also spoke at rallies and was named in press releases as the lead negotiator for CUAD. Exhs. H, I, J, K, and L.

The Respondent, through counsel, asserts that he did not fail to disclose he was a member, because he was never a member of CUAD, and provides letters from professors who emphasized he was not a member, but served only as a negotiator between CUAD and the school's administration. Exh 13, Tabs J and K.

However, the question listed in Form I-485, asks "have you **EVER** been a member of, involved in, or in any way associated with any organization, association, fund, foundation, party, club, society, or similar group in the United States or in any other location in the world including any military service". Here, the evidence shows that the Respondent was involved in and associated with CUAD and by the Respondent's own admission he was a negotiator between CUAD and Columbia University.

The Court also notes that even if the Respondent was not involved with CUAD before April 17, 2024, (approximately two weeks after his application was submitted), the Respondent has an ongoing obligation and duty to update his application with corrections as they become available to him. Otherwise, aliens could file their applications and then commit acts that would make them inadmissible, without accountability. The Respondent's failure to disclose his association with CUAD was a crucial step in the application process and the Court finds this failure to disclose shut off a line of inquiry that would predictably have disclosed other relevant facts

regarding his activities with CUAD and affected the immigration application process as a whole. *See United States v. Wu*, 419 F.3d 142, 145 (2d Cir. 2005) (holding that a false statement is material . . . if it has the potential significantly to affect the integrity or operation of the *importation process as a whole*. . .). Thus, by failing to disclose information regarding the Respondent's involvement, association and participation with CUAD, the Respondent shut off a line of inquiry that would predictably have disclosed other relevant facts regarding his activities with CUAD. As such, the Court finds this allegation is sustained by clear and convincing evidence.

### 4. Analysis and Conclusion

The Court finds that the Respondent failed to disclose his involvement, association and participation with UNRWA and CUAD on his Form I-485. The Court further finds that had the Respondent disclosed his connection to UNRWA and CUAD, the disclosure would have triggered the need for additional information and further processing, involving some degree of discretionary decision-making on the part of the USCIS adjudicator. The Court also further notes there is evidence that the Respondent knew of the potential immigration consequences by being involved in protests organized by varying organizations on campus. The Respondent demonstrated that he is well educated on matters of international administration and policy.[1] Additionally, the Respondent was quoted in the news as stating he did not participate in the protests during this time because he was worried about the immigration consequences, specifically that he would lose his student visa. Exh. 7a, Tab E. The Court finds the Respondent's failure to disclose his involvement, association and participation with CUAD and UNRWA were such that the truth "would predictably have disclosed other facts relevant to [his] qualifications." *Kungys*, 485 U.S. at 774. This necessary step in the decision-making process was forestalled by the Respondent's failure to disclose information. It is both reasonable and appropriate for this Court to apply the standard which requires that when a Respondent fails to disclose information that the omission exhibits a level of materiality such that it would have had "a natural tendency to influence or the capability to influence government action." *See U.S. v. Pirela-Pirela*, 809 F.3d 1195, 1201 (11th Cir. 2015) (*citing United States v. Johnson*, 139 F.3d 1359, 1363 (11th Cir.1998) (as applied in prosecution pursuant to the Arms Export Control Act).

In sum, a common-sense, practical interpretation of part 8, page 9, of the Form I-485 would require the disclosure of the Respondent's involvement, association and participation with UNRWA and CUAD. *See U.S. v. Pirela-Pirela*, 809 F.3d at 1201 (*citing United States v. Sepulveda,* 115 F.3d 882, 887 (11th Cir.1997) (recognizing that a court has no obligation "to override common sense and evident statutory purpose" in construing criminal statutes (citation omitted)). It would defy logic and common sense and undermine the immigration application process as a whole for this Court to ignore conduct that occurred, days after submitting the I-485 and months before the I-485 was processed and approved. The I-485 is only as reliable as the completeness of the information provided on the form by applicants. Therefore, as the Court has sustained allegations 6 and 8, the Court finds that removability under INA § 212(a)(6)(C)(i), charging the Respondent with seeking or having sought to procure or having procured a visa, other

---

[1] The Respondent was attending Colombia University pursuing a graduate degree in public administration and international affairs at the time he completed the application.

documentation, admission into the United States, or other benefit under the INA, by fraud or willfully misrepresenting a material fact, has been established by clear and convincing evidence. Accordingly, the charge of removability under INA § 237(a)(1)(A) is sustained.

## III.    EVIDENCE PRESENTED

The record contains exhibits one through thirty-five, the Respondent's testimony, and the testimony of Dr. Muriam Davis, Ms. Leila Hilal, Dr. Lisa Wedeen, and Professor Khaled Elgindy. The Court has familiarized itself with the entire record of proceedings and considered all submitted evidence regardless of whether mentioned in this decision. *See* 8 C.F.R. § 1240.1(b).

### A.  Documentary Evidence

Exhibit 1:     Notice to Appear (filed March 9, 2025)

Exhibit 2:     Form I-261 (filed March 17, 2025)

Exhibit 3:     Respondent's Motion for Continuance or Alternative to Appear via Webex (filed March 19, 2025)

Exhibit 3a:    DHS's Opposition to the Motion for Continuance (filed March 19, 2025)

Exhibit 3b:    Respondent's Reply in Support Motion for Continuance or Alternative to Appear via Webex (filed March 20, 2025)

Exhibit 3c:    Respondent's Proof of Service on the Motion for Continuance or Alternative to Appear via Webex (filed March 20, 2025)

Exhibit 3d:    Court's Order Granting Respondent's Motion for Webex (issued March 20, 2025)

Exhibit 4:     Respondent's Second Motion to Appear via Webex (filed March 31, 2025)

Exhibit 4a:    Court's Order Granting Second Respondent's Motion for Webex (issued March 31, 2025)

Exhibit 5:     Respondent's Motion for Production of Documents (filed on April 3, 2025)

Exhibit 5a:    Court's Order Denying Motion for Production of Documents (issued April 8, 2025)

Exhibit 6:     Respondent's Motion for Continuance (filed on April 3, 2025)

Exhibit 6a:    Court's Order Denying Motion for Continuance (issued April 8, 2025)

Exhibit 7:     DHS Evidence Part 1 (6 pages) (filed April 9, 2025)

Exhibit 7a:    DHS Evidence Part 2 (42 pages), Tabs A-E (filed April 9, 2025)

Exhibit 7b:    DHS Evidence Part 3 (41 pages), Tabs F-L (filed April 9, 2025)

Exhibit 7c:    DHS Evidence Part 4 (15 pages), Tabs A-C (filed April 9, 2025)

Exhibit 8:     Respondent's Submission, List of Legal Team Members and Family Friends Attending the Hearing for Observation (filed April 10, 2025)

| | |
|---|---|
| Exhibit 8a: | Respondent's Submission, List of Legal Team Members Who Will Be Observing the Hearing via Webex (filed April 10, 2025) |
| Exhibit 9: | Respondent's Motion to Compel Production Of (1) Prior Statements of Government Witnesses, Including the Attachments Referenced in Secretary Rubio's Undated Memorandum and Prior Versions of The Memorandum, and (2) Exculpatory Evidence (filed Apr. 11, 2025) |
| Exhibit 9a: | Court's Order denying Motion to Compel Production (issued April 11, 2025) |
| Exhibit 10: | Respondent's Motion to Issue Subpoena to Secretary of State Marco Rubio to Appear for Testimony and Produce the Attachment to The Rubio Memorandum (filed Apr. 11, 2025) |
| Exhibit 10a: | Court's Order Denying Motion to Subpoena (issued April 11, 2025) |
| Exhibit 11: | Respondent's Motion to Continue (filed April 11, 2025) |
| Exhibit 12: | Respondent's First Motion to Terminate (filed April 11, 2025) |
| Exhibit 12a: | Respondent's Evidence in Support of Motion to Terminate (April 11, 2025) |
| Exhibit 12b: | DHS's Opposition to Motion to Terminate (filed April 21, 2025) |
| Exhibit 12c: | Respondent's Response to the DHS's Opposition issued to Terminate (April 24, 2025) |
| Exhibit 12d: | Court's Order Denying the Motion to Terminate (issued April 25, 2025) |
| Exhibit 13: | Respondent's Document List Opposing Allegations (filed April 11, 2025) |
| Exhibit 14: | Respondent's Additional Evidence and Document List for Mr. Khalil Refuting the Charges Against Him in The Notice to Appear and Form I-261 (filed April 23, 2025) |
| ███████ | ████████████████████████████████████████ |
| | ██████████████████████ |
| Exhibit 16: | Court's Scheduling Order (issued April 25, 2025) |
| Exhibit 17: | Respondent's Motion for Access to Electronics for Respondent's Counsel (filed April 28, 2025) |
| Exhibit 17a: | Court's Order on Motion to Access to Electronics (issued May 12, 2025) |
| Exhibit 18: | Respondent's Motion for Public Access (filed April 28, 2025) |
| Exhibit 18a: | Court's Order on Motion for Public Access (issued May 12, 2025) |
| Exhibit 19: | Respondent's Submission of Evidence, (235 pages), Tabs A-M (filed May 12, 2025) |
| Exhibit 19a: | Respondent's Submission of Evidence, (545 pages), Tabs N-R (filed May 12, 2025) |
| Exhibit 20: | Respondent's Motion for Video Appearance by Witnesses (filed May 12, 2025) |

Exhibit 20a:    Court's Order granting Motion for Video Appearance by Witnesses (issued May 14, 2025)

Exhibit 21:    Respondent's Submission of Witness List (filed May 12, 2025)

Exhibit 22:    DHS's Submission of Background Checks (filed May 12, 2025)

Exhibit 23:    DHS's Submission of Evidence Part 1, (165 pages), Tabs A-L (filed May 12, 2025)

Exhibit 23a:    DHS's Submission of Evidence Part 2 (68 pages) (filed May 12, 2025)

Exhibit 23b:    DHS's Submission of Evidence Part 3, (263 pages), Tabs A-J (filed May 12, 2025)

Exhibit 24:    DHS's Motion to Pretermit (filed May 12, 2025)

█████████    ███████████████████████████████████████████████████

Exhibit 25:    Respondent's Motion for Continuance (filed May 19, 2025)

Exhibit 25a:    DHS's Opposition to Motion for Continuance (filed May 20, 2025)

Exhibit 25b:    Respondent's Reply to DHS Opposition to Motion for Continuance (filed May 21, 2025)

Exhibit 26:    Respondent's Second Motion to Terminate (filed May 19, 2025)

Exhibit 26a:    DHS's Opposition to Motion to Terminate (filed May 20, 2025)

Exhibit 26b:    Respondent's Reply to DHS's Opposition to Motion to Terminate (filed May 21, 2025)

Exhibit 27:    Respondent's Submission of Evidence (400 pages), Tabs A-P (filed May 19, 2025)

Exhibit 27a:    Respondent's Additional Submission of Evidence (320 pages), Tab Q (filed May 20, 2025)

Exhibit 28:    Respondent's Written Objections to Evidence Submitted by the Department (filed May 19, 2025)

Exhibit 29:    Respondent's Motion to Compel Presence of Adverse Witnesses to Appear for Testimony, And to Issue Subpoena to Government Witnesses (filed May 19, 2025)

Exhibit 29a:    DHS's Opposition to Motion to Compel (filed May 21, 2025)

Exhibit 30:    Respondent's Motion to Increase Page Limits (filed May 20, 2025)

Exhibit 31:    Respondent's Additional Witness List (filed May 20, 2025)

Exhibit 32:    Respondent's Additional Family Friends Who Will Be Attending (filed May 22, 2025)

█████████    ███████████████████████████████████████

Exhibit 34:    Respondent's Written Closing Argument (filed June 2, 2025)

Exhibit 35:    DHS's Written Closing Argument (filed June 2, 2025)

## B. Summary of Testimony

The Court will now summarize the testimony presented at the individual merits hearing. The Court reiterates this is a summary of testimony and is not meant to be a verbatim transcript of testimony given by the witnesses. If a portion of testimony is not summarized by the Court, that does not mean it was not reviewed or considered.









---

[2] Ms. Halil testified that the President of the United States, Donald Trump, The United States Secretary of State, Marco Rubio, and the United States Speaker of the House, Mike Johnson, framed the Respondent.



## IV.    CREDIBLITY AND CORROBRATION





### 1. Credibility of the Respondent

### 2. Credibility and Expert Witness Designation of Dr. Muriam Davis



### 3. *Credibility and Expert Witness of Ms. Leila Hilal*

### 4. *Credibility and Expert Witness of Dr. Lisa Wedeen*

### 5. *Credibility and Expert Witness of Professor Khaled Elgindy*

## V. ELIGIBILITY FOR RELIEF



1. ████████





## 2. Respondent's Claim

*a.* █████████

█████████████



████████



*2.* ██████████████████████



Add.321









**b.**



2.





a.



b. 

## VI. CONCLUSION

████████████████████████████████████████████████████████████████
███████████████████████████ Therefore, the request for relief will be denied.  Based upon the above and foregoing, the following orders shall be entered:

**ORDERS:** ████████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████
████████████████████████

████████████████████████████████████████████████████████████
████████████

████████████████████████████████████████████████████████████
████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

**IT IS HEREBY FURTHER ORDERED that Respondent be REMOVED from the United States to Algeria, or in the alternative to Syria.**

JAMEE COMANS

Digitally signed by JAMEE COMANS
Date: 2025.06.20 11:06:16 -05'00'

June 20, 2025
Date

Jamee E. Comans
United States Immigration Judge

████████████████████

**Order of the Immigration Judge**

Immigration Judge: COMANS, JAMEE  06/20/2025

**Certificate of Service**

This document was served:
Via: [ M ] Mail | [ P ] Personal Service | [ E ] Electronic Service
To: [  ] Noncitizen | [  ] Noncitizen c/o custodial officer | [ E ] Noncitizen atty/rep. | [ E ] DHS
Respondent Name : KHALIL, MAHMOUD | A-Number : ██████
Riders:

Date:  06/20/2025  By:  MOOREHEAD, FELICIA, Court Staff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

      *Petitioner*,

   v.

DONALD TRUMP et al.,

      *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

**OPINION and ORDER**

**Table of Contents**

I.   **Background**
    **A.**   **The Facts**
    **B.**   **Procedural History**
    **C.**   **The Court's Approach**
II.  **Preliminary Injunction Requirements**
    **A.**   **Success**
    **B.**   **Harm**
    **C.**   **Equities**
    **D.**   **Public Interest**
III. **The Preliminary Injunction**

\*    \*    \*

Federal officials detained a lawful permanent resident and seek to remove him from the United States for two reasons.

One reason is that the Secretary of State has determined that his activities and presence in the United States "compromise a compelling . . . foreign policy interest."

The lawful permanent resident filed a habeas corpus petition and has moved to preliminarily enjoin federal officials from

removing him from the United States based on the Secretary's determination.

The motion is granted.

* * *

I.    **Background**

   A.    **The Facts**

The relevant facts for now are as follows.

A lawful permanent resident[1] was arrested by federal officials. See Declaration of Amy E. Greer (ECF 11-1) ¶¶ 4-6.

He remains in immigration custody. See Petitioner's Amended Memorandum of Law in Support of Motion for Preliminary Injunctive Relief (ECF 124) ("Motion for Preliminary Injunction") at 1-2.

The Department of Homeland Security is seeking to remove him from the United States on two grounds.

The first ground:

In 2024, the lawful permanent resident inaccurately completed his lawful-permanent-resident application. See DHS Evidence, Tab 2 (Apr. 9, 2025) (Form I-485); see also Additional Charges of Inadmissibility (Mar. 17, 2025) (ECF 90-1) ("Additional Charges") at 1.

This can be a basis for removal. See Additional Charges at 1; see also 8 U.S.C. §§ 1182(a)(6)(C)(i), 1227(a)(1)(A).

The second ground for removal:

The Secretary of State determined that the lawful permanent resident's continued activities or presence in the United States would "compromise a compelling . . . foreign policy interest." Memorandum from Marco Rubio, Secretary of State, to Kristi Noem, Secretary of Homeland Security (ECF 198-1) ("Determination"), at 1.

Such a determination can also be a basis for removal. See 8 U.S.C. § 1227(a)(4)(C).

---

[1]  Mahmoud Khalil.

2

B. __Procedural History__

The lawful permanent resident filed a habeas corpus petition in federal court.  See ECF 2.

From here, he is called "the Petitioner."  The various people he named in the petition are called "the Respondents."[2]

The Petitioner moved to preliminary enjoin his removal from the United States.  See ECF 66.[3]

The preliminary injunction motion became fully submitted on May 14, with the filing of the parties' last legal brief.  See ECF 256.

On May 28, the Court ruled on the motion.

As to the __first__ ground of removal, related to the Petitioner's alleged failure to accurately complete the lawful-permanent-resident application, the Court denied the motion.

The Court held that the Petitioner had put forward no evidence, see Khalil v. Trump, 2025 WL 1514713, at *54 (D.N.J. May 28, 2025), and also had not meaningfully developed legal arguments. See id. at *52–53.

As to the __second__ ground of removal, related to the Secretary of State's determination, the Court held the Petitioner was likely to succeed on the merits of his claim, see id. at *52, but had not sufficiently addressed the other things a preliminary injunction applicant must show.  See id. at *55.

---

[2]  The Respondents are listed in the current habeas petition as: President of the United States Donald Trump; Acting Field Office Director of New York, United States Immigration and Customs Enforcement, William P. Joyce; Warden of Elizabeth Contract Detention Facility Yolanda Pittman; Acting Director of United States Immigration and Customs Enforcement Caleb Vitello; Secretary of the United States Department of Homeland Security Kristi Noem; Secretary of the United States Department of State Marco Rubio; and Attorney General of the United States Pamela Bondi.

[3]  For a fuller description of the relevant procedural history, see Khalil v. Trump, 2025 WL 1514713, at *2–3 (D.N.J. May 28, 2025).

3

As to these matters, the Court indicated it would allow the record to be supplemented.  See id.; see also ECF 273.

The Petitioner said that he would need just under a week to do so.  See Petitioner's Letter (May 29, 2025) (ECF 274).  The Court set a briefing schedule accordingly, see ECF 275, and the final brief was filed yesterday.  See ECF 295.

### C.  **The Court's Approach**

To obtain a preliminary injunction, the Petitioner must show four things.  See Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).

He must establish that "he is [1] likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Id.  Of these, the "most critical" elements are the first and second.  See Nken v. Holder, 556 U.S. 418, 434 (2009).

The Court considers each of these four below, see Part II, and concludes that a preliminary injunction should issue as to the Secretary of State's determination.  The preliminary injunction's terms are set out in Part III.

## II.  **Preliminary Injunction Requirements**

### A.  **Success**

To obtain a preliminary injunction as to the Secretary's determination, the Petitioner must first show that he is likely to succeed on the merits of his claim.  See Winter, 555 U.S. at 20.

He has made this showing.  See Khalil, 2025 WL 1514713, at *56.

### B.  **Harm**

Next, the Petitioner must demonstrate that he is likely to suffer irreparable harm without preliminary relief.  See Winter, 555 U.S. at 20.

The Court concludes that he has done so.

\*      \*      \*

4

<u>First</u>, the Petitioner states that the Secretary's determination has cost him a job, <u>see</u> Declaration of Mahmoud Khalil ("Khalil Declaration") (June 4, 2024) (ECF 281-1) ¶¶ 15-16, and damaged his career prospects through "career-ending" professional harm. <u>See</u> <u>id</u>. ¶¶ 15-17 (describing a hoped-for career in "diplomacy and international affairs," steps taken down that road, and the difficulty of sustaining such a career in light of the Secretary's determination).  The Respondents do not contest this.  <u>See</u> Respondents' Letter (June 9, 2025).  And as a legal matter, serious long-term damage to career prospects can count as irreparable harm.[4]  <u>See</u> <u>Kamdem-Ouaffo</u> v. <u>Task Mgmt. Inc.</u>, 792 F. App'x 218, 222 (3d Cir. 2019) (citing <u>Morton</u> v. <u>Beyer</u>, 822 F.2d 364, 372 n.13 (3d Cir. 1987)); <u>Acierno</u> v. <u>New Castle Cnty.</u>, 40 F.3d 645, 654 (3d Cir. 1994); <u>see also</u> <u>Carson</u> v. <u>Am. Brands, Inc.</u>, 450 U.S. 79, 89 & n.16 (1981); <u>Valley</u> v. <u>Rapides Parish Sch. Bd.</u>, 118 F.3d 1047, 1055-56 (5th Cir. 1997); <u>NAACP, Inc.</u> v. <u>Town of E. Haven</u>, 70 F.3d 219, 224 (2d Cir. 1995).

*     *     *

<u>Second</u>, the Petitioner states that the Secretary's determination harms his reputation.  <u>See</u> Khalil Declaration ¶¶ 3, 8-10, 16, 22.  Again, the Respondents have opted not to contest this.  <u>See</u> Respondents' Letter (June 9, 2025).  And when it cannot be compensated through money damages, as cannot readily be done here, reputational injury can count as irreparable harm.  <u>See</u>, <u>e.g.</u>, <u>Guardian Life Ins. Co. of Am.</u> v. <u>Est. of Cerniglia</u>, 446 F. App'x 453, 456 (3d Cir. 2011); <u>Kos Pharms., Inc.</u> v. <u>Andrx Corp.</u>, 369 F.3d 700, 726 (3d Cir. 2004); <u>Pappan Enters., Inc.</u> v. <u>Hardee's Food Sys., Inc.</u>, 143 F.3d 800, 805 (3d Cir. 1998); <u>accord</u>, <u>e.g.</u>, <u>Life Spine, Inc.</u> v. <u>Aegis Spine, Inc.</u>, 8 F.4th 531, 546 (7th Cir. 2021); <u>Register.com., Inc.</u> v. <u>Verio, Inc.</u>, 356 F.3d 393, 404 (2d Cir. 2004); <u>Rent-a-Center, Inc.</u> v. <u>Canyon Television & Appliance Rental, Inc.</u>, 944 F.2d 597, 603 (9th Cir. 1991); <u>see</u> <u>also</u> 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2948.1 (4th ed. 2025) ("Injury to reputation . . . is not easily measurable in monetary terms, and so often is viewed as irreparable."); <u>Bennington Foods LLC</u> v.

---

[4]  Loss of employment, standing on its own, generally would not. <u>See</u> <u>Morton</u>, 822 F.2d at 372; <u>Moteles</u> v. <u>Univ. of Pa.</u>, 730 F.2d 913, 919 (3d Cir. 1984); 1 Moore's Manual --- Federal Practice and Procedure § 10A.22(2)(c) (2025).

St. Croix Renaissance, Grp., LLP, 528 F.3d 176, 178–79 (3d Cir. 2008).

* * *

Third, the Petitioner states that the Secretary's determination deters him from engaging in speech-related activities. In particular, the Petitioner states that he engaged in protest activities, see Khalil Declaration ¶ 12, and that "[a]s I remain detained because of the [Secretary of State's] [d]etermination, . . . I am unable to protest." Id. ¶ 13.[5]

Again, the Respondents have not contested this factually. See Respondents' Letter (June 9, 2025).[6]

And per the Supreme Court, "chilling" of speech counts as irreparable harm. See Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion); see also, e.g., Hartman v. Moore, 547 U.S. 250, 256 (2006); Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 794 (1988); Wooley v. Maynard, 430 U.S. 705, 714 (1977).[7]

---

[5] The Petitioner's speech-related activities concern political speech. See Petition ¶¶ 22–23, 26, 29; Khalil Declaration ¶¶ 12–14; Declaration of Noor Ramez Abdalla (Mar. 14, 2025) (ECF 55) ¶¶ 6–8; see also Khalil, 2025 WL 1232369, at *45–46. And political speech is entitled to special protection under the First Amendment. See id. at *45.

[6] There is ample record evidence that the Petitioner engaged in speech-related activities. See Third Amended Petition (ECF 236) ("Petition") ¶¶ 22–29; Khalil Declaration ¶¶ 12–14; Declaration of Noor Ramez Abdalla (Mar. 14, 2025) (ECF 55) ¶¶ 6–8. And also that he would return to these activities if detention did not prevent him from doing so. See Khalil Declaration ¶¶ 13–14, 23; Petition ¶ 72; see also Khalil Declaration ¶¶ 9–12; Declaration of Veronica Salama, Exhibit B ("Abdalla June 4 Declaration") ¶ 26; Petition ¶ 22; cf. Falcone v. Dickstein, 92 F.4th 193, 210 (3d Cir. 2024). (The Petition has been verified. See Khalil Declaration ¶ 1. Therefore, the Court treats it as evidence. See, e.g., K-2 Ski Co. v. Head Ski Co., 467 F.2d 1087, 1088 (9th Cir. 1972); see also Bascom Food Prods. Corp. v. Reese Finer Foods, Inc., 715 F. Supp. 616, 624 n.14 (D.N.J. 1989).)

[7] Three things. First, the underlying likely legal violation here relates to unconstitutional vagueness. See Khalil, 2025 WL

6

Add.338

To be sure, it might be argued that the Petitioner would be
detained anyway.  After all, as noted above, the Department of
Homeland Security is seeking to remove the Petitioner based not
only on the Secretary of State's determination --- but also on a
second basis, the Petitioner's alleged failure to accurately

---

1514713, at *52.  But a chilling effect on speech can count as
an irreparable harm even where the underlying legal violation is
not itself a First Amendment violation.  See, e.g., Reporters
Comm. for Freedom of the Press v. Rokita, 751 F. Supp. 3d 931,
943-44, 947 (S.D. Ind. 2024) (so holding); Ctr. for Individual
Freedom, Inc. v. Ireland, 2008 WL 1837324, at *5 (S.D. W. Va.
Apr. 22, 2008) (same); Alexander v. Thornburgh, 713 F. Supp.
1278, 1287-88 (D. Minn. 1989) (same); cf. Walls v. Sanders, 733
F. Supp. 3d 721, 741 (E.D. Ark. 2024) (holding that a vague
statute that assertedly chills teachers' classroom speech does
not count as irreparable injury because "when . . . teachers
speak in the course of carrying out . . . required employment
obligations, they have no personal interest in the content of
that speech") (cleaned up).  To be sure, causation principles
require a tight nexus between the underlying legal violation and
the chilling impact on speech.  Cf. Goldie's Bookstore v. Super.
Ct. of Cal., 739 F.2d 466, 472 (9th Cir. 1984).  Here, the Court
finds, there is plainly that sort of close link.  Second, the
Petitioner seems to suggest that his detention may itself count
as irreparable harm.  See Petitioner's Letter (June 4, 2025)
(ECF 280) at 1 & n.1.  But there are cases that tug in different
directions on this.  Compare, e.g., Arevalo v. Hennessy, 882
F.3d 763, 767 (9th Cir. 2018), and United States v. Bogle, 855
F.2d 707, 710-11 (11th Cir. 1988), with Watkins v. Muhammad,
2024 WL 4524525, at *3 (7th Cir. Oct. 18, 2024) ("[T]he ordinary
hardships [such as pretrial detention] experienced by criminal
defendants do not rise to the level of irreparable harm."); see
also Respondents' Letter (June 9, 2025) (ECF 288) at 2
(discussing this point in the immigration context).  The
Petitioner's legal briefs do not meaningfully discuss this or
cite cases in support of his position.  Third, as part of his
irreparable-harm filing, the Petitioner put forward evidence to
suggest the Secretary's determination has chilled the speech of
third parties.  But the Petitioner makes no legal argument as to
how that can count as irreparable harm here.  See, e.g., Kansas
v. United States, 124 F.4th 529, 534 (8th Cir. 2024) ("The
irreparable-harm analysis focuses on the moving party, not . . .
[a] third party.") (cleaned up).

complete his lawful-permanent-resident application.  <u>See</u>
Additional Charges at 1.

Maybe the Petitioner would be detained, in any event, on that
second basis.  And if so, it might be argued, there would not be
any incremental chilling effect from detaining the Petitioner
for an <u>additional</u> reason, the Secretary of State's
determination.

But that argument does not work.

The reason: the evidence is that lawful permanent residents are
virtually never detained pending removal for the sort of alleged
omissions in a lawful-permanent-resident application that the
Petitioner is charged with here.  And that strongly suggests
that it is the Secretary of State's determination that drives
the Petitioner's ongoing detention --- not the other charge
against him.

On this point, there are three relevant pieces of evidence.
(Again, none of this is contested by the Respondents.  <u>See</u>
Respondents' Letter (June 9, 2025).)

First, Kerry Doyle[8] states in a declaration that "[l]awful
permanent residents . . . are . . . certainly not detained,

---

[8] Doyle's relevant experience:

> I served as Principal Legal Advisor (PLA),
> for Immigration Customs Enforcement (ICE)
> from September 2021 through September 2024.
> In that role, I oversaw the more than 1,500
> attorneys and staff who work for the Office
> of the Principal Legal Advisor (OPLA) across
> the country.  As PLA, I was responsible for
> establishing the direction and priorities of
> our office in alignment with the Office of
> General Counsel (OGC), ICE, and DHS
> leadership.  During that time, I also served
> on detail as Acting Deputy General Counsel,
> Office of General Counsel (OGC), Department
> of Homeland Security (DHS) from February
> 2024 through May 2024 and as Deputy General
> Counsel from October 2024 through December
> 2024.  I was appointed as an Immigration

Add.340

based solely on the types of allegedly missing information described [here][.]" Declaration of Veronica Salama, Exhibit P (ECF 281-16) ¶ 18.

Second, per Stacy Tolchin: "it is incredibly rare to see a lawful permanent resident detained . . . for[, as in this case,] having failed to disclose a past membership or association on the application for adjustment of status." Declaration of Veronica Salama, Exhibit L (ECF 281-12) ¶ 13 (emphasis added).

Tolchin, whose experience is extensive, see id. ¶¶ 1, 4-5, says this:

> I have represented at least ten permanent residents who have been placed into removal proceedings after they were denied naturalization. The only ones who were detained were those who had criminal convictions that DHS believed made them removable, in addition to being ineligible for naturalization.

Id. ¶ 17.

And all the more so, per Tolchin, as to one of the questions that the Petitioner allegedly answered inaccurately, given the history of "many" federal immigration officials essentially ignoring this question, see id. ¶ 12; see also id. ¶ 8; the question's asserted vagueness, see id. ¶¶ 7-11; the case law that has developed under it, see id. ¶¶ 13-14; and the particular context here. See id. ¶ 15.

> As relevant to [the Petitioner]'s case, it is incredibly rare to see a lawful permanent resident detained . . . for having failed to disclose a past membership or association on the application for adjustment of status.

---

> Judge and served in that position from December 2024 through mid-February 2025.

> In private practice, I have represented many hundreds of noncitizens in removal proceedings.

Declaration of Veronica Salama, Exhibit P (ECF 281-16) ¶¶ 3-4.

9

Id. ¶ 16.

The third declaration is Ira J. Kurzban's.[9]

He states that, in general, lawful permanent residents are
typically not detained by the immigration judge unless detention
is mandatory.  See Kurzban Declaration ¶ 14.  "[I]t is extremely
unusual for a lawful permanent resident charged . . . [for]
making material misrepresentations to be detained pending
removal proceedings absent aggravating circumstances such as a
criminal record."  Id. ¶ 15; see also id. ¶ 16.  And all of that
generally tracks with this case.[10]

The Doyle, Tolchin, and Kurzban declarations are each based on
extensive professional experience.  They are written in a
careful way.  And they back each other up; they are mutually
reinforcing, one to the next.

Based on the declarations, the Court finds as a matter of fact
that it is overwhelmingly likely that the Petitioner would not
be detained based solely on the lawful-permanent-resident-
application charge.  Rather, the Court finds, the Petitioner's
detention almost surely flows from the charge that is based on
the Secretary of State's determination.[11]

---

[9]  Kurzban's relevant experience: a leading immigration-law
scholar, see Declaration of Veronica Salama, Exhibit K (ECF 281-
11) ("Kurzban Declaration") ¶ 4, and practitioner, see id. ¶¶ 2-
3, 5-7, who has been counsel of record on various landmark
Supreme Court cases.  See id. ¶ 6.

[10]  The Petitioner has no criminal record.  See Khalil
Declaration ¶ 5.  The Secretary of State's determination does
not say that he has been involved in criminal activity or
violence.  See Determination at 1-2.  And the Respondents have
not put forward any evidence as to involvement by the Petitioner
in violence, destruction of property, or any other sort of
criminal activity.

[11]  The Petitioner also states that even "[b]eyond [his]
immediate detention," Khalil Declaration at ¶ 14, the Secretary
of State's determination chills his speech.  The Court credits
this, and finds as a factual matter that even if the Petitioner
were not detained, or even if he were detained on another basis,
the Secretary's determination would deter him from speaking.

10

                              \*      \*      \*

To sum up:

The Respondents have not contested the evidence put forward by the Petitioner, and in light of that the Court finds as a matter of fact that the Petitioner's career and reputation are being damaged and his speech is being chilled --- and this adds up to irreparable harm.

### C. **Equities**

So far, the Court has held that the Petitioner is likely to succeed on the merits and would suffer irreparable harm without an injunction. See Part II.A and Part II.B.

Now the Court considers the third requirement for an injunction.[12] Has the Petitioner shown "that the balance of equities tips in his favor"? Winter, 555 U.S. at 20.

Yes.

The Respondents can have little or no interest in applying the relevant underlying statutes in what is likely an unconstitutional way. See A.C.L.U. v. Ashcroft, 322 F.3d 240, 251 n.11 (3d Cir. 2003), aff'd and remanded, 542 U.S. 656 (2004) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.").

And "[w]hen a plaintiff is claiming the loss of a First Amendment right, courts commonly rule that even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue." 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2948.2 (3d ed. 2025) (citing Ramirez v. Collier, 595 U.S. 411, 433 (2022); Roman Cath. Diocese of Brooklyn v. Cuomo, 592 U.S. 14, 19 (2020); Yang v. Kosinski, 960 F.3d 119, 136 (2d Cir. 2020); Cmty. House, Inc. v. City of Boise, 490 F.3d 1041, 1059 (9th Cir. 2007)); accord

---

This is in part because of the vagueness associated with the determination's underlying approach. That makes it hard to know what speech might potentially be covered, see Khalil, 2025 WL 1514713, at \*37–42, and more likely that a person will curb his speech. See id. at \*41 n.63.

[12] This third requirement is less important than the first two. See Nken, 556 U.S. at 434.

Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty., 39 F.4th 95, 109 (3d Cir. 2022).

**D.  Public Interest**

Finally, the Petitioner must show "that an injunction is in the public interest."  Winter, 555 U.S. at 20.[13]

"[T]he public has no interest in the enforcement of what is very likely an unconstitutional statute."  Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1290 (11th Cir. 2013); accord, e.g., Schrader v. Dist. Att'y of York Cnty., 74 F.4th 120, 128–29 (3d Cir. 2023); Chamber of Com. of U.S. v. Edmondson, 594 F.3d 742, 771 (10th Cir. 2010).

And on the other side of the ledger, there is a chilling effect on speech.  See Amalgamated Transit Union Loc. 85, 39 F.4th at 109 ("There is a strong public interest in upholding the requirements of the First Amendment.  And, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff.") (cleaned up).

**III. The Preliminary Injunction**

All four preliminary injunction factors point in the same direction.  See Part II.  In light of that, the Court exercises its discretion, see Benisek v. Lamone, 585 U.S. 155, 158 (2018), and holds:

First, the Respondents are preliminarily enjoined from seeking to remove the Petitioner from the United States based on the Secretary of State's determination, as reflected in the Secretary's memorandum to the Secretary of Homeland Security.

Second, because the Court's preliminary injunction bars the Respondents from seeking to remove the Petitioner based on the Secretary's determination, the Respondents are also

---

[13]  This fourth requirement is less important than the first two. See Nken, 556 U.S. at 434.

preliminarily enjoined from detaining the Petitioner based on the Secretary of State's determination.[14]

The Court hereby stays its preliminary injunction for around 40 hours, until 9:30AM on June 13. This is to allow the Respondents to seek appellate review should they wish to.

In addition, the preliminary injunction shall not go into effect unless and until the Petitioner posts a nominal bond in the amount of $1, consistent with the requirement of Federal Rule of Civil Procedure 65(c).[15]

\*    \*    \*

---

[14]  The two holdings set out in the text have no impact on efforts to remove the Petitioner for reasons other than the Secretary of State's determination.

[15]  The Respondents have requested the posting of a bond. See Respondents' Opposition to Petitioner's Motion for a Preliminary Injunction (ECF 156) at 35. But they have not specified any costs associated with complying with a preliminary injunction that they would seek to get back if the injunction were undone on appeal. See id.; see generally Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797, 804-05 (3d Cir. 1989) ("[T]he bond serves to inform the plaintiff of the price they can expect to pay if the injunction was wrongfully issued."); see also Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100, 103 (3d Cir. 1988). The Court is unaware of any such costs. See Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 426 (3d Cir. 2010); Siegel v. Platkin, 653 F. Supp. 3d 136, 161 (D.N.J. 2023); Koons v. Reynolds, 649 F. Supp. 3d 14, 45 (D.N.J. 2023); Beattie v. Line Mountain Sch. Dist., 992 F. Supp. 2d 384, 397 (M.D. Pa. 2014); Stilp v. Contino, 629 F. Supp. 2d 449, 468 (M.D. Pa. 2009), aff'd and remanded, 613 F.3d 405 (3d Cir. 2010). To be sure, if the Respondents opt to appeal, some of their attorneys' time would be occupied. But a Rule 65 bond does not typically aim to cover the costs associated with attorneys' fees. See Tullock v. Mulvane, 184 U.S. 497, 510-12 (1902) (quoting Oelrichs v. Spain, 82 U.S. (15 Wall.) 211, 230-31 (1872)); Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 560 (2d Cir. 2011); Fireman's Fund Ins. Co. v. S.E.K. Constr. Co., 436 F.2d 1345, 1351-52 (10th Cir. 1971); Sionix Corp. v. Moorehead, 299 F. Supp. 2d 1082, 1086 (S.D. Cal. 2003); Minn. Power & Light Co. v. Hockett, 105 F. Supp. 2d 939, 942 (S.D. Ind. 1999); 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2954 & n.1.

IT IS on this 11th day of June, 2025, so ORDERED.

_____

Michael E. Farbiarz, U.S.D.J.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

      *Petitioner,*

    v.

DONALD TRUMP et al.,

      *Respondents.*

No. 25-cv-01963 (MEF)(MAH)

**ORDER**

The Court preliminarily enjoined the Respondents from detaining the Petitioner on a particular charge. See Khalil v. Trump, 2025 WL 1649197, at *6 (D.N.J. June 11, 2025). That preliminary injunction is now in effect.

The Petitioner filed a letter this morning, stating "the Government [has not] represented that Mr. Khalil is being detained based on any ground other than the one the Court enjoined." ECF 301 at 1 (emphasis added).

It would plainly be unlawful to detain the Petitioner on a charge the Court preliminarily enjoined.

But by their letter of this afternoon, at ECF 304, the Respondents have now represented that the Petitioner is being detained on another, second charge.

That second charge has not been preliminary enjoined by the Court.

As the Court noted at some length on May 28, (1) the Petitioner did not put forward factual evidence as to why it might be unlawful to detain him on the second charge, and (2) the Petitioner failed to make meaningful legal arguments as to that second charge. See Khalil v. Trump, 2025 WL 1514713, at *52-54 (D.N.J. May 28, 2025); see also Khalil, 2025 WL 1649197, at *2, *6.

The Petitioner has not sought appellate review as to the Court's May 28 holdings.

As the Respondents note in their letter today, a number of avenues are now available to the Petitioner, including a bail application to the immigration judge presiding over the immigration case.

To the extent the Petitioner requests relief from this Court, the request is denied.

IT IS on this 13th day of June, 2025, so **ORDERED**.

_____
Michael E. Farbiarz, U.S.D.J.