**Nos. 25-2162 & 25-2357**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

———————————

MAHMOUD KHALIL,

*Petitioner-Appellee,*

v.

PRESIDENT UNITED STATES OF AMERICA; DIRECTOR NEW YORK
FIELD OFFICE IMMIGRATION AND CUSTOMS ENFORCEMENT;
WARDEN ELIZABETH CONTRACT DETENTION FACILITY; DIRECTOR
UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT;
SECRETARY UNITED STATES DEPARTMENT OF HOMELAND SECURITY;
SECRETARY UNITED STATES DEPARTMENT OF STATE; ATTORNEY
GENERAL UNITED STATES OF AMERICA,

*Respondents-Appellants.*

———————————

On Appeal from the United States District Court
for the District of New Jersey, No. 25-1963 (MEF) (MAH)

———————————

## EMERGENCY MOTION TO STAY THE DISTRICT COURT'S
## JULY 17, 2025 ORDER PENDING APPEAL
### (Relief requested by July 31, 2025)

———————————

BRETT A. SHUMATE
Assistant Attorney General

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel for Immigration
Litigation

ALANNA T. DUONG
DHRUMAN Y. SAMPAT
Senior Litigation Counsel

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

RELEVANT BACKGROUND ................................................................................... 3

ARGUMENT ............................................................................................................... 5

    I.   The Government is Likely to Succeed on the Merits of its Appeal. ................... 5

        A.   The July 17 Order Far Exceeds the Permissible Relief that May Be Awarded by a District Court Exercising Habeas Jurisdiction. ..................... 6

        B.   The INA Bars the District Court's Encroachment on Petitioner's Removal Proceedings. ......................................................................................... 8

    II.  The Government Will Be Irreparably Harmed By The District Court's Expanded Preliminary Injunction. ......................................................................... 12

    III. The Public Interest Favors a Stay of the July 17 Order. ................................... 16

CONCLUSION ......................................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM: DISTRICT COURT'S JULY 17, 2025 ORDER

# TABLE OF AUTHORITIES

## Cases

*Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*,
510 F.3d 1 (1st Cir. 2007) ........................................................................ 13

*Bonhometre v. Gonzales*,
414 F.3d 442 (3d Cir. 2005) ...................................................................... 10

*Conchatta, Inc. v. Evanko*,
83 F. App'x 437 (3d Cir. 2003) ................................................................. 15

*DHS v. Thuraissigiam*,
591 U.S. 103 (2020) .................................................................................... 7

*Duvall v. Atty. Gen. of U.S.*,
436 F.3d 382 (3d Cir. 2006) ...................................................................... 12

*E.O.H.C. v. Secretary DHS*,
950 F.3d 177 (2020) ................................................................................... 10

*Fiallo v. Bell*,
430 U.S. 787 (1977) ................................................................................... 14

*Hilton v. Braunskill*,
481 U.S. 770 (1987) ..................................................................................... 5

*M.M. v. Paterson Board of Education*,
736 F. App'x 317 (3d Cir. 2018) ............................................................... 16

*Maryland v. King*,
567 U.S. 1301 (2012) ................................................................................. 13

*Massieu v. Reno*,
91 F.3d 416 (3d Cir. 1996) ........................................................................ 16

*Mathews v. Diaz*,
426 U.S. 67 (1976) ..................................................................................... 14

*Munaf v. Geren*,
553 U.S. 674 (2008) ..................................................................................... 6

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................... 5, 16, 17

*North Hanover Township,*
    2023 WL 7986408 (D.N.J. 2023) ................................................. 15

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) ....................................................................... 6

*Reno v. Am.-Arab Anti-Discrimination Comm.,*
    525 U.S. 471 (1999) ................................................................. 13, 17

*Sears, Roebuck & Co. v. NLRB,*
    473 F.2d 91 (D.C. Cir. 1972) ....................................................... 16

*Small v. Kiley,*
    567 F.2d 163 (2d Cir. 1977) ......................................................... 16

*Tazu v. Att'y Gen. United States,*
    975 F.3d 292 (3d Cir. 2020) ....................................................... 9, 10

*United States v. Martinez-Fuerte,*
    428 U.S. 543 (1976) ...................................................................... 16

*Younger v. Harris,*
    401 U.S. 37 (1971) ........................................................................ 14

## Statutes

8 U.S.C. § 1182(a)(6)(C)(i) ................................................................ 11

8 U.S.C. § 1227(a)(4)(C) ............................................................. 1, 4, 15

8 U.S.C. § 1227(a)(1)(A) .................................................................... 1

8 U.S.C. § 1227(a)(1)(H) .................................................................... 1

8 U.S.C. § 1252(a)(2)(D) .................................................................. 16

8 U.S.C. § 1252(a)(5) ...................................................... 2, 10, 11, 16

8 U.S.C. § 1252(b)(9) .................................................. 2, 8, 10, 11, 16

8 U.S.C. § 1252(g) ..................................................................... 2, 8, 9

# Other Authority

*Securing the Border*, 89 Fed. Reg. 81,158 (Oct. 7, 2024) ..................................................... 13

# INTRODUCTION

Having already enjoined Respondents ("the Government") from removing Petitioner Mahmoud Khalil from the United States and ordered that he be released from detention, on July 17 the district court entered yet another order—this one expanding its preliminary injunction to effect an unprecedented intrusion into parallel administrative proceedings in contravention of the historic limits on a habeas court's jurisdiction and Congress's explicit judgment to channel challenges to detention and removal through the petition-for-review process. The district court's July 17 order ("the July 17 Order") mandates that the Government cause the immigration judge ("IJ") (1) to vacate or amend her June 20 decision to the extent it finds that Petitioner is removable from the United States based on the Secretary of State's foreign-policy determination, 8 U.S.C. § 1227(a)(4)(C); and (2) to evaluate Petitioner's eligibility for a Section 237(a)(1)(H) waiver of removability due to his document-fraud charge, 8 U.S.C. §§ 1227(a)(1)(A), 1182(a)(6)(C)(i), without reference to the Secretary of State's foreign-policy determination. ECF 355.[1] To the Government's knowledge, no district court has *ever* previously interfered with ongoing immigration proceedings in this manner. Nor has Petitioner or the district court cited any such precedent. The Court should stay the July 17 Order pending appeal.

---

[1] Unless otherwise indicated, record citations are to docket number 2:25-cv-01963.

The Government is likely to succeed on appeal of this latest order because the district court has no authority to micromanage ongoing removal proceedings. First, the July 17 Order's intrusion into the inner-workings of the removal proceedings far exceeds the historic function of habeas corpus to secure release from detention—relief that the district court already provided through its June 20 release order that is already on appeal. Habeas relief that has no effect on Petitioner's corpus is a contradiction in terms. Second, the July 17 Order's intrusion into Petitioner's ongoing removal proceedings falls in the heartland of multiple statutory bars that strip district courts of jurisdiction to review the Executive's decisions to commence and adjudicate removal proceedings. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), (g). The July 17 Order is not the district court's *first* order to transgress these jurisdictional bars—but it is by far the most egregious violation. However this Court rules on the Government's pending motion to stay the district court's June 20 release order, the July 17 Order is plainly unlawful and should be stayed pending appeal.

The Government will likely suffer irreparable harm absent a stay. The July 17 Order forces the Government to risk permanently forfeiting an entire ground for removing Petitioner, which it may not be able to reassert if this Court were to stay or reverse the preliminary injunction. This Court should not compel the Government to shoulder that risk, especially given the clear unlawfulness of the July 17 Order. At a minimum, the July 17 Order injects substantial inefficiencies into the removal proceedings, substituting piecemeal litigation for Congress's choice of streamlined

adjudication. In stark contrast, none of the supposed harms that Petitioner claims he will suffer is a result of the IJ's consideration of the foreign-policy determination during the removal proceedings; if anything, they are caused by the foreign-policy determination *itself*—which is not (and could not be) the subject of the lower court's preliminary injunction.

This Court should stay the July 17 Order pending appeal. Absent a stay, the Government will be required to comply with the July 17 Order's directives by August 1, 2025, at 10:00 a.m. ECF 367 at 9. Therefore, the Government respectfully requests that the Court rule on the Government's motion, or grant an administrative stay, by July 31, 2025.

## RELEVANT BACKGROUND

On June 11, 2025, the district court issued an order preliminarily enjoining the Government "from seeking to remove the Petitioner from the United States based on the Secretary of State's determination." ECF 299 at 12. Subsequently, on June 20 the court granted Petitioner's motion for release from custody. ECF 316. The Government has appealed both of those decisions and has filed a motion for a stay pending appeal of the district court's release order, which is now fully briefed. *See* No. 25-2162, Mot. to Stay the District Court's Order Pending Appeal (June 26, 2025), Dkt. 16-1 ("Mot. to Stay Release Order").

Petitioner sought clarification of the district court's preliminary injunction, *see* ECF 332, and after additional letter briefing, the district court issued an order

purporting "to clarify in three ways the meaning of its June 11 preliminary injunction." ECF 355. First, the court determined that, under the June 11 preliminary injunction, the Government "must cause" the IJ "to promptly vacate or amend her June 20 decision to the extent it finds the Petitioner removable from the United States on the [foreign-policy] charge, which charge rests on the Secretary of State's determination." *Id.* at 2. Second, the court concluded that, the Government did "not need to cause" the IJ "to revisit the determination she made in the June 20 decision as to the Petitioner's eligibility for asylum." *Id.* at 4. Third, the court determined that, the Government "must cause" the IJ to consider and determine: "(i) whether the Petitioner should be granted a waiver of removability, *see* 8 U.S.C. § 1227(a)(1)(H), in connection with the charge lodged against him as to his alleged failure to accurately complete his lawful permanent resident application," and "(ii) whether the Petitioner should be afforded an evidentiary hearing in connection with the [IJ's] assessment of his waiver-of-removability arguments." *Id.* at 5. The Government was directed to "ensure that" in making these waiver-related determinations, the "immigration judge gives no consideration to the Secretary of State's determination that the Petitioner is removable from the United States under 8 U.S.C. § 1227(a)(4)(C) [the foreign-policy charge]." *Id.*

Further, the district court ordered that, if these actions could not be completed by close of business on July 18—the very next day—then the Government must "promptly cause" the IJ "to take all appropriate steps on July 18 that would be required to ensure that she would not be divested of her jurisdiction over this case if a notice of

4

appeal from her June 20 decision" would be filed by the deadline. *Id.* at 9. These "appropriate steps," the court stated, "might potentially include the [IJ] timely reopening the case and vacating her June 20 decision." *Id.*

On July 18, "[p]ursuant to the District Court Order of July 17, 2025," the IJ reopened Petitioner's removal proceedings. The Government immediately filed a notice of appeal and moved to stay the district court's order pending appeal. Dkt. No. 25-2357; ECF 360-1. The district court denied the Government's stay motion on July 25, 2025. ECF 367. In its order, the district court directed the Government to comply with the remaining requirements in the July 17 Order by August 1, 2025, at 10:00 am. *Id.* at 9.

## ARGUMENT

Courts consider four factors in assessing a motion for stay pending appeal: (1) the movant's likelihood of prevailing on the merits of the appeal, (2) whether the movant will suffer irreparable harm absent a stay, (3) the harm that other parties will suffer if a stay is granted, and (4) the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors "are the most critical[,]" and, when the government is a party, its interests and the public interest "merge." *Nken v. Holder*, 556 U.S. 418, 434-35 (2009). Each of these factors weighs in favor of a stay.

## I.    The Government is Likely to Succeed on the Merits of its Appeal.

The district court's July 17 Order intrudes on the IJ's adjudication of the pending removal proceedings against Petitioner in direct contravention of longstanding limits

on federal courts' habeas jurisdiction and in defiance of multiple statutory bars that strip district courts of jurisdiction over removal proceedings. The July 17 Order is not the first of the district court's orders to transgress these limits on its jurisdiction, as the Government has explained in its pending motion to stay the district court's order releasing Petitioner from custody. *See generally* Mot. to Stay Release Order. But the July 17 Order is certainly the most flagrant violation. The Court should not allow the district court's disregard for Congress's limits on its authority to continue unabated while the Government pursues its appeal.

A.   **The July 17 Order Far Exceeds the Permissible Relief that May Be Awarded by a District Court Exercising Habeas Jurisdiction.**

The July 17 Order violates fundamental limits on a federal court's habeas jurisdiction. As the Government has explained in its motion to stay the district court's release order, the court never acquired jurisdiction over Petitioner's habeas petition because it was not filed in the district of confinement, and it did not name the custodian detaining Petitioner in that district. *See* Mot. to Stay Release Order at 9-12. That threshold error applies equally to the July 17 Order. But even if the district court had acquired jurisdiction over the habeas petition, the July 17 Order far exceeds the relief that may be awarded by a federal court sitting in habeas.

"Habeas is at its core a remedy for unlawful executive detention," and so the traditional function of habeas is to secure the habeas petitioner's release. *Munaf v. Geren*, 553 U.S. 674, 693 (2008); *see also Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("[T]he

traditional function of the writ is to secure release from illegal custody"). The July 17 Order did not order Petitioner's release; the court had already ordered that relief by a prior order. *See* ECF 316. Instead, the July 17 Order reaches matters wholly unrelated to detention or release—dictating the content of the IJ's decisions and the grounds for her determinations. *Supra*, pp. 3-4. In essence, the district court sitting in habeas exercised direct appellate review of the IJ's interlocutory proceedings. Such relief is foreign to the historic function of habeas. *See DHS v. Thuraissigiam*, 591 U.S. 103, 118 (2020) (finding that the alien's requested relief of "vacatur of his removal order and an order directing the Department to provide him with a new opportunity to apply for asylum and other relief from removal falls outside the scope of the common-law habeas writ") (cleaned up).

In its order denying the Government's motion for a stay pending appeal, the district court asserted that the July 17 Order does not exceed the scope of permissible habeas relief because, on its view, the July 17 Order was merely a clarification of the preliminary injunction order and "there can be no meaningful suggestion that the June 11 preliminary injunction … pushed beyond the Court's core habeas jurisdiction" because "Petitioner was detained then." ECF 367. That makes no sense. A district court sitting in habeas is not empowered to order relief outside the bounds of its habeas jurisdiction just because the petitioner is in detention. So whether the July 17 Order is viewed as a modification or clarification of the preliminary injunction, the relief it recognizes is not relief a court sitting in habeas may order.

Put simply, the writ of habeas corpus is not an all-purpose writ under which district courts enjoy roving authority to exercise direct appellate review over any and all ongoing agency adjudications—especially when doing so does not actually implicate custody over any corpus. Petitioner has already secured all the relief that habeas corpus can offer: he is not in detention and cannot be removed based on the foreign-policy ground. Even if habeas corpus relief were available here, the July 17 Order radically exceeds its bounds.[2]

### B.   The INA Bars the District Court's Encroachment on Petitioner's Removal Proceedings.

Even if the July 17 Order were a proper exercise of a federal court's habeas jurisdiction, it is directly foreclosed by the INA's multiple statutory provisions that strip district courts of authority to intrude into removal proceedings and channel all challenges to removal proceedings to the courts of appeals through the petition-for-review process. *See* 8 U.S.C. §§ 1252(g), (b)(9); *see generally* Mot. to Stay Release Order at 12-16.

*First*, the INA prohibits *any court* from interfering with the Executive's discretionary decisions regarding the adjudication of removal proceedings. The statute provides that "no court"—including a court sitting in habeas—"shall have jurisdiction

---

[2]  The district court noted that "habeas relief is available to people operating under various restraints on liberty well short of detention." ECF 367. But the key point is that the July 17 Order does not remedy any such restraint on Petitioner's liberty—it is directed at the IJ and her administration of the removal proceedings.

to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to … adjudicate cases … against any alien." 8 U.S.C. § 1252(g). That prohibition applies regardless of whether an alien "restyle[s]" his challenge as being directed "to the Executive's general lack of authority to violate due process, equal protection, the Administrative Procedure Act, or some other federal law." *Tazu v. Att'y Gen. United States*, 975 F.3d 292, 298 (3d Cir. 2020).

The July 17 Order runs headlong into this bar. Petitioner challenged how the IJ was conducting the removal proceedings—specifically, the IJ's reliance on the Secretary of State's foreign-policy determination. The July 17 Order resolved that challenge by dictating how the IJ must "adjudicate" Petitioner's removal proceeding—it compels the IJ to vacate her June 20 decision finding Petitioner removable, it delineates the grounds the IJ may consider for removal, it directs the IJ to adjudicate Petitioner's Section 237 waiver application, and it dictates what grounds the IJ may rely on when considering the waiver application. *Supra*, pp. 3-4. On its face, the July 17 Order falls within the heartland of Section 1252(g)'s prohibition on federal courts deciding any claim "arising from the decision or action by the Attorney General to … adjudicate" an alien's case.

*Second*, the INA channels all challenges arising from an alien's removal proceedings through the Board of Immigration Appeals and to the courts of appeals through the filing of a petition for review. Federal district courts have no role in this process.

Specifically, the INA provides that "judicial review of all questions of law and fact … arising from any action taken or proceeding brought to remove an alien from the United States … shall be available only in judicial review of a final order" through "a petition for review filed with an appropriate court of appeals," and that otherwise "no court shall have jurisdiction, [including] by habeas corpus …, to review such an order or such questions of law or fact."  8 U.S.C. § 1252(a)(5), (b)(9); *see also id.* § 1252(a)(5) (petition for review is "the sole and exclusive means for judicial review"). Sections 1252(a)(5) and (b)(9) thus serve as a "zipper clause" to channel and consolidate judicial review of claims arising from removal proceedings into the petition-for-review process in the courts of appeals. *E.O.H.C. v. Secretary DHS*, 950 F.3d 177, 184 (2020) ("To prevent piecemeal litigation, the INA usually requires aliens to bring their claims together."); *Tazu*, 975 F.3d at 296 (Section 1252 "funnel[s] removal-related claims away from district courts and into a petition for review in a single court of appeals"); *Bonhometre v. Gonzales*, 414 F.3d 442, 446 (3d Cir. 2005) (highlighting Congress's "clear intent to have all challenges to removal orders heard in a single forum (the courts of appeals)" as part of a petition for review).  If the claim can receive meaningful review through a petition for review, it *must* be raised through that mechanism—or not at all. *E.O.H.C.*, 950 F.3d at 185-86.

The July 17 Order circumvents the channeling function of Sections 1252(a)(5) and (b)(9) and usurps this Court's role as the sole forum authorized to adjudicate claims arising from or related to removal proceedings.  Whether the IJ may rely on the foreign-

policy determination during Petitioner's removal proceedings—either as a ground for removal or as part of its consideration of Petitioner's eligibility for a Section 237 waiver—is a "question[] of law … arising from any action taken or proceeding brought to remove an alien from the United States." 8 U.S.C. § 1252(b)(9). Therefore, any challenge to the IJ's conduct or decisionmaking regarding the foreign-policy determination may be reviewed only by *this Court* through a petition for review. But the July 17 Order upends that carefully calibrated framework by installing *the district court* as the tribunal with authority to exercise appellate review of the IJ's proceedings. That is a direct usurpation of this Court's statutorily conferred prerogative as the "sole and exclusive" tribunal with authority to adjudicate such legal challenges.[3]

The July 17 Order thus disregards *two* statutory bars to its exercise of jurisdiction over Petitioner's challenges to the IJ's conduct during his removal proceedings. The Court should not allow the district court's aggrandizement to continue while the Government pursues its appeal.

---

[3] Petitioner has previously argued that Sections 1252(a)(5) and (b)(9) apply only when there is an order of removal. *See* No. 25-2162, Opp. to Respondent's Mot. to Stay the District Court's Order Pending Appeal at 15 (3d Cir. July 9, 2025), Dkt. 23-1. That is incorrect. *See* No. 25-2162, Reply in Supp. of Mot. to Stay the District Court's Order Pending Appeal at 4-5 (3d Cir. July 18, 2025), Dkt. 28. In any event, Petitioner's argument has no application to the July 17 Order, which came after the IJ's June 20 decision finding Petitioner removable—*i.e.,* an order of removal under the INA.

## II. The Government Will Be Irreparably Harmed By The District Court's Expanded Preliminary Injunction.

The July 17 Order will inflict irreparable harm on the Government by prohibiting the IJ from relying on the Secretary of State's foreign-policy determination for *any* purpose—either as a ground for Petitioner's removal or in connection with Petitioner's Section 237 waiver request.

**A.** First, by forbidding the IJ to rely on the Secretary of State's foreign-policy determination, the July 17 Order puts the Government at risk of forfeiting reliance on that removal ground in perpetuity. Even if the government ultimately were to prevail in its appeal of the preliminary injunction, it still may be barred from presenting the foreign-policy determination as a basis for Petitioner's removability if the underlying removal proceedings have otherwise concluded. *See Duvall v. Atty. Gen. of U.S.*, 436 F.3d 382, 388 (3d Cir. 2006) (holding that collateral estoppel applies to immigration proceedings and opining that the doctrine requires "the [DHS] to present all available evidence against the individual during a single hearing"). And complicated issues of collateral estoppel and res judicata could arise if the IJ were to grant Petitioner a Section 237, but this Court were to reverse the preliminary injunction. *See Duvall*, 436 F.3d at 386-92. Although there are exceptions to rules of preclusion, neither the district court nor Petitioner have identified *a single case* analyzing issues of claim or issue preclusion in these circumstances. And if the question were presented, Petitioner would

undoubtedly argue vigorously that the rules of preclusion bar any further removal proceedings based on the foreign-policy determination.

Even if the Government were not precluded from reasserting the foreign-policy charge against Petitioner if it were to prevail in its appeal, requiring it to fully litigate proceedings at this stage and only wait until a future date to consider that additional charge would result in the "deconstruction, fragmentation, and hence prolongation of removal proceedings" that Congress deliberately sought to prevent by streamlining removal proceedings. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 485-87 (1999) (*"AADC"*). Considering the inefficiencies injected into the proceedings by the July 17 Order, and the additional strain it will place on an already overburden system, the Government will clearly be harmed by the "scattershot" approach required by the expanded injunction. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007); *Securing the Border*, 89 Fed. Reg. 81,158 (Oct. 7, 2024) (discussing the United States's strained immigration system). Petitioner did not attempt to argue otherwise below. *See* ECF 354.

Second, the July 17 Order irreparably harms the Government by preventing it from relying on a statute duly enacted by Congress. "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation modified). The foreign-policy ground—§ 1227(a)(4)(C)(i)— remains federal law, and the July 17 Order effectively nullifying that provision for

purposes of Petitioner's removal proceedings irreparably harms the Executive's interests in enforcing and applying federal law.

That harm is particularly acute in light of the comity between the branches of the federal government that has traditionally required a heighted showing of harm before a court will enjoin an administrative proceeding. *See, e.g., Younger v. Harris*, 401 U.S. 37, 46 (1971). This principle has special salience in the immigration context, where the Supreme Court has long recognized that it is to Congress and the Executive that the Constitution has delegated responsibility over immigration matters. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976). For that reason, judicial review over immigration matters has been exceedingly narrow. *See, e.g., Fiallo v. Bell*, 430 U.S. 787, 792 (1977). The court's unjustified expansion of the injunction tramples these principles and, by transcending its narrow remit in immigration cases, it has and continues to cause irreparable harm to the interests and prerogatives of the government.

**B.** By contrast, Petitioner will not suffer any harm if the July 17 Order is stayed. The district court's preliminary injunction prevents Petitioner from being removed based on the foreign-policy charge, and the court separately ordered Petitioner's release from custody. ECF 299, 316. The July 17 Order has no effect on either of those orders, and Petitioner is not irreparably harmed just by allowing the Government to preserve its ability to rely on the foreign-policy determination in the event it prevails on appeal.

Nor will a stay of the July 17 Order harm Petitioner's reputation, career prospects, or chill his speech, as he argued below. Those harms do not derive from the

ongoing removal proceedings; they derive from the Secretary of State's public (and ongoing) determination that Petitioner is removable under 8 U.S.C. § 1227(a)(4)(C) as an alien "whose presence or activities in the United States … would have serious adverse foreign policy consequences for the United States." The July 17 Order did not remedy those harms, and so a stay of that Order will not exacerbate those harms either. And a stay of the July 17 Order will not impair Petitioner's ability to speak. Although Petitioner has speculated about a "chilling effect," the risk "of being dissuaded from speech must be "real or immediate" and "in the near future." *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003). Petitioner remains out of custody pursuant to the district court's release order, and he is free to engage in whatever speech he chooses— as he is doing at this very time, conducting a media blitz with several media organizations and publicly meeting with multiple members of Congress. *See, e.g.*, ECF 345-10 & 345-11; *Reading v. North Hanover Township*, 2023 WL 7986408, at *6 (D.N.J. 2023) (holding that plaintiff's fear of censorship was "unfounded" where she continued to post publicly on her blog without continued monitoring or engagement from defendants). Such extensive publicity-seeking actions bely Petitioner's contention that his speech is being somehow chilled.

Finally, Petitioner will not be harmed if the July 17 Order is stayed and the IJ determines that he is ineligible for a Section 237 waiver due to the Secretary of State's foreign-policy determination. In that event, Petitioner is free to seek relief from the Board of Immigration Appeals and then the appropriate court of appeals through a

petition for review—just as Congress intended. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9). Being required to follow the statutorily prescribed process for obtaining review of IJ decisions, including constitutional claims, is not a cognizable injury. *See* 8 U.S.C. § 1252(a)(2)(D). It is the same process that every other alien charged with removability must invoke, and Petitioner has not shown that the process is inadequate to address his claims. *See, e.g.*, *Massieu v. Reno*, 91 F.3d 416, 422 (3d Cir. 1996) ("[D]elaying plaintiff's constitutional challenge until after he exhausts his administrative remedies will in no way foreclose meaningful judicial review."); *M.M. v. Paterson Board of Education*, 736 F. App'x 317, 320 (3d Cir. 2018) (concluding that administrative exhaustion would not be futile where "M.M. has not demonstrated that the administrative process is unable to provide an appropriate remedy for the harms alleged") (citation omitted). Indeed, it is black-letter law that the burdens of litigation do not constitute irreparable harm. *See Small v. Kiley*, 567 F.2d 163, 165 (2d Cir. 1977) ("[i]rreparable harm cannot be established by a mere reliance on the burden of submitting to agency hearings" (quoting *Sears, Roebuck & Co. v. NLRB*, 473 F.2d 91, 93 (D.C. Cir. 1972)).

## III. The Public Interest Favors a Stay of the July 17 Order.

It is well settled that the public interest in the enforcement of the United States' immigration laws is significant. *See, e.g.*, *United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Nken*, 556 U.S. at 435. There is "always a public interest in prompt execution of removal orders." *Nken*, 556 U.S. at 436. That principle extends to the prompt resolution of determining removability because "[t]he continued presence of

an alien lawfully deemed removable undermines the streamlined removal proceedings IIRIRA established, and 'permit[s] and prolong[s] a continuing violation of United States law.'" *Id.* (quoting *AADC*, 525 U.S. at 490). Allowing the July 17 Order to remain in force impairs the Government's ability to enforce and apply federal law, which is contrary to the public interest.

## CONCLUSION

For these reasons, the Government respectfully requests that the Court stay the district court's July 17 Order pending appeal, or grant an administrative stay, by July 31, 2025.

Respectfully submitted,

/s/ *Alanna T. Duong*

BRETT A. SHUMATE
Assistant Attorney General

ALANNA T. DUONG
Senior Litigation Counsel
Office of Immigration Litigation
Civil Division, U.S. Dept. Justice
PO Box 878, Ben Franklin Station
Washington, D.C. 20044
alanna.duong@usdoj.gov

YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General

DREW C. ENSIGN
Deputy Assistant Attorney General

AUGUST E. FLENTJE
Special Counsel for Immigration
Litigation

July 25, 2025

DHRUMAN Y. SAMPAT
Senior Litigation Counsel

Attorneys for Respondents-Appellants

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) and 32(g) because it was prepared using Garamond type, is double-spaced, has 10.5 or fewer characters per inch; and contains 4,323 words, excluding the parts exempted by Fed. R. App. P. 32(f).

<div style="margin-left:50%">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

July 25, 2025                                   Attorney for Respondents-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on July 25, 2025, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Third Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

<div style="margin-left:50%">

*/s/ Alanna T. Duong*
ALANNA T. DUONG
Senior Litigation Counsel
U.S. Department of Justice

</div>

# ADDENDUM

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

MAHMOUD KHALIL,

       *Petitioner*,

    v.

DONALD TRUMP et al.,

       *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

<u>OPINION and ORDER</u>

\*    \*    \*

For the purposes of this brief Opinion and Order, the Court assumes familiarity with the facts and procedural history of this case.

\*    \*    \*

On June 11, the Court preliminarily enjoined the Respondents "from seeking to remove the Petitioner from the United States based on the Secretary of State's determination." <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1649197, at *6 (D.N.J. June 11, 2025).

The Petitioner sought clarification as to how the June 11 preliminary injunction applies in certain circumstances. <u>See</u> Petitioner's Letter (July 1, 2025) (ECF 332).

As to that question, the parties filed briefs, <u>see</u> Petitioner's Letter (July 11, 2025) (ECF 347), Respondents' Letter (July 15, 2025) (ECF 349); the Court issued an Opinion and Order, <u>see</u> <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1981392 (D.N.J. July 16, 2025); the parties filed supplemental materials, <u>see</u> Petitioner's Brief (July 17, 2025) (ECF 352), Respondents' Brief (July 17, 2025) (ECF 353); Petitioner's Reply Brief (July 17, 2025) (ECF 354); and the Court issued a clarifying Opinion and Order, on July 17. <u>See</u> <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1983755 (D.N.J. July 17, 2025).

The clarifying order required the Respondents to take certain steps on July 18. <u>See</u> <u>id</u>. at *5.

The Respondents did not fully do so. Rather, after the close of business on July 18, <u>see</u> Motion to Stay (July 18, 2025) (ECF 360), they filed a motion for a stay. <u>See</u> <u>id</u>. at 1–2.

The motion became fully briefed a few hours ago. <u>See</u> ECF 366.

It is denied.

*　　*　　*

The Respondents carry the burden of persuasion as to their stay application. <u>See</u> <u>Landis v. N. Am. Co.</u>, 299 U.S. 248, 255 (1936); <u>see also</u> <u>Hertz Corp.</u> v. <u>Gator Corp.</u>, 250 F. Supp. 2d 421, 424–25 (D.N.J. 2003).

And in analyzing the Respondents' application, the Court must consider four things:

> (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

<u>In re Revel AC, Inc.</u>, 802 F.3d 558, 568 (3d Cir. 2015) (cleaned up); <u>see also</u> <u>Jazz Pharms., Inc.</u> v. <u>Avadel CNS Pharms., LLC</u>, 2022 WL 17735952, at *1 (D. Del. Dec. 5, 2022); <u>Blue Gentian</u> v. <u>Tristar Prods., Inc.</u>, 2021 WL 3561215, at *4 (D.N.J. Aug. 12, 2021).

Walk through these here.

*　　*　　*

The <u>first</u> thing: likelihood of success on the merits.

As to this, the Respondents focus all but exclusively on the argument that the Court did not have jurisdiction to enter the June 11 preliminary injunction that was then clarified by the Court's July 17 Opinion and Order.

The Respondents are not likely to succeed on these arguments.

The Respondents argue that jurisdiction was stripped by 8 U.S.C. § 1252(b)(9).  See Motion to Stay at 4–5.  But as the Court has previously set out, see Khalil v. Joyce, --- F. Supp. 3d ---, 2025 WL 1232369, at *6–29 (D.N.J. Apr. 29, 2025), the Respondents' proposed interpretation of Section 1252(b)(9) runs aground on the plain text of the statute, see id. at *13–16, and is at odds with a Third Circuit decision.  See id. at *21–23 (citing EOHC v. Sec'y U.S. Dep't of Homeland Sec., 950 F.3d 177 (3d Cir. 2020)).

And if anything, the Court's approach to Section 1252(b)(9) is now on sturdier footing.

In decisions handed down after the Court's ruling, the Second Circuit and the Fourth Circuit have taken the same approach to interpreting the statute.  See Suri v. Trump, 2025 WL 1806692, at *8–9 (4th Cir. July 1, 2025); Ozturk v. Hyde, 136 F.4th 382, 399–401 (2d Cir. 2025).

The Respondents also seem to argue that there is a lack of jurisdiction here because the Court's "new directive[]," Motion to Stay at 3 --- that is, the July 17 clarification of the June 11 preliminary injunction --- is (a) too far removed from the Court's habeas jurisdiction, and (b) is inconsistent with Section 1252(g).  See id. at 2–4.

These arguments are not persuasive for a range of reasons, ably set out by the Petitioner.  See Opposition Brief (ECF 362) at 16–25.[1]

---

[1]  Two things here.  First, the Respondents specifically requested a rapid decision.  See Respondents' Letter (July 25, 2025) at 1.  So the Court does not work through each point they raise.  And in general, it relies on the Petitioner's papers, even when it does not say so explicitly.  Second, as to jurisdiction, it bears noting that some of what the Respondents argue is surprising.  They seem to suggest, for example, that habeas relief is no longer available here because the Petitioner is no longer detained; he has been granted bail.  See Motion to Stay at 2–3.  But habeas relief is available to people operating under various restraints on their liberty well short of detention.  See Jones v. Cunningham, 371 U.S. 236, 240 (1963) ("History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to

But for now, note only one point.

The July 17 Opinion and Order was not a "new directive[]," as the Respondents suggest. Rather, on July 17 the Court only clarified its earlier June 11 preliminary injunction. <u>See</u> Khalil, 2025 WL 1983755, at *1 (saying this).

To see why this is so, look back for a moment --- and then consider the implications for the Court's jurisdiction.

As the Court previously explained, entry by the immigration judge of her June 20 decision was, as to the Secretary of State's determination, directly at odds with the plain language of this Court's June 11 preliminary injunction. <u>See id</u>.

But before making any final determinations, the Court sought further information as to familiar equitable factors like irreparable harm. <u>See Khalil</u>, 2025 WL 1981392, at *3-4.

This was not because the Court aimed to issue a new injunction, for which a showing of irreparable harm would be needed. Not at all. Rather, it was because the Court's view is that interpretation of a pre-existing injunction should focus on more than plain text. It should also take account of broader equitable factors. <u>See id</u>. at *3 n.5 (explaining this).

Seeking equities-related information was not a tell that the Court was considering a "new" injunction.

It was what the Court said it was: an effort to ensure that interpretation of the <u>old</u> injunction, the June 11 one, was itself grounded in equitable concerns.

The Court was "hesitat[ing]" pending receipt and review of equities-related information, <u>id</u>. at *3 --- not in order to issue a new injunction, but rather to consider whether it made

---

support the issuance of habeas corpus."); <u>accord</u> <u>Maleng</u> v. <u>Cook</u>, 490 U.S. 488, 491 (1989); <u>R</u> v. <u>Clarkson</u>, 93 Eng. Rep. 625 (K.B. 1722). And while courts have issued bail in habeas cases for well over a century, <u>see</u>, <u>e.g.</u>, <u>Mapp</u> v. <u>Reno</u>, 241 F.3d 221, 225 n.4 (2d Cir. 2001) (collecting cases), there is no suggestion in the case law that habeas courts lose their habeas jurisdiction when they grant bail.

sense to interpret the July 11 preliminary injunction against the Respondents for all its plain text was worth.[2]

Why does this matter?

Because when the July 17 Opinion and Order is properly understood --- as what it said it was, solely a clarification of the June 11 preliminary injunction --- then the Respondents' jurisdictional arguments melt away.

Whatever else might be said, see footnote 1, there can be no meaningful suggestion that the June 11 preliminary injunction

---

[2] Two points here. First, the more searching interpretive look undertaken by the Court could have benefited the Respondents --- because, as the Court noted, see Khalil, 2025 WL 1983755, at *1, their relevant actions violated the plain text of the June 11 preliminary injunction. Possibly whittling back a bit on an injunction is a long way from "expanding" it, as the Respondents repeatedly suggest. (And note that the more searching look did indeed aid the Respondents. The Court interpreted the June 11 decision in accord with the dictates of its plain text as to the immigration judge's June 20 reliance on the Secretary of State's determination. See id. But with an eye to the equities, the Court did not hold the Respondents to the just-plain-text meaning of the June 11 preliminary injunction as to the immigration judge's asylum approach. See id. at *2.) A second point. The fact that the Court's July 17 clarifying Opinion and Order was more detailed and more specific than the operative language of the June 11 preliminary injunction does not suggest that the July 17 clarification was an entirely "new" injunction. Greater detail was necessary because the Respondents did not comply with the June 11 preliminary injunction. Imagine that at Time 1 a court orders a bailed criminal defendant: "do not apply for new travel documents." And then imagine that the Court learns at Time 2 that the defendant has applied for a visa to a particular country. The visa is no passport. But should it count as a "new travel document," as the plain meaning of those words suggests? If the Court answers "yes," and issues a Time 3 injunction ("the visa counts as a travel document, and the visa must be surrendered to the United States Marshals Service") no one would think the greater detail of the Time 3 injunction somehow makes it a "new directive[]." It is an interpretation of the old injunction, packaged with an instruction to comply with it.

(as clarified on July 17) pushed beyond this Court's core habeas jurisdiction. The Petitioner was detained then.

And there can be no suggestion that Section 1252(g), which limits federal courts' involvement in immigration courts' "adjudicat[ing] [of] cases," strips away jurisdiction.

The Court's June 11 preliminary injunction was not barred by Section 1252(g) for interference with immigration judge adjudication. See Khalil, 2025 WL 1232369, at *56-58 (explaining why).

And the Court's June 11 preliminary injunction (as clarified on July 17) now requires alterations to the immigration court's June 20 "adjudicat[ion]" only because the June 11 preliminary injunction was not complied with in the first place.

A jurisdictional problem cannot be created after the fact by failing to comply with an earlier federal court order as to which there was jurisdiction. This is obvious, and the Respondents, who bear the burden here, see Landis, 299 U.S. at 255, have made no showing to the contrary.

\*     \*     \*

Second, as to irreparable injury, the Respondents press a grab bag of arguments.

But again, they do not carry their burden, for reasons well stated by the Petitioner. See Opposition Brief at 8-14. Those will not be repeated here.

Some quick points, though.

[1]

If a stay is not entered, the Respondents vaguely gesture at arguments they "may" one day be barred from making. Motion to Stay at 6. And they point in tentative fashion to litigation developments that "could raise . . . complicated [preclusion] issues." Id.

These arguments are better developed in the Respondents' brief of yesterday. See Reply Brief (ECF 363) at 4-5.

But the Petitioner plainly has the better of them. See Opposition Brief at 8-10.

And the Respondents' arguments are not remotely strong enough to carry their burden.

[2]

The Respondents also say that a stay should be granted because of the "absurd inefficiencies," Motion to Stay at 6, that would be generated if: no stay is granted; this Court's June 11 preliminary injunction is vacated; and the Respondents would then be forced to "reinstate the foreign policy ground," id., that is currently reflected in the immigration judge's June 20 decision.

But this is exaggerated.

The immigration judge's decision on the foreign policy ground is written.  Indeed, it was issued on June 20.  It is on the shelf.  If the Third Circuit undoes this Court's undoing of the immigration judge's June 20 foreign-policy-ground decision --- then reinstatement is simple.  It is no meaningful inefficiency, let alone something that veers toward the irreparable.

[3]

More generally, the Respondents repeatedly invoke the "inefficiencies" associated with the Court's June 11 preliminary injunction, as clarified by the Court's July 17 Opinion and Order, and the problems of "piecemeal" litigation and the "additional strain" that will put on "an already overburdened system."  Motion to Stay at 6-7.

But the Respondents, who have the burden, make no real factual or legal effort to show that the costs of litigating on two tracks in this case (here, and in immigration court) adds up to irreparable injury.

And more fundamentally, it is the Congress that decides where jurisdiction is allocated.  And Congress has opted for (a) leaving in place the habeas jurisdiction of the federal courts while also (b) allowing for proceedings before immigration courts.

That may cause some arguable inefficiencies.

But operating within that system is not the stuff of irreparable harm, any more than it is irreparable harm to have to follow the rules of evidence or to litigate tort cases as to which Congress has waived the federal government's sovereign immunity.

[4]

Finally, the Respondents invoke <u>Maryland</u> v. <u>King</u>, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers), for the proposition that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." <u>Id</u>. at 1303 (cleaned up).

But this is to ignore the context of the Chief Justice's words, as the Fourth Circuit has recently suggested. <u>See</u> <u>Suri</u>, 2025 WL 1806692, at *9.

In <u>King</u>, the implication of the lower-court ruling was that Maryland would not be able to use its DNA Collection Act, which allowed state officials to collect DNA from arrestees suspected of certain serious crimes. <u>See</u> 567 U.S. at 1303–04.

Here, the Court did something markedly narrower.

It did not enjoin the Respondents from generally using a statute, Section 1227(a)(4)(C). And it took no step that even suggested that the statute might not be usable across the board.

Rather, it held that, given what was within the four corners of the Secretary of State's determination in this case, Section 1227(a)(4)(C) was likely vague as applied to the Petitioner's case. <u>See</u> <u>Khalil</u> v. <u>Trump</u>, --- F.Supp.3d ---, 2025 WL 1514713, at *14 (D.N.J. May 28, 2025).

This does not disable the Respondents more generally. It only disables them, for now, in this case.

If this sort of impact --- in a single case, as to a single litigant, on a preliminary basis --- can count as irreparable injury, on the theory that it disables the government from "effectuating" a statute, <u>King</u>, 567 U.S. at 1303, then the government will be able to show irreparable injury virtually every time it loses in a lower court.

That is not the law.

\*     \*     \*

The <u>third</u> and <u>fourth</u> factors here are less important than the first two.

But the Court has closely balanced them, and they, too, show that the Respondents have not carried their burden.

8

Most fundamentally, the balance of the equities and the public interest strongly favors the Petitioner.

The Court issued a preliminary injunction, and nine days later the immigration judge issued a decision that was at odds with it.  Those are the critical facts here; in light of them, the Respondents do not have the equities on their side and the public interest does not favor their position.

If there was doubt as to the meaning of the Court's June 11 preliminary injunction, the Respondents could have sought clarification before the June 20 decision issued.  They did not do so.

Instead, they now argue that "[a]ny . . . uncertainty is directly traceable to [the] Petitioner's decision to challenge th[]e removal charges through . . . collateral proceeding[s] in [the] district court, rather than through the streamlined review process that Congress crafted by statute."  Reply Brief at 6.

But this does not work.

Parties are free to use the litigation paths that Congress has created.  One of those is a "collateral proceeding in [the] district court."  And when a district court issues a preliminary injunction, as here, it must be complied with.  The fault for non-compliance is on the party that did not comply.  Not the party that brought the case.

                          *     *     *

The application for a stay is denied.

The Respondents must comply with the directives reflected in Khalil, 2025 WL 1983755, by August 1 at 10:00am.

This added time is to afford the opportunity for appellate consideration that the Respondents have today suggested they will promptly seek.

IT IS on this 25th day of July, 2025, so **ORDERED**.

                                    _____
                                    Michael E. Farbiarz, U.S.D.J.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MAHMOUD KHALIL,

       *Petitioner*,

   v.

DONALD TRUMP et al.,

       *Respondents*.

No. 25-cv-01963 (MEF)(MAH)

<u>**OPINION and ORDER**</u>

\*    \*    \*

For the purposes of this brief Opinion and Order, the Court assumes familiarity with the facts and procedural history of this case.

\*    \*    \*

On June 11, the Court preliminarily enjoined the Respondents "from seeking to remove the Petitioner from the United States based on the Secretary of State's determination." <u>Khalil</u> v. <u>Trump</u>, 2025 WL 1649197, at *6 (D.N.J. June 11, 2025).

The Petitioner sought clarification as to how the June 11 preliminary injunction applies in certain particular circumstances. <u>See</u> Petitioner's Letter (July 1, 2025) (ECF 332).

As to that question, the parties filed letter briefs, <u>see</u> Petitioner's Letter (July 11, 2025) (ECF 347), Respondents' Letter (July 15, 2025) (ECF 349), the Court issued an Opinion and Order, <u>see</u> ECF 350, and the parties filed supplemental materials. <u>See</u> Petitioner's Brief (July 17, 2025) (ECF 352); Respondents' Brief (July 17, 2025) (ECF 353); Petitioner's Reply Brief (July 17, 2025) (ECF 354).

The Court writes briefly here to clarify in three ways the meaning of its June 11 preliminary injunction.

<center>*     *     *</center>

<u>First</u>.

Under the June 11 preliminary injunction, the Respondents must cause the immigration judge to promptly vacate or amend her June 20 decision to the extent it finds the Petitioner removable from the United States on the 8 U.S.C. § 1227(a)(4)(C) charge, which charge rests on the Secretary of State's determination.

The reason for this is straightforward.

In accord with the June 11 preliminary injunction, the June 20 decision simply should not have included any finding that the Petitioner can be removed from the United States on the Section 1227 charge.

At bottom, the core purpose of such a finding is to advance the process of removing the Petitioner from the United States on the referenced charge.

And there is no meaningful real-world difference between that and what the June 11 preliminary injunction explicitly forbade. <u>See</u> <u>Khalil</u>, 2025 WL 1649197, at *6 ("Respondents are preliminarily enjoined from seeking to remove the Petitioner from the United States based on the Secretary of State's determination.").

In short: issuance of the Section 1227 finding was directly inconsistent with the June 11 preliminary injunction.[1]

---

[1]  In recent weeks, the Respondents have apparently contended that the Court's June 11 preliminary injunction was forward-looking only, and that it therefore does not require any backward-looking undoing of actions already taken.  <u>See</u> Respondents' Letter (July 15, 2025) at 3.  The Respondents do not seem to make that argument now.  <u>See</u> Respondents' Brief (July 17, 2025).  But one way or another, the argument misses the mark.  The June 20 immigration court finding came down <u>after</u> this Court's June 11 preliminary injunction.  It should not have been made.  The Court, today, needs to take a backward-looking action --- to reach back and compel the June 20 decision to be vacated or amended --- because the June 11 preliminary injunction was not properly complied with.  That has nothing to do with whether the June 11 preliminary injunction did or did not include a backward-looking aspect; as of June 11, the June

And the underlying equities here, see ECF 350 at 3-4, make clear that the June 11 preliminary injunction should be interpreted and applied as written.

The Petitioner has filed a declaration that sets out harms he continues to face because of the Secretary of State's determination and the Respondents' efforts to remove him on that basis --- even after this Court's June 11 preliminary injunction. See Declaration of Mahmoud Khalil (July 16, 2025) (ECF 352-2) ¶¶ 3-9, 12.

The Respondents have not contested the Petitioner's declaration. And the immigration judge, before whom the Petitioner testified in person, described him as "credible." In the Matter of Mahmoud Khalil (June 20, 2025) (ECF 333) at 17.

Against this backdrop, the Court generally credits the Petitioner's declaration and finds as a factual matter that the continued post-June 11 efforts to remove him from the United States on the Section 1227 charge are causing various types of harm. Reputational harm. See Declaration of Mahmoud Khalil ¶¶ 3, 7. Professional harm. See id. And the chilling of speech. See id. ¶¶ 5-6.

These can count as irreparable injury, see Khalil, 2025 WL 1649197, at *2-5, and the Court finds as a factual matter that they do here.

Moreover, the Petitioner persuasively argues that if the Section 1227 finding remains in the immigration judge's June 20 decision, the Board of Immigration Appeals would simply have no choice under existing case law but to affirm it. See Khalil v. Joyce, 2025 WL 1232369, at *41-42 (D.N.J. Apr. 29, 2025); Petitioner's Brief (July 17, 2025) at 4 (citing declarations).

And once the Board decides the Petitioner's appeal, he will be subject to a final order of removal, losing his status as a lawful permanent resident and therefore his ability to work. See Petitioner's Brief (July 17, 2025) at 4 (citing declarations). The Respondents have disputed none of this, and the Court credits it.

---

20 decision had of course not yet been issued. Even if the June 11 preliminary injunction had only prospective effect, the June 20 decision should not have included the Section 1227 removal finding.

Bottom line: the June 20 decision must be vacated or amended, to the extent stated above.

*       *       *

Second.

Under the June 11 preliminary injunction, the Respondents do not need to cause the immigration judge to revisit the determination she made in the June 20 decision as to the Petitioner's eligibility for asylum under 8 U.S.C. § 1158.

The immigration judge conducted an extensive and close written analysis of the asylum issue, spanning six single-spaced pages and based on live testimony.  See In the Matter of Mahmoud Khalil at 14-16, 21-26.

In light of this, the immigration judge concluded that the Petitioner is not eligible for asylum --- for reasons that she explicitly stated are not based on the Secretary of State's determination.  See id. at 21.

That conclusion is independent of the Secretary of State's determination.  Therefore, it is not at odds with the Court's June 11 preliminary injunction, which ordered relief only as to the determination.[2]

_____

[2]  The Petitioner takes a different view.  He notes that asylum was also denied by the immigration judge on another ground, the Secretary's determination.  See Petitioner's Letter (July 11, 2025) at 1, 3 (citing In the Matter of Mahmoud Khalil at 20-21).  And the Petitioner argues that if that other ground is left in place, then the Board of Immigration Appeals might affirm the June 20 decision on that ground --- and ignore the immigration judge's independent, factual asylum analysis.  See Petitioner's Letter (July 11, 2025) at 3.  If the Board of Immigration Appeals opts to one day go down that road, the Petitioner can then seek relief from this Court.  But the Board of Immigration Appeals deserves this Court's respect.  And this Court will not proceed on the assumption that the Board will at some point take a step that would (a) be in some tension with this Court's June 11 preliminary injunction and (b) not engage with the extensive and independent asylum analysis undertaken by the immigration judge.  More generally, the Respondents are right to note that federal immigration law aims to preserve a wide swath of Executive Branch discretion and autonomy.  See Respondents'

*     *     *

Third.

Under the June 11 preliminary injunction, the Respondents must cause the immigration judge to consider in an appropriately full and thorough manner, and then determine: (i) whether the Petitioner should be granted a waiver of removability, see 8 U.S.C. § 1227(a)(1)(H), in connection with the charge lodged against him as to his alleged failure to accurately complete his lawful permanent resident application ("LPR Charge"), and (ii) whether the Petitioner should be afforded an evidentiary hearing in connection with the immigration judge's assessment of his waiver-of-removability arguments.

The Respondents must ensure that, in doing the things set out in the preceding paragraph, the immigration judge gives no consideration to the Secretary of State's determination that the Petitioner is removable from the United States under 8 U.S.C. § 1227(a)(4)(C).

The basis for the above is again straightforward.

The June 11 preliminary injunction prohibited removal of the Petitioner from the United States "based on the Secretary of State's determination."

As the Court has noted, the June 11 preliminary injunction "is not qualified."  ECF 350 at 2.  "It covers all efforts," including "[t]hose that as a practical matter meaningfully rely on the Secretary's determination."  Id.

The Court finds as a factual matter that the Respondents' efforts to remove the Petitioner from the United States on the LPR Charge "meaningfully rely on the Secretary's determination."

---

Brief (July 17, 2025) at 3.  And the Respondents are also right to note that district courts such as this do not have appellate jurisdiction over the Executive's immigration tribunals.  See Respondents' Letter (July 15, 2025) at 1-3.  All of that weighs against this Court becoming more involved in the functioning of the immigration courts than is strictly necessary --- and against requiring that the asylum part of the June 20 decision now be undone, based on a speculation as to how the Board of Immigration Appeals might one day proceed.

The Petitioner has filed multiple factual declarations on this
point.[3]  Each is based on extensive experience,[4] and none has
been contested by the Respondents.  The Court generally credits
these declarations.

As a factual matter, the declarations establish the following:

- As to the LPR Charge, Section 1227(a)(1)(H) permits a
  waiver of removability for someone who "is the spouse [and]
  parent . . . of a citizen of the United States."  See Doyle
  Declaration ¶¶ 19-20; Tolchin Declaration ¶ 6; Kurzban
  Declaration ¶ 15.  The Petitioner fits into this category.
  See Declaration of Mahmoud Khalil ¶ 7.

- A request for a Section 1227(a)(1)(H) waiver is typically
  made by requesting an evidentiary hearing before an
  immigration judge.  See Doyle Declaration ¶ 23; Tolchin
  Declaration ¶ 8; Kurzban Declaration ¶ 16.

- That request was repeatedly made here, see Declaration of
  Marc Van Der Hout (ECF 352-1) ¶¶ 6, 7-8, but it was denied,
  see id. ¶¶ 9-16, and the immigration judge issued her
  decision on the LPR Charge without assessing the
  Petitioner's eligibility for a Section 1227(a)(1)(H)
  waiver.  See id. ¶ 14; see generally In the Matter of
  Mahmoud Khalil.

- But evidentiary hearings are typically granted to those
  who, like the Petitioner, are statutorily eligible for a
  Section 1227(a)(1)(H) waiver.  See Tolchin Declaration ¶ 13
  ("[U]nder normal circumstances, where a noncitizen . . .
  meet[s] the eligibility criteria [of
  Section 1227(a)(1)(H)], and has stated their intention to
  pursue a § 1227(a)(1)(H) waiver, an evidentiary hearing
  must be scheduled[.]"); Kurzban Declaration ¶ 20 ("An

---

[3]  The relevant ones are the declarations of Kerry E. Doyle,
Stacy Tolchin, and Ira J. Kurzban.  See Declaration of Kerry E.
Doyle ("Doyle Declaration") (ECF 352-3); Declaration of Stacy
Tolchin ("Tolchin Declaration") (ECF 352-4); Declaration of Ira
J. Kurzban ("Kurzban Declaration") (ECF 352-5).

[4]  See Doyle Declaration ¶¶ 2-4; Tolchin Declaration ¶ 1; Kurzban
Declaration ¶¶ 1-6; see generally Khalil, 2025 WL 1649197, at *5
(describing these declarants as having "extensive professional
experience").

Immigration Judge's refusal to hold an evidentiary hearing on a waiver for an individual who is statutorily eligible for the waiver is highly unusual and is contrary to the normal conduct of immigration court procedure.").

- This strongly suggests that the Secretary of State's determination is operating as the hurdle that is preventing an evidentiary hearing, and therefore the possibility of a waiver.

- And that suggestion is buttressed by the way that the proceedings have unfolded before the immigration judge. See Declaration of Marc Van Der Hout ¶¶ 14–15.

- Not considering a Section 1227(a)(1)(H) waiver on the LPR Charge is no academic matter.  The Court finds as a factual matter that not considering a waiver increases by a meaningful margin the likelihood that the Petitioner will ultimately be removed from the United States on the LPR Charge.  The next three bullet points explain why.

- Per Kerry E. Doyle: "In the normal course, as the spouse of a U.S. Citizen, and the father of a U.S. citizen child, without any criminal history, or other history of immigration violations, [the Petitioner] would be an excellent candidate for the 1227(a)(1)(H) waiver."  Doyle Declaration ¶ 29.  And more generally, "most lawful permanent residents with a U.S. citizen spouse and/or child, who were not otherwise inadmissible at time of adjustment to lawful permanent resident status will be granted the waiver, particularly for such a minor type of alleged fraud."  Id.

- Per Stacey Tolchin: "[I]f the sole charge of removal against a noncitizen were under 8 U.S.C. § 1227(a)(1)(A), due to what is perceived as fraud and/or misrepresentation at the time that they adjusted their status, the likelihood of obtaining a waiver under § 1227(a)(1)(H) would be high where the noncitizen has close relationships to U.S. citizen and/or lawful permanent resident family members and they lack any criminal history."  Tolchin Declaration ¶ 15. In her judgment, the "Petitioner easily would have [been] granted that waiver given his relationship to his U.S.

citizen wife and minor U.S. citizen son, as well as his lack of criminal history."  <u>Id</u>. ¶ 16.

- Per Ira J. Kurzban: "[W]aivers pursuant [to] 8 U.S.C. § 1227(a)(1)(H) are regularly granted to LPRs who satisfy the statutory requirements for such relief."  Kurzban Declaration ¶ 22.

In short: the Court finds as a factual matter that the Secretary of State's determination is the likely reason that the Section 1227(a)(1)(H) waiver has not been ruled on --- and that not ruling on the waiver meaningfully raises the odds that the Petitioner will be removed from the United States.

This means that non-consideration of a Section 1227(a)(1)(H) waiver on the LPR Charge amounts to what the Court enjoined on June 11: "seek[ing] to remove the Petitioner from the United States based on the Secretary of State's determination."  <u>Khalil</u>, 2025 WL 1649197, at *6.

                    *     *     *

A final point.

Complying with what is set out above may take some time.

And the Petitioner has persuasively established that he aims to appeal from the immigration judge's June 20 decision and must do so shortly --- and that when he does, the immigration judge will lose jurisdiction over the case and would, at that point, not be able to vacate or amend the June 20 decision or to work through the waiver-of-removability issue described above.  <u>See</u> Petitioner's Brief (July 17, 2025) at 4 (citing Tolchin Declaration ¶ 17); <u>Puc-Ruiz</u> v. <u>Holder</u>, 629 F.3d 771, 782 (8th Cir. 2010).

That would undermine the preliminary injunctive relief ordered by the Court on June 11, as clarified today.

The Court has power to ensure that its injunctive decrees are effective as a practical matter.  <u>See</u> <u>Nken</u> v. <u>Holder</u>, 556 U.S. 418, 428 (2009); <u>Swann</u> v. <u>Charlotte-Mecklenburg Bd. of Ed.</u>, 402 U.S. 1, 15-16 (1971); <u>McComb</u> v. <u>Jack. Paper Co.</u>, 336 U.S. 187, 193 (1949).

Therefore, the Court orders:

If it appears (as seems overwhelmingly likely) that each of the steps set out in this Opinion and Order cannot be appropriately and thoughtfully completed before the close of business on July 18, then the Respondents shall promptly cause the immigration judge to take all appropriate steps on July 18 that would be required to ensure that she would not be divested of her jurisdiction over this case if a notice of appeal from her June 20 decision were filed by the Petitioner on July 19, July 20, or July 21.

These "appropriate steps" might potentially include the immigration judge timely reopening the case and vacating her June 20 decision.[5]

---

[5] In its filings of July 15 and July 17, the Respondents repeatedly suggest that the Court is "expand[ing]" its June 11 preliminary injunction. See Respondents' Letter (July 15, 2025) at 2; Respondents' Brief (July 17, 2025) at 3. This is not accurate. As the Court's July 16 Opinion and Order made clear, the plain language of the June 11 preliminary injunction generally favors the Petitioner's positions. See ECF 350 at 1-2. For example, the language of the June 11 preliminary injunction clearly supports vacating or amending the June 20 decision to eliminate its Section 1227 finding --- because, in light of the language of the June 11 preliminary injunction, that finding simply should not have been made. But injunctions should be interpreted and applied with an eye to the underlying equities, and not just to their text. See ECF 350 at 2. And Article III courts should avoid involvement in the important work of immigration tribunals unless doing so is strictly necessary. Given this backdrop, the Court did not simply rest on the plain language of the June 11 preliminary injunction. Rather, it sought factual evidence before landing on a final conclusion. See ECF 350 at 5-6 & 6 n.7. That evidence has now been submitted, and it includes uncontested evidence as to injuries to the Petitioner that flow from the June 20 finding as to Section 1227(a)(4)(C)(i). See Declaration of Mahmoud Khalil ¶¶ 4-9. That evidence does not serve as a basis for "expanding" the June 11 preliminary injunction. It simply helps to show why the equities favor applying the June 11 preliminary injunction as it was written. And doing that means that the June 20 decision must be vacated or amended. As to the immigration judge's non-consideration of a Section 1227(a)(1)(H) waiver, the

*    *    *

IT IS on this 17th day of July, 2025, so **ORDERED**.

_____

Michael E. Farbiarz, U.S.D.J.

---

point is a bit different.  The uncontested factual evidence that
has now been put before the Court makes clear that, but for the
Secretary's determination, a waiver application on the LPR
Charge would normally have been taken up and resolved --- and
that if it was, that might well favor a person situated like the
Petitioner.  That uncontested factual evidence does not serve as
a basis for "expanding" the June 11 preliminary injunction.
Rather, it shows that the June 11 injunction, as it was written,
compels consideration of the waiver possibility.  After all,
given the facts here, there is no real-world difference between
(a) seeking to remove the Petitioner on the LPR Charge, with the
Secretary's determination operating as the impediment to a
possible waiver of removal and (b) what the June 11 preliminary
injunction explicitly forbids --- "seeking to remove the
Petitioner from the United States based on the Secretary of
State's determination."