# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Mahmoud Khalil,

*Petitioner–Appellee,*

v.

Donald J. Trump, in his official capacity as President of the United States, et al.,

*Respondents–Appellants.*

On appeal from the United States District Court for the
District of New Jersey — No. 2:25-CV-01963 (MEF)

## BRIEF OF *AMICUS CURIAE* THE KNIGHT FIRST AMENDMENT INSTITUTE AT COLUMBIA UNIVERSITY IN SUPPORT OF PETITIONER–APPELLEE

Xiangnong Wang
Ramya Krishnan
Stephany Kim
Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
george.wang@knightcolumbia.org

**Corporate Disclosure Statement**

Pursuant to Federal Rule of Appellate Procedure 26.1, undersigned counsel certifies that *amicus curiae* the Knight First Amendment Institute has no parent corporation and that no publicly held corporation owns 10 percent or more of its stock.

<u>/s/ Xiangnong Wang</u>
Xiangnong Wang

# Table of Contents

Corporate Disclosure Statement ................................................................i

Table of Authorities ........................................................................iv

Interest of Amicus Curiae .................................................................1

Introduction ..................................................................................1

I.     The Fifth Amendment's vagueness doctrine protects individuals from arbitrary and standardless deprivations of their liberty interests. ..................................................................................3

II.    Mr. Khalil was targeted as part of a broader ideological deportation policy whose features compound the due process concerns identified by the district court. ...................................................5

    A.    The government targeted Mr. Khalil pursuant to its policy of arresting, detaining, and deporting pro-Palestinian protesters. ..........................................................................5

         1.    The President and senior officials have made clear through their public statements that the government has an ideological deportation policy. ..................................5

         2.    DHS and the State Department have implemented the policy. ..................................................................8

         3.    Mr. Khalil was targeted under the policy. ..........................17

    B.    The government's implementation of the ideological deportation policy compounds the concerns with fair notice and arbitrary and discriminatory enforcement that underlie the district court's decision. ..........................................19

         1.    DHS focused its investigative efforts on leads sourced from unreliable third-party websites. ..................20

         2.    DHS referred student protesters to the State Department based on unvetted allegations that their

activities were antisemitic, supported terrorism, or otherwise compromised U.S. foreign policy interests.........22

3. State Department officials were not bound by any explicit standards when determining whether student protesters' activities would have adverse foreign policy consequences for the United States. ........................25

4. That the policy represents a significant change in the government's practice further supports the district court's conclusion. ............................................................27

Conclusion.....................................................................................28

Combined Certificate of Compliance......................................................30

Certificate of Service.........................................................................31

## Table of Authorities

### Cases

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ....................................................................4

*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012) ........................3, 4, 27

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................................3, 4

*Kolender v. Lawson*, 461 U.S. 352 (1983) ............................................................26

*NEA v. Finley*, 524 U.S. 569 (1998) .....................................................................26

*Sessions v. Dimaya*, 584 U.S. 148 (2018) ...............................................................4

*Smith v. Goguen*, 415 U.S. 566 (1974) ..............................................................4, 26

*United States v. Williams*, 553 U.S. 285 (2008) .....................................................4

### Statutes

8 U.S.C. § 1182 .........................................................................................................2

8 U.S.C. § 1227 .........................................................................................................2

### Other Authorities

Anti-Defamation League, *Betar USA*, https://perma.cc/VW5F-ZV5X .................11

Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025,
   1:05 PM), https://perma.cc/Z5PU-7MZT ...........................................................6

Homeland Security (@DHSgov), X (Mar. 9, 2025, 9:29 PM),
   https://perma.cc/3NNQ-235L..............................................................................6

Marco Rubio (@marcorubio), X (Mar. 9, 2025, 6:10 PM),
   https://perma.cc/Q7EH-M4LW............................................................................6

Michel Martin & Destinee Adams, *DHS official defends Mahmoud
   Khalil arrest, but offers few details on why it happened*, NPR (Mar.
   13, 2025), https://perma.cc/Q45C-6B9A .........................................................6, 7

*Our Mission*, Canary Mission, https://perma.cc/KT5V-PYSE (captured Sep. 15, 2025) ...................................................................10

Secretary Marco Rubio (@SecRubio), X (Mar. 6, 2025, 5:30 PM), https://perma.cc/KD9R-BNV3....................................................6

Secretary of State Marco Rubio Remarks to the Press, U.S. Dep't of State (Mar. 28, 2025), https://perma.cc/5YPB-GBGX .......................................7

Transcript, AAUP v. Rubio, Day 3, Vol. 1, https://perma.cc/9AB5-UDPH ...........................................................................9, 21, 27, 28

Transcript, AAUP v. Rubio, Day 3, Vol. 2, https://perma.cc/ML8M-YCFL................................................................................passim

Transcript, AAUP v. Rubio, Day 4, Vol. 1, https://perma.cc/HRD8-BXA8 ...............................................................................passim

Transcript, AAUP v. Rubio, Day 4, Vol. 2, https://perma.cc/E4K5-KMRB .............................................................................10, 11, 21

Transcript, AAUP v. Rubio, Day 5, Vol. 2, https://perma.cc/S5RT-KM3X .............................................................................14, 16, 18

Transcript, AAUP v. Rubio, Day 7, Vol. 1, https://perma.cc/7NQX-4QS4....................................................................................16, 17

Transcript, AAUP v. Rubio, Day 7, Vol. 2, https://perma.cc/KC98-EBMN ....................................................................................19

Transcript, AAUP v. Rubio, Day 8, https://perma.cc/2ZW8-GFZR...............passim

Transcript, AAUP v. Rubio, Day 9, Vol. 1, https://perma.cc/29H7-XDLE .................................................................................passim

**Interest of Amicus Curiae**

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education. The Institute's aim is to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government. The Institute represents the plaintiffs in *American Association of University Professors* ("*AAUP*") *v. Rubio*, No. 25-CV-10685-WGY (D. Mass. 2025), a lawsuit challenging the government's policy of arresting, detaining, and deporting noncitizen students and faculty based on their lawful pro-Palestinian advocacy. During a ten-day bench trial in July, senior government officials tasked with implementing that policy offered testimony relevant to the issues presented in this appeal.[1]

**Introduction**

This case concerns whether the First and Fifth Amendments permit the government to detain and attempt to deport Mahmoud Khalil, a lawful permanent

---

[1] No counsel for a party authored this brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than *amicus curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief. The parties have consented to the filing of this amicus brief.

resident, for engaging in constitutionally protected advocacy. Mr. Khalil was detained following Secretary Rubio's determination under 8 U.S.C. § 1227(a)(4)(C) (the "foreign policy ground") that Mr. Khalil's presence or activities in the United States would have potentially serious foreign policy consequences and compromise a compelling U.S. foreign policy interest. JA311.[2] The court below held that the foreign policy ground, as applied to Mr. Khalil through this determination, is likely void for vagueness. JA299–301. As the court explained, the application of that ground here fails to give ordinary people in Mr. Khalil's position fair notice of which of their otherwise-lawful activities could result in their detention and deportation, and is so standardless as to invite arbitrary and discriminatory enforcement. JA300–01. We agree with the district court's conclusion.

We submit this brief to make two points. First, the Fifth Amendment's vagueness doctrine protects individuals from arbitrary and standardless deprivations of their liberty interests. These safeguards are especially important when First Amendment rights are at stake. Second, the government targeted Mr. Khalil as part of a broader policy whose features compound the due process concerns that were the

---

[2] Under the foreign policy ground, a noncitizen may not be deported based on "past, current, or expected beliefs, statements, or associations [that] would be lawful in the United States unless the Secretary of State personally determines that the [noncitizen]'s [presence or activities] would compromise a compelling United States foreign policy interest." 8 U.S.C. § 1182(a)(3)(C)(iii); *id.* § 1227(a)(4)(C)(ii) (incorporating this provision into the foreign policy ground for removal).

bases of the district court's decision. Recent testimony in *AAUP v. Rubio* demonstrates that government officials targeted student protesters for deportation based on unvetted third-party allegations that the students had engaged in speech that was antisemitic or pro-Hamas, and that the officials did so without any standards to guide their assessment of that speech—or U.S. foreign policy interests. The result was that officials conflated pro-Palestinian advocacy with antisemitism and support for terrorism, and that they applied the foreign policy ground to student protesters in ways that no one in Mr. Khalil's position could reasonably anticipate. This Court should affirm the decision below.

## I.     The Fifth Amendment's vagueness doctrine protects individuals from arbitrary and standardless deprivations of their liberty interests.

It is a "basic principle of due process" that a law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *see also F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (explaining that the "requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment"). As the Supreme Court has explained, vagueness doctrine is aimed at addressing "at least two connected but discrete due process concerns[.]" *Fox Television Stations*, 567 U.S. at 253. First, "regulated parties should know what is required of them so they may act accordingly." *Id.* And second, "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Id.*

Accordingly, laws must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply them." *Grayned*, 408 U.S. at 108; *see also United States v. Williams*, 553 U.S. 285, 304 (2008) (A law is impermissibly vague when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *Sessions v. Dimaya*, 584 U.S. 148, 155–56 (2018).

These concerns with fair notice and arbitrary and discriminatory enforcement are heightened when a law implicates First Amendment rights. *See Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (noting that due process concerns are "further aggravated" when dealing with vague laws whose terms "abut upon sensitive areas of basic First Amendment freedoms"). In this context, courts rigorously adhere to the Fifth Amendment's due process requirements "to ensure that ambiguity does not chill protected speech." *Fox Television Stations*, 567 U.S. 239 at 253–54; *see also Grayned*, 408 U.S. at 109. Where a law is "capable of reaching expression sheltered by the First Amendment," due process "demands a greater degree of specificity than in other contexts." *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

The decision below rested on these fundamental principles. JA300–01.

II. **Mr. Khalil was targeted as part of a broader ideological deportation policy whose features compound the due process concerns identified by the district court.**

A. **The government targeted Mr. Khalil pursuant to its policy of arresting, detaining, and deporting pro-Palestinian protesters.**

In response to two executive orders issued by President Trump shortly after he took office—E.O. 14,161 and E.O. 14,188—the Department of Homeland Security ("DHS") and the Department of State adopted a policy of arresting, detaining, and deporting students and faculty for their pro-Palestinian advocacy (the "ideological deportation policy"). Testimony from government officials in *AAUP v. Rubio* confirms the existence of this policy and that Mr. Khalil was targeted as part of it.

1. **The President and senior officials have made clear through their public statements that the government has an ideological deportation policy.**

Beginning in early March 2025, the President and senior government officials have repeatedly proclaimed their intent to arrest, detain, and deport noncitizen students and faculty based on speech they deem to be pro-Hamas or antisemitic. For instance, on March 6, two days before Mr. Khalil's arrest, Secretary Rubio posted to X from his official Secretary of State account: "Those who support designated terrorist organizations, including Hamas, threaten our national security. . . . Violators of U.S. law—including international students—face visa denial or

revocation, and deportation." Secretary Marco Rubio (@SecRubio), X (Mar. 6, 2025, 5:30 PM), https://perma.cc/KD9R-BNV3. In the days following Mr. Khalil's arrest, Secretary Rubio returned to X, promising: "We will be revoking the visas and/or green cards of Hamas supporters in America so they can be deported." Marco Rubio (@marcorubio), X (Mar. 9, 2025, 6:10 PM), https://perma.cc/Q7EH-M4LW; *see also* Homeland Security (@DHSgov), X (Mar. 9, 2025, 9:29 PM), https://perma.cc/3NNQ-235L (DHS stating on its official account that Khalil was arrested for being "aligned" with Hamas). And President Trump posted to Truth Social: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. . . . We will find, apprehend, and deport these terrorist sympathizers from our country—never to return again." Donald J. Trump (@realDonaldTrump), Truth Social (Mar. 10, 2025, 1:05 PM), https://perma.cc/Z5PU-7MZT.

In their public statements about the policy, officials have routinely conflated pro-Palestinian advocacy with speech that is pro-Hamas or antisemitic. *See, e.g.*, Michel Martin & Destinee Adams, *DHS official defends Mahmoud Khalil arrest, but offers few details on why it happened*, NPR (Mar. 13, 2025), https://perma.cc/Q45C-6B9A (Deputy Secretary of Homeland Security Troy Edgar: "[Khalil] is somebody that we've invited and allowed . . . to come into the country, and he's put himself in

the middle of the process of basically pro-Palestinian activity."); *see also* Secretary of State Marco Rubio Remarks to the Press, U.S. Dep't of State (Mar. 28, 2025), https://perma.cc/5YPB-GBGX (Secretary Rubio acknowledging that most of the administration's hundreds of visa revocations to date have "related to pro-Palestinian protests"). And they have made clear that their policy is about speech—not about antisemitic violence or conduct. When Deputy Secretary Edgar was asked whether any criticism of Israel or the U.S. could lead to deportation, he said: "Let me put it this way, . . . imagine if he came in and filled out the form and said, 'I want a student visa.' They asked him, 'What are you going to do here?' And he says, 'I'm going to go and protest.' We would have never let him into the country." *See* Martin & Adams.

Testimony from *AAUP* confirms that DHS and State Department personnel treat these public pronouncements as policy. For instance, John Armstrong, the seniormost official in the State Department's Bureau of Consular Affairs and one of key individuals involved in implementing the policy, explained that he views Secretary Rubio's public statements about U.S. foreign policy interests and goals, about antisemitism, and about the Executive Orders 14,161 and 14,188, as guidance that the Bureau must follow; and that some of the Secretary's public statements have been formally incorporated into agency guidance. Armstrong testified that his understanding that the foreign policy of the U.S. is to "be strongly against

antisemitism" is drawn directly from Secretary Rubio's public statements. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 21:2–8, https://perma.cc/29H7-XDLE. He likewise understands that it is Secretary Rubio's position, and thus the position of the State Department, to oppose antisemitism on "college campuses," as well as in the rest of the United States. *Id.* 22:20–23:3. And Armstrong views U.S. foreign policy, based on Secretary Rubio's public statements, as diametrically opposed to "anyone organizing antisemitic activity in the United States," including student protesters. *Id.* 21:21–22:5. Armstrong, like the officials discussed above, routinely conflated pro-Palestinian and anti-war advocacy with antisemitism. *See infra* pp. 14–15. He acknowledged that Secretary Rubio's public statements about the policy have even been formally incorporated into official State Department guidance. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 23:7–18 (explaining that he has "cleared" diplomatic cables relating to the policy that quote from the Secretary's public statements).

### 2. DHS and the State Department have implemented the policy.

The existence of the ideological deportation policy is also evidenced by its implementation. In broad strokes, the policy has three components. First, DHS launched an operation to identify students engaged in pro-Palestinian advocacy—an operation that involved receiving lists of potential targets that came almost entirely from third-party groups dedicated to identifying and blacklisting individuals they deem to be anti-American, anti-Israel, or antisemitic. A team within DHS rapidly

converted these lists into reports that repeated unvetted allegations that the targeted individuals espoused antisemitism or support for terrorism. Second, DHS and the State Department developed a new referral process to compile information on the targeted individuals and fast-track them for deportation. This process involved only a cursory review of the reports generated by DHS, and the presentation of unverified third-party allegations as fact. Third, once the State Department authorized the removal of the targeted individuals, DHS quickly arrested them in ways that were intended to intimidate.

Government officials testifying in *AAUP* detailed how DHS and the State Department implemented each step of this policy. Peter Hatch, a senior official within DHS's Homeland Security Investigations ("HSI") and the head of its Office of Intelligence, explained that, beginning in early March 2025, he was directed by senior HSI leadership to launch a new operation to identify student protesters for potential referral to the State Department. Transcript, AAUP v. Rubio, Day 3, Vol. 1, 71:15–17, 72:17–19, https://perma.cc/9AB5-UDPH. As part of this operation, the Office of Intelligence was directed to prepare "reports of analysis" on those students. *Id.* 74:12–17. This effort was not limited to students suspected of having committed a crime or of having engaged in non-speech-related activity that would render them inadmissible or removable; rather, the focus was on students who had engaged in

protests. Transcript, AAUP v. Rubio, Day 4, Vol. 2, 110:15–111:15, https://perma.cc/E4K5-KMRB.

Hatch revealed that HSI leadership directed the Office of Intelligence to review a list of over 5,000 people sourced from the website of Canary Mission—an organization which publishes blacklists of people it deems to be anti-American, anti-Israel, or antisemitic—to identify noncitizen student protesters on which to prepare reports. Transcript, AAUP v. Rubio, Day 3, Vol. 2, 110:14–25, https://perma.cc/ML8M-YCFL; *see also* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 17:15–19:4, https://perma.cc/HRD8-BXA8.[3] To manage the volume of leads, the Office of Intelligence formed a specialized "Tiger Team" to quickly prepare reports on those individuals. Transcript, AAUP v. Rubio, Day 4, Vol. 2, 87:15–17; *see also* Transcript, AAUP v. Rubio, Day 3, Vol. 2, 96:21–97:7, 111:2–18. Hatch estimated that at least 75% of the names the Tiger Team received came from Canary Mission. Transcript, AAUP v. Rubio, Day 4, Vol. 1, 15:10–13.

Although the majority of leads came from Canary Mission, HSI's "top leadership" also provided the team with other lists of protesters on a rolling basis. Transcript, AAUP v. Rubio, Day 4, Vol. 2, 78:7–79:25, 80:25–81:5. This included

---

[3] Canary Mission's website states that the organization "documents individuals and organizations that promote hatred of the USA, Israel, and Jews on North American college campuses and beyond." *Our Mission*, Canary Mission, https://perma.cc/KT5V-PYSE (captured Sep. 15, 2025).

names that came from Betar U.S., *see* Transcript, AAUP v. Rubio, Day 3, Vol. 2, 118:12–18, an organization that the Anti-Defamation League includes in its database of "groups that subscribe to and/or promote extremist or hateful ideologies" and describes as "openly embrac[ing] Islamophobia and harass[ing] Muslims." Anti-Defamation League, *Betar USA*, https://perma.cc/VW5F-ZV5X.

According to Hatch, the Tiger Team produced reports on at least 200 individuals, *see* Transcript, AAUP v. Rubio, Day 4, Vol. 2, 83:22–84:1, including Mr. Khalil, *see* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 46:19–47:5. The reports documented and focused on targeted individuals' pro-Palestinian advocacy. *See* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 39:16–18; Transcript, AAUP v. Rubio, Day 4, Vol. 2*,* 84:2–85:16, 86:17–87:3. And they included unverified allegations from third-parties that this activity was antisemitic, pro-Hamas, or anti-Israel—allegations that the Office of Intelligence did not independently corroborate. *See* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 22:3–11, 23:16–24:13 (Hatch explaining that the office's role was to gather information, not make determinations as to whether a protester's documented activity was in fact antisemitic or supportive of terrorism). Several reports, including the one for Mr. Khalil, included links to the subject's Canary Mission profile. *See id.* 48:23–50:14. Once completed, these reports were sent to HSI's National Security Division. Transcript, AAUP v. Rubio, Day 3, Vol. 2, 98:17–99:3.

Andre Watson, the seniormost official in the National Security Division, described the new referral process developed to compile information on student protesters and fast-track them for deportation. Under this new process, Watson reviewed the reports of analysis prepared by the Office of Intelligence and assessed whether to refer the individuals discussed in those reports to the State Department for potential action. *See* Transcript, AAUP v. Rubio, Day 8, 48:5–15; 49:19–51:7, https://perma.cc/2ZW8-GFZR. If Watson approved a referral, he signed a preprepared letter and forwarded the report of analysis to John Armstrong, the head of the State Department's Bureau of Consular Affairs. *Id.* 50:19–51:17, 74:3–8.

Watson's referral letters purported to provide a summary of actions by the identified protester "that violate President Trump's Executive Orders on antisemiti[sm]," Transcript, AAUP v. Rubio, Day 8, 81:23–82:9, 83:11–14, and they sought decisions from the State Department to revoke those protesters' visas or determine them removable, *see id.* 74:11–75:6. In some cases, the letters expressly sought the Secretary of State's assessment of whether the subjects' activities in the U.S. would compromise a compelling foreign policy interest or may have serious adverse foreign policy consequences. *Id.* 74:23–75:2, 84:12–23. At least some of those letters suggested that the subjects' actions "may be sufficient" for the Secretary to make such a determination under the foreign policy ground. *Id.* 84:12–23.

In determining whether to approve a referral, Watson relied only on the information contained in the Office of Intelligence's reports of analysis. Transcript, AAUP v. Rubio, Day 8, 77:19–25. And his review of the reports was cursory. Watson explained that he reviewed reports of analysis only to determine that they were "complete"—that is, to make sure that the reports contained what they purported to contain and that they were readable. *Id.* 78:1–15. He did not review the reports to determine whether the activities they described were in fact antisemitic or had adverse foreign policy consequences for the U.S. *Id.* 81:16–82:5, 84:5–85:3. Rather, the referral letters adopted the unverified third-party claims contained in the reports and presented them as fact. *See id.* 84:5–86:5. Watson testified that he approved *every* referral he received through this process. *Id.* 78:16–19.

Once a referral was transmitted to the State Department, officials in the Bureau of Consular Affairs reviewed the referral and decided whether to revoke a protester's visa or find them removable. John Armstrong, the seniormost official in the Bureau, testified that he and others reviewed protesters' activities for antisemitism or "support" for terrorism as part of the agency's efforts to implement the relevant executive orders. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 24:20–25:23, 32:3–20. These assessments were based on the information provided through Watson's referral letters. Transcript, AAUP v. Rubio, Day 8, 49:16–51:1 (Watson

testimony); Transcript, AAUP v. Rubio, Day 5, Vol. 2, 88:14–89:13, https://perma.cc/S5RT-KM3X (Armstrong testimony).

In making these evaluations, Armstrong regularly conflated pro-Palestinian advocacy with antisemitism and support for terrorism. Armstrong testified that his office had not received guidance on what kind of protest activity could constitute antisemitism or support for terrorism, or would otherwise compromise U.S. foreign policy. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 25:15–26:24. As a result, when reviewing referrals, he applied his own personal understanding of the relevant executive orders, U.S. foreign policy, support for terrorism, and antisemitism. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 35:17–36:9. For instance, under Armstrong's interpretation, antisemitism is "unjustified views, biases, or prejudices, or actions against Jewish people, or Israel, that are the result of hatred towards them." *Id.* 28:9–12. He believes that "views" contrary to Israel are necessarily antisemitic, and that it is not possible for a person to be "just against Israel" and "not against Jews," calling that distinction "a farcical argument" and "just a dodge." *Id.* 28:14–23.

Based on his personal understanding, Armstrong interpreted a wide range of statements expressing criticism of Israel or support for Palestinians as a potential ground for deportation, including under the foreign policy ground. For example, Armstrong testified at trial that in his view:

- The phrase "[f]rom the river to the sea, Palestine will be free," could lead to deportation because it "call[s] for genocide of all Israelis, because there's no space for Israelis in that 'river to the sea.'" Transcript, AAUP v. Rubio, Day 9, Vol. 1, 34:2–8.

- A statement denouncing Zionism is antisemitic and a potential ground for deportation because Zionism is "Jewish patriotism or Israeli patriotism." *Id.* 34:9–12.

- A statement criticizing Israel's actions in Gaza could be a ground of deportation, depending on the statement. For example, a statement describing Israel's actions as "worse than the Nazis" could render a noncitizen deportable. *Id.* 34:13–23.

- A statement calling for limiting military aid to Israel or for an arms embargo on Israel could be a ground for deportation. *Id.* 34:24–35:7.

- A statement calling Israel an "apartheid state" could be a ground for deportation. *Id.* 35:13–16.

Armstrong applied this interpretation, which he described as the "common understanding in our culture in our society of what antisemitism is," in his decision-making concerning the referrals from DHS. *Id.* 28:2–4, 36:1–9.

For referrals involving lawful permanent residents like Mr. Khalil, Armstrong prepared an "action memo" for Secretary Rubio proposing that the Secretary

determine them removable. These action memos attached Watson's referral letter, the report of analysis prepared by the Office of Intelligence, and a proposed letter to DHS notifying it of the State Department's decision. *See, e.g.*, Transcript, AAUP v. Rubio, Day 9, Vol. 1, 47:1–7 (describing the action memo on Mr. Khalil). Armstrong testified that he sent approximately 15 to 20 action memos concerning "student protests, protesters, and concerns about antisemitism" to Secretary Rubio, Transcript, AAUP v. Rubio, Day 5, Vol. 2, 119:4–12, and that "almost all" were approved, *id.* 119:13–19.

Once the State Department determined that a protester was removable, DHS acted quickly to arrest and detain that individual, often in ways designed to intimidate. Usually, when the State Department revokes a person's visa or determines them to be removable, DHS can, but it need not, arrest the person. Transcript, AAUP v. Rubio, Day 8, 102:14–103:23 (Watson testimony). The ideological deportation policy, however, called for targeted protesters to be arrested, unless they had already left the United States. *Id.* 53:10–54:6. The circumstances of several of the arrests effectuated under the policy were objectively frightening. In some cases, DHS did not inform individuals of the State Department's decision to revoke their visas or to find them removable before their arrests. *See, e.g.*, Transcript, AAUP v. Rubio, Day 7, Vol. 1, 76:24–77:5, https://perma.cc/7NQX-4QS4 (describing Rumeysa Öztürk's arrest). And, even those not suspected of having

committed a crime were met with a show of force. *See, e.g.*, *id.* 16:15–18 (testifying that there were ten to fifteen agents involved in Mohsen Mahdawi's arrest). Many of the arresting agents wore masks. *See, e.g.*, *id.* 49:18–20 (describing Ms. Öztürk's arrest). DHS also sought to quickly transfer several noncitizens from their communities in the Northeast to a distant detention facility in Louisiana. *See, e.g.*, Appellee's Br. 6 (describing Mr. Khalil's transfer); Transcript, AAUP v. Rubio, Day 7, Vol. 1, 30:15–31:1, 33:14–34:3 (describing Mr. Mahdawi's attempted transfer).

### 3. Mr. Khalil was targeted under the policy.

The determination Secretary Rubio made in Mr. Khalil's case (the "Rubio Determination") arose out of the ideological deportation policy described above. Hatch, the head of HSI's Office of Intelligence, testified that his office created a report of analysis about Mr. Khalil. Transcript, AAUP v. Rubio, Day 4, Vol. 1, 46:19–47:5. The report included a link to Canary Mission's profile of Khalil. *Id.* 48:23–50:14. It also included articles from other third-party sources, including the *New York Post*. *Id.* 50:2–6. Hatch acknowledged that the only articles included in the report of analysis on Mr. Khalil were those "that relate to protests of Israel and Palestine, and not any other topic." *Id.* 50:22–51:1.

Watson, who leads HSI's National Security Division, recalled signing and sending the letter referring Mr. Khalil to the State Department. Transcript, AAUP v. Rubio, Day 8, 79:21–23; *see also id.* 75:13–14. And he confirmed that the Rubio

Determination resulted from the referral he made. *Id.* 75:7–25. Watson's referral letter attached the report of analysis on Mr. Khalil, *see id.* 82:18, and purported to "provide a summary of the actions by Mahmoud Khalil that violate President Trump's Executive Orders on antisemiti[sm]," *id.* 81:23–82:9, 83:11–14. Consistent with his typical process under the process, Watson relied only on the report of analysis in preparing the referral, and reviewed that report only for completeness. *Id.* 77:19–25, 78:1–15. Watson's letter asserted, among other things, that Mr. Khalil was a key figure "in the March 6, 2025, protest at [Barnard] College." *Id.* 88:18–89:5. And it suggested that his actions "may be sufficient" for the Secretary of State to determine that there are compelling adverse foreign policy consequences for the United States from his presence or activities. *Id.* 84:12–23.

Senior State Department official Armstrong testified that he personally reviewed the referral for Mr. Khalil. Transcript, AAUP v. Rubio, Day 5, Vol. 2, 127:4–22. And just one day after receiving Watson's referral letter, Armstrong approved an action memo recommending that Secretary Rubio determine Mr. Khalil to be removable under the foreign policy ground. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 47:1–7. Secretary Rubio approved Armstrong's recommendation and issued the Rubio Determination. *See* JA311–12. The Rubio Determination specifically invokes the foreign policy ground. JA311. And it explains that the Secretary's determinations were "based on information provided by [HSI]"

regarding Mr. Khalil's participation in "antisemitic protests and disruptive activities,

. . . [that] undermine U.S. policy to combat anti-Semitism around the world and in

the United States." JA311–12. The Rubio Determination attached the Office of

Intelligence's report of analysis (referred to as the "HSI Subject Profile of Mahmoud

Khalil") and Watson's referral letter pertaining to Mr. Khalil. JA312.

DHS immediately acted on the Rubio Determination by arresting and

detaining Mr. Khalil. *See* Appellee's Br. 6; Transcript, AAUP v. Rubio, Day 7, Vol.

2, 101:16–108:7, https://perma.cc/KC98-EBMN (testimony from Darren

McCormack, the agent who supervised Mr. Khalil's arrest, describing the

circumstances surrounding the arrest).

### B.     The government's implementation of the ideological deportation policy compounds the concerns with fair notice and arbitrary and discriminatory enforcement that underlie the district court's decision.

Testimony from *AAUP* reveals that the manner in which government officials

implemented the ideological deportation policy was arbitrary and standardless. At

nearly every step, DHS and State Department personnel executing the policy failed

to operate under any explicit guidelines intended to cabin their discretion. Rather,

they applied their own personal understandings of important enforcement criteria or

deferred to the unsubstantiated allegations of third-parties. These features compound

the concerns with fair notice and arbitrary and discriminatory enforcement that were the bases of the district court's decision below.

### 1. DHS focused its investigative efforts on leads sourced from unreliable third-party websites.

As described above, HSI's Office of Intelligence launched an operation to identify and investigate student protesters for potential referral to the State Department. *See supra* pp. 9–11. Peter Hatch, the DHS official tasked with overseeing this work, testified that most of the leads the Office of Intelligence identified came from unvetted third-party websites, and that much of the information contained in the reports of analysis the Office produced included unverified and uncorroborated allegations from those third-parties.

As Hatch explained, the vast majority of the leads that the Office of Intelligence identified—approximately 5,000 names—came from the website of Canary Mission, a group whose express aim is to document "hatred" against America, Israel, and Jews by blacklisting individuals it characterizes as antisemitic. *See supra* p. 10. Despite the unique role Canary Mission played in defining the Office of Intelligence's work, Hatch testified that he did not know how that list of leads came to HSI, or anything about Canary Mission's purpose or its methodology in identifying people to include on its website. Transcript, AAUP v. Rubio, Day 3, Vol. 2, 112:10–15, 113:17–23; *see also* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 16:10–12 ("I don't know the purpose, the stated intent of the website. I don't know

any of the people behind the website."); Transcript, AAUP v. Rubio, Day 4, Vol. 2, 81:6–10. Indeed, the Office of Intelligence's efforts to identify student protesters did not appear to be cabined by any meaningful standards. For instance, while Hatch noted that part of his office's work involved looking for protesters the government characterizes as "supporting terrorist organizations," Transcript, AAUP v. Rubio, Day 3, Vol. 1, 74:18–24; Transcript, AAUP v. Rubio, Day 3, Vol. 2, 90:6–10, he admitted that he had not received any direction about what "supporting" terrorist organizations means, Transcript, AAUP v. Rubio, Day 3, Vol. 2, 93:4–8.

The Office of Intelligence's reports of analysis also included unsubstantiated accusations from third-parties that individuals had engaged in activities that were antisemitic or supported terrorism. *See supra* p. 11. Although Hatch understood that Canary Mission's website included claims that should not be taken as "authoritative," *see* Transcript, AAUP v. Rubio, Day 3, Vol. 2, 111:21–112:17, the Office of Intelligence nonetheless routinely included information sourced from Canary Mission in its reports of analysis, including the report on Mr. Khalil, *see* Transcript, AAUP v. Rubio, Day 4, Vol. 1, 48:23–50:14. Hatch repeatedly maintained at trial that the Office of Intelligence's role was not to assess whether allegations included in a report were actually true, but only to present "facts" relevant to a potential removability determination. *See* Transcript, AAUP v. Rubio,

Day 4, Vol. 1, 22:3–11, 23:16–24:13; *see also* Transcript, AAUP v. Rubio, Day 3, Vol. 2, 96:5–10.

DHS's process of identifying and investigating individuals targeted pursuant to the policy highlights the problems of lack of fair notice and the potential for arbitrary and discriminatory enforcement that were the bases of the district court's decision below. Students and scholars engaged in pro-Palestinian advocacy could not reasonably expect to know that they would be targeted for deportation under the foreign policy ground merely because Canary Mission or some other third-party group characterized their activities as antisemitic or pro-Hamas. Nor could they anticipate that DHS would simply pass along those third-party allegations without independent corroboration. Moreover, as Hatch's testimony shows, the Office of Intelligence's work was guided not by any express criteria but by third-party sources that Hatch himself believed should not be treated as authoritative. The result was to vest individual officers with unfettered discretion to target student protesters for deportation under the foreign policy ground.

> **2. DHS referred student protesters to the State Department based on unvetted allegations that their activities were antisemitic, supported terrorism, or otherwise compromised U.S. foreign policy interests.**

Testimony from Andre Watson similarly shows that DHS's decisions to refer protesters on to the State Department were made in arbitrary ways. Watson's

testimony reveals that his assessments were not based on his own evaluation of an individual's activities or any standards communicated to him through agency leadership but on the unverified, third-party allegations contained in the reports of analysis he received from the Office of Intelligence.

As explained earlier, when making referrals, Watson reviewed reports of analysis only to determine whether they were "complete." *See supra* p. 13. He did not review the reports or the referral letters prepared in connection with those reports to determine whether the activities they described were in fact antisemitic or posed adverse foreign policy consequences. Transcript, AAUP v. Rubio, Day 8, 81:16–82:5, 84:5–85:3. Instead, he deferred to the claims contained in the reports of analysis, including the unvetted allegations made by third-parties, and adopted them as fact. *See id.* 84:5–86:5. Watson testified that he did not personally determine whether a person's activities are antisemitic and did not know how HSI determines that a person's activities are antisemitic. *Id.* 82:3–5. Watson nonetheless signed referral letters accusing protesters of engaging in antisemitic activities. *Id.* 81:23–82:9. In Watson's words, although he signed the referral letter accusing Mr. Khalil of antisemitic conduct, he "didn't" and "do[es]n't" actually make that determination himself. *Id.* 82:3–5. Nor was Watson aware of any standards HSI had adopted for deciding whether a person's activities in fact were antisemitic or supported terrorism. *Id.* 88:14–17.

Similarly, although Watson signed referral letters advising that the State Department may have sufficient grounds to determine that an individual's presence or activities in the U.S. may have adverse foreign policy consequences, Transcript, AAUP v. Rubio, Day 8, 84:12–23, he testified that he does not make this determination himself, does not know how HSI makes that determination, and does not know who at HSI is responsible for making that determination in a given case. *Id.* 84:5–11, 84:24–85:3. Watson also testified that he does not know whether the relevant executive orders he was tasked to implement indicate that it is the foreign policy of the United States to combat antisemitism; that he has not been told that the United States has a policy of combatting antisemitism; and that he does not know whether antisemitism or pro-Palestinian advocacy falls within HSI's national security or public safety mandates. *Id.* 89:17–90:8, 95:7–24.

As Watson's testimony makes clear, no one in Mr. Khalil's position could reasonably anticipate what activity could potentially subject them to referral to the State Department. Watson admitted that his referral decisions were based on assessments that he does not make (and that he does not know how to make). Nor, by Watson's own admission, were his referrals guided by any meaningful or explicit criteria. Instead, Watson simply deferred to the reports of analysis created by the Office of Intelligence—reports that repeated unverified third-party allegations—and adopted those claims as fact.

### 3. State Department officials were not bound by any explicit standards when determining whether student protesters' activities would have adverse foreign policy consequences for the United States.

Although State Department personnel were responsible for reviewing referrals from DHS and determining whether protesters could be removable under the foreign policy ground, those officials also were not bound by any meaningful standards. John Armstrong testified that, under the policy, the Bureau of Consular Affairs was asked to review whether the activities of the referred protesters were antisemitic or otherwise contrary to U.S. foreign policy. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 25:15–18. But despite being the seniormost official in the Bureau (as well as the final decision-maker in cases involving visa revocations), Armstrong stated that he did not receive formal or informal guidance on what constitutes antisemitism. *Id.* 25:15–26:24. To his knowledge, other Bureau personnel responsible for preparing action memos in response to referrals also did not receive any training on what constitutes antisemitism. *Id.* 26:25–27:9.

Instead, in determining whether to recommend or approve removability determinations, Armstrong applied his personal understanding of the relevant executive orders, U.S. foreign policy, what it means to express support for a terrorist organization, and what constitutes antisemitism. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 35:17–36:9. As explained above, Armstrong's views of what constitutes

antisemitism are extremely broad and not cabined by any set standards. He conflated criticism of Israel with antisemitism, believing that it is not possible for a person to be "just against Israel" and "not against Jews." *See supra* p. 14 (quoting Transcript, AAUP v. Rubio, Day 9, Vol. 1, 28:14–23). And he identified several expressions of disagreement with U.S. or Israeli policy or support for Palestinians—for instance, calling Israel an "apartheid state"—as statements that could make someone deportable because, in his view, they are antisemitic, they support terrorism, or they otherwise implicate the foreign policy ground. *See id.* Armstrong testified that he applied these personal criteria when evaluating whether to send an action memo to Secretary Rubio recommending removal, and when making visa revocation decisions. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 28:2–4, 36:1–9.

None of the criteria Armstrong used are evident from the text of the foreign policy ground or any official guidance applying that ground. But providing officials like Armstrong with such unfettered discretion to target speech they personally disfavor is precisely one of the dangers the vagueness doctrine was designed to prevent. *See Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (explaining that when a law lacks "minimal guidelines," it permits a "standardless sweep" that allows those enforcing the law "to pursue their personal predilections" (quoting *Smith*, 415 U.S. at 575)); *see also NEA v. Finley*, 524 U.S. 569, 588 (1998) ("Under the First and Fifth Amendments, speakers are protected from arbitrary and discriminatory

enforcement of vague standards."). Moreover, given the arbitrary and standardless nature of Armstrong's judgments with respect to antisemitism and U.S. foreign policy interests, neither Mr. Khalil nor anyone else is his position could reasonably be expected to be on notice of what advocacy could result in the government targeting them for arrest and deportation.

4. **That the policy represents a significant change in the government's practice further supports the district court's conclusion.**

The abrupt and extraordinary shift in how the government has used the foreign policy ground further supports the district court's conclusion that the foreign policy ground, as applied to Mr. Khalil through the Rubio Determination, is unconstitutionally vague. As the Supreme Court has explained, evidence of a "changed course" in the application of a standard, particularly an "abrupt" change involving "sensitive areas of basic First Amendment Freedoms," demonstrates a lack of fair notice. *Fox Television Stations*, 567 U.S. at 254. A number of government officials tasked with implementing the ideological deportation policy acknowledged in their testimony in *AAUP* that the policy represents a sharp break with past practice.

For instance, Hatch testified that prior to March 2025, HSI's Office of Intelligence had never been asked to prepare reports of analysis on student protesters based on their protest activity. Transcript, AAUP v. Rubio, Day 3, Vol. 1, 66:4–10. Nor had the Office of Intelligence ever been directed to prepare reports on people

27

listed on Canary Mission's website. Transcript, AAUP v. Rubio, Day 3, Vol. 2, 112:18–22. Similarly, Hatch could not recall any instance prior to 2025 where HSI provided information to the State Department about a student protester, Transcript, AAUP v. Rubio, Day 3, Vol. 1, 67:13–15, or of a lawful permanent resident or visa holder "being referred to the State Department because of protest activity," *id.* 66:11–67:3. Armstrong likewise testified that, prior to the start of the new referral process, he was not aware of any previous decisions by Secretary Rubio to exercise his removal authority under the 8 U.S.C. § 1227(a)(4)(C) foreign policy provision. Transcript, AAUP v. Rubio, Day 9, Vol. 1, 48:2–9. In fact, he stated at trial that he could recall only one instance in which that 4(C) authority had been used by any Secretary of State "in this century." Transcript, AAUP v. Rubio, Day 9, Vol. 1, 49:8–19.

This abrupt and extraordinary shift in focus to using the foreign policy ground to target student protesters further demonstrates that the application of that ground to Mr. Khalil fails to provide the public with fair notice.

### Conclusion

This Court should affirm the rulings of the court below.

September 17, 2025

Respectfully submitted,

 /s/ Xiangnong Wang
Xiangnong Wang
Ramya Krishnan
Stephany Kim

Alex Abdo
Jameel Jaffer
Knight First Amendment Institute at
    Columbia University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
george.wang@knightcolumbia.org

*Counsel for Amicus Curiae*

## Combined Certificate of Compliance

In accordance with the applicable Federal Rules of Appellate Procedure and Local Rules for the Third Circuit, I certify as follows:

1. I, Xiangnong Wang, am a member in good standing of the Bar of this Court.

2. This brief complies with the type-volume limit of the Court of Appeals for the Third Circuit Local Rules because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Local Rule 29.1(b), it contains 6,479 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)–(6) because it was prepared using Microsoft Word in 14-point Times New Roman font, a proportionally spaced typeface.

3. The text of the electronic brief filed is identical to the text in the paper copies to follow.

4. The electronic file containing the brief was scanned for viruses using NordVPN file checker and no viruses were detected. NordVPN file checker does not indicate a version number.

Dated: September 17, 2025                         */s/ Xiangnong Wang*
                                                  Xiangnong Wang

**Certificate of Service**

I, Xiangnong Wang, certify that on September 17, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: September 17, 2025                          */s/ Xiangnong Wang*
                                                  Xiangnong Wang