# U.S. Court of Appeals
# for the Third Circuit

Nos. 25-2162 & 25-2357

Mahmoud Khalil

v.

President, United States of America; Director, New
York Field Office, Immigration and Customs
Enforcement; Warden, Elizabeth Contract Detention
Facility; Director, U.S. Immigration and Customs
Enforcement; Secretary, U.S. Department of
Homeland Security, et al.,
Appellants

_____

Appeal from the U.S. District Court, D.N.J.
Judge Michael E. Farbiarz, No. 2:25-cv-01963

Before: Hardiman, Bibas, and Freeman, *Circuit Judges*
Argued Oct. 21, 2025; Filed Jan. 15, 2026

_____

Opinion of the Court

PER CURIAM. This case raises important jurisdictional questions about habeas corpus and immigration. At issue are three orders entered by the U.S. District Court for the District of New Jersey at the request of a lawful permanent resident, Mahmoud Khalil. The first order prevented the government from removing him from the country. The second ordered his release from custody. The third intervened in his immigration-court proceedings.

The first question presented is whether the New Jersey District Court had jurisdiction over Khalil's habeas petition. We hold that it did. Though Khalil was initially detained in New York, by the time his lawyer filed the petition there, immigration officials had moved him to New Jersey. Because the lawyer could have filed his petition in New Jersey then, the New York court's transfer of the case to New Jersey was effective. And Khalil's Second Amended Petition, naming the warden of the Elizabeth Detention Center, related back to his original filing. So he satisfied the federal habeas statute's requirement that a petitioner name his immediate custodian. Thus, the New Jersey court had habeas jurisdiction.

Our conclusion about habeas jurisdiction requires us to answer a second question: Did the Immigration and Nationality Act (INA) strip the New Jersey District Court of subject matter jurisdiction? It did. Because the INA channels "[j]udicial review of all questions of law . . . arising from any action taken or proceeding brought to remove an alien from the United States" into a single petition for review filed with a federal court of appeals, we hold that the District Court lacked

jurisdiction over Khalil's removal proceedings. 8 U.S.C. § 1252(b)(9).

Our holdings vindicate essential principles of habeas and immigration law. The scheme Congress enacted governing immigration proceedings provides Khalil a meaningful forum in which to raise his claims later on—in a petition for review of a final order of removal. We will therefore VACATE and REMAND with instructions to dismiss Khalil's habeas petition.

## I

Khalil is a citizen of Algeria who was born in a Palestinian refugee camp in Syria. He entered the United States on a student visa on December 20, 2022, and enrolled in a master's program at Columbia University. In November 2023, Khalil married an American citizen; he became a lawful permanent resident a year later. He describes himself as "compelled to be an outspoken advocate for Palestinian human rights." App. 1033. Since October 2023, Khalil has condemned "Israel's military operation in Gaza," calling it "a genocide." *Id.* Khalil also criticized Columbia University for, in his view, "financing and in other ways facilitating such violence." *Id.* At Columbia, Khalil was co-president of the Palestine Working Group at the School of International and Public Affairs, "where he helped organize educational events and lectures on Palestine." *Id.* He was also president of the Palestinian Student Society at Columbia, which "serves to engage with and celebrate Palestinian culture, history, and identity." *Id.*

A

In early March 2025, Secretary of State Marco Rubio advised Secretary of Homeland Security Kristi Noem that Khalil was removable from the country. In support of that determination, Secretary Rubio invoked 8 U.S.C. § 1227(a)(4)(C) and concluded that Khalil's "presence or activities in the United States . . . would have potentially serious adverse foreign policy consequences for the United States." App. 1023.

Acting on the Rubio determination, on the evening of March 8, special agents from Homeland Security Investigations arrested Khalil at his New York City apartment and took him into custody, transporting him to a federal building in Manhattan. There, he was served with a Notice to Appear (NTA) charging him as removable under the INA's foreign-policy provision.

In the middle of the night, Khalil's attorney checked ICE's Online Detainee Locator System, which showed that her client was detained in New York. So at 4:40 a.m., she filed a habeas petition in the Southern District of New York. Among other things, the petition sought to enjoin Khalil's detention and removal as illegal, contending that the government was retaliating against Khalil's protected speech, preventing his future political speech and activism, and violating due process. The petition named as respondents ICE's Acting New York Field Office Director, ICE's Acting Director, the Secretary of Homeland Security, and the Attorney General.

By the time Khalil's attorney filed the petition in Manhattan, though, Khalil had been transferred to the Elizabeth Detention Facility in New Jersey—even though ICE's online database still showed that he was in New York. By 9:00 a.m., the locator had updated to show Khalil in New Jersey. But around that time, ICE started transporting Khalil from Elizabeth, New Jersey, to Jena, Louisiana. That afternoon, the government informed one of Khalil's attorneys of the transfer. Khalil arrived at an immigration detention center in Jena, Louisiana, early in the morning of March 10.

### B

On March 12, the government moved in the Southern District of New York to dismiss Khalil's habeas petition for lack of jurisdiction or to transfer the action to Louisiana. Soon after, the government served Khalil with an amended NTA. In addition to the foreign-policy charge under 8 U.S.C. § 1227(a)(4)(C), the NTA alleged that Khalil had "procured" his status as a lawful permanent resident "by fraud or by willfully misrepresenting a material fact" in violation of 8 U.S.C. §§ 1227(a)(1)(A) and 1182(a)(6)(C)(i). App. 591. According to the government, Khalil failed to disclose that he was: (1) "a member of the United Nations Relief and Works Agency for Palestine Refugees (UNRWA) from June through November 2023, as a political affairs officer"; (2) continually employed "as a Program Manager by the Syria Office in the British Embassy in Beirut beyond 2022"; and (3) "a member of the Columbia University Apartheid Divest (CUAD)." *Id*.

C

On March 19, the Southern District of New York transferred Khalil's case—but not to Louisiana, as the government had requested. Instead, it transferred the action to the District of New Jersey. After getting the case, the New Jersey District Court ordered that Khalil "shall not be removed from the United States, unless and until the Court issues a contrary Order." App. 1784. The government again moved to dismiss for lack of habeas jurisdiction or to transfer to the Western District of Louisiana. The District Court denied that motion. It then held that no provision of the INA, including 8 U.S.C. §1252(b)(9) or (g), stripped it of subject-matter jurisdiction.

Khalil later amended his petition several more times. The amendments added allegations that the government had adopted an unlawful policy of targeting immigrants for pro-Palestinian speech; that the foreign-policy provisions of the INA were unconstitutionally vague as applied; that Khalil's detention was impermissibly punitive; and that the fraud charge was impermissibly retaliatory under the First Amendment and unlawfully departed from the government's own rules and procedures.

D

After holding that it had both habeas and subject-matter jurisdiction, the District Court considered the merits of Khalil's motion for a preliminary injunction. On May 28, 2025, the

Court found that Khalil had shown that he was likely to succeed on the merits of his challenge to removal on the foreign-policy charge, but not on the fraud charge. Then, on June 11, the District Court held that Khalil satisfied the other prerequisites for a preliminary injunction and enjoined the government from detaining and removing him based on the foreign-policy charge. On June 20, the District Court ordered the government to release Khalil from detention, which it did.

E

While the District Court was adjudicating Khalil's habeas petition, an immigration judge in Louisiana was adjudicating his removal from the United States through the administrative process governing removal. Back in April, the immigration judge held a hearing on removability and orally found Khalil removable on the foreign-policy charge. During the hearing, the immigration judge permitted Khalil to present evidence, including witness testimony. The immigration judge did not, however, allow discovery into the foreign-policy charge. It held that the Secretary of State's determination under § 1227(a)(4)(C) was "presumptive and sufficient evidence that the alien is deportable" and the government "is not required to present additional evidence of removability." App. 1854 (relying on *Matter of Ruiz-Massieu*, 22 I. & N. Dec. 833 (BIA 1999)). Then, on the same day that the District Court ordered Khalil's release (June 20), the immigration judge issued a written opinion affirming her oral order that Khalil was removable on the foreign-policy charge. The written opinion additionally held that Khalil was removable based on the fraud

charge, denied Khalil asylum, withholding of removal, and relief under the Convention Against Torture, and ordered him removed to Algeria (where he is a citizen) or Syria (his native land).

F

Faced with the conflicting mandates of the District Court and the immigration judge, the parties returned to the District Court to litigate the effect of its preliminary injunction.

In response, the District Court ordered the government to "cause the immigration judge to promptly vacate or amend her June 20 decision to the extent it finds [Khalil] removable" based on the foreign-policy charge. *Khalil v. Trump*, 2025 WL 1983755, at *1 (D.N.J. July 17, 2025). At the same time, the Court noted that it was not ordering the government "to cause the immigration judge to revisit the determination she made in the June 20 decision as to [Khalil's] eligibility for asylum under 8 U.S.C. § 1158." *Id.* at *2. The Court also ordered the government to cause the immigration judge to consider whether Khalil should be granted a waiver of removability in connection with the fraud charge. We stayed the District Court's order insofar as it "require[d] [the government] to cause the [i]mmigration [j]udge to consider [Khalil's] request for waiver of removability." ECF No. 41.

To comply with the District Court's order, the immigration judge vacated her April oral determination of removability. She apparently did not vacate her written June 20 decision and

order, which held that Khalil was removable under both the foreign-policy and fraud charges. The government timely appealed the District Court's orders finding that it had jurisdiction, entering a preliminary injunction, and ordering Khalil released. We have jurisdiction over this preliminary injunction under 28 U.S.C. § 1292(a)(1). We review de novo whether the District Court had habeas jurisdiction over Khalil's petition under 28 U.S.C. § 2241 and whether its subject-matter jurisdiction was stripped by the INA. *See Tazu v. Att'y Gen.*, 975 F.3d 292, 296 (3d Cir. 2020).

## II

Our evaluation of the District Court's habeas jurisdiction involves two essential principles of habeas law: (1) the district-of-confinement rule and (2) the immediate-custodian requirement.

## A

We begin with the district-of-confinement rule. District courts may grant habeas relief only "within their respective jurisdictions." 28 U.S.C. § 2241(a). This requires "nothing more than that the court issuing the writ have jurisdiction over the custodian." *Braden v. 30th Jud. Cir. Ct. of Ky.*, 410 U.S. 484, 495 (1973). So "jurisdiction lies in only one district: the district of confinement." *Rumsfeld v. Padilla,* 542 U.S. 426, 443 (2004).

In support of its holding that it had jurisdiction over
Khalil's petition, the District Court relied on 28 U.S.C. § 1631.
That statute lets a federal court that lacks jurisdiction transfer
a case to another court where it could have been brought. The
District Court acknowledged that Khalil had filed his original
petition in the Southern District of New York—a court that
lacked jurisdiction because he was detained in New Jersey at
the time of filing. But because the petition was filed when
Khalil was detained in New Jersey, the Court held that it
satisfied the district-of-confinement requirement. The Court
"assumed jurisdiction over the . . . petition, since it 'would
have been able to exercise jurisdiction on the date that the
petition was filed.'" *Khalil v. Joyce*, 777 F. Supp. 3d 369, 392
(D.N.J. 2025) (quoting *Martinez-Nieto v. Att'y Gen.*, 805 F.
App'x 131, 135 (3d Cir. 2020)). We agree.

1

Section 1631 provides:

> Whenever a civil action is filed in a court . . . and
> that court finds that there is a want of
> jurisdiction, the court shall, if it is in the interest
> of justice, transfer such action or appeal to any
> other such court . . . in which the action or appeal
> could have been brought at the time it was filed.

28 U.S.C. § 1631. Khalil was first detained on March 8, 2025,
in New York. At about 3:20 a.m. on March 9, he arrived at the
Elizabeth Detention Facility in New Jersey. Around 4:40 a.m.,

Khalil's attorneys filed his habeas petition in the Southern District of New York. On March 10, Khalil arrived at the Central Louisiana ICE Facility in Jena, Louisiana. On March 19, the Southern District of New York transferred the petition to the District of New Jersey.

Everyone agrees that the petition was filed in the Southern District of New York while Khalil was detained in New Jersey. So when it was filed, the *only* district where it could have properly been brought under 28 U.S.C. § 2241(a) was the District of New Jersey. Given the Southern District of New York's "want of jurisdiction," 28 U.S.C. § 1631, that court was authorized to transfer the action to the District of New Jersey (the jurisdiction where it could have been brought when it was filed). The Southern District of New York could have dismissed the petition without prejudice if it found that transfer was inappropriate. But the government never challenged that court's conclusion that transfer was "in the interest of justice." So, under § 1631, it was proper to treat Khalil's petition as if it were filed in the District of New Jersey early in the morning of March 9—when he was detained there. The petition therefore complied with the district-of-confinement rule.

The government argues that § 1631 does not let a court "acquire substantive authority that it otherwise lacked." Gov't Br. 22 (emphasis omitted). That is true but irrelevant. In *Hoffman v. Blaski*, 363 U.S. 335 (1960), the Supreme Court considered whether the phrase "where it might have been brought" in 28 U.S.C. § 1404(a) required the transferee court to have had jurisdiction when the original action was filed, or

whether it allowed transfer only to a court that would have had jurisdiction at the time of the transfer. *Id.* at 342–44. The Court concluded that the "unambiguous, direct[, and] clear" language of the transfer statute permitted only the former. *Id*. at 343 (quotation omitted). More recently, we have noted that § 1404(a) "is comparable to [§] 1631." *D'Jamoos ex rel. Est. of Weingeroff v. Pilatus Aircraft Ltd*., 566 F.3d 94, 110 (3d Cir. 2009).

As a result, the District Court did not use § 1631 to obtain jurisdiction that it would otherwise have lacked. The only effect of the transfer statute is that "the action . . . shall proceed as if it had been filed in . . . the court to which it is transferred on the date upon which it was actually filed in . . . the court from which it is transferred." 28 U.S.C. § 1631. That is consistent with what happened here; the New Jersey District Court did not use § 1631 to *acquire* jurisdiction. It simply explained the effect under § 1631 of the transfer. Had the petition been filed in the District of New Jersey early in the morning of March 9, the action would have been properly before that Court. Thus, the transfer "merely remedie[d] the procedural defect—it convey[ed] no substantive authority" on the transferee court that it would have lacked at the time the action was filed. *Öztürk v. Hyde*, 136 F.4th 382, 391–92 (2d Cir. 2025).

2

Having determined that the transfer from New York to New Jersey was consistent with 28 U.S.C. § 1631, we turn now to the government's argument that § 1631 does not apply to

habeas proceedings. Though the government did not make this argument below, "[j]urisdictional requirements cannot be . . . forfeited [and] must be raised by courts *sua sponte*." *Boechler, P.C. v. Comm'r*, 596 U.S. 199, 203 (2022).

Section 1631 applies to civil actions. And though they are "hybrid actions," "habeas proceedings are generally considered civil in nature [and] the term 'civil action' includes habeas petitions." *Hassine v. Zimmerman*, 160 F.3d 941, 954 (3d Cir. 1998) (first quotation); *Parrott v. Gov't of V.I.*, 230 F.3d 615, 620 (3d Cir. 2000) (second quotation) (citation omitted); *see also id.* at 620 n.7 (stating that we have treated habeas proceedings "as civil, rather than criminal . . . for purposes of determining jurisdiction").

Though we have "construed the term 'civil action' to exclude habeas petitions, we did so only in the procedural, not jurisdictional, context of the filing fees imposed under the Prison Litigation Reform Act." *Id.* (second source) (citing *Santana v. United States*, 98 F.3d 752, 754–56 (3d Cir. 1996)). Besides, we have explained that district courts may transfer habeas petitions under § 1631 when they were erroneously filed there. *See Robinson v. Johnson*, 313 F.3d 128, 139 (3d Cir. 2002) (stating that, when a second or successive petition was erroneously filed in a district court without the permission of a court of appeals, "the district court's only option is to dismiss the petition or transfer it to the court of appeals pursuant to 28 U.S.C. § 1631"). For these reasons, we hold that the phrase "civil action" in § 1631 encompasses habeas proceedings and

that the District Court properly applied the statute in holding that it had jurisdiction over Khalil's petition.

3

We next consider the government's argument that the District Court lost jurisdiction when the government transported Khalil from New Jersey to Louisiana. It did not. Relying on *Ex parte Endo*, 323 U.S. 283 (1944), the District Court correctly explained that "a habeas court with jurisdiction does not lose it because the detainee has been moved out of the district." *Khalil*, 777 F. Supp. 3d at 396.

In *Endo*, the petitioner had filed a petition for a writ of habeas corpus in the Northern District of California challenging her detention in accordance with military orders that resulted in the mass confinement of Japanese Americans. 323 U.S. at 284–85. While her challenge to the district court's denial of habeas relief was pending on appeal, the government transferred her to a detention center in Utah. *Id*. at 285. The Supreme Court held that the District Court for the Northern District of California retained jurisdiction over the petition despite Endo's transfer to Utah. *Id*. at 306–07. And after reversing the denial of habeas relief, it remanded the matter to the District Court for the Northern District of California for further proceedings—even though Endo was no longer confined there. *Id*. at 285, 307. The Court explained that the

> objective [of habeas relief] may be in no way
> impaired or defeated by the removal of the

14

prisoner from the territorial jurisdiction of the District Court. That end may be served and the decree of the court made effective if a respondent who has custody of the prisoner is within reach of the court's process even though the prisoner has been removed from the district since the suit was begun.

*Id*. at 307. The Supreme Court reaffirmed this holding in *Padilla*, explaining that "[w]hen the government moves a habeas petitioner after she properly files a petition naming her immediate custodian, the District Court retains jurisdiction." *Padilla*, 542 U.S. at 441.

Our longstanding precedent likewise supports Khalil's position that the government's post-filing transfer of a habeas petitioner out of a district court's territorial jurisdiction does not deprive the district court of jurisdiction over the petition. *See Ex parte Catanzaro*, 138 F.2d 100, 101 (3d Cir. 1943) (noting, a year before *Endo*, our skepticism that "passing about of the body of a prisoner from one custodian to another after a writ of habeas corpus has been applied for can defeat the jurisdiction of the Court to grant or refuse the writ on the merits of the application"); *Anariba v. Dir., Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 446 (3d Cir. 2021) (holding that the district court retained habeas jurisdiction after the petitioner was transferred out of the district because "it already had acquired jurisdiction over [the] properly filed habeas petition that named [the petitioner's] then-immediate custodian").

In sum, under § 1631, we must treat Khalil's petition as if he had originally filed it in the District of New Jersey. So the District Court had jurisdiction as the district of confinement when the petition was filed. And under *Endo* and *Anariba*, Khalil's later transfer to Louisiana did not divest the District Court of jurisdiction.

B

We turn now to whether Khalil properly named his immediate custodian. "Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody within the United States, he should name his warden as respondent." *Padilla*, 542 U.S. at 447. "The logic of this rule rests in an understanding that 'the warden . . . has day-to-day control over the prisoner and who can produce the actual body.'" *Anariba*, 17 F.4th at 444 (quotation omitted). It "serves the important purpose of preventing forum shopping by habeas petitioners." *Id*. at 445 (quoting *Padilla*, 542 U.S. at 447). "So if a § 2241 petitioner does not adhere to the immediate custodian rule, then the district court lacks jurisdiction to entertain the petition." *Id*.

Khalil's original habeas petition did not name his immediate custodian (the warden at the Elizabeth Detention Center in New Jersey). Normally, this would defeat jurisdiction. But the District Court held that under the "unknown custodian exception," Khalil's petition satisfied the immediate-custodian requirement even though it did not name the warden. *See Demjanjuk v. Meese*, 784 F.2d 1114, 1116 (D.C. Cir. 1986) (describing unknown-custodian exception).

16

The Court reasoned that Khalil's lawyers were "affirmatively led to believe that he was in New York—and because no phone calls were allowed, [Khalil] could not undo the impression." *Khalil*, 777 F. Supp. 3d at 403. So, it held, the unknown-custodian exception applied and permitted Khalil to name his "ultimate" custodian—the Secretary of Homeland Security. *Id.*

1

We need not reach the District Court's unknown-custodian holding. On April 3, 2025, around 24 days after he was transferred to Louisiana, Khalil filed a Second Amended Petition adding the warden of the Elizabeth Detention Center as a respondent. The Third and Fourth Amended Petitions do likewise. Khalil never named the warden of the Central Louisiana ICE Facility as a respondent.

Khalil's amendments "relate[ ] back" to the original date of filing under the Federal Rules of Civil Procedure. Khalil Br. 21. "An amendment to a pleading relates back to the date of the original pleading" when "the amendment changes the party" if certain conditions are met. Fed. R. Civ. P. 15(c)(1)(C). "The 'original pleading' to which Rule 15 refers is the complaint in an ordinary civil case, and the petition in a habeas proceeding." *Mayle v. Felix*, 545 U.S. 644, 655 (2005).

The government does not dispute that the conditions of Rule 15(c)(1)(C) were met here. So we must treat Khalil's amendments naming the warden of the New Jersey detention facility as if they were effective on March 9—when he filed his

original petition. At that time, Khalil was being held in New Jersey, so the petition, as amended, accurately named his then-immediate custodian. Though his petition was filed in the Southern District of New York, we must proceed "as if it had been filed in . . . [the District of New Jersey] on the date upon which it was actually filed in . . . [the Southern District of New York]." 28 U.S.C. §1631. Thus, we hold that the petition complied with the immediate-custodian requirement.

2

The government argues that even if the Court had jurisdiction over Khalil's original petition "it certainly lacked jurisdiction over the amended petition[s]—at the time [Khalil] voluntarily amended his petition[s], his counsel knew *exactly* where he was detained." Gov't Br. 25. It adds that Khalil's amended petitions "supersede[]" his prior petitions, and his amended petitions do not satisfy the requirements of jurisdiction. *Id.* (relying on *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22 (2025)).

The government is right that generally "an amended pleading supersedes the original pleading and renders the original pleading a nullity," so "the most recently filed amended complaint becomes the operative pleading." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019). In habeas proceedings, this means that "[w]hen a petition is amended by leave of the court, the cause proceeds on the amended petition." *Washer v. Bullitt Cnty.*, 110 U.S. 558, 562 (1884). So we will treat the Fourth Amended Petition as the operative petition.

The government is also right that when "a plaintiff amends [his] complaint . . . a federal court's jurisdiction depends on what the new complaint says." *Royal Canin*, 604 U.S. at 30. In *Royal Canin*, for example, the Court held that a district court loses its subject matter jurisdiction when a plaintiff amends her complaint to eliminate the federal-law claims that enabled removal, leaving only state-law claims. *Id*. The Court explained that once the claims implicating federal-question jurisdiction were gone, the district court's "supplemental jurisdiction over the state claims dissolved too." *Id*. at 44. In short, the lesson of *Royal Canin* is that a federal court may lose subject-matter jurisdiction if a plaintiff amends his complaint in a manner that removes the basis for that jurisdiction.

But that is not what happened here. *Habeas* jurisdiction (in the sense of the district-of-confinement and immediate-custodian rules) is not the same thing as *subject-matter* jurisdiction. *Padilla*, 542 U.S. at 434 n.7 ("The word 'jurisdiction,' of course, is capable of different interpretations. We use it in the sense that it is used in the habeas statute, 28 U.S.C. § 2241(a), and not in the sense of subject-matter jurisdiction of the District Court."); *see also Darfur v. U.S. Parole Comm'n*, 34 F.4th 1090, 1096–97 (D.C. Cir. 2022) ("The immediate custodian rule implicates personal jurisdiction, not subject matter jurisdiction; likewise, the requirement to file in the district of confinement concerns venue, not subject-matter jurisdiction."). And the government has offered no authority suggesting that *Royal Canin* should apply to habeas proceedings. We decline to so extend it.

19

Instead, the relevant precedents are *Endo* and *Anariba*. Under those cases, the Court retained jurisdiction over Khalil's petition despite his post-filing transfer from a facility in the District of New Jersey to one in the Western District of Louisiana. *See Endo*, 323 U.S. at 307. There is no reason to think that *Endo* no longer applies once a petitioner amends his petition after transfer. Khalil's amendments do not affect this analysis and did not divest the District Court of habeas jurisdiction.

## III

The District Court correctly held that it had habeas jurisdiction over Khalil's petition. But that was only half of the jurisdictional puzzle. The District Court also needed subject-matter jurisdiction over the action. Yet various provisions of the INA limit an alien's ability to collaterally attack (challenge) ongoing immigration proceedings through habeas. The District Court did not see those limits as barring subject-matter jurisdiction over Khalil's claims. We disagree. As we explain, 8 U.S.C. § 1252(b)(9) strips the District Court of jurisdiction, requiring Khalil to wait to raise his claims until he files a petition for review (PFR) of a final order of removal. So we need not reach the government's alternative argument that § 1252(g) also bars jurisdiction.

## A

Khalil challenges both his removal and his detention pending removal proceedings, claiming that both are unlawful

on various grounds. Those claims collide with one of the INA's jurisdictional bars: 8 U.S.C. §1252(b)(9). That subsection provides: "Judicial review of all questions of law and fact . . . *arising from* any *action taken* or *proceeding brought* to remove an alien from the United States . . . shall be available only in judicial review of a final order [of removal]." (emphasis added).

Khalil does not dispute that his detention is an "action taken" as a part of his removal proceedings. *See Carlson v. Landon*, 342 U.S. 524, 538 (1952) (detention is "necessarily" a part of the removal process). And removal proceedings are "proceedings brought to remove an alien." *E.O.H.C. v. Sec'y, U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 184 (3d Cir. 2020). The question is whether Khalil's claims "aris[e] from" that action or proceeding.

1

In *E.O.H.C.*, we read the "arising from" phrase to require courts to "ask: If not now, when? If the answer would otherwise be never, then §1252(b)(9) poses no jurisdictional bar." 950 F.3d at 186. The "point" of that subsection, we explained, "is to channel claims into a single [PFR], not to bar claims that do not fit within that process." *Id.* So when aliens can get review later—by litigating before an immigration judge, the Board of Immigration Appeals, and then by way of a PFR to a court of appeals—they must do so. *Id.* at 180. District courts play little if any role in that sequence. *See id.* But when aliens raise claims that courts cannot "meaningfully" review through the PFR process, those claims do not "aris[e]

21

from" the "action[s] taken" or "proceeding[s] brought" to remove them. *Id.* at 186.

*E.O.H.C.* left open an important question: Is a claim now or never if a petitioner alleges an *injury* that cannot be *remedied* later through a PFR? Or must the claim raise *legal or factual questions* that cannot later be *reviewed* via a PFR? *E.O.H.C.* had no occasion to pass on that distinction, because both criteria were satisfied there. The government had started proceedings to remove E.O.H.C. and his daughter to Guatemala, their home country. *Id.* at 181. As they awaited their removal hearing, the government tried to send them to Mexico. *Id.* To challenge the government's sending them to Mexico, E.O.H.C. and his daughter filed a habeas petition. *Id.* We held that despite § 1252(b)(9)'s bar, the district court had jurisdiction, since "[b]y the time there is a final order of removal to Guatemala . . ., it will be too late to review *or* remedy their return to Mexico in the meantime." *Id.* at 187 (emphasis added); *see also id.* at 186 (stating that because "review *and* relief may come too late," the court has jurisdiction) (emphasis added). In other words, a PFR could neither review their legal claims (challenging interim relocation) nor remedy their asserted injury (being forced to await a hearing in a dangerous city in Mexico). *See id.* at 186–87.

Our dissenting colleague disagrees with our reading of *E.O.H.C.*, emphasizing the opinion's statement that § 1252(b)(9) "does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a

final order of removal." Partial Dissent 18 (quoting *E.O.H.C.*, 950 F.3d at 186). But as she acknowledges, when we referred to "relief," it was generally "alongside" a discussion of "review." *Id.* at 20 n.12. Various passages in *E.O.H.C.* emphasized the inability both to review a claim and to remedy injuries arising from that claim; we never had to decide which was necessary or sufficient. So the "rule about redressability" our colleague purports to locate in *E.O.H.C.* was not necessary to that opinion's holding at all. *Id.*

Khalil's case requires us to tease these strands apart. Khalil says his claims are now-or-never ones because his *injuries* are ongoing and his rights are "being violated, now." Khalil Br. 38 (citing *Mahdawi v. Trump*, 136 F.4th 443, 452 (2d Cir. 2025) (emphasis omitted)). But his claims raise *legal questions* challenging the government's very basis for trying to remove (and thus detaining) him. Unlike E.O.H.C.'s claim about being sent to Mexico temporarily, Khalil's questions are not "wholly collateral" to the removal process; they are "inextricably linked" to it. *Öztürk v. Hyde*, 155 F.4th 187, 189, 191–92 (2d Cir. 2025) (Menashi, J., concurring in denial of rehearing en banc) (internal quotation marks omitted).

2

We now answer the question left open by *E.O.H.C.*: A now-or-never claim must raise legal or factual *questions* that a court of appeals will not later be able to review meaningfully on a PFR. It is not enough to assert an injury that cannot be

remedied later. We base that conclusion on § 1252(b)(9)'s text, title, and purpose.

First comes the text. The now-or-never principle is a gloss on § 1252(b)(9)'s phrase "arising from." But another phrase comes first: "Judicial review of all questions of law and fact." So to avoid getting channeled to a PFR, a claim must raise now-or-never *questions*, not just now-or-never harms. *See Tazu*, 975 F.3d at 299 (explaining that § 1252(b)(9) channels "legal questions" that are "bound up with (and thus 'aris[e] from') an 'action taken' to remove" an alien). The subsection's title bolsters our reading of the text: It covers "[c]onsolidation of *questions* for judicial review," not "claims." 8 U.S.C. § 1252(b)(9).

The statute's purpose (as Supreme Court and circuit precedent have described it) confirms our reading too. Section 1252(b)(9) works as a "zipper" clause, channeling "most claims that even relate to removal" into PFRs. *Reno v. AADC*, 525 U.S. 471, 483 (1999) (first quotation); *E.O.H.C.*, 950 F.3d at 184 (second quotation). It ensures that petitioners get only one bite at the apple. Letting petitioners raise now-or-never injuries through habeas based on claims that can be litigated later would subvert that channeling scheme. If, for instance, a detained alien claimed that the INA section that made him removable was unconstitutionally vague, he could bring that claim right away on habeas (because illegal detention cannot be remedied later). With a final judgment in hand, the winning side could use issue preclusion or law of the case in the later PFR, leaving that court nothing to decide. *See Paulo v. Holder*,

669 F.3d 911, 918 (9th Cir. 2011) (holding that habeas finding that alien was not removable precluded relitigating that issue in removal proceedings). That prospect would encourage the very "piecemeal litigation" that § 1252(b)(9) is designed to prevent. *E.O.H.C.*, 950 F.3d at 184.

Our dissenting colleague responds that "the word 'questions' in the title and text of § 1252(b)(9) . . . cannot bear the weight" we place on it. Partial Dissent 22. According to her, the word "questions" "sheds no light on the meaning of 'arising from'" because the former term does not modify the latter. *Id*. We agree that the word "questions" does not modify "arising from." But that proves nothing. As she acknowledges, "[o]ur discussion in *E.O.H.C.* controls the meaning of 'arising from.'" *Id.* at 23. Yet *E.O.H.C.* held only that now-or-never claims do not "arise from" "action[s] taken or proceeding[s] brought to remove an alien." 950 F.3d at 185–86; 8 U.S.C. § 1252(b)(9). The repeated statutory references to "questions" show that what *makes* a claim now-or-never is that it raises questions that cannot be reviewed later, on a petition for review of a final order of removal.

Our colleague also worries that our reading of § 1252(b)(9) "renders meaningful review hollow," since a PFR court cannot later redress harms incurred from, say, unconstitutional immigration detention. Partial Dissent 20. But our legal system routinely forces petitioners—even those with meritorious claims—to wait to raise their arguments. Consider an innocent defendant who was convicted of a serious crime and imprisoned because his trial lawyer was ineffective. His

detention is wrongful: He did not actually commit the crime. But that does not entitle him to seek immediate release through habeas; first, he must exhaust his direct appeal. *See, e.g.*, 28 U.S.C. §2254(b)(1)(A). That delay does not foreclose meaningful review. It just streamlines the process for seeking it. Congress has the power to balance concerns about the orderly adjudication of claims with concerns about remedying harms from illegal detention. The balance that Congress struck in §1252(b)(9) requires bringing legal questions later if they can be answered later.

### B

Each of the legal questions Khalil raises in his petition can be decided later, on a PFR. He challenges a broad array of alleged governmental misconduct under the First and Fifth Amendments, as well as the Administrative Procedure Act (APA) and *Accardi v. Shaughnessy*, 347 U.S. 260 (1954). (He also seeks release on bail, but that is a remedy, not an independent claim.) But addressing any of those claims would require deciding whether removing Khalil would be unlawful—the very issue decided through the PFR process. To be sure, the immigration judge's order of removal is not yet final; the Board has not affirmed her ruling and has held the parties' briefing deadlines in abeyance pending this opinion. But if the Board ultimately affirms, Khalil can get meaningful review.

Start with Khalil's argument that the government is targeting him under a policy of punishing aliens' pro-

Palestinian speech. Khalil says that the policy is unconstitutionally vague and retaliatory and violates the APA and *Accardi*. But he can litigate all those challenges on a PFR after the Board issues a final order of removal, since the alleged policy is a "matter[ ] on which the validity of the final order is contingent." *Massieu v. Reno*, 91 F.3d 416, 422 (3d Cir. 1996) (Alito, J.).

Khalil also argues that both the foreign-policy and fraud charges violate the First and Fifth Amendments and either the APA or *Accardi*. The fraud charge is pending before the Board; if the Board affirms, then Khalil can challenge it on a PFR. The foreign-policy charge may be before the Board as well, since the immigration judge appears never to have vacated her written order sustaining Khalil's removal on that basis. The immigration judge did vacate her oral order finding Khalil removable on the foreign-policy charge. But she also made clear that her vacatur was solely to comply with the District Court's (now-vacated) injunction. So the Board could conclude that the charge is still live or remand to the immigration judge to reinstate it. In either case, Khalil could challenge the foreign-policy charge on a PFR too.

Alternatively, the Board could proceed only on the fraud charge. In that case, Khalil's challenges to the foreign-policy charge would not yet be ripe for review by the PFR court, because that charge would not be a ground for his removal. *See Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967); *Jie Fang v. Dir. U.S. Immigr. & Customs Enf't*, 935 F.3d 172, 186 (3d Cir. 2019). Nor would those challenges be ripe for a *habeas*

petition. And § 1252(b)(9) has nothing to say about questions that cannot be raised now *or* later. Those claims are unreviewable for reasons unrelated to the INA.

Though Khalil also challenges his detention, his arguments against it are identical to his arguments against removal. He even says that the government's policy includes both "detain[ing]" and "deport[ing]" its targets. Dist. Ct. Dkt. No. 382, ¶ 2. Because "the arguments [Khalil] has offered to challenge the detention necessarily challenge the government's decision to commence removal proceedings," the PFR court will be able to review those "legal questions" once the Board enters a final order of removal. *Öztürk*, 155 F.4th at 192–93 (Menashi, J., concurring in denial of rehearing en banc) (citation modified).

Khalil brings only one detention-specific claim. He says the government violated the Fifth Amendment's Due Process Clause by arresting and confining him to punish him. To be sure, some claims can be detention-specific, like the length- and conditions-of-confinement claims discussed in *E.O.H.C.* 950 F.3d at 186. But Khalil's claim is not one of them: it just repackages his challenges to his removal. In essence, he argues that his detention is impermissible retaliation and unlawful because it depends on the unconstitutionally vague foreign policy ground. So his "punitive detention" claim rises or falls with the others. We judge pleadings not by their labels, but by their substance. *Lewis v. Att'y Gen.*, 878 F.2d 714, 722 n.20 (3d Cir. 1989). Khalil cannot plead around § 1252(b)(9) by calling his challenge to removal a challenge to his detention.

Our dissenting colleague fears that if a "final order of removal . . . never come[s]," Khalil will be unable to seek review of his claims down the line. Partial Dissent 26. Not so. To start, the Board has set an expedited briefing schedule for Khalil's appeal of the immigration judge's order of removal. That schedule suggests that if the Board agrees that Khalil should be removed, it will say so quickly. And because the underlying questions will continue to undergird his challenges to removal, they will remain redressable and reviewable. *Contra* Partial Dissent 21. Plus, if the government did detain an alien and then tried to evade judicial review by refusing to enter a final order of removal for a long time, *E.O.H.C.* already recognized that the alien could bring a prolonged detention challenge in federal district court despite § 1252(b)(9). *See* 950 F.3d at 185–86 (interpreting *Jennings v. Rodriguez*, 583 U.S. 281, 293 (2018) (opinion of Alito, J.)).

## C

Khalil offers five arguments why § 1252(b)(9) should not channel his claims into the PFR process, but none persuades.

## 1

Khalil first claims that our precedent limits § 1252(b)(9)'s scope to challenges to final orders of removal entered by the Board. *See Chehazeh v. Att'y Gen.*, 666 F.3d 118, 131 (3d Cir. 2012). And the Board has not entered such an order here.

The Supreme Court has since abrogated that part of *Chehazeh*. Seven years ago, a fractured Court interpreted § 1252(b)(9) in *Jennings v. Rodriguez*. *Jennings* involved a challenge to INA provisions that allowed prolonged detention without a bond hearing. 583 U.S. at 289–90. A three-Justice plurality concluded that § 1252(b)(9) did not strip jurisdiction over the challenge. *Id.* at 294–95 (opinion of Alito, J.). But it did not rely on the lack of a final order of removal. Instead, it reasoned that the "questions of law and fact" raised by the challengers were not linked closely enough to the government's efforts to remove them. *See id.* at 293. The plurality strongly suggested that § 1252(b)(9) *would* strip jurisdiction over claims with closer connections, like "challeng[es] [to] the decision to detain them in the first place or to seek removal," challenges to "any part of the process by which . . . removability will be determined," and requests to "review . . . an order of removal." *Id.* at 294. Yet if § 1252(b)(9) applied only *after* a final order of removal had been entered, it would not bar challenges to the decision to detain or seek removal or the removability process—all actions that must precede a final order of removal. So the plurality necessarily rejected *Chehazeh*'s reading of § 1252(b)(9).

A separate three-Justice bloc agreed that § 1252(b)(9) did not strip jurisdiction. *Id.* at 355 (Breyer, J., concurring in relevant part and dissenting in part). But those Justices relied on the same reasoning as *Chehazeh*: that § 1252(b)(9) "by its terms applies only '[w]ith respect to review of an order of

removal," and that the aliens were "challeng[ing] their detention without bail, not an order of removal." *Id.*

The plurality's reading of § 1252(b)(9) binds us. When no opinion of the Court commands a majority of the Justices, we must look for the "narrowest of the opinions and the common denominator of the Court's resulting decision." *Lebanon Farms Disposal, Inc. v. Cnty. of Lebanon*, 538 F.3d 241, 248 (3d Cir. 2008) (interpreting *Marks v. United States*, 430 U.S. 188, 193 (1977)). The *Jennings* plurality would let district courts adjudicate some, but not all, habeas challenges arising from actions taken before entry of a final order of removal. The three partially concurring Justices would have let district courts adjudicate all such challenges. Under the *Marks* rule, the plurality's narrower reading defines the proper scope of § 1252(b)(9).

Considering the *Jennings*'s plurality's strong implication that § 1252(b)(9) covers at least some challenges to detention before a final order of removal, *E.O.H.C.* conspicuously did not rely on *Chehazeh*. Applying *Chehazeh*'s logic to *E.O.H.C.* would have obviated the whole discussion of § 1252(b)(9) because the Board had never finalized E.O.H.C.'s order of removal. *See* 950 F.3d at 182, 186 (citing *Chehazeh* only in a passing parenthetical). If *Chehazeh* were still good law, *E.O.H.C.* could have been five pages shorter. *Chehazeh* does not help Khalil.

Our dissenting colleague disagrees that *Jennings* abrogated *Chehazeh*. But we are unconvinced. She observes that a

majority of the Justices in *Jennings* (the three-Justice plurality, plus the three Justices whose views were represented by Justice Breyer's partial concurrence) "agreed that, whatever the exact scope of § 1252(b)(9) . . ., that provision did not strip jurisdiction over the *Jennings* detainees' habeas petitions." Partial Dissent 4. As she notes, "[n]othing about that conclusion conflicts with *Chehazeh*." *Id.* We agree. But the plurality's *reasoning* does conflict with *Chehazeh*. And when we consider whether an intervening plurality opinion of the Supreme Court has abrogated a panel precedent, we must look at the Court's reasoning, not just its holding. *See Lebanon Farms*, 538 F.3d at 247–48. Doing so, we observe that if *Chehazeh*'s logic had carried the day, the *Jennings* plurality would have had no reason to distinguish the aliens' case from challenges to "the decision to detain them in the first place or to seek removal." 583 U.S. at 294 (opinion of Alito, J.).

2

Next, Khalil cites cases from other circuits, but he overstates that authority. One of his cases took the same view as *Chehazeh*, but it predated *Jennings*. *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006). Another relied on legislative history and a pre-*Jennings* case without even citing *Jennings* in the relevant section, let alone acknowledging that it might require a different analysis. *Kong v. United States*, 62 F.4th 608, 614 (1st Cir. 2023). In a third case, the petitioners were not "challenging the decision to detain them" but only the bond procedures used. *Miranda v. Garland*, 34 F.4th 338, 347, 353 n.6 (4th Cir. 2022) (quoting *Jennings*, 583 U.S. at 294

32

(opinion of Alito, J.)). And two others challenged only the length of confinement without a bond hearing, a claim that does not get channeled into the PFR review process. *Black v. Decker*, 103 F.4th 133, 142 (2d Cir. 2024); *German Santos v. Warden, Pike Cnty. Corr. Facility*, 965 F.3d 203, 206–08 (3d Cir. 2020); *see E.O.H.C.*, 950 F.3d at 186.

That leaves only two circuits that have recently denied stays in three factually similar cases, though in different procedural postures. Each case relies on all or part of *Chehazeh*'s reasoning—reasoning that *Jennings* implicitly abrogated. *See Suri v. Trump*, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025); *Mahdawi*, 136 F.4th at 451–52; *Öztürk*, 136 F.4th at 399. None of them confronts how that approach would disrupt the zipper clause, "circumventing the usual immigration process." *Suri*, 2025 WL 1806692, at *10 (Wilkinson, J., dissenting) (noting that the INA's PFR process is enough to preserve judicial review of "the essential constitutional questions"). So we respectfully disagree with the Second and Fourth Circuits.

3

Khalil also briefly implies that his detention challenges count as conditions-of-confinement claims exempt from channeling under § 1252(b)(9). Not so. True conditions-of-confinement challenges attack the conditions at the detention center as "inhumane." *Jennings*, 583 U.S. at 294 (opinion of Alito, J.). Examples include depriving inmates of needed insulin, halal, or kosher food. *E.O.H.C.*, 950 F.3d at 186. Khalil's

argument has nothing to do with the conditions in which he was being held, but the mere fact of detention.

4

Khalil also fears that reading § 1252(b)(9) to delay review until his PFR would raise First Amendment and Suspension Clause problems. But his only authority for his First Amendment concern is a suggestion in a partial concurrence by Justice Ginsburg in *AADC* that was largely rejected by the majority. *Compare AADC*, 525 U.S. at 498 (Ginsburg, J., concurring in part and in the judgment) (suggesting that courts might need to hear immediately selective-enforcement challenges claiming a "chilling effect on current speech"), *with id.* at 491 (majority opinion) (holding that, except perhaps when "the alleged basis of discrimination is . . . outrageous," courts may not review selective-enforcement challenges to deportation proceedings at all). Plus, even Justice Ginsburg concluded that on the record before the Court, the INA's "channeling" scheme does enough to preserve a "opportunity to raise a [First Amendment] claim during the [PFR] phase." *Id.* at 495 (Ginsburg, J., concurring in part and in the judgment). And the availability of the PFR process satisfies the Suspension Clause. *See Luna v. Holder*, 637 F.3d 85, 95 (2d Cir. 2011).

5

Finally, Khalil fears that immigration courts lack the power to develop adequate factual records, so the PFR court will not

be able to meaningfully review his claims down the road. If Khalil were truly unable to build a fulsome administrative record before the immigration courts, then his legal questions could not be reviewed adequately on a PFR. *See* 8 U.S.C. § 1252(b)(4)(A) (limiting the PFR court to "decid[ing] the petition only on the administrative record on which the order of removal is based"). But aliens in immigration proceedings may put on testimony and exhibits, which become part of the record. 8 C.F.R. § 1240.9. Khalil did just that, submitting four witnesses plus thirty-five exhibits at a hearing earlier this year.

True, there were limits on what Khalil could do at that hearing. Relying on BIA precedent, the immigration judge refused to allow discovery into how the Secretary of State decided to make him removable on the foreign-policy charge. That may have prevented him from proving a causal link to retaliation or discriminatory enforcement, which could show that the alleged policy is unconstitutionally vague. And the structure of the immigration-court system is ill-suited to developing pattern-and-practice challenges. *See McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 497 (1991).

But if the administrative record is inadequate for these reasons or any others, the PFR court can deal with the problem. To be sure, the INA appears to limit judicial review to the administrative record. *Cf. AADC*, 525 U.S. at 488 n.10 (majority opinion). But that language simply restates a "generally applicable rule of administrative law"; it does not "prescribe a special rule for immigration cases." Pet'rs' Reply Br., No. 97-1252, *Reno v. AADC*, 1998 WL 727540, at *13 (S.

Ct. Oct. 14, 1998). And a provision of the Hobbs Act lets the PFR court remand a case to a district court for a hearing with more factfinding if (1) the agency has not held a hearing before taking the challenged action, (2) it need not do so by law, and (3) there are genuine issues of material fact. 28 U.S.C. § 2347(b)(3); *see also AADC*, 525 U.S. at 496 n.2 (Ginsburg, J., concurring in part and in the judgment) (describing this mechanism); *Gallo-Alvarez v. Ashcroft*, 266 F.3d 1123, 1129 (9th Cir. 2001) (remanding PFR for more factfinding under this subsection).

Statutory context confirms that this part of the Hobbs Act applies to the INA. When Congress enacted § 1252 in its present form, it expressly barred courts from using a companion provision of the Hobbs Act, § 2347(c), to supplement the record in immigration cases. 8 U.S.C. § 1252(a)(1). By barring recourse to subsection (c) alone, Congress strongly implied that PFR courts may still use subsection (b). *Cf. Russello v. United States*, 464 U.S. 16, 23 (1983). So we hold, following *Gallo-Alvarez*, that § 2347(b)(3) is available in immigration proceedings when a party meets its preconditions.

Khalil did not get a hearing before the government issued the Rubio determination, detained him, or charged him as removable for visa fraud. Nor is there any evidence that the government held a hearing before adopting the alleged policy that he challenges. So he should be able to invoke § 2347(b)(3). Indeed, at oral argument, the government conceded that it would not object to a district-court remand if Khalil sought one

from the PFR court. And after oral argument, the government reiterated its consistent position that the INA "does not preclude a court of appeals from obtaining additional fact-finding if the agency record is inadequate" either through the Hobbs Act's remand process, by appointing a special master, or through another "appropriate mechanism" born out of "constitutional necessity." Gov't 28(j) Ltr. 2 (citing §2347(b)(3), Fed. R. App. P. 48, and *AADC*, 525 U.S. at 496 n.2 (1999) (Ginsburg, J., concurring in part and in the judgment) (quoting *AADC* Pet'rs' Reply Br. *13)).

Given these mechanisms, the PFR court can meaningfully review Khalil's claims. That remains the case even if, as Khalil argues, immigration judges and the BIA cannot pass on constitutional questions. No one disputes that a PFR court can hear constitutional claims. *See, e.g.*, *Santos-Alvarado v. Barr*, 967 F.3d 428, 439 (5th Cir. 2020) (considering a Fifth Amendment due process claim). And by using a Hobbs Act remand, a special master, or a similar administrative mechanism to supplement the record as needed, a PFR court can order any additional factfinding needed to pass on those claims.

Our dissenting colleague worries that the PFR court may not "obtain fact-finding," raising the prospect that "Khalil will [not] be able to develop an adequate factual record for his constitutional claims." Partial Dissent 25. Given the government's concessions, we think that unlikely. In any event, we cannot "anticipate what another court is given to decide" and tailor our reasoning accordingly. *BASF Wyandotte*

*Corp. v. Costle*, 582 F.2d 108, 112 n.7 (1st Cir. 1978) (quoting *NLRB v. Bayside Enters.*, 514 F.2d 475, 476 (1st Cir. 1975) (per curiam)). Rather, we must exercise our independent judgment. Exercising that judgment, we conclude that a PFR court has the tools to supplement the factual record if needed.

\* \* \* \* \*

The immigration laws enacted by Congress ordinarily require an alien to challenge his deportation in a PFR—unless he raises questions that a court of appeals could not meaningfully review in that context. That scheme ensures that petitioners get just one bite at the apple—not zero or two. But it also means that some petitioners, like Khalil, will have to wait to seek relief for allegedly unlawful government conduct. Because Khalil raises legal questions that a PFR court can meaningfully review later on, the INA bars him from attacking his detention and removal in a habeas petition. We will therefore VACATE and REMAND to the District Court with instructions to dismiss the petition.

*Counsel for Appellants*
Drew C. Ensign          [Argued]
Alanna Thanh Duong
Dhruman Y. Sampat
U.S. DEPARTMENT OF JUSTICE

*Counsel for Appellee*
Brett M. Kaufman          [Argued]
Esha Bhandari

Brian M. Hauss
AMERICAN CIVIL LIBERTIES UNION

Farrin R. Anello
Molly K.C. Linhorst
Jeanne LoCicero
Liza F. Weisberg
AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY

Baher A. Azmy
CENTER FOR CONSTITUTIONAL RIGHTS

Kyle Barron
Alina Das
WASHINGTON SQUARE LEGAL SERVICES
NYU SCHOOL OF LAW
IMMIGRANT RIGHTS CLINIC

Amy Belsher
Robert Hodgson
Veronica R. Salama
NEW YORK CIVIL LIBERTIES UNION

Oona Cahill
Johnny Sinodis
Marc Van Der Hout
VAN DER HOUT

Ramzi Kassem
MAIN STREET LEGAL SERVICES

*Counsel for Amicus Curiae National Jewish Advocacy Center in Support of Appellants*
Jason B. Torchinsky

HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK

*Counsel for Amicus Curiae Professor Kellen R. Funk in Support of Appellee*
Kellen Funk
COLUMBIA UNIVERSITY SCHOOL OF LAW
APPELLATE LITIGATION CLINIC

*Counsel for Amicus Curiae Knight First Amendment Institute at Columbia University in Support of Appellee*
Xiangnong Wang
COLUMBIA UNIVERSITY
KNIGHT FIRST AMENDMENT INSTITUTE

*Counsel for Amici Curiae Foundation for Individual Rights and Expression, National Coalition Against Censorship, Cato Institute, Rutherford Institute, Pen America, and First Amendment Lawyers Association in Support of Appellee*
Ronald G. London
FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION

*Counsel for Amici Curiae Scholars of Constitutional Law in Support of Appellee*
Lawrence S. Lustberg
GIBBONS

*Counsel for Amici Curiae 73 Faith Organizations Congregations and Faith Leaders in Support of Appellee*
Jessica Rofe
RUTGERS UNIVERSITY
CONSTITUTIONAL LITIGATION CLINIC

*Counsel for Amici Curiae Immigration Lawyers, Law*

*Professors, and Scholars in Support of Appellee*
Fatma Marouf
TEXAS A&M UNIVERSITY SCHOOL OF LAW
LEGAL CLINICS

*Counsel for Amici Curiae 108 Columbia University and
Barnard College Faculty Members in Support of Appellee*
Luna Droubi
BELDOCK LEVINE & HOFFMAN

*Counsel for Amici Curiae Habeas Scholars in Support of
Appellee*
Jon Romberg
SETON HALL UNIVERSITY SCHOOL OF LAW
CENTER FOR SOCIAL JUSTICE

*Counsel for Amici Curiae International Law Professors,
Scholars, and Practitioners in Support of Appellee*
Sarah H. Paoletti
UNIVERSITY OF PENNSYLVANIA SCHOOL OF LAW
TRANSNATIONAL LEGAL CLINIC

FREEMAN, *Circuit Judge*, dissenting in part and dissenting from the judgment.

I join the majority opinion insofar as it concludes the District Court had habeas jurisdiction. However, in my view, the District Court also had subject matter jurisdiction. Because no provision of the INA stripped the District Court of that jurisdiction, I would review the merits of the grant of injunctive relief.

# I

There are two reasons why 8 U.S.C. § 1252(b)(9) does not strip the District Court of jurisdiction. First, as our extant precedent holds, § 1252(b)(9) channels claims into a petition for review only when there is a final order of removal. *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 133 (3d Cir. 2012). Second, § 1252(b)(9) strips courts of jurisdiction only over claims "arising from" a removal proceeding. And we have held that "now-or-never claims"—claims unable to be remedied later—do not arise from a removal proceeding. *E.O.H.C. v. Sec'y U.S. Dep't of Homeland Sec.*, 950 F.3d 177, 185–86 (3d Cir. 2020). Because Khalil does not have a final order of removal and raises now-or-never claims, the District Court's jurisdiction is sound.

## A

Section 1252(a)(1) of the INA governs "[j]udicial review of a final order of removal." 8 U.S.C. § 1252(a)(1).

And § 1252(b) lists several requirements "[w]ith respect to review of an order of removal under subsection (a)(1)."  One such requirement is at issue here.  Section 1252(b)(9) states: "Judicial review of all questions of law and fact . . . arising from any action taken or proceeding brought to remove an alien from the United States . . .  shall be available only in judicial review of a final order [of removal]."  8 U.S.C. § 1252(b)(9).

In *Chehazeh v. Attorney General*, we held that § 1252(b)(9) takes effect at a specific moment: when the noncitizen becomes subject to a final order of removal.  666 F.3d at 133.  Our decision was based on the plain text of § 1252(b)(9) and *Immigration and Naturalization Service v. St. Cyr*, 533 U.S. 289, 310–14 (2001), where the Supreme Court discussed the meaning of § 1252(b)(9) in the context of § 1252 as a whole.

In *St. Cyr*, the Court explained that, by its terms, § 1252(b) "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'"  533 U.S. at 313 (alteration in original) (quoting 8 U.S.C. § 1252(b)).  As a result, § 1252(b)(9)'s jurisdiction stripping "applies only with respect to review of an order of removal under subsection (a)(1)."  *Id.* (citation modified).

Relying on *St. Cyr*'s analysis, we held in *Chehazeh* that § 1252(b)(9)'s jurisdiction-stripping is "inapplicable" when

2

there is no final order of removal.[1]   *Chehazeh*, 666 F.3d at 131–32 (citing *St. Cyr*, 533 U.S. at 313 and 8 U.S.C. § 1252(a)(1)).  Khalil is not subject to a final order of removal, so, under *Chehazeh*, § 1252(b)(9) does not apply to his claims.  This is sufficient to end the § 1252(b)(9) analysis.

Instead of following *Chehazeh*'s clear rule, the majority opinion declares it abrogated by *Jennings v. Rodriguez*, 583 U.S. 281 (2018).  Maj. Op. 30.  Not so.

1

In *Jennings*, noncitizens in removal proceedings brought habeas corpus petitions challenging the length of their detention.  *Jennings*, 583 U.S. at 290–91.  A divided Supreme Court held that § 1252(b)(9) did not strip federal courts of jurisdiction over the habeas petitions.  *Id.* at 294–95.  Six Justices agreed on this point.

Like we did in *Chehezah*, three Justices reasoned that § 1252(b)(9) could not apply without a final order of removal.  *Id.* at 355 (Breyer, J., dissenting in part) ("Jurisdiction . . . is

---

[1] We noted that the passage of the REAL ID Act of 2005 did not affect our application of *St. Cyr*, as "the REAL ID Act did not modify § 1252(b) or the instruction that § 1252(b)(9) 'applies only "[w]ith respect to review of an order of removal under subsection (a)(1)."'"   *Chehazeh*, 666 F.3d at 132 (quoting *St. Cyr*, 533 U.S. at 313 (quoting 8 U.S.C. § 1252(b))).

unaffected by 8 U.S.C. § 1252(b)(9), which by its terms applies only with respect to review of an order of removal under § 1252(a)(1). The respondents challenge their detention without bail, not an order of removal." (citation modified)). A different set of three justices expressly avoided defining the scope of § 1252(b)(9), which they deemed unnecessary to resolve the case. *Id.* at 294 (opinion of Alito, J.) ("The parties in this case have not addressed the scope of § 1252(b)(9), and it is not necessary for us to attempt to provide a comprehensive interpretation."). Instead, they reasoned that § 1252(b)(9) did not present a jurisdictional bar in that particular case, where the detainees did not challenge an order of removal, the decision to detain or remove them, or the process by which they were being detained and removed. *Id.* at 294–95.

Together, these six Justices agreed that, whatever the exact scope of § 1252(b)(9) may be, that provision did not strip jurisdiction over the *Jennings* detainees' habeas petitions. As today's majority opinion recognizes, nothing about that conclusion conflicts with *Chehazeh*. Maj. Op. 32. Indeed, in addition to the two Courts of Appeals that agreed with our

interpretation of § 1252(b)(9) before *Jennings*,[2] two more joined the chorus after *Jennings*.[3]

---

[2] *Nadarajah v. Gonzales*, 443 F.3d 1069, 1075 (9th Cir. 2006) ("By its terms, [§ 1252(b)(9)] does not apply to federal habeas corpus petitions that do not involve final orders of removal."); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006) ("[S]ection 1252(b)(9) applies only '[w]ith respect to review of an order of removal.'").

[3] *Ozturk v. Hyde*, 136 F.4th 382, 399 (2d Cir. 2025) (looking to "the very text of § 1252(b)," including its reference to § 1252(a)(1), to conclude that the provision only applies with respect to a final order of removal, and rejecting an argument that *Jennings* required a different interpretation); *Suri v. Trump*, No. 25-1560, 2025 WL 1806692, at *9 (4th Cir. July 1, 2025) (citing *Ozturk*, 136 F.4th at 399).

The majority opinion contends that the Second and Fourth Circuits' approach "disrupt[s] the zipper clause." Maj. Op. 33. *See St. Cyr*, 533 U.S. at 313 (describing § 1252(b)(9) as a "zipper clause" because "[i]ts purpose is to consolidate 'judicial review' of immigration proceedings into one action in the court of appeals" where there is a final order of removal). But the zipper clause's scope is defined by the statutory text. And the Second and Fourth Circuits' approach is consistent with "the general rule that the narrower construction of a

Only the First Circuit has held otherwise. *See Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland Sec.*, 510 F.3d 1, 9 (1st Cir. 2007) ("By its terms, the provision aims to consolidate 'all questions of law and fact' that 'arise from' either an 'action' or a 'proceeding' brought in connection with the removal of an alien." (quoting 8 U.S.C. § 1252(b)(9))).   But it did so without acknowledging that § 1252(b) only reaches "review of an order of removal under subsection (a)(1)."  8 U.S.C. § 1252(b)(9).  So that opinion is incompatible with *St. Cyr.  See St. Cyr*, 533 U.S. at 313.

2

Because none of the three opinions in *Jennings* garnered a majority of the Court, we must conduct a *Marks* analysis to discern *Jennings*' holdings.  *See Marks v. United States*, 430 U.S. 188, 193 (1977).  Under *Marks*, the holding of a divided Supreme Court "may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds."  *Id.* (citation modified).  This analysis must account for any dissenting opinions that were necessary to the holding with respect to a given legal question.  *See United States v. Jacobsen*, 466 U.S. 109, 116–17 & n.12 (1984); *United States v. Donovan*, 661 F.3d 174, 182 (3d Cir. 2011) (explaining this Court should "look[] to the votes of dissenting Justices if they,

---

jurisdiction-stripping provision is favored."   *E.O.H.C.*, 950 F.3d at 184 (citation modified).

combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue").

In our *Marks* analysis of *Jennings*, the relevant legal question is when § 1252(b)(9) strips jurisdiction from courts. So we analyze Justice Alito's and Justice Breyer's opinions— the two opinions that garnered a majority concluding that § 1252(b)(9) did not strip courts of jurisdiction. Justice Breyer would have adopted a broad rule that § 1252(b)(9) only strips jurisdiction over challenges to final orders of removal; absent a final order of removal, § 1252(b)(9) has no effect. *Jennings*, 583 U.S. at 355 (Breyer, J., dissenting in part). For his part, Justice Alito eschewed adopting any rule about the bounds of § 1252(b)(9). Instead, he made a case-specific decision. In his view, "it [wa]s enough to note that [the detainees] [we]re not asking for review of an order of removal; . . . not challenging the decision to detain them in the first place or to seek removal; and . . . not even challenging any part of the process by which their removability will be determined." *Id.* at 294 (opinion of Alito, J.). Given those circumstances, Justice Alito reasoned that the petitioners' claims did not "arise from" actions taken to remove them, so § 1252(b)(9) did not apply. *Id.* at 294–95.

As the *Jennings* opinion providing the narrower grounds for holding that § 1252(b)(9) did not strip courts of jurisdiction, Justice Alito's opinion provides the *Marks* holding of that case: Whatever the exact contours of § 1252(b)(9)'s jurisdiction stripping are, jurisdiction is not stripped where the petitioner is not asking for review of an

order of removal, does not challenge the decision to seek detention or removal, and does not challenge the procedures through which removability will be determined. *Id.* at 294–95. The majority opinion reads Justice Alito's opinion to say more. *See* Maj. Op. 30. It does not. And what today's majority extrapolates from Justice Alito's opinion is not the *Marks* holding, as it did not garner a majority of the *Jennings* Justices.

In characterizing Justice Alito's opinion, today's majority opinion relies on the logical fallacy of denying the antecedent. That fallacy extrapolates an "if-then" statement to mean if the initial condition is reversed, then the outcome will necessarily be reversed. *See Agri Processor Co. v. N.L.R.B.*, 514 F.3d 1, 6 (D.C. Cir. 2008) (citing Patrick J. Hurley, *A Concise Introduction to Logic* 323 (9th ed. 2006)). For example, consider the statement "if it is not cold outside, there is no snow." It does not follow that "if it is cold outside, there is snow." *Id.*

In *Jennings*, Justice Alito listed three characteristics of the habeas petitions and concluded that § 1252(b)(9) did not apply. It does not follow that if those three characteristics were reversed, § 1252(b)(9) would apply. And it certainly does not follow that if *just one* of those characteristics were reversed, § 1252(b)(9) would strip jurisdiction. But that is the majority's gloss on Justice Alito's opinion. Maj. Op. 30 (stating that Justice Alito's opinion "strongly suggested" § 1252(b)(9) would strip jurisdiction if the characteristics were reversed, and positing that this suggestion "necessarily reject[s]" *Chehazeh*'s

holding about § 1252(b)(9)). *But see Jennings*, 583 U.S. at 294 (opinion of Alito, J.) (expressly declining to make any "attempt to provide a comprehensive interpretation" of § 1252(b)(9)'s scope). We cannot espouse an interpretation premised on logical error.

In any event, even assuming Justice Alito's opinion suggested a view contrary to *Chehazeh*, that cannot constitute the *Marks* holding of the Court for a simple reason: It is incompatible with the views of the remaining five Justices who participated in *Jennings*. This suggestion directly contradicts the views of the three justices who joined Justice Breyer's opinion. *Id.* at 355 (Breyer, J., dissenting in part) (stating, as we held in *Chehazeh*, that § 1252(b)(9) applies only when there is a final order of removal). And it has no overlap with the discussion of § 1252(b)(9) in Justice Thomas's partial concurrence (for himself and one other Justice). Justice Thomas explained his view that § 1252(b)(9) strips courts of jurisdiction over all claims challenging detention during removal proceedings, including those filed by the *Jennings* detainees. *Id.* at 317–18, 326 (Thomas, J., concurring in part). He "would . . . [have] vacate[d] the judgment below with instructions to dismiss for lack of jurisdiction." *Id.* at 314. For

that reason, he did not join Part II of Justice Alito's opinion—the part that addressed § 1252(b)(9).[4]

Because the *Marks* rule from *Jennings* does not upset *Chehazeh*, I would apply our extant precedent and hold that § 1252(b)(9) did not strip the District Court of jurisdiction over Khalil's habeas petition.[5]

## B

Apart from the *Chehazeh* issue, our Court has established a second brightline rule that governs this case: Section 1252(b)(9) "does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside

---

[4] Justice Thomas recognized that he was in the minority on the jurisdictional question, and he joined only the portions of Justice Alito's opinion that addressed the merits of the claims. *Jennings*, 583 U.S. at 314 (Thomas, J., concurring in part) ("But because a majority of the Court believes we have jurisdiction, and I agree with the Court's resolution of the merits, I join Part I and Parts III–VI of the Court's opinion.").

[5] The majority opinion suggests that we implicitly acknowledged *Jennings*'s effect on *Chehazeh* when we "conspicuously did not rely on *Chehazeh*" in *E.O.H.C.* Maj. Op. 31. But when we determine our precedent has been abrogated, we say as much. Thus, *E.O.H.C.*'s silence does not support the majority's opinion's view.

review of a final order of removal." *E.O.H.C.*, 950 F.3d at 186. We call such challenges "now-or-never claims." *Id.* at 185–86. And even when now-or-never claims "flow from an action taken or proceeding brought to remove an alien," they do not "*arise from* that action or proceeding" such that § 1252(b)(9) would strip the courts' jurisdiction. *Id.* at 186 (citation modified and emphasis added).

We established this rule in *E.O.H.C.* based on two presumptions regarding Article III jurisdiction. The first is "the usual 'strong presumption in favor of judicial review of administrative action.'" *Id.* at 184 (quoting *St. Cyr*, 533 U.S. at 298). The second is "the general rule that the narrower construction of a jurisdiction-stripping provision is favored." *Id.* at 184 (citation modified); *United States v. Dohou*, 948 F.3d 621, 626 (3d Cir. 2020).

The presumption that the Executive Branch's actions are subject to judicial review is "well-settled" and "traces its lineage back to the foundations of our Republic." *Dohou*, 948 F.3d at 626 (first quoting *Kucana v. Holder*, 558 U.S. 233, 251–52 (2010)). The presumption is especially strong in the context of the writ of habeas corpus, which "has always been available to review the legality of Executive detention." *St. Cyr*, 533 U.S. at 305.

With those presumptions in mind, in *E.O.H.C.* we asked what it means for a question to "aris[e] from" an action or proceeding brought to remove a noncitizen from the United States. 950 F.3d at 184 (quoting 8 U.S.C. § 1252(b)(9)). We

reviewed the Supreme Court's two recent rulings that shed light on the "arising from" language, and we discerned that "the Justices appear to agree that now-or-never claims like the ones here do not 'aris[e] from' detention or removal proceedings and so may go forward." *Id.* at 185. We first discussed *Jennings*, where the three-Justice plurality rejected interpreting the phrase "arising from" with "uncritical literalism" that could lead to "extreme" and "staggering results" that "no sensible person could have intended." *Id.* (quoting *Jennings*, 583 U.S. at 293–94). And we observed that the Court in *Jennings* held that § 1252(b)(9) did not strip jurisdiction over claims of prolonged detention. *Id.* (citing *Jennings*, 583 U.S. at 293). We also reviewed *Nielsen v. Preap*, where a plurality of the Court held that § 1252(b)(9) did not strip jurisdiction over a challenge to a statute requiring immigration detention without bond hearings. *Id.* (citing *Preap*, 586 U.S. 392, 402 (2019)).

"We distill[ed] a simple principle from *Jennings*, *Preap*, and the presumptions favoring judicial review." *Id.* at 185–86. That principle is: "We must ask: If not now, when?" *Id.* at 186. If the answer is "never," then "§ 1252(b)(9) poses no jurisdictional bar. In other words, it does not strip jurisdiction when aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal." *Id.* So, to assess whether a claim is now-or-never, we ask whether a court of appeals can meaningfully redress the alleged injury when that court reviews a final order of removal. If not, the noncitizen need not wait for the final order to seek redress. *Id.* As we

explained, this is consistent with "the point of [§ 1252(b)(9)]," which "is to channel claims into a single petition for review, not to bar claims that do not fit within that process." *Id.*

To apply this rule here, we must ask which, if any, of the claims in Khalil's habeas petition are now-or-never claims. At least three are.

1

Khalil's operative habeas petition contains four claims. All four challenge Khalil's detention based on the Rubio determination and the government's policy of targeting for detention and removal noncitizens who engage in pro-Palestinian expressive activities (the "Policy").[6]

Claim 1 asserts that the government violated Khalil's First Amendment rights when it targeted and detained him in retaliation for his past protected speech, to prevent him from speaking while in detention, and to try to chill or prevent future speech. Claim 2 asserts that the government violated the Due Process Clause of the Fifth Amendment when it detained him

---

[6] One of these four claims also challenges the government's decision to lodge a second charge of removability—one for willful misrepresentation—against Khalil in March 2025. It asserts that the second charge of removability is meritless, is pretextual, and was brought in retaliation for Khalil's First Amendment activity, including the filing of his habeas petition.

punitively and based on the Policy and Rubio determination. It also asserts that the Policy and the Rubio determination are unconstitutionally vague, making it impossible to discern what speech will be punished. Claim 3 asserts that the Policy and the Rubio determination violate the Administrative Procedure Act ("APA") and the *Accardi* doctrine.[7] Claim 4 asserts that Khalil's substantial claims and extraordinary circumstances support his release on bail pending the adjudication of his habeas corpus proceedings. This claim alleges that Khalil's speech is severely curtailed while in ICE custody.

The orders on appeal relate to the First Amendment, Due Process, and bail claims. The parties do not address the APA and *Accardi* claim in their appellate briefs, so I do not address it here.

In the First Amendment, Due Process, and bail claims, Khalil alleged that the government's actions caused him to lose his First Amendment freedoms during his detention. *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."

---

[7] The *Accardi* doctrine requires government agencies to adhere to their agency regulations. *See Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

(citation modified)).[8]  The District Court then found, based on undisputed evidence, that Khalil's "speech [wa]s being chilled" while he was detained.  JA 18.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023); *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna*

---

[8]  Khalil relied on longstanding precedent that lawful permanent residents have First Amendment protections.  *See Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) (citing *Bridges* for the proposition that "resident aliens have First Amendment rights); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953) ("[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment. None of these provisions acknowledges any distinction between citizens and resident aliens.").

*Transit Sys.*, 938 F.3d 424, 442 (3d Cir. 2019).[9]  So when Khalil alleged the loss of his First Amendment freedoms while

---

[9] *See also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod*, 427 U.S. at 373)); *Neb. Press Ass'n v. Stuart*, 423 U.S. 1327, 1329 (1975) ("[A]ny First Amendment infringement that occurs with each passing day is irreparable."); *Amalgamated Transit Union Loc. 85 v. Port Auth. of Allegheny Cnty.*, 39 F.4th 95, 108 (3d Cir. 2022) (concluding that restrictions "prevent[ing] employees from expressing their views on a range of issues, from race relations to mask mandates" constituted irreparable injury under the First Amendment); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 317 (3d Cir. 2020) ("[N]o remedy at law can cure CIR's First Amendment injury because '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (second alteration in original) (quoting *Elrod*, 427 U.S. at 373)); *B.H. ex rel. Hawk v. Easton Area Sch. Dist.*, 725 F.3d 293, 323 (3d Cir. 2013) ("The ban [on breast-cancer-awareness bracelets] prevents B.H. and K.M. from exercising their right to freedom of speech, which unquestionably constitutes irreparable injury.  An after-the-fact money judgment would hardly make up for their lost opportunity to wear the bracelets in school." (citation modified)).

in detention, he alleged an irreparable injury. And when the District Court made a factual finding that Khalil's speech was being chilled, that resolved the question of irreparable harm.[10]

To halt the irreparable harm Khalil suffered during his detention, the District Court entered an injunction and authorized Khalil's release on bail. Today, we do not reach whether all requirements for the injunction and bail order were satisfied, but no one disputes the central basis for those orders: Khalil was being irreparably harmed while detained. Nor does anyone dispute that those irreparable harms will resume the moment when Khalil's preliminary injunction and bail order are vacated. So Khalil sought (and fleetingly obtained) "relief that courts cannot meaningfully provide alongside review of a final order of removal."[11] *E.O.H.C.*, 950 F.3d at 186. His claims are now-or-never claims.

---

[10] The government does not challenge the finding that Khalil's speech was being chilled. Nor could it, as it presented no contrary evidence in the District Court.

[11] *See* JA 1054 (requesting that the District Court vacate and set aside the Policy and the Rubio determination); D.C. ECF 67 (requesting that the District Court preliminarily enjoin (a) "Rubio's determination that the INA's 'Foreign Policy Ground' applies to him" and (b) "Respondents from enforcing their Policy of targeting for detention and removal noncitizens

2

Despite the irreparable injury from Khalil's past detention and forthcoming re-detention, the majority opinion says Khalil's claims are not now-or-never.  It reasons that Khalil can seek review of the legal and factual questions later.  Maj. Op. 26–29.  But that is not the relevant question.  Instead, we must ask whether the alleged harms can be *remedied* later.

The majority opinion contends that our *E.O.H.C.* opinion "left open" whether the now-or-never analysis turns on future ability to remedy harms or future ability to review questions.  Maj. Op. 22, 23.  It did not.  We settled that question when we held that "[§ 1252(b)(9)] does not strip jurisdiction when aliens seek *relief* that courts *cannot meaningfully provide* alongside review of a final order of removal."  950 F.3d at 186 (emphases added).  After we announced that rule, we proceeded to apply it.

The petitioners in *E.O.H.C.* raised several claims challenging whether the government could return them to Mexico during the pendency of proceedings to remove them to Guatemala.  *Id.* at 181–82.  With respect to each claim, we considered whether a court of appeals would be able to redress the petitioners' injuries later, when reviewing a final order of

---

who engage in constitutionally protected expressive activity in the United States in support of Palestinian rights or critical of Israel").

removal. *Id.* at 186–88. For most claims, we determined that a court could not because the injuries were irreparable. We deemed those now-or-never claims.

With respect to two claims "alleg[ing] injuries that would be caused by appellants' interim return to Mexico, not their final removal to Guatemala," we said "[n]either claim can be *redressed* at the end of the removal proceedings. So neither is barred by [§ 1252(b)(9)]." *Id.* at 187 (emphasis added). Next, as to a constitutional claim about the right to counsel, we wrote: "[T]he constitutional violation, as alleged, arises not from the efforts to remove them to Guatemala, but from those to return them to Mexico in the meantime. And the constitutional *harm* from those matters *could not be remedied* after a final order of removal." *Id.* (emphases added). So "this too is a now-or-never claim, [and] § 1252(b)(9) does not bar a district court's review." *Id.* Finally, we addressed one claim that was *not* now-or-never: the claim about the petitioners' statutory right to counsel. With regard to that claim, we found "no *irreparable harm*" because "[t]he court of appeals can *redress* any deprivation of counsel in the removal proceedings before the alien is removed." *Id.* at 188 (emphases added). So the district court lacked jurisdiction. *Id.* Again, the determining factor was redressability of the injury.[12]

---

[12] Although at times in *E.O.H.C.* we referenced a court's ability to "review" questions, we did so only alongside a

By saying the relevant question is meaningful reviewability, not irreparable harm, today's majority opinion not only conflicts with *E.O.H.C.*—it also renders meaningful review hollow. Even if Khalil becomes subject to a final order of removal, a court of appeals could vacate the order of removal, but that would not redress the First Amendment injuries Khalil sustained while detained.[13] Absent redressability, that court will lack jurisdiction to address those

discussion of whether relief was available. *See E.O.H.C.*, 950 F.3d at 186 ("[R]eview *and relief* may come too late *to redress* these conditions of confinement." (emphases added)); *id.* at 187 ("[I]t will be too late to review *or remedy* their return to Mexico in the meantime." (emphasis added)). By contrast, when we announced our rule about redressability, we did so without reference to whether a court could review legal or factual questions. *Id.* at 186 ("When a detained alien seeks *relief* that a court of appeals cannot meaningfully provide on petition for review of a final order of removal, § 1252(b)(9) does not bar consideration by a district court." (emphasis added)); *see also id.* at 187 (determining that § 1252(b)(9) does not strip jurisdiction over two claims because "[n]either claim can be *redressed* at the end of the removal proceedings" (emphasis added)).

[13] *But see Jennings*, 583 U.S. at 293 (opinion of Alito, J.) ("And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review.").

past harms. *Greenberg v. Lehocky*, 81 F.4th 376, 384 (3d Cir. 2023) ("To establish standing, a plaintiff must show an injury in fact fairly traceable to the challenged action that a favorable ruling may redress."). So Khalil's First Amendment injuries during his detention may get *no* review, let alone meaningful review. Only this habeas petition can provide Khalil meaningful review of the First Amendment harms from his detention.[14]

---

[14] The majority opinion attempts to analogize Khalil's circumstances to those of an innocent state prisoner who must challenge his conviction in state court before seeking federal habeas corpus relief. *See* Maj. Op. 25–26 (citing the federal habeas corpus statute's exhaustion requirement for state prisoners, 28 U.S.C. § 2254(b)(1)). This analogy is inapt for two reasons. First, Khalil has not been convicted by a state— a sovereignty with concurrent powers whose judgment is entitled to comity. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991). Instead, the federal government has caused Khalil's injuries, and there is no question that they are irreparable. *See Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Second, state courts can provide remedies to innocent state prisoners before those persons reach federal court. By contrast, if § 1252(b)(9) strips courts of jurisdiction over Khalil's habeas petition, no

3

The majority opinion also points to the word "questions" in the title and text of § 1252(b)(9) to support its position about how to identify a now-or-never claim. That word cannot bear the weight the majority opinion places on it.

Section 1252(b)(9) channels claims that present (1) "questions of law or fact" (2) "arising from" (3) an "action taken or proceeding brought to remove an alien from the United States." We must give effect to each of those requirements. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a statute." (citation modified)). And a plain reading shows that the phrase "arising from" qualifies the phrase "questions of law and fact." Not all questions of law and fact are channeled into a petition for review—only those questions "arising from" a removal action are.

The majority opinion conflates the first and second requirements of § 1252(b)(9). It says that something may only "aris[e] from" a removal proceeding if it is a "question." Maj. Op. 23–26. But that sheds no light on the meaning of "arising from." All legal claims raise questions. So the presence of the word "questions" in the provision's title is unilluminating. *See*

---

court or administrative agency will have jurisdiction to remedy the loss of Khalil's First Amendment freedoms. *See infra* Section I.B.4.

8 U.S.C. § 1252(b)(9) ("Consolidation of questions for judicial review"); Maj. Op. 25 ("The repeated statutory references to 'questions' show that what *makes* a claim now-or-never is that it raises questions that cannot be reviewed later, on a petition for review of a final order of removal.").

Our discussion in *E.O.H.C.* controls the meaning of "arising from." That phrase means seeking relief that can be provided through a petition for review. *See E.O.H.C.*, 950 F.3d at 186 ("read[ing] the phrase 'arising under' [sic]" to "not strip jurisdiction where aliens seek relief that courts cannot meaningfully provide alongside review of a final order of removal"). The phrase "questions of law or fact" does its own work—it clarifies that a court reviewing a final order of removal under § 1252(b)(9) has jurisdiction to address legal *and factual* questions. This contrasts with 8 U.S.C. § 1252(a)(2)(D), which strips courts of jurisdiction over questions of fact in certain immigration matters. 8 U.S.C. § 1252(a)(2)(D) (restoring courts' jurisdiction to review "constitutional claims or questions of law" related to denials of discretionary relief or orders against criminal aliens, despite the jurisdiction-stripping function of 8 U.S.C. § 1252(a)(2)(B), (C)); *see Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 225 (2020) (recounting that "§ 1252(a)(2)(D), which we shall call the Limited Review Provision, says that in such instances courts may consider only 'constitutional claims or questions of law'").

4

Even under the majority opinion's approach of asking whether the *questions* in Khalil's habeas petition can be reviewed later, there are more reasons why Khalil's claims are not likely to get meaningful review following a final order of removal.

First, the Immigration Judge in this case denied Khalil's requests to develop a factual record on his constitutional claims. JA 162 (telling Khalil "he is in the wrong court" for development of a factual record about his constitutional claims). So there will be no factual record for the Fifth Circuit Court of Appeals to review alongside a final order of removal.[15]

The government posits that, if the record is insufficient when Khalil's petition for review reaches the Fifth Circuit, that court *could* transfer the proceedings to a district court for fact-finding, appoint a special master, or implement some other fact-finding mechanism. The majority opinion says the government conceded that it would consent to such procedures. Maj. Op. 36–37. But the government took no position on whether it would consent; it merely noted that the INA does

---

[15] Khalil must bring his petition for review in the Fifth Circuit—"the court of appeals for the judicial circuit in which the immigration judge completed the proceedings." 8 U.S.C. § 1252(b)(2).

not preclude courts of appeals from using those procedures.[16] Moreover, regardless of the government's position, we cannot say whether the Fifth Circuit would obtain fact-finding—or even whether that court would issue a stay of removal so that Khalil could remain in the country for any such find-finding proceedings.

This leaves me with no assurance that Khalil will be able to develop an adequate factual record for his constitutional claims. And where a court of appeals will lack an adequate record to review constitutional claims, "restricting judicial review to the courts of appeals . . . is the practical equivalent of a total denial of judicial review" of those claims. *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 497 (1991). This is not only a matter of practicalities—it also informs our statutory construction. After all, "it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review." *Id.* at 496.

Second, the Immigration Judge held that she lacked jurisdiction to rule on Khalil's constitutional challenges. At oral argument in this appeal, the government referenced for the

---

[16] The government conceded it would not object to Khalil's attempts to develop the factual record before *the Immigration Judge*. Oral Arg. Tr. 56–57. But the government's non-opposition does not provide Khalil an opportunity to develop that record, particularly where the Immigration Judge repeatedly denied his requests to do so.

first time a new agency guidance about immigration judges' jurisdiction.  It later produced a copy of a September 2025 policy memorandum stating that immigration judges "may generally consider arguments arising out of constitutional law."  Gov't 28(j) Ltr., Oct. 22, 2025, Ex. A at 6.  But this new general guidance—the lawfulness of which neither the Fifth Circuit nor this Court has addressed—hardly persuades me that Khalil will obtain the review necessary to redress his injuries.

Third, "the final order of removal might never come." *E.O.H.C.*, 950 F.3d at 186.  That is, he may prevail in his agency appeal.  Although that would be welcome relief to Khalil, it would also deprive him of any ability to challenge his months of First Amendment injuries or the government's decisions that caused them.  *See Jennings*, 583 U.S. at 293 (opinion of Alito, J.) ("And of course, it is possible that no such order would ever be entered in a particular case, depriving that detainee of any meaningful chance for judicial review."); *Ozturk*, 136 F.4th at 401 (same).

For all these reasons, § 1252(b)(9) does not strip the District Court of jurisdiction over at least three of Khalil's habeas corpus claims.

## II

Section 1252(g) did not strip the District Court of jurisdiction over Khalil's claims either.  That provision applies to claims "arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or

execute removal orders." 8 U.S.C. § 1252(g). After enacting § 1252(g), Congress transferred immigration enforcement authority from the Attorney General to the Secretary of Homeland Security ("DHS Secretary"). 8 U.S.C. § 1103(a); 6 U.S.C. § 202. Accordingly, § 1252(g) applies to actions taken by the DHS Secretary. But section 1252(g) "does not sweep broadly" and "reaches only these three specific actions." *Tazu v. Att'y Gen.*, 975 F.3d 292, 296 (3d Cir. 2020); *see also Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 482 (1999) ("The provision applies only to three discrete actions that the [DHS Secretary] may take.").

Because of the specific limitations in § 1252(g)'s text, the Supreme Court has "rejected as 'implausible' the Government's suggestion that § 1252(g) covers 'all claims arising from deportation proceedings' or imposes 'a general jurisdictional limitation.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (quoting *AADC*, 525 U.S. at 482). Although "many other decisions or actions . . . may be part of the deportation process," they do not fall within the provision's scope. *AADC*, 525 U.S. at 482.

The government contends that § 1252(g) applies because Khalil is challenging the DHS Secretary's decision to commence proceedings against him. The government is incorrect. Khalil challenges the *Secretary of State*'s determination that his expressive activity compromises compelling United States foreign policy interests. He also challenges the government's Policy of targeting pro-

Palestinian activists as the subjects of the *Secretary of State*'s determinations. These are not challenges to any decision or action by the DHS Secretary. Moreover, as the District Court explained, the Secretary of State's determination preceded the DHS Secretary's exercise of discretion to commence proceedings against Khalil. And I would join our sister circuits that have held "§ 1252(g) does not bar review of the actions that occurred prior to any decision to 'commence proceedings.'" *Wong v. United States*, 373 F.3d 952, 965 (9th Cir. 2004); *see also United States v. Hovsepian*, 359 F.3d 1144, 1155 (9th Cir. 2004) ("The district court may consider a purely legal question that does not challenge the [DHS Secretary]'s discretionary authority, even if the answer to that legal question . . . forms the backdrop against which the [DHS Secretary] later will exercise discretionary authority."); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1368 (11th Cir. 2006) ("While this provision bars courts from reviewing certain exercises of discretion by the [DHS Secretary], it does not proscribe substantive review of the underlying legal bases for those discretionary decisions and actions.").

The government argues the Rubio determination and the DHS Secretary's decision to bring removal proceedings are inextricably intertwined such that § 1252(g) strips jurisdiction over challenges to both. But we must read § 1252(g) "narrow[ly]." *AADC*, 525 U.S. at 487. And while the Rubio determination was a precursor to the DHS Secretary's decision to commence removal proceedings, the two actions are distinct. Only the DHS Secretary exercises prosecutorial

28

discretion when she decides to commence removal proceedings. So only that action is covered by § 1252(g). *See id.* at 485 n.9 (stating that § 1252(g) "was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion").

*   *   *

Khalil claims that the government violated his fundamental constitutional rights. He has also alleged—and proven—irreparable injuries during his detention. Precedent and principles of statutory interpretation lead me to conclude that "it is most unlikely that Congress intended to foreclose all forms of meaningful judicial review" over his claims. *McNary*, 498 U.S. at 496. I would hold that the INA does not strip the District Court of jurisdiction over Khalil's claims, so I would address the merits of the District Court's orders granting Khalil preliminary injunctive relief and authorizing his release from detention. I respectfully dissent.