**Nos. 25-2162 & 25-2357**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

---

Mahmoud KHALIL,

*Petitioner–Appellee*,

Donald J. TRUMP, in his official capacity as President of the United States; William P. JOYCE, in his official capacity as Acting Field Office Director of New York, Immigration and Customs Enforcement; Yolanda PITTMAN, in her official capacity as Warden of Elizabeth Contract Detention Facility; Todd LYONS, in his official capacity as Acting Director of Immigration and Customs Enforcement; Markwayne MULLIN, in his official capacity as Secretary of the Department of Homeland Security; Marco RUBIO, in his official capacity as Secretary of State; and Pamela BONDI, in her official capacity as Attorney General of the Department of Justice,

*Respondents–Appellants*.

---

### DECLARATION OF BAHER A. AZMY, ESQ.

---

I, Baher A. Azmy, hereby declare as follows:

1. I am the Legal Director of the Center for Constitutional Rights in New York, New York and counsel to the Petitioner-Appellee in the above-captioned action. I submit this Declaration in support of Petitioner-Appellee's Motion to Recuse Hon. Judge Emil Bove from Consideration of Petitioner-Appellee's Petition for Rehearing En Banc.

1

2.      Attached hereto are true and correct copies of the following:

| Exhibit 1 | United States Senate Committee on the Judiciary, 119th Congress, Questionnaire for Judicial Nominees of Emil Joseph Bove III |
|---|---|
| Exhibit 2 | United States Senate Committee on the Judiciary, 119th Congress, Nomination of Emil J. Bove, III to be U.S. Circuit Judge for the Third Circuit: Questions for the Record (Answers to Written Questions for Emil Bove from Sen. Peter Welch) |

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 1, 2026          /s/ Baher Azmy
New York, New York            Baher Azmy

2

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 1, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system. I further certify that all participants in this case, including Petitioner's counsel, are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Baher Azmy*
Baher Azmy
Center For Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
Tel: (212) 614-6464

# EXHIBIT 1

# EXHIBIT 2

**Senator Peter Welch**
**Senate Judiciary Committee**
**Written Questions for Emil Bove**
**Hearing on "Nominations"**
**Wednesday, June 25, 2025**

1. How many appellate briefs have you filed?

   Response: I have participated in the filing of approximately 32 appellate briefs.

2. How many times have you argued before an appellate court?

   Response: I have argued approximately 11 appeals before federal and state appellate courts.

3. President Trump announced your nomination on May 28, 2025.

   a. Prior to this date, did you discuss your nomination with President Trump? If so, when did that occur?

      Response: No.

   b. Prior to this date, did you discuss your nomination with anyone at the White House? If so, when did that occur?

      Response: I addressed the process that preceded my nomination in question 26 of the Senate Judiciary Questionnaire.

   c. Did you meet with President Trump prior to his announcement? If so, where did you meet, who was present, and what was discussed?

      Response: Please see my responses to question 3.a and question 3.b.

4. The government requested a dismissal of the indictment against New York City Mayor Eric Adams in *United States v. Adams*, 24 CR 556 (S.D.N.Y.) on February 14, 2025. You personally signed the request.

   a. Who made the final decision about whether the government would request a dismissal of the indictment?

      Response: My publicly available memorandum to the Acting U.S. Attorney for the Southern District of New York, dated February 10, 2025, stated that the directive was authorized by the Attorney General.

1

As a judicial nominee and a member of the New Jersey and New York bars, I must respectfully decline to disclose non-public facts in response to this question. First, I have an ethical obligation to preserve confidential communications and advice that I may have provided to clients, including at DOJ. *See, e.g.*, N.J. Rule 1.6; N.Y. Rule 1.6. Second, it would be inappropriate for me to disclose legal advice or other confidential information, arguably to the detriment of my clients, in a manner that could be viewed as an effort to advance my personal interest in confirmation. *See, e.g.*, N.J. Rule 1.8(b); N.Y. Rule 1.8(b). Third, efforts to obtain the Executive Branch's confidential information in the context of a confirmation hearing present difficult separation-of-powers questions. Fourth, even the prospect that the Executive Branch's confidential information could be required to be disclosed in the context of a confirmation hearing would undermine the candor and free exchange of ideas that is necessary to the effective operation of the Executive Branch. *See Trump v. United States*, 603 U.S. 593, 612-13 (2024) (describing "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking, as well as the need to protect communications between high Government officials and those who advise and assist them in the performance of their manifold duties" (cleaned up)). Numerous nominees have taken the same approach, including Justice Kagan, who explained at her confirmation hearing: "I cannot reveal any kind of internal deliberations of the Department of Justice." Additional examples of similar positions taken by past nominees, who were confirmed, are set forth in Appendix A to my responses to Chairman Grassley's questions for the record.

b.  Did you discuss the dismissal with Tom Homan prior to filing it?

Response: Please see my response to question 4.a.

c.  Who at the White House did you consult with regarding the decision to dismiss the indictment prior to filing it?

Response: Please see my response to question 4.a.

d.  Did you discuss the dismissal with Todd Blanche before February 12, 2025?

Response: Please see my response to question 4.a.

e.  You stated during your nominations hearing that "policy reasons made it appropriate to dismiss the charges." What are those policy reasons?

Response: I was referring to the policy reasons set forth in the publicly available brief filed in the case. *See* ECF No. 160, *United States v. Adams*, No. 24 Cr. 556 (S.D.N.Y. Mar. 7, 2025).

f.  You also stated during your nominations hearing that the indictment against Mayor Adams would impact his ability to serve as mayor and campaign for reelection. In your view, under what circumstances is it appropriate to bring criminal charges against an elected official?

Response: Because this question implicates an issue that could come before me as a judge if I am fortunate enough to be confirmed, it would be inappropriate for me, as a nominee, to respond. To the extent this question seeks information regarding my views on public policy issues, consistent with the Code of Conduct and positions taken by prior nominees, it would be inappropriate for me, as a nominee, to take a position.

5.  According to public reporting, the Department of Justice opened an investigation into a protest at Barnard College that occurred on February 26, 2025.

a.  Did you order the opening of that investigation?

Response: To the extent this question seeks non-public information, please see my response to question 4.a. However, there is a publicly available affidavit filed by an FBI agent that discloses some details of the investigation. *See* ECF No. 17-1, *In re Application of the New York Times Company in the matter of Columbia University Apartheid Divest*, No. 25 Mc. 218 (S.D.N.Y June 16, 2025).

According to the affidavit, during the incident on February 26, 2025, a Barnard College employee was assaulted. *Id.* ¶ 14. On March 5, 2025, "a group of masked individuals entered a multi-purpose building at Barnard College," and members of the group "distributed paper leaflets purporting to be authored by the Hamas Media Office which purported to articulate reasons why the October 7, 2023 mass killings of Israeli civilians were morally justified." *Id.* Hamas is a designated foreign terrorist organization under U.S. law, and members of Hamas are charged with terrorism offenses in the United States in relation to the attack on October 7, 2023. *See, e.g.*, *United States v. Haniyeh, et al.*, No. 24 Mag. 438 (S.D.N.Y.).

A group called "Columbia University Apartheid Divest," or "CUAD," took credit for organizing and carrying out the February 26 and March 5, 2025 incidents at Barnard College. *See* ECF No. 17-1 ¶ 14, *In re Application of the New York Times Company in the matter of Columbia University Apartheid Divest*, No. 25 Mc. 218 (S.D.N.Y June 16, 2025). In October 2024, CUAD issued an "open letter"

3

supporting a Columbia student who had been disciplined "for stating, during an Instagram live stream, that 'Zionists don't deserve to live' and 'Be grateful that I'm not just going out and murdering Zionists.'" *Id.* ¶ 12. On March 14, 2025, a social media account associated with CUAD posted a picture of the residence of the interim President of Columbia University. *Id.* ¶¶ 8-9. The picture showed red spray paint on the residence, which appears to have been intended to look like blood, along with a black inverted triangle that, according to the affidavit, "is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate homes and buildings as targets for attack." *Id.* ¶ 10.

b. Did you issue orders or give directions to the Civil Rights Division during the course of that investigation? If so, what orders or directions did you give?

Response: Please see my response to question 4.a.

c. Did you issue orders or give directions to the Federal Bureau of Investigation (FBI) during the course of that investigation? If so, what orders or directions did you give?

Response: Please see my response to question 4.a.

d. Did you order or direct FBI agents from the Joint Terrorism Task Force to put on raid jackets and stand in formation during the course of that investigation?

Response: Please see my response to question 4.a.

6. According to public reporting, in 2018 an email was sent to supervisors at the U.S. Attorney's Office for the Southern District of New York regarding complaints about you.

a. Have you read that email?

Response: Yes.

b. Did you hang a copy of that email in your office?

Response: Yes, between approximately 2018 and 2019, I hung the email on the wall next to my computer in order to remind myself of lessons learned through mentorship from my supervisors and to motivate myself as I continued to pursue a promotion to become a supervisor of the national security unit, which I obtained in 2019.

    c. Due to this complaint, or others, were you asked or ordered to complete any trainings?

    Response: I do not recall being asked to complete any particular training beyond that which was required of all individuals in similar supervisory positions.

    d. Do you know Joan Loughnane? If so, please describe your relationship with Ms. Loughnane?

    Response: Yes. Ms. Loughnane is a professional colleague.

    e. Do you know Lisa Zornberg? If so, please describe your relationship with Ms. Zornberg?

    Response: Yes. Ms. Zornberg is a professional colleague.

7. Please describe your involvement in the firing of prosecutors from the U.S. Attorney's Office for the District of Columbia who were assigned cases involving the insurrection on January 6, 2021.

Response: I issued a publicly available memorandum on January 31, 2025 relating to the terminations of the probationary employees at the U.S. Attorney's Office for the District of Columbia. The memorandum explained my understanding that "<u>after</u> President Trump was elected to his second term in Office, the Biden Administration's Justice Department converted these employees to permanent status," which "resulted in the mass, purportedly permanent hiring of a group of AUSAs" that "improperly hindered the ability of Acting U.S. Attorney [Ed] Martin to staff his office in furtherance of his obligation to faithfully implement the agenda that the American people elected President Trump to execute." The memorandum further explained that these "subversive personnel actions" drove my thinking about the termination decisions of these probationary employees.

To the extent this question seeks non-public information, please see my response to question 4.a. In addition, because certain of the personnel decisions at issue are the subject of ongoing litigation, it would be inappropriate for me, as a judicial nominee, to comment further.

    a. How many of these prosecutors were fired?

    Response: I do not know the exact number.

    b. Did you personally approve these terminations?

    Response: Please see my response to question 7.

8.  Please describe your involvement in the development of a list of agents at the FBI who were assigned cases involving the insurrection on January 6, 2021.

Response: I issued a memorandum on January 31, 2025, which is publicly available, requesting the list of FBI employees who were assigned to investigations and prosecutions relating to events on January 6, 2021. The memorandum stated that the requested list would be used to "commence a review process to determinate whether any additional personnel actions are necessary." Consistent with that explanation, the Acting Director of the FBI indicated in a February 4, 2025 email that he was "confident" that DOJ would "undertake a full and fair review of the data we provided" and that "the FBI does not consider anyone's identification on one of these lists as an indicator of misconduct." ECF No. 11-2, *Does 1-9 v. DOJ*, No. 25 Civ. 325 (D.D.C. Feb. 24, 2025). The following day, I sent a private email to the FBI that reiterated the point: "No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties." ECF No. 11-3, *id.* In light of the ongoing litigation, DOJ "has not commenced this [review] process" or "accessed the unclassified list of names that prior acting FBI leadership claimed to have sent." ECF No. 45-1 at 4, *id.*

To the extent this question seeks non-public information, please see my response to question 4.a. In addition, because this issue is the subject of ongoing litigation, it would be inappropriate for me, as a judicial nominee, to comment further. *See Does 1-9 v. DOJ*, No. 25 Civ. 325 (D.D.C.); *FBI Agents Ass'n v. DOJ*, No. 25 Civ. 328 (D.D.C.)

a.  Have any adverse employment actions been taken against agents on this list related to their investigation of the insurrection on January 6, 2021?

Response: Please see my response to question 8.

6

**UNITED STATES SENATE**
**COMMITTEE ON THE JUDICIARY**

**QUESTIONNAIRE FOR JUDICIAL NOMINEES**

**<u>PUBLIC</u>**

1.    **<u>Name</u>**: State full name (include any former names used).

Emil Joseph Bove III

2.    **<u>Position</u>**: State the position for which you have been nominated.

Circuit Judge, United States Court of Appeals for the Third Circuit

3.    **<u>Address</u>**: List current office address. If city and state of residence differs from your place of employment, please list the city and state where you currently reside.

Office:          Office of the Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530

Residence:    East Stroudsburg, Pennsylvania and Arlington, Virginia

4.    **<u>Birthplace</u>**: State year and place of birth.

1981; Geneva, New York

5.    **<u>Education</u>**: List in reverse chronological order each college, law school, or any other institution of higher education attended and indicate for each the dates of attendance, whether a degree was received, and the date each degree was received.

2005 – 2008, Georgetown University Law Center, J.D.; 2008

1999 – 2003, State University of New York at Albany, B.A.; 2003

6.    **<u>Employment Record</u>**: List in reverse chronological order all governmental agencies, business or professional corporations, companies, firms, or other enterprises, partnerships, institutions or organizations, non-profit or otherwise, with which you have been affiliated as an officer, director, partner, proprietor, or employee since graduation from college, whether or not you received payment for your services. Include the name and address of the employer and job title or description.

2025 – Present
Office of the Deputy Attorney General

United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Principal Associate Deputy Attorney General (January 2025 – Present)
Acting Deputy Attorney General (January 2025 – March 2025)

2023 – 2025
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, New York 10005
Partner

2022 – 2023
Chiesa Shahinian & Giantomasi PC
105 Eisenhower Parkway
Roseland, New Jersey 07068
Member

2012 – 2021
United States Attorney's Office for the Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278
Assistant United States Attorney (2012 – 2021)
Acting Deputy Chief, Narcotics Unit (2019)
Co-Chief, Terrorism and International Narcotics Unit (2019 – 2021)

2010 – 2012
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Associate

2009 – 2010
The Honorable Richard C. Wesley
United States Court of Appeals for the Second Circuit
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007
Law Clerk

2008 – 2009
The Honorable Richard J. Sullivan
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

Law Clerk

2007 – 2008
Professor Nicholas Quinn Rosenkranz
Georgetown University Law Center
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
Research Assistant

Summer 2007
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Summer Associate

Summer 2006
The Honorable Denny Chin
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007
Summer Intern

2003 – 2005
United States Attorney's Office for the Southern District of New York
One Saint Andrews Plaza
New York, New York 10007
Paralegal

Other Affiliations (unpaid)
2022 – 2024
Focused Conservation
609 Greenwich Street
New York, New York 10014
Board Member

7.      **Military Service and Draft Status**:  Identify any service in the U.S. Military, including dates of service, branch of service, rank or rate, serial number (if different from social security number) and type of discharge received, and whether you have registered for selective service.

I did not serve in the military. I registered for the selective service upon turning 18.

8.      **Honors and Awards**:  List any scholarships, fellowships, honorary degrees, academic or professional honors, honorary society memberships, military awards, and any other special recognition for outstanding service or achievement.

3

Director's Award for Superior Performance by a Litigative Team, United States Department of Justice (2019)

Georgetown University Law Center
    Magna cum laude (top 5%) (2008)
    Order of the Coif (2008)
    Editor-in-Chief, Georgetown Law Journal's Annual Review of Criminal Procedure (2007 – 2008)
    Staff Editor, Georgetown Law Journal (2006 – 2008)
    Finalist, Robert J. Beaudry Moot Court Competition (2006)

Graduate Scholarship, Jack Kent Cooke Foundation (2005 – 2008)

Mid-Atlantic Champion & Best Brief Award, ABA National Appellate Advocacy Competition (2007)

State University of New York at Albany
    Summa cum laude (2003)
    Phi Beta Kappa (2003)
    Chancellor's Award for Student Excellence (2003)
    Presidential Undergraduate Leadership Award (2003)
    Co-Captain, NCAA Division I Men's Lacrosse Team (2001 – 2003)
    Presidential Scholars Program (1999 – 2003)

America East Athletic Conference Male Scholar Athlete of the Year (2002, 2003)

Academic All-American (2002, 2003)

9.     **Bar Associations**: List all bar associations or legal or judicial-related committees, selection panels or conferences of which you are or have been a member, and give the titles and dates of any offices which you have held in such groups.

New York State Bar Association
New York City Bar Association

10.     **Bar and Court Admission**:

    a.     List the date(s) you were admitted to the bar of any state and any lapses in membership. Please explain the reason for any lapse in membership.

    New York, 2009
    New Jersey, 2022

    Shortly after I left Chiesa Shahinian & Giantomasi PC in 2023, I ceased being an active member of the New Jersey bar because I did not anticipate practicing state law in New Jersey during my representation of President Trump as a partner at Blanche Law PLLC.

4

Accordingly, I did not participate in New Jersey CLE programs or pay bar dues. As a result, I became administratively ineligible to practice law in New Jersey. I addressed this ineligibility in 2025 and am currently a member in good standing of the New Jersey bar.

b.    List all courts in which you have been admitted to practice, including dates of admission and any lapses in membership. Please explain the reason for any lapse in membership. Give the same information for administrative bodies that require special admission to practice.

United States Court of Appeals for the District of Columbia Circuit, 2023
United States Court of Appeals for the Second Circuit, 2014
United States Court of Appeals for the Eleventh Circuit, 2024
United States District Court for the District of New Jersey, 2022
United States District Court for the Eastern District of New York, 2010
United States District Court for the Southern District of New York, 2010

11.    **Memberships**:

a.    List all professional, business, fraternal, scholarly, civic, charitable, or other organizations, other than those listed in response to Questions 9 or 10 to which you belong, or to which you have belonged, since graduation from law school. Provide dates of membership or participation, and indicate any office you held. Include clubs, working groups, advisory or editorial boards, panels, committees, conferences, or publications.

Institute for Financial Market Regulation, Albany Law School, Advisory Council (approximately 2014 – 2016)

b.    The American Bar Association's Commentary to its Code of Judicial Conduct states that it is inappropriate for a judge to hold membership in any organization that invidiously discriminates on the basis of race, sex, or religion, or national origin. Indicate whether any of these organizations listed in response to 11a above currently discriminate or formerly discriminated on the basis of race, sex, religion or national origin either through formal membership requirements or the practical implementation of membership policies. If so, describe any action you have taken to change these policies and practices.

To the best of my knowledge, no organization listed above currently discriminates or formerly discriminated on the basis of race, sex, religion or national origin either through formal membership requirements or the practical implementation of membership policies.

12.    **Published Writings and Public Statements**:

a.    List the titles, publishers, and dates of books, articles, reports, letters to the editor, editorial pieces, or other published material you have written or edited, including material published only on the Internet. Supply copies of all published material to the Committee.

5

With Danielle Corcione and Brittany Manna, *State Sanctions Targeting Russia Present Complicated Questions for Companies, Regulators*, New York Law Journal (2023). Copy supplied.

With Lee Vartan, *Chinese Efforts to Obstruct Huawei Prosecution Illustrate Hybrid Corporate Espionage Risks*, New Jersey Law Journal (2022). Copy supplied.

With Brittany Manna, *2 Worthy Goals for the DOJ's New Domestic Terrorism Unit*, Law360 (2022). Copy supplied.

With Hon. Richard J. Sullivan, *Federal Sentencing Guidelines*, in Business Crimes (2012). Copy supplied.

*Preserving the Value of Unanimous Criminal Jury Verdicts in Anti-Deadlock Instructions*, 97 Geo. L.J. 251 (2008). Copy supplied.

*Institutional Factors Bearing on Criminal Charging Decisions in Complex Regulatory Environments*, 45 Am. Crim. L. Rev. 1347 (2008). Copy supplied.

With Michael Kotlarczyk, *Letter from the Editors*, 37 Ann. Rev. Crim. Proc. i (2008). Copy supplied.

*American System of Corporate Governance*, Rockefeller Review (2003), presented at Rice University Undergraduate Research Conference (2004). I have not been able to locate a copy of this article.

*Haste Makes Waste*, MSNBC.com (2002). I have not been able to locate a copy of this article.

b.    Supply copies of any reports, memoranda or policy statements you prepared or contributed in the preparation of on behalf of any bar association, committee, conference, or organization of which you were or are a member. If you do not have a copy of a report, memorandum or policy statement, give the name and address of the organization that issued it, the date of the document, and a summary of its subject matter.

I do not recall preparing or participating in the preparation of any such reports, memoranda, or policy statements.

Although I understand that internal memoranda for the Department of Justice are not responsive to this question, internal memoranda that I authored and/or helped prepare have been publicly disclosed. In the interest of transparency, I have included the ones of which I am aware here:

Memorandum for All Component Heads from the Deputy Attorney General Regarding Preventing Conflicts of Interest Between the Department of Justice and Private Counsel Engaged by the Government (May 9, 2025). Copy supplied.

6

Memorandum for All Department Employees from the Deputy Attorney General Regarding Engagement with the American Bar Association (Apr. 9, 2025). Copy supplied.

Memorandum for All Department Employees from the Deputy Attorney General Regarding Ending Regulation By Prosecution (Apr. 7, 2025). Copy supplied.

Memorandum for All Department Employees from the Deputy Attorney General Regarding Operation Take Back America (Mar. 6, 2025). Copy supplied.

Memorandum for All Department Employees from the Deputy Attorney General Regarding U.S. Attorneys' Offices Staffing Priorities (Mar. 6, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Eliminating Internal Discriminatory Practices (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Ending Illegal DEI and DEIA Discrimination and Preferences (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Establishment of Joint Task Force October 7 (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding General Policy Regarding Charging, Plea Negotiations, and Sentencing (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding General Policy Regarding Zealous Advocacy on Behalf of the United States (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Reinstating the Prohibition on Improper Guidance Documents (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Reinstating the Prohibition on Improper Third-Party Settlements (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Restoring a Measure of Justice to the Families of Victims of Commuted Murderers (Feb. 5, 2025). Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Restoring the Integrity and Credibility of the Department of Justice (Feb. 5, 2025). Copy

supplied.

Memorandum for All Department Employees from the Attorney General Regarding Return to Full-Time In-Person Work at the Department of Justice (Feb. 5, 2025).  Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions (Feb. 5, 2025).  Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Sanctuary Jurisdiction Directives (Feb. 5, 2025).  Copy supplied.

Memorandum for All Department Employees from the Attorney General Regarding Total Elimination of Cartels and Transnational Criminal Organizations (Feb. 5, 2025).  Copy supplied.

Memorandum for All Department Employees from the Acting Deputy Attorney General Regarding Interim Policy Changes Regarding Charging, Sentencing, And Immigration Enforcement (Jan. 21, 2025).  Copy supplied.

c.      Supply copies of any testimony, official statements or other communications relating, in whole or in part, to matters of public policy or legal interpretation, that you have issued or provided or that others presented on your behalf to public bodies or public officials.

DOJ Press Release, *Violent Illegal Alien Arrested After Release from Local Jail Despite Federal Arrest Warrant* (2025).  Copy supplied.

DOJ Press Release, *Attorney General Pamela Bondi Announces 29 Wanted Defendants from Mexico Taken into U.S. Custody* (2025).  Copy supplied.

I issued an official statement to the media, as Acting Deputy Attorney General, following a February 19, 2025 hearing in *United States v. Adams*, No. 24 Cr. 556 (S.D.N.Y.).  Copy supplied.

Although I understand that internal memoranda and other internal communications for the Department of Justice are not responsive to this question, three documents related to this subject matter have been publicly disclosed.  In the interest of transparency, I include them here:

Memorandum to the FBI Acting Director from the Acting Deputy Attorney General Regarding Terminations (Jan. 31, 2025).  Copy supplied.

Memorandum to the Acting United States Attorney for the Southern District of New York from the Acting Deputy Attorney General Regarding Dismissal Without Prejudice

of Prosecution of Mayor Eric Adams (Feb. 10, 2025). Copy supplied.

Letter to the Acting United States Attorney for the Southern District of New York from the Acting Deputy Attorney General Regarding *United States v. Adams*, No. 24 Cr. 556 (S.D.N.Y.) (Feb. 13, 2025). Copy supplied.

d.      Supply copies, transcripts or recordings of all speeches or talks delivered by you including commencement speeches, remarks, lectures, panel discussions, conferences, political speeches, and question-and-answer sessions. Include the date and place where they were delivered, and readily available press reports about the speech or talk. If you do not have a copy of the speech or a transcript or recording of your remarks, give the name and address of the group before whom the speech was given, the date of the speech, and a summary of its subject matter. If you did not speak from a prepared text, furnish a copy of any outline or notes from which you spoke.

In approximately 2020, I spoke to South American law enforcement in Buenos Aires, Argentina regarding threats presented by Hezbollah. At the time, I was a prosecutor at the United States Attorney's Office for the Southern District of New York and a member of the Department of Justice's Hezbollah Financing and Narcoterrorism Team. I have not been able to locate a transcript, prepared text, outline, or notes relating to my remarks.

Panel Chairman, "A Comparative Discussion of Regulatory Compliance Within Firms," Association for Public Policy Analysis & Management Research Conference (2007). I have not been able to locate a transcript, prepared text, outline, or notes relating to this panel.

e.      List all interviews you have given to newspapers, magazines or other publications, or radio or television stations, providing the dates of these interviews and copies of the clips or transcripts of these interviews where they are available to you.

Podcast interview, "Chattinn Cyber" podcast with Marc Schein of Marsh McLennan, "Economic Sanctions, Cyber Law Enforcement, And Private-Government Collaboration For Cyber Protection" (2023). Audio available at: https://www.chattinncyber.com/2023/03/13/economic-sanctions-cyber-law-enforcement-and-private-government-collaboration-for-cyber-protection-with-emil-bove.

Podcast interview, "Breaking Hezbollah's Golden Rule" podcast with Matthew Levitt of the Washington Institute for Near East Policy, "Episode 7: Hezbollah 'Black Ops' in the Western Hemisphere" (2022). Audio and transcript of the podcast available at: https://www.washingtoninstitute.org/policy-analysis/podcast-breaking-hezbollahs-golden-rule-season-1.

Corinne Ramey & James Fanelli, *Michael Avenatti Rests Defense Without Calling Witnesses in Fraud Trial; Former lawyer declines to take the stand after signaling he would; closing arguments are set for Wednesday*, The Wall Street Journal Online (2022). Copy supplied.

9

Mark Singelais, *Big sticks speak loudly: UAlbany coach sets sights beyond the league title*, The Times Union (Albany, NY) (2002). Copy supplied.

13.    **Judicial Office**: State (chronologically) any judicial offices you have held, including positions as an administrative law judge, whether such position was elected or appointed, and a description of the jurisdiction of each such court.

I have not held judicial office.

a.    Approximately how many cases have you presided over that have gone to verdict or judgment? _____

    i.    Of these cases, approximately what percent were:

    jury trials:                    ___%
    bench trials:                   ___%

    ii.    Of these cases, approximately what percent were:

    civil proceedings:              ___%
    criminal proceedings:           ___%

b.    Provide citations for all opinions you have written, including concurrences and dissents.

c.    For each of the 10 most significant cases over which you presided, provide: (1) a capsule summary of the nature of the case; (2) the outcome of the case; (3) the name and contact information for counsel who had a significant role in the trial of the case; and (4) the citation of the case (if reported) or the docket number and a copy of the opinion or judgment (if not reported).

d.    For each of the 10 most significant opinions you have written, provide: (1) citations for those decisions that were published; (2) a copy of those decisions that were not published; and (3) the names and contact information for the attorneys who played a significant role in the case.

e.    Provide a list of all cases in which certiorari was requested or granted.

f.    Provide a brief summary of and citations for all of your opinions where your decisions were reversed by a reviewing court or where your judgment was affirmed with significant criticism of your substantive or procedural rulings. If any of the opinions listed were not officially reported, provide copies of the opinions.

g.    Provide a description of the number and percentage of your decisions in which you issued an unpublished opinion and the manner in which those unpublished opinions

10

are filed and/or stored.

h. Provide citations for significant opinions on federal or state constitutional issues, together with the citation to appellate court rulings on such opinions. If any of the opinions listed were not officially reported, provide copies of the opinions.

i. Provide citations to all cases in which you sat by designation on a federal court of appeals, including a brief summary of any opinions you authored, whether majority, dissenting, or concurring, and any dissenting opinions you joined.

14. **Recusal:** If you are or have been a judge, identify the basis by which you have assessed the necessity or propriety of recusal (If your court employs an "automatic" recusal system by which you may be recused without your knowledge, please include a general description of that system.) Provide a list of any cases, motions or matters that have come before you in which a litigant or party has requested that you recuse yourself due to an asserted conflict of interest or in which you have recused yourself sua sponte. Identify each such case, and for each provide the following information:

I have not held judicial office.

a. whether your recusal was requested by a motion or other suggestion by a litigant or a party to the proceeding or by any other person or interested party; or if you recused yourself sua sponte;

b. a brief description of the asserted conflict of interest or other ground for recusal;

c. the procedure you followed in determining whether or not to recuse yourself;

d. your reason for recusing or declining to recuse yourself, including any action taken to remove the real, apparent or asserted conflict of interest or to cure any other ground for recusal.

15. **Public Office, Political Activities and Affiliations:**

a. List chronologically any public offices you have held, other than judicial offices, including the terms of service and whether such positions were elected or appointed. If appointed, please include the name of the individual who appointed you. Also, state chronologically any unsuccessful candidacies you have had for elective office or unsuccessful nominations for appointed office.

Principal Associate Deputy Attorney General (January 2025 – Present) and Acting Deputy Attorney General (January 2025 – March 2025), United States Department of Justice. I was appointed Principal Associate Deputy Attorney General by Acting Attorney General James McHenry, and I served as Acting Deputy Attorney General by operation of law pursuant to the Federal Vacancies Reform Act.

11

b.      List all memberships and offices held in and services rendered, whether compensated or not, to any political party or election committee. If you have ever held a position or played a role in a political campaign, identify the particulars of the campaign, including the candidate, dates of the campaign, your title and responsibilities.

I have not held any memberships or offices in, or rendered any services to, any political party or election committee.

16.   **Legal Career:** Answer each part separately.

a.      Describe chronologically your law practice and legal experience after graduation from law school including:

    i.      whether you served as clerk to a judge, and if so, the name of the judge, the court and the dates of the period you were a clerk;

From 2008 to 2009, I served as a law clerk to the Honorable Richard J. Sullivan, who at the time was a member of the United States District Court for the Southern District of New York.

From 2009 to 2010, I served as a law clerk to the Honorable Richard C. Wesley, United States Court of Appeals for the Second Circuit.

    ii.     whether you practiced alone, and if so, the addresses and dates;

I have not practiced law alone.

    iii.    the dates, names and addresses of law firms or offices, companies or governmental agencies with which you have been affiliated, and the nature of your affiliation with each;

2010 – 2012
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004
Associate
Summer Associate (Summer 2007)

2012 – 2021
United States Attorney's Office for the Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278
Assistant United States Attorney (2012 – 2019)
Acting Deputy Chief, Narcotics Unit (2019)
Co-Chief, Terrorism & International Narcotics Unit (2019 – 2021)

2022 – 2023
Chiesa Shahinian & Giantomasi PC
105 Eisenhower Parkway
Roseland, New Jersey 07068
Member

2023 – 2025
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, New York 10005
Partner

2025 – Present
Office of the Deputy Attorney General
United States Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Principal Associate Deputy Attorney General (January 2025 – Present)
Acting Deputy Attorney General (January 2025 – March 2025)

iv.     whether you served as a mediator or arbitrator in alternative dispute
        resolution proceedings and, if so, a description of the 10 most significant
        matters with which you were involved in that capacity.

I have not served as a mediator or arbitrator in alternative dispute resolution
proceedings.

b.   Describe:

i.      the general character of your law practice and indicate by date when its
        character has changed over the years.

After completing my clerkships, I worked as an associate in the Criminal Defense
and Investigations Group at the New York office of Sullivan & Cromwell LLP
between 2010 and 2012. My work at Sullivan & Cromwell focused on assisting
partners in the representation of entities and individuals in connection with federal
criminal and regulatory investigations as well as cross-border matters.

Between 2012 and 2021, I was a federal prosecutor at the United States
Attorney's Office for the Southern District of New York. During that period, I
participated in 12 federal criminal trials and more than 20 federal criminal
appeals. My work focused on national security matters and international drug
trafficking. I briefly served as an Acting Deputy Chief of the Office's Narcotics
Unit in approximately 2019, and I was a Co-Chief of the Office's Terrorism and
International Narcotics Unit between 2019 and 2021. I also served on the
Office's discovery committee, which involved establishing policy and designing

13

training for prosecutors as well as addressing complex discovery issues that arose in the Office's work.

In the beginning of 2022, I joined Chiesa Shahinian & Giantomasi PC, a New Jersey law firm. As a partner at the firm, I represented individuals and entities in a variety of prosecutions and regulatory matters at the state and federal levels. This work included criminal cases and investigations in New Jersey and New York. *See, e.g., United States v. Alexandre*, No. 22 Cr. 326 (S.D.N.Y.). I represented clients in non-public investigations in New Jersey that were conducted by, for example, the New Jersey Attorney General, the New Jersey Bureau of Securities, and the New Jersey Division of Taxation. I also represented clients in federal civil matters, bankruptcy proceedings, and an American Arbitration Association arbitration. *See, e.g., Velicheti v. Javan, et al.*, No. 23 Civ. 1716 (D.N.J.); *L&M Healthcare Communications LLC v. Pantano, et al.*, No. 22 Civ. 481 (D.N.J.).

In 2023, I joined Blanche Law PLLC as a partner. My work at Blanche Law focused on working with the firm's founder, Todd Blanche, to represent President Trump in trial court and appellate proceedings relating to three matters: *People v. Trump*, Ind. 71543-23 (N.Y. County Supreme Court), *United States v. Trump*, No. 23 Cr. 257 (D.D.C.), and *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla.).

    ii.        your typical clients and the areas at each period of your legal career, if any, in which you have specialized.

In private practice, prior to my representation of President Trump, my typical clients were individuals and entities involved in criminal and/or regulatory investigations.

c.       Describe the percentage of your practice that has been in litigation and whether you appeared in court frequently, occasionally, or not at all. If the frequency of your appearances in court varied, describe such variance, providing dates.

The vast majority of my practice has involved litigation. Since 2012, I have appeared in court frequently.

    i.        Indicate the percentage of your practice in:

| | | |
|---|---|---|
| 1. | federal courts: | 70% |
| 2. | state courts of record: | 20% |
| 3. | other courts: | 0% |
| 4. | administrative agencies: | 10% |

    ii.        Indicate the percentage of your practice in:

| | | |
|---|---|---|
| 1. | civil proceedings: | 5% |

2.    criminal proceedings:        95%

d.    State the number of cases in courts of record, including cases before administrative law judges, you tried to verdict, judgment or final decision (rather than settled), indicating whether you were sole counsel, chief counsel, or associate counsel.

I have participated in 13 criminal trials. Twelve of the trials were in federal court, and one was in state court. Twelve of the trials were jury trials, and one was a bench trial. One of my 13 trials ended with a deadlocked jury, which resulted in a mistrial, and the defendant in one of my other trials entered a guilty plea before the trial concluded.

I participated in 12 of the 13 trials as a federal prosecutor in the Southern District of New York. For 11 of those federal trials, I was co-counsel with one or more other Assistant United States Attorneys. We did not designate a "chief" or "lead" counsel in those cases. At each of those federal trials, I gave at least one opening or summation and/or questioned witnesses. For the other federal trial, I acted as a "second seat" to then-junior prosecutors. I did not deliver a jury address at that trial.

My state court trial was in New York County Supreme Court. I was one of the defense lawyers in that proceeding.

i.    What percentage of these trials were:

1.    jury:                        92%
2.    non-jury:                    8%

e.    Describe your practice, if any, before the Supreme Court of the United States. Supply copies of any briefs, amicus or otherwise, and, if applicable, any oral argument transcripts before the Supreme Court in connection with your practice.

I have not argued before the United States Supreme Court. I participated in the briefing of two cases before the Court: *Trump v. United States*, No. 23-939 (2024) and *Trump v. New York*, No. 24A666 (2025). Copies supplied.

17.    **Litigation**: Describe the ten (10) most significant litigated matters which you personally handled, whether or not you were the attorney of record. Give the citations, if the cases were reported, and the docket number and date if unreported. Give a capsule summary of the substance of each case. Identify the party or parties whom you represented; describe in detail the nature of your participation in the litigation and the final disposition of the case. Also state as to each case:

a.    the date of representation;

b.    the name of the court and the name of the judge or judges before whom the case was litigated; and

15

c.    the individual name, addresses, and telephone numbers of co-counsel and of principal counsel for each of the other parties.

1.    *United States v. Trump*, No. 23 Cr. 80101 (S.D. Fla.) (Judge Aileen Cannon) (Representation: 2023 – 2025)

I helped defend President Trump against criminal charges brought by Special Counsel Jack Smith in the Southern District of Florida.  The Indictment was returned on June 8, 2023.  A Superseding Indictment adding a defendant and charges was returned on July 27, 2023.  The Superseding Indictment charged President Trump with 32 counts relating to the handling of allegedly classified documents, as well as additional charges relating to alleged process crimes.

I briefed and argued some of the most significant issues in the case.  This work included extensive briefing and argument relating to the application of the Classified Information Procedures Act and other discovery issues.  I helped brief and argued President Trump's successful motions relating to violations of the Appointments and Appropriations Clauses, which served as the basis for Judge Cannon's dismissal of the entire case.  *See United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024).  I also helped brief President Trump's opposition to Jack Smith's appeal of that decision to the United States Court of Appeals for the Eleventh Circuit.  *See United States v. Trump*, No. 24-12311 (11th Cir. Oct. 25, 2024) (ECF No. 42).  Smith voluntarily dismissed the appeal after President Trump won the election in November 2024.

Co-counsel:

Todd Blanche & Kendra Wharton
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
(202) 514-2000

Christopher Kise & Lazaro Fields
Continental PLLC
101 North Monroe Street, Suite 750
Tallahassee, Florida 32301
(850) 332-0702

Opposing counsel:

Jay Bratt, JP Cooney, Julie Edelstein, David Harbach, Anne McNamara, James Pearce, John Pellettieri, David Raskin, Brett Reynolds, & Cecil VanDevender
Addresses and phone numbers unknown

2.    *United States v. Trump*, No. 23 Cr. 257 (D.D.C.) (Judge Tanya Chutkan) (Representation: 2023 – 2025)

16

I helped defend President Trump against criminal charges brought by Special Counsel Jack Smith in the District of Columbia. The case related to the 2020 election. The Indictment was returned on August 1, 2023. Following a remand by the United States Supreme Court, a Superseding Indictment was returned on August 27, 2024. The Superseding Indictment charged President Trump with four crimes relating to events in 2020 and 2021.

I helped brief successful motions in the District Court and secure critical appellate relief for President Trump. This work included (i) a motion relating to discovery issues, *United States v. Trump*, 753 F. Supp. 3d 17 (D.D.C. 2024); (ii) challenging a gag order that the appellate court partially vacated, *United States v. Trump*, 88 F.4th 990 (D.C. Cir. 2023); and (iii) helping brief President Trump's meritorious presidential immunity motion, *see, e.g.*, *Trump v. United States*, 603 U.S. 593 (2024). Smith voluntarily dismissed the case after President Trump won the election in November 2024.

Co-counsel:

Todd Blanche & Kendra Wharton
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 514-2000

John Lauro & Gregory Singer
400 N Tampa Street
15th Floor
Tampa, Florida 33602
(813) 222-8990

Opposing counsel:

JP Cooney, Molly Gaston, James Pearce, John Pellettieri, & Thomas Windom
Addresses and phone numbers unknown

3.      *People v. Trump*, Ind. 71543-23 (N.Y. County Supreme Court) (Justice Juan Merchan) (Representation: 2023 – 2025)

I helped defend President Trump against criminal charges brought by Manhattan District Attorney Alvin Bragg. On March 30, 2023, an Indictment was returned with 34 counts relating to alleged falsification of business records under New York law. Jury selection commenced on April 15, 2024, and the jury returned guilty verdicts on May 30, 2024. The case resulted in a sentence of unconditional discharge on January 10, 2025. Appellate proceedings involving new counsel are ongoing.

I helped draft numerous pretrial motions in the case, including a motion to dismiss based on presidential immunity, preemption under the Federal Election Campaign Act, and

17

other constitutional grounds. At trial, I cross-examined several witnesses. I briefed, and in some instances argued, collateral attacks to the proceedings in New York's Appellate Division, First Department; New York's Court of Appeals; the United States District Court for the Southern District of New York; and the United States Court of Appeals for the Second Circuit. *See, e.g., Trump v. New York*, No. 23 Civ. 3773 (S.D.N.Y. Sept. 3, 2024) (ECF Nos. 48-49); *Trump v. New York*, No. 24-2299 (2d Cir. Sept. 4, 2024) (ECF Nos. 7, 16); *Trump v. Merchan*, 227 A.D.3d 518 (1st Dep't 2024); *Trump v. Merchan*, 227 A.D.3d 569 (1st Dep't 2024); *Trump v. Merchan*, 41 N.Y.3d 1013 (N.Y. 2024). I also participated in the briefing of President Trump's motion to the United States Supreme Court to stay his sentencing. *See Trump v. New York*, No. 24A666 (2025).

Co-counsel:

Todd Blanche & Kendra Wharton
950 Pennsylvania Avenue, NW
Washington, D.C. 20530
(202) 514-2000

Susan Necheles & Gedalia Stern
1120 Sixth Avenue, 4th Floor
New York, New York 10036
(212) 997-7400

Opposing counsel:

Christopher Conroy, Matthew Colangelo, Katherine Ellis, Susan Hoffinger, Becky Mangold, Joshua Steinglass
New York County District Attorney's Office
1 Hogan Place
New York, New York 10013
(212) 335-9000

4.      *United States v. Rahimi*, No. 16 Cr. 760 (S.D.N.Y.) (Judge Richard M. Berman) (Representation: 2017 – 2021)

I was part of the team that investigated and prosecuted Ahmad Khan Rahimi, known as the "Chelsea Bomber." On September 17, 2016, based on inspiration from terrorist organizations such as al Qaeda and ISIS, Rahimi detonated bombs in Seaside Park, New Jersey, Elizabeth, New Jersey, and Manhattan, New York. Rahimi's terrorist attack injured more than 30 people and caused hundreds of thousands of dollars in property damage. On September 19, 2016, Rahimi opened fire on several New Jersey police officers before they were able to arrest him. Miraculously, no one was killed during the course of these crimes.

On September 20, 2016, we coordinated with the United States Attorney's Office for the District of New Jersey to charge Rahimi with bombing-related crimes in both Districts.

18

*See United States v. Rahimi*, 16 Mag. 3594 (D.N.J.). On November 16, 2016, an eight-count Indictment charging similar offenses was returned in the Southern District of New York. Jury selection commenced on September 27, 2017, and the jury convicted Rahimi on all counts on October 16, 2017. On February 13, 2018, the court sentenced Rahimi principally to life imprisonment. In October 2019, the Union County Prosecutor's Office convicted Rahimi of 30 New Jersey crimes, including attempted murder, relating to the arrest.

I participated in the investigation, pretrial litigation, trial, sentencing, and appeal of this case. I was present at the FBI's Joint Operations Command Center in Manhattan when Rahimi detonated the first of his New York bombs on September 17, 2016. The investigative work involved coordinating with state and federal prosecutors and law enforcement in New Jersey. Pretrial litigation included successfully opposing a suppression motion. *See, e.g., United States v. Rahimi*, 2017 WL 2984169 (S.D.N.Y. 2017). At trial, I gave the prosecution's main summation. I offered testimony from, among others, victims, FBI agents, and experts relating to DNA analysis and forensic examinations of seized electronic devices. After sentencing, I helped brief the appeal in the United States Court of Appeals for the Second Circuit, which resulted in the conviction being affirmed. *See United States v. Rahimi*, 794 F. App'x 4 (2d Cir. 2019).

In 2019, I and other members of the prosecution team received the Director's Award for Superior Performance by a Litigative Team from the United States Department of Justice for our work on this case.

Co-Counsel:

Shawn Crowley (a prosecutor at the time of the case)
350 Fifth Avenue, Suite 7110
New York, New York 10118
(212) 763-0883

Andrew DeFilippis (a prosecutor at the time of the case)
125 Broad Street
New York, New York 10004
(212) 558-4000

Opposing Counsel:

Sabrina Shroff
80 Broad Street, 19th Floor
New York, New York 20004
(646) 763-1490

5.    *United States v. Buryakov, et al.*, No. 15 Cr. 73 (S.D.N.Y.) (Judge Richard M. Berman) (Representation: 2015 – 2016)

19

I participated in the prosecution of Evgeny Buryakov, who was a member of the SVR, which is Russia's foreign intelligence service. Between 2012 and 2015, Buryakov and two other SVR officers, Igor Sporyshev and Victor Podobnyy, acted as illegal agents of Russia in the United States and engaged in economic espionage operations.

On January 23, 2015, Buryakov, Sporyshev, and Podobnyy were charged with conspiracy and substantive offenses relating to their illegal work for the SVR. The FBI arrested Buryakov, but Sporyshev and Podobnyy fled to Russia. On February 9, 2015, an Indictment was returned charging the same offenses. On March 11, 2016, Buryakov pleaded guilty to conspiring to act as an agent of Russia. On May 25, 2016, the District Court sentenced Buryakov principally to 30 months' imprisonment.

I participated in the prosecution and sentencing of Buryakov. This work included briefing on issues relating to the scope of 18 U.S.C. § 951, and extensive litigation pursuant to the Classified Information Procedures Act.

Co-counsel:

Adam Fee (a prosecutor at the time of the investigation)
1999 Avenue of the Stars, Suite 2700
Los Angeles, California 90067
(310) 620-5719

Ian McGinley (a prosecutor at the time of the investigation)
787 Seventh Avenue
New York, New York 10019
(212) 839-5385

Brendan Quigley (a prosecutor at the time of the case)
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2520

Stephen J. Ritchin
300 Quarropas Street
White Plains, New York 10601
(212) 636-2200

Anna Margaret Skotko (a prosecutor at the time of the investigation)
29 Broadway, Floor 31
New York, New York 10006
(646) 396-5251

Opposing counsel:

Scott Hershman

20

1221 Avenue of the Americas
New York, New York 10020-1095
(212) 819-8366

6.    *United States v. Kourani*, No. 17 Cr. 417 (S.D.N.Y.) (Judge Alvin Hellerstein)
        (Representation: 2015 – 2021)

I was part of the team that investigated and prosecuted Ali Kourani.  The case resulted in
the first-ever U.S. trial conviction of a member of Hezbollah's external terrorist
operations unit, the Islamic Jihad Organization.  Kourani helped Hezbollah and Iran
prepare to strike strategic and vulnerable targets around New York City, such as federal
facilities housing day care centers, critical infrastructure, counterterrorism command
posts, and international airports, as well as members of the NYPD, the Mossad, and the
Israel Defense Forces.

On May 31, 2017, we charged Kourani with terrorism, immigration, and weapons crimes.
An eight-count Indictment charging similar offenses was returned on June 28, 2017.  Jury
selection commenced on May 6, 2019, and the jury convicted Kourani on all counts on
May 16, 2019.  On December 3, 2019, the court sentenced Kourani principally to 40
years' imprisonment.

I participated in the investigation, pretrial litigation, trial, sentencing, and appeal of this
case.  The work included successful litigation under the Classified Information
Procedures Act and in response to a suppression motion.  *See, e.g., United States v.
Kourani*, 2018 WL 1989583 (S.D.N.Y. 2018).  At trial, I gave the prosecution's main and
rebuttal summations.  I offered testimony from, among others, FBI agents and an expert
relating to Hezbollah, the Islamic Jihad Organization, and other Iran proxies.  After
sentencing, I argued the appeal in the United States Court of Appeals for the Second
Circuit, which resulted in the conviction being affirmed.  *See United States v. Kourani*, 6
F.4th 345 (2d Cir. 2021).

Co-counsel:

Amanda Houle
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

Opposing counsel:

Alexei Schacht
123 West 94th Street
New York, New York 10025
(646) 729-8180

7.    *United States v. Hernandez Alvarado*, No. 15 Cr. 379 (S.D.N.Y.) (Judge P. Kevin

21

Castel) (Representation: 2015 – 2021)

I was part of the team that investigated and prosecuted Juan Antonio Hernandez Alvarado for a drug-importation conspiracy that involved at least 185,000 kilograms of cocaine, approximately $138.5 million in drug proceeds, multiple murders, and related weapons offenses. Hernandez Alvarado was a Honduran congressman during some of the offense conduct, and his co-conspirators included his brother—former Honduran president Juan Orlando Hernandez Alvarado—and several other Honduran congressmen, military officials, and national police, among others.

On November 23, 2018, we charged Hernandez Alvarado with a conspiracy to import cocaine, related weapons crimes, and making false statements to federal officials. Jury selection commenced on October 2, 2019, and the jury convicted Hernandez Alvarado on all counts on October 8, 2019. On March 30, 2021, the court sentenced Hernandez Alvarado principally to life imprisonment. I also supervised the investigation of Hernandez Alvarado's brother, who was charged with similar drug-trafficking and firearms offenses on January 27, 2022, after he completed his term as Honduran president and subsequent to my departure from the United States Attorney's Office for the Southern District of New York.

I participated in the investigation, pretrial litigation, trial, and sentencing of Juan Antonio Hernandez Alvarado. At trial, I presented the government's main summation and offered testimony from several cooperating witnesses. The conviction was subsequently affirmed. *See United States v. Morales*, 2024 WL 220402 (2d Cir. 2024).

Co-counsel:

Amanda Houle & Jason Richman
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

Matthew Laroche (a prosecutor at the time of the case)
55 Hudson Yards
New York, New York 10001
(212) 530-5514

Opposing counsel:

Michael Tein & T. Omar Malone
11045 SW 69th Avenue
Miami, Florida 33156
(305) 442-1101

8.      *United States v. Campo Flores, et al.*, No. 15 Cr. 765 (S.D.N.Y.) (Judge Paul Crotty) (Representation: 2015 – 2019)

22

I was part of the team that investigated and prosecuted Efrain Campo Flores and Francisco Flores De Freitas in connection with a sting investigation that involved a conspiracy to import 800 kilograms of cocaine into the United States. Campo Flores and Flores De Freitas are nephews of Cilia Flores, who is the wife of Venezuelan *de facto* leader Nicolas Maduro. Prior to their arrests in Haiti, the defendants indicated that they would source the cocaine from a member of the terrorist organization known as the *Fuerzas Armadas Revolucionarias de Colombia*, and they agreed to use Maduro's official plane hangar to dispatch the cocaine from Venezuela.

On November 4, 2015, an Indictment was returned charging the defendants with participating in a conspiracy to import cocaine. Jury selection commenced on November 2, 2016, and the jury convicted the defendants on November 18, 2016. On December 14, 2017, the court sentenced each defendant principally to 216 months' imprisonment.

I participated in the investigation, pretrial litigation, trial, sentencing, and appeal of the case. This work included extensive pretrial and posttrial litigation relating to discovery and suppression motions. *See United States v. Flores*, 2017 WL 1133430 (S.D.N.Y. 2017); *United States v. Campo Flores*, 2016 WL 5946472 (S.D.N.Y. 2016). At trial, I gave the government's opening statement and rebuttal summation. I also presented testimony from DEA agents and cooperating witnesses. I briefed and argued the defendants' direct appeal, which resulted in the convictions being affirmed. *See United States v. Flores*, 945 F.3d 687 (2d Cir. 2019).

Co-counsel:

Brendan Quigley (a prosecutor at the time of the case)
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2520

Opposing counsel:

Randall Jackson
51 West 52nd Street
New York, New York 10019
(212) 403-1248

Michael Mann
787 Seventh Avenue
New York, New York 10019
(212) 839-5837

David Rody
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202

(410) 949-1177

John Zach
55 Hudson Yards, 20th Floor
New York, New York 10001
(212) 303-3648

9.      *United States v. Chun*, No. 16 Cr. 518 (S.D.N.Y.) (Judge Victor Marrero)
        (Representation: 2015 – 2017)

I was part of the team that investigated and prosecuted Kun Shan Chun, an FBI employee who stole sensitive U.S. government information for the Chinese government. Over the course of more than a decade, while Chun was an FBI electronics technician with a Top Secret security clearance, he disclosed information to a Chinese official relating to FBI surveillance, technology, and organizational structure. Chun also disclosed the identity of an FBI agent, which placed the agent at risk for targeting by China.

On March 14, 2016, we charged Chun with four counts of making false statements to federal officials in connection with investigations relating to his security clearance. The FBI arrested Chun on March 16, 2016. On August 1, 2016, Chun pleaded guilty to acting as an agent of China while he worked at the FBI. On January 1, 2017, the District Court sentenced Chun principally to 24 months' imprisonment.

I participated in the investigation, guilty plea, and sentencing. This work included developing a prosecution and discovery strategy that balanced holding Chun accountable for his crimes against the FBI with the need to protect sensitive aspects of the case through litigation under the Classified Information Procedures Act. Chun did not file a direct appeal.

Co-counsel:
Andrea Surratt (a prosecutor at the time of the investigation)
1601 Wewatta Street, Suite 815
Denver, Colorado 80202
(303) 524-8645

Opposing counsel:

Jonathan Marvinny
52 Duane Street, 10th Floor
New York, New York 10007
(212) 417-8792

10.     *United States v. Hunter, et al.*, No. 13 Cr. 521 (S.D.N.Y.) (Judge Ronnie Abrams)
        (Representation: 2013 – 2021)

I was part of the team that investigated and prosecuted Joseph Hunter and several

24

mercenaries in connection with a murder-for-hire conspiracy, and a 2012 murder in the Philippines. Hunter had previously served in the U.S. army, and many of the other defendants had served in foreign military services.

Phase one of the *Hunter* case involved a sting investigation that led to a murder-for-hire conspiracy in which Hunter and four other defendants agreed to murder a DEA agent and a DEA informant. The defendants also conspired to import cocaine into the United States. This first phase of the case culminated in September 2013 arrests and extraditions of the defendants from Liberia, Estonia, and Thailand. The five defendants pleaded guilty, as did five other defendants in a related sting investigation involving a conspiracy to import 100 kilograms of methamphetamine from North Korea, which I also helped prosecute. *See United States v. Stammers, et al.*, No. 13 Cr. 579 (S.D.N.Y.).

Phase two of the *Hunter* case involved charges against Hunter, Adam Samia, and Carl David Stillwell for a 2012 murder in the Philippines. On July 22, 2015, an Indictment was returned charging the three defendants with murder and money laundering crimes. Jury selection commenced on April 2, 2018, and the jury convicted the defendants on all counts on April 18, 2018. In 2018, the trial court imposed mandatory life sentences on each defendant. The court subsequently imposed reduced sentences in light of an intervening ruling by the United States Supreme Court.

I participated in the investigation, pretrial litigation, trial, and sentencings of these cases. At the trial, I presented the government's rebuttal summation, and I offered testimony from a cooperating witness and DEA agents. I briefed and argued the direct appeal, which resulted in the trial convictions being affirmed except with respect to a consented-to sentencing remand. *See United States v. Hunter*, 2022 WL 1166623 (2d Cir. 2022). I also briefed and argued litigation in the District Court and Second Circuit concerning an *ex parte* ruling pursuant to the Classified Information Procedures Act. *See United States v. Hunter*, 32 F.4th 22 (2d Cir. 2022); *United States v. Stillwell*, 986 F.3d 196 (2d Cir. 2021).

Co-counsel:

Rebekah Donaleski (a prosecutor at the time of the case)
55 Hudson Yards
New York, New York 10001
(212) 479-6148

Opposing counsel from the 2018 trial:

Cesar De Castro
111 Fulton Street - 602
New York, New York 10038
(646) 285-2077

Valerie Alice Gotlib

25

225 Broadway, Suite 2815
New York, New York 10007
(917) 536-8171

David Stern & Jeremy Schneider
100 Lafayette Street, Suite 501
New York, NY 10013
(212) 571-5500

Robert Ray
One World Trade Center, 85th Floor
New York, New York 10007
(212) 433-2853

18.  **Legal Activities**: Describe the most significant legal activities you have pursued, including significant litigation which did not progress to trial or legal matters that did not involve litigation. Describe fully the nature of your participation in these activities. List any client(s) or organization(s) for whom you performed lobbying activities and describe the lobbying activities you performed on behalf of such client(s) or organizations(s). (Note: As to any facts requested in this question, please omit any information protected by the attorney-client privilege.)

1.    Venezuelan Leadership Prosecutions

I helped investigate and charge several Venezuelan leaders with narco-terrorism offenses and sanctions crimes.

In March 2019, we charged Tareck El Aissami and others with violating the Foreign Narcotics Kingpin Designation Act and related sanctions. *United States v. El Aissami, et al.*, No. 19 Cr. 144 (S.D.N.Y.). El Aissami previously served as Vice President to Venezuela's *de facto* leader, Nicholas Maduro, and as Governor of Venezuela's Aragua State, where designated foreign terrorist organization *Tren de Aragua* initially flourished. El Aissami is alleged to have participated in a multi-year scheme to provide millions of dollars' worth of illegal flight services to sanctioned Venezuelan leaders, including services relating to Maduro's 2018 campaign for reelection. El Aissami has not been arrested in connection with the pending charges.

In March 2020, we charged Maduro and other Venezuelan leaders with participating in a narco-terrorism conspiracy with members of the *Fuerzas Armadas Revolucionarias de Colombia* terrorist organization, as well as related drug-trafficking and weapons offenses. *See United States v. Maduro, et al.*, No. 11 Cr. 205 (S.D.N.Y.). As alleged, Maduro worked with co-conspirators to "flood" the United States with cocaine and use the drug as a weapon against the American people. Maduro has not been arrested in connection with the pending charges.

2.    Sanctions-Related Seizures of Commercial Vessels

As a Co-Chief of the Terrorism and International Narcotics Unit at the United States Attorney's Office for the Southern District of New York, I helped supervise forfeiture actions involving the

26

seizure of commercial vessels in connection with violations of economic sanctions targeting North Korea. *See United States v. The Tanker Vessel Known As The "Courageous,"* No. 21 Civ. 3636 (S.D.N.Y.); *United States v. The Bulk Cargo Carrier Known As The "Wise Honest,"* No. 19 Civ. 4210 (S.D.N.Y.).

The seizure of the "Wise Honest" was based on the vessel's use in illegal coal shipments from North Korea and the delivery of heavy machinery to North Korea, in violation of, among other statutes, the International Emergency Economic Powers Act (IEEPA). The seizure of the "Courageous" was based on the vessel's use in illicit deliveries of petroleum products through ship-to-ship transfers with North Korean vessels and direct shipments to the North Korea, also in violation of IEEPA and other statutes.

3.      *United States v. Turkiye Halk Bankasi A.S.,* No. 15 Cr. 867 (S.D.N.Y.)

I helped supervise the sanctions prosecution of Turkiye Halk Bankasi A.S. (Halkbank) while I was Co-Chief of the Terrorism and International Narcotics Unit at the United States Attorney's Office for the Southern District of New York.

Halkbank is a Turkish state-owned bank charged with conspiring to evade sanctions against Iran by allegedly laundering billions of dollars of Iranian oil and gas proceeds through the global financial system. My supervision of the case included providing strategic guidance to the responsible prosecutors relating to the Classified Information Procedures Act as well as litigation in the District Court and Court of Appeals relating to the Foreign Sovereign Immunities Act. *See United States v. Halkbank,* 2020 WL 5849512 (S.D.N.Y. 2020); *see also United States v. Turkiye Halk Bankasi A.S.,* 16 F.4th 336 (2d Cir. 2021). The Supreme Court granted certiorari with respect to the Foreign Sovereign Immunities Act issue after I left the United States Attorney's Office for the Southern District of New York. *See Turkiye Halk Bankasi A.S. v. United States,* 598 U.S. 264 (2023).

19.     **Teaching**: What courses have you taught? For each course, state the title, the institution at which you taught the course, the years in which you taught the course, and describe briefly the subject matter of the course and the major topics taught. If you have a syllabus of each course, provide copies to the committee.

I have not taught courses. Between approximately 2019 and 2021, while I was an Assistant United States Attorney, I spoke to individual classes at New York University Law School about investigative techniques and trial strategy in connection with the students' prosecution externship.

20.     **Deferred Income/ Future Benefits**: List the sources, amounts and dates of all anticipated receipts from deferred income arrangements, stock, options, uncompleted contracts and other future benefits which you expect to derive from previous business relationships, professional services, firm memberships, former employers, clients or customers. Describe the arrangements you have made to be compensated in the future for any financial or business interest.

27

Upon retirement, I will receive benefits from the Federal Employees Retirement System and the Federal Thrift Savings program.

21. **Outside Commitments During Court Service**: Do you have any plans, commitments, or agreements to pursue outside employment, with or without compensation, during your service with the court? If so, explain.

I have no plans, commitments, or agreements to pursue outside employment if confirmed.

22. **Sources of Income**: List sources and amounts of all income received during the calendar year preceding your nomination and for the current calendar year, including all salaries, fees, dividends, interest, gifts, rents, royalties, licensing fees, honoraria, and other items exceeding $500 or more (if you prefer to do so, copies of the financial disclosure report, required by the Ethics in Government Act of 1978, may be substituted here).

In May 2025, I filed financial disclosures pursuant to the Ethics in Government Act of 1978. When my nomination is formally submitted to the Senate, I will file my mandated Financial Disclosure Report and supply a copy to this Committee.

23. **Statement of Net Worth**: Please complete the attached financial net worth statement in detail (add schedules as called for).

See attached Net Worth Statement.

24. **Potential Conflicts of Interest**:

a.      Identify the family members or other persons, parties, categories of litigation, and financial arrangements that are likely to present potential conflicts-of-interest when you first assume the position to which you have been nominated. Explain how you would address any such conflict if it were to arise.

My current position at the United States Department of Justice could give rise to actual or potential conflicts arising from the fact that I am overseeing criminal and civil matters across the country, including in the Third Circuit. My previous work as an Assistant United States Attorney could also give rise to actual or potential conflicts.

While in private practice, I represented several individuals and entities that are or were either being investigated or prosecuted by a component of the Department of Justice.

If confirmed, I would handle all matters involving actual or potential conflicts of interest through careful application of the applicable ethical rules, and any other relevant statutes, ethical canons, and rules. I would recuse myself in cases that I was personally involved in should any such matter come before the court.

b.      Explain how you will resolve any potential conflict of interest, including the

28

procedure you will follow in determining these areas of concern.

In general, if I am confirmed, I would refer to 28 U.S.C. § 455, the Code of Conduct for United States Judges, any guidance provided by the Chief Judge of the Third Circuit and the Administrative Office for the United States Courts, and any other applicable laws, rules, and practices governing conflicts of interest. In situations that present actual conflicts of interest based on my current or prior positions at the Department of Justice, I would recuse myself from any cases in which I was personally involved as a prosecutor or supervisor. In situations involving potential conflicts of interest, I would disclose all relevant information to the parties, allow the parties to be heard, and then rule on any recusal motion based upon the application of all relevant authorities and guidance.

25.    **Pro Bono Work**: An ethical consideration under Canon 2 of the American Bar Association's Code of Professional Responsibility calls for "every lawyer, regardless of professional prominence or professional workload, to find some time to participate in serving the disadvantaged." Describe what you have done to fulfill these responsibilities, listing specific instances and the amount of time devoted to each.

The majority of my career has been dedicated to public service at the Department of Justice, with a focus on cases involving violent crime, terrorism, and drug cartels. While I worked at the United States Attorney's Office for the Southern District of New York, it is my understanding that I was restricted from engaging in the practice of law on behalf of any entity other than the federal government. However, in addition to participating in trainings for junior prosecutors, I volunteered my time to speak with law students, interns, and foreign delegations about matters relating to my work.

For two periods during my career, I have worked in private practice. First, I engaged in *pro bono* work as an associate at Sullivan & Cromwell LLP between 2010 and 2012. To the best of my recollection, this work included representing one or more individual clients in immigration matters and assisting the Brooklyn District Attorney's Office with an appeal.

Second, while I worked at Chiesa Shahinian & Giantomasi PC between 2022 and 2023, I worked on a *pro bono* matter involving claims by a prisoner against a jail in Cumberland County, New Jersey relating to prison conditions during the COVID-19 pandemic. *See Barnes v. Warren, et al.*, No. 21 Civ. 12942 (D.N.J.). Between 2022 and 2024, I also volunteered my time as a board member of Focused Conservation, which is a non-profit that supports efforts to combat illicit wildlife trafficking.

26.    **Selection Process**:

a.    Please describe your experience in the entire judicial selection process, from beginning to end (including the circumstances which led to your nomination and the interviews in which you participated). Is there a selection commission in your jurisdiction to recommend candidates for nomination to the federal courts? If so, please include that process in your description, as well as whether the commission recommended your nomination. List the dates of all interviews or communications you

29

had with the White House staff or the Justice Department regarding this nomination. Do not include any contacts with Federal Bureau of Investigation personnel concerning your nomination.

In approximately mid-March 2025, a member of the White House Counsel's Office asked if I was interested in serving as a judge on the United States Court of Appeals for the Third Circuit. After I responded affirmatively, personnel from the White House Counsel's Office and the Department of Justice's Office of Legal Policy interviewed me on March 31, 2025. On May 14, I interviewed with Senator Booker. On May 15, I interviewed with Senator Kim.

Throughout this process, I have been in periodic contact with attorneys with the Office of Legal Policy and White House Counsel's Office.

b.      Has anyone involved in the process of selecting you as a judicial nominee discussed with you any currently pending or specific case, legal issue or question in a manner that could reasonably be interpreted as seeking any express or implied assurances concerning your position on such case, issue, or question? If so, explain fully.

No.

# EXHIBIT 2

**Senator Peter Welch**
**Senate Judiciary Committee**
**Written Questions for Emil Bove**
**Hearing on "Nominations"**
**Wednesday, June 25, 2025**

1. How many appellate briefs have you filed?

   Response: I have participated in the filing of approximately 32 appellate briefs.

2. How many times have you argued before an appellate court?

   Response: I have argued approximately 11 appeals before federal and state appellate courts.

3. President Trump announced your nomination on May 28, 2025.

   a. Prior to this date, did you discuss your nomination with President Trump? If so, when did that occur?

      Response: No.

   b. Prior to this date, did you discuss your nomination with anyone at the White House? If so, when did that occur?

      Response: I addressed the process that preceded my nomination in question 26 of the Senate Judiciary Questionnaire.

   c. Did you meet with President Trump prior to his announcement? If so, where did you meet, who was present, and what was discussed?

      Response: Please see my responses to question 3.a and question 3.b.

4. The government requested a dismissal of the indictment against New York City Mayor Eric Adams in *United States v. Adams*, 24 CR 556 (S.D.N.Y.) on February 14, 2025. You personally signed the request.

   a. Who made the final decision about whether the government would request a dismissal of the indictment?

      Response: My publicly available memorandum to the Acting U.S. Attorney for the Southern District of New York, dated February 10, 2025, stated that the directive was authorized by the Attorney General.

1

As a judicial nominee and a member of the New Jersey and New York bars, I must respectfully decline to disclose non-public facts in response to this question. First, I have an ethical obligation to preserve confidential communications and advice that I may have provided to clients, including at DOJ. *See, e.g.*, N.J. Rule 1.6; N.Y. Rule 1.6. Second, it would be inappropriate for me to disclose legal advice or other confidential information, arguably to the detriment of my clients, in a manner that could be viewed as an effort to advance my personal interest in confirmation. *See, e.g.*, N.J. Rule 1.8(b); N.Y. Rule 1.8(b). Third, efforts to obtain the Executive Branch's confidential information in the context of a confirmation hearing present difficult separation-of-powers questions. Fourth, even the prospect that the Executive Branch's confidential information could be required to be disclosed in the context of a confirmation hearing would undermine the candor and free exchange of ideas that is necessary to the effective operation of the Executive Branch. *See Trump v. United States*, 603 U.S. 593, 612-13 (2024) (describing "the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking, as well as the need to protect communications between high Government officials and those who advise and assist them in the performance of their manifold duties" (cleaned up)). Numerous nominees have taken the same approach, including Justice Kagan, who explained at her confirmation hearing: "I cannot reveal any kind of internal deliberations of the Department of Justice." Additional examples of similar positions taken by past nominees, who were confirmed, are set forth in Appendix A to my responses to Chairman Grassley's questions for the record.

b. Did you discuss the dismissal with Tom Homan prior to filing it?

Response: Please see my response to question 4.a.

c. Who at the White House did you consult with regarding the decision to dismiss the indictment prior to filing it?

Response: Please see my response to question 4.a.

d. Did you discuss the dismissal with Todd Blanche before February 12, 2025?

Response: Please see my response to question 4.a.

e. You stated during your nominations hearing that "policy reasons made it appropriate to dismiss the charges." What are those policy reasons?

Response: I was referring to the policy reasons set forth in the publicly available brief filed in the case. *See* ECF No. 160, *United States v. Adams*, No. 24 Cr. 556 (S.D.N.Y. Mar. 7, 2025).

f. You also stated during your nominations hearing that the indictment against Mayor Adams would impact his ability to serve as mayor and campaign for reelection. In your view, under what circumstances is it appropriate to bring criminal charges against an elected official?

Response: Because this question implicates an issue that could come before me as a judge if I am fortunate enough to be confirmed, it would be inappropriate for me, as a nominee, to respond. To the extent this question seeks information regarding my views on public policy issues, consistent with the Code of Conduct and positions taken by prior nominees, it would be inappropriate for me, as a nominee, to take a position.

5. According to public reporting, the Department of Justice opened an investigation into a protest at Barnard College that occurred on February 26, 2025.

a. Did you order the opening of that investigation?

Response: To the extent this question seeks non-public information, please see my response to question 4.a. However, there is a publicly available affidavit filed by an FBI agent that discloses some details of the investigation. *See* ECF No. 17-1, *In re Application of the New York Times Company in the matter of Columbia University Apartheid Divest*, No. 25 Mc. 218 (S.D.N.Y June 16, 2025).

According to the affidavit, during the incident on February 26, 2025, a Barnard College employee was assaulted. *Id.* ¶ 14. On March 5, 2025, "a group of masked individuals entered a multi-purpose building at Barnard College," and members of the group "distributed paper leaflets purporting to be authored by the Hamas Media Office which purported to articulate reasons why the October 7, 2023 mass killings of Israeli civilians were morally justified." *Id.* Hamas is a designated foreign terrorist organization under U.S. law, and members of Hamas are charged with terrorism offenses in the United States in relation to the attack on October 7, 2023. *See, e.g.*, *United States v. Haniyeh, et al.*, No. 24 Mag. 438 (S.D.N.Y.).

A group called "Columbia University Apartheid Divest," or "CUAD," took credit for organizing and carrying out the February 26 and March 5, 2025 incidents at Barnard College. *See* ECF No. 17-1 ¶ 14, *In re Application of the New York Times Company in the matter of Columbia University Apartheid Divest*, No. 25 Mc. 218 (S.D.N.Y June 16, 2025). In October 2024, CUAD issued an "open letter"

supporting a Columbia student who had been disciplined "for stating, during an Instagram live stream, that 'Zionists don't deserve to live' and 'Be grateful that I'm not just going out and murdering Zionists.'" *Id.* ¶ 12. On March 14, 2025, a social media account associated with CUAD posted a picture of the residence of the interim President of Columbia University. *Id.* ¶¶ 8-9. The picture showed red spray paint on the residence, which appears to have been intended to look like blood, along with a black inverted triangle that, according to the affidavit, "is a symbol that has been used by militants affiliated with the terrorist organization Hamas in the ongoing Israel-Hamas conflict to designate homes and buildings as targets for attack." *Id.* ¶ 10.

b. Did you issue orders or give directions to the Civil Rights Division during the course of that investigation? If so, what orders or directions did you give?

Response: Please see my response to question 4.a.

c. Did you issue orders or give directions to the Federal Bureau of Investigation (FBI) during the course of that investigation? If so, what orders or directions did you give?

Response: Please see my response to question 4.a.

d. Did you order or direct FBI agents from the Joint Terrorism Task Force to put on raid jackets and stand in formation during the course of that investigation?

Response: Please see my response to question 4.a.

6. According to public reporting, in 2018 an email was sent to supervisors at the U.S. Attorney's Office for the Southern District of New York regarding complaints about you.

a. Have you read that email?

Response: Yes.

b. Did you hang a copy of that email in your office?

Response: Yes, between approximately 2018 and 2019, I hung the email on the wall next to my computer in order to remind myself of lessons learned through mentorship from my supervisors and to motivate myself as I continued to pursue a promotion to become a supervisor of the national security unit, which I obtained in 2019.

   c.   Due to this complaint, or others, were you asked or ordered to complete any trainings?

       Response: I do not recall being asked to complete any particular training beyond that which was required of all individuals in similar supervisory positions.

   d.   Do you know Joan Loughnane? If so, please describe your relationship with Ms. Loughnane?

       Response: Yes. Ms. Loughnane is a professional colleague.

   e.   Do you know Lisa Zornberg? If so, please describe your relationship with Ms. Zornberg?

       Response: Yes. Ms. Zornberg is a professional colleague.

7.  Please describe your involvement in the firing of prosecutors from the U.S. Attorney's Office for the District of Columbia who were assigned cases involving the insurrection on January 6, 2021.

Response: I issued a publicly available memorandum on January 31, 2025 relating to the terminations of the probationary employees at the U.S. Attorney's Office for the District of Columbia. The memorandum explained my understanding that "<u>after</u> President Trump was elected to his second term in Office, the Biden Administration's Justice Department converted these employees to permanent status," which "resulted in the mass, purportedly permanent hiring of a group of AUSAs" that "improperly hindered the ability of Acting U.S. Attorney [Ed] Martin to staff his office in furtherance of his obligation to faithfully implement the agenda that the American people elected President Trump to execute." The memorandum further explained that these "subversive personnel actions" drove my thinking about the termination decisions of these probationary employees.

To the extent this question seeks non-public information, please see my response to question 4.a. In addition, because certain of the personnel decisions at issue are the subject of ongoing litigation, it would be inappropriate for me, as a judicial nominee, to comment further.

   a.   How many of these prosecutors were fired?

       Response: I do not know the exact number.

   b.   Did you personally approve these terminations?

       Response: Please see my response to question 7.

Case: 25-2162    Document: 139-2    Page: 48    Date Filed: 04/01/2026

8. Please describe your involvement in the development of a list of agents at the FBI who were assigned cases involving the insurrection on January 6, 2021.

Response: I issued a memorandum on January 31, 2025, which is publicly available, requesting the list of FBI employees who were assigned to investigations and prosecutions relating to events on January 6, 2021.  The memorandum stated that the requested list would be used to "commence a review process to determinate whether any additional personnel actions are necessary."  Consistent with that explanation, the Acting Director of the FBI indicated in a February 4,2025 email that he was "confident" that DOJ would "undertake a full and fair review of the data we provided" and that "the FBI does not consider anyone's identification on one of these lists as an indicator of misconduct."  ECF No. 11-2, *Does 1-9 v. DOJ*, No. 25 Civ. 325 (D.D.C. Feb. 24, 2025).  The following day, I sent a private email to the FBI that reiterated the point: "No FBI employee who simply followed orders and carried out their duties in an ethical manner with respect to January 6 investigations is at risk of termination or other penalties."  ECF No. 11-3, *id.*  In light of the ongoing litigation, DOJ "has not commenced this [review] process" or "accessed the unclassified list of names that prior acting FBI leadership claimed to have sent."  ECF No. 45-1 at 4, *id.*

To the extent this question seeks non-public information, please see my response to question 4.a.  In addition, because this issue is the subject of ongoing litigation, it would be inappropriate for me, as a judicial nominee, to comment further.  *See Does 1-9 v. DOJ*, No. 25 Civ. 325 (D.D.C.); *FBI Agents Ass'n v. DOJ*, No. 25 Civ. 328 (D.D.C.)

    a. Have any adverse employment actions been taken against agents on this list related to their investigation of the insurrection on January 6, 2021?

    Response: Please see my response to question 8.